# No. 23-10385

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

*Plaintiffs-Appellants,*

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA; ROBIN OLIVERI, individually and in her official capacity as Assistant Principal of Deerlake Middle School; RACHEL THOMAS, individually and in her official capacity as Counselor Deerlake Middle School; ROCKY HANNA, individually and in his official capacity as Superintendent Leon Schools; DR. KATHLEEN RODGERS, individually and in her official capacity as former Assistant Superintendent Equity Officer and Title IX Compliance Coordinator for Leon County Schools,

*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the Northern District of Floridan
Case No. 4:21-cv-00415
Chief District Judge Mark E. Walker

---

## BRIEF OF AMICUS CURIAE STATE OF MONTANA, FLORIDA AND 19 OTHER STATES SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL

---

ASHLEY MOODY
  *Attorney General of Florida*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
PL-01, The Capitol
Tallahassee, FL 32399-1050
Phone: (850) 414-3300
Fax: (850) 410-2672
henry.whitaker@myfloridalegal.com
*Counsel for Amicus Curiae*
*State of Florida*

AUSTIN KNUDSEN
  *Montana Attorney General*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
peter.torstensen@mt.gov
*Counsel for Amicus Curiae*
*State of Montana*

CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1) and 26.1-2(b), the undersigned counsel certifies that the following listed persons may have an interest in the outcome of this case:

1.  Alabama, State of

2.  Alaska, State of

3.  Arkansas, State of

4.  Bailey, Andrew

5.  Bell, Daniel W.

6.  Bird, Brenna

7.  Cameron, Daniel

8.  Carr, Christopher M.

9.  Corrigan, Christian B.

10. Fitch, Lynn

11. Florida, State of

12. Georgia, State of

13. Griffin, Tim

14. Hanna, Rocky

15.   Hilgers, Michael T.

16.   Idaho, State of

17.   Iowa, State of

18.   Jackley, Marty J.

19.   Kansas, State of

20.   Kentucky, Commonwealth of

21.   Knudsen, Austin

22.   Kobach, Kris

23.   Labrador, Raúl

24.   Landry, Jeff

25.   Littlejohn, January

26.   Littlejohn, Jeffrey

27.   Louisiana, State of

28.   Marshall, Steve

29.   Mississippi, State of

30.   Missouri, State of

31.   Miyares, Jason

32.   Montana, State of

33.   Moody, Ashley

34.   Morrisey, Patrick

35.   Nebraska, State of

36.   Oliveri, Robin

37.   Reyes, Sean D.

38.   Rodgers, Kathleen

39.   School Board of Leon County, Florida

40.   Skrmetti, Jonathan

41.   South Carolina, State of

42.   South Dakota, State of

43.   Taylor, Treg

44.   Tennessee, State of

45.   Texas, State of

46.   Thomas, Rachel

47.   Torstensen, Jr., Peter M.

48.   Utah, State of

49.   Virginia, Commonwealth of

50.   Webster, Brent

51.   West Virginia, State of

52.   Whitaker, Henry C.

53.   Wilson, Alan

To the best of *Amici*'s knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 30th day of May, 2023.

*s/Peter M. Torstensen, Jr.*
Peter M. Torstensen, Jr.
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CITATIONS ..................................................................... iii

INTERESTS OF AMICI CURIAE ............................................................ 1

STATEMENT OF THE ISSUES FOR REVIEW ......................................... 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT .................................................................................... 6

I. Parents Possess a Longstanding, Fundamental Right to Direct
the Care and Custody of Their Children. ........................................... 6

II. The District's Policy Violated Appellants' Fundamental Right
to Care for Their Child. ..................................................................... 10

    A. The Policy authorized school officials to make decisions
about a child's gender identity behind parents' backs .............. 10

    B. School districts across the country have adopted parental
exclusion policies. .......................................................................... 13

CONCLUSION ................................................................................. 17

CERTIFICATE OF COMPLIANCE ....................................................... 21

CERTIFICATE OF SERVICE .............................................................. 21

## TABLE OF CITATIONS

## Cases

*Arnold v. Bd. of Educ.*,
  880 F.2d 305 (11th Cir. 1989) .......................................................... 2

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) .................................................................. 7, 8

*Doe v. Pub. Health Tr.*,
  696 F.2d 901 (11th Cir. 1983) .......................................................... 9

*Maddox v. Stephens*,
  727 F.3d 1109 (11th Cir. 2013) ........................................................ 6

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) .......................................................... 16

*May v. Anderson*,
  345 U.S. 528 (1953) ...................................................................... 1

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ................................................................... 1, 7

*Parham v. J.R.*,
  442 U.S. 584 (1979) ............................................................... *passim*

*Pierce v. Soc'y of Sisters*,
  268 U.S. 510 (1925) ...................................................................... 7

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) .................................................................... 7-8

*Stanley v. Illinois*,
  405 U.S. 645 (1972) ................................................................... 1, 8

*Thompson v. Oklahoma*,
  487 U.S. 815 (1988) ...................................................................... 9

*Troxel v. Granville*,
  530 U.S. 57 (2000) .............................................................. *passim*

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ............................................................... 7

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................... 8

**United States Code**

  10 U.S.C. § 505 ..................................................................... 9

  23 U.S.C. § 158 ..................................................................... 9

**United States Constitution**

  U.S. Const. amend. XIV ........................................................ 6

  U.S. Const. amend. XXVI ...................................................... 9


**Other Authorities**

*After Being Denied Tattoo, Sixth Grader Decides to Have
Gender Reassignment Surgery Instead*, THE BABYLON BEE
(Apr. 13, 2022)..................................................................... 11

Charlotte-Mecklenburg Schs., *Supporting Transgender
Students* (June 20, 2016) ..................................................... 15

Chi. Pub. Schs., *Guidelines Regarding the Support of Trans-
gender and Gender Nonconforming Students* (2019) ........................ 14

D.C. Pub. Schs., *Transgender and Gender-Nonconforming
Pol'y Guidance* (2015) .......................................................... 14

GLSEN & ACLU, *Know Your Rights: A Guide for Transgender
and Gender Nonconforming Students* (2016).................................... 16

GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local
Education Agency Policy on Transgender and Nonbinary
Students* (Rev. Oct. 2020) ..................................................... 16

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* ...................................................................... 15

*Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022).......... 12

L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy/Nondiscrimination Complaint Procedures* (Aug. 14, 2020) ................................................................. 14

Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights* (2016) ...................................................... 16

N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, ................................................................. 15

N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students*) ......................... 15

Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students* (June 16, 2016) ................................................. 14

Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights* (Mar. 2022)) ............................................. 12

M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, Federalist (Mar. 9, 2022) .......... 14

Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), Int'l J. of Transgenderism .............................................................. 12

Elie Vandenbussche, *Detransition-Related Needs and Support:*
*A Cross-Sectional Online Survey*, 69 J. HOMOSEXUALITY 1602
(2021).................................................................................................  13

## INTERESTS OF AMICI CURIAE

The States of Montana, Florida, Alabama, Alaska, Arkansas, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia file this amicus brief to emphasize the importance of parents' fundamental right to direct the upbringing of their minor children—a right the Supreme Court has described as "essential" and "far more precious … than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) and *May v. Anderson*, 345 U.S. 528, 533 (1953)).

## STATEMENT OF THE ISSUES FOR REVIEW

1.  Whether the trial court erred in applying the "shock the conscience" standard to Plaintiffs' substantive due process claims challenging conduct that directly interfered with fundamental parental rights.

2.  Whether the trial court erred in ruling that the fundamental right of parents to direct the upbringing of their children is not clearly established so that the individual Defendants are entitled to qualified immunity.

3.   Whether the trial court erred in finding that substantive due process is a disfavored concept that Plaintiffs' claims would impermissibly expand.

## SUMMARY OF ARGUMENT

Our constitutional system has "historically … recognized that the natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).  There is therefore a "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel v. Granville*, 530 U.S. 57, 69 (2000) (plurality op.).  That means that a school may not keep parents in the dark about critical medical and social decisions concerning their own children.  *See Arnold v. Bd. of Educ.*, 880 F.2d 305, 312–13 (11th Cir. 1989).  School districts thus can't shut a parent out of their child's decision about their gender identity simply because the child objects or because the school believes the parent isn't supportive enough of an immediate gender transition.

January and Jeffrey Littlejohn ("Appellants") sent their minor child—A.G.—to Deerlake Middle School, a public school in the Leon County School District (the "District"), for the 2020-21 school year.  DE-

66, at 2. A.G. was experiencing "gender confusion" before the start of the school year and asked Appellants for permission to use "J." as a name and "they/them" pronouns, but Appellants declined to give A.G. permission to do so. *Id.* Afterwards, Littlejohn[1] emailed one of A.G.'s teachers to notify them that A.G. was experiencing gender confusion, that they were seeking a private counselor for A.G., and that they didn't consent to A.G. using "J." as a name and "they/them" pronouns—though they consented to A.G. using "J." as a nickname with classmates and teachers. *Id.* at 2–3.

But after Littlejohn's email, A.G. reached out to Rachel Thomas, a Deerlake counselor, and asked permission to use a new name and pronouns. *Id.* at 3. In response, Thomas set up a meeting with A.G. and several other Deerlake staff on September 8, 2020 to create a support plan that allowed A.G. to select choose a preferred name, pronouns, restroom, and room-sharing arrangements for school fieldtrips. *Id.* at 3. Thomas and the other Deerlake staff, relied on Leon County School's 2018 Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming, and

---

[1] For clarity, the brief refers to the Littlejohns together as "Appellants" and to January Littlejohn individually as "Littlejohn."

Questioning Support Guide ("Policy"), which was created by Dr. Kathleen Rodgers, as Assistant Superintendent, and approved by Rocky Hanna, the Superintendent. *Id.* at 2; *see also* DE-38-1.

But as required by the Policy, Appellants were never notified about the September meeting, nor were they invited to attend, because A.G. didn't ask for them to attend. DE-66, at 2. A.G.'s support plan indicated that Appellants were "aware, but not supportive" of A.G.'s request to use a new name and pronouns. *Id.* at 4. A week later, Littlejohn learned about the September meeting, and she reached out to Thomas and Robin Oliveri, an assistant principal at Deerlake, seeking information about the meeting. *Id.* Both Thomas and Oliveri refused to provide Littlejohn with any information, arguing that A.G. was protected by a non-discrimination law that only permitted parental notice or input at the student's request. *Id.* Oliveri explained that student consent was necessary to protect the student's safety, a less-than-subtle suggestion that A.G. wouldn't be safe if Appellants were notified about the support plan. *Id.*

A month later, Littlejohn met with Rodgers to get more information about the Policy, and during that meeting, she declined Rodgers' request to meet privately with A.G. *Id.* at 4–5. Appellants later learned that

Rodger defied Littlejohn's request and scheduled a private meeting with A.G. to discuss the support plan without notifying them, and they directed Rodgers to cancel the meeting. *Id.* at 5.

In early November 2020, Appellants met with Deerlake staff to discuss the September meeting with A.G., and they were provided with a copy of A.G.'s support plan. *Id.* At that meeting, Deerlake and District staff were unable to direct Appellants to any law that allowed (or required) school officials to "meet with students and discuss 'LGBTQ (or any other) issues' without parental consent." *Id.*

Appellants claimed that shutting them out of A.G.'s decision-making process for these crucial decisions, including the use of a new name and pronouns, caused A.G. emotional distress and exacerbated A.G.'s psychological and educational difficulties, increased the costs associated with providing educational alternatives to A.G., and damaged their family dynamic. *Id.*

Even though the district court recognized that parents have a "fundamental liberty interest" in the "care, custody, and control of their child[ren]" "that is protected by the U.S. Constitution," *see id.* at 11 (citing *Troxel*, 530 U.S. at 66), it approached Appellants' "substantive due

process claims with great caution" because "parental rights … are a 'murky area of unenumerated constitutional rights,'" *see id.* at 12 (quoting *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)).

But the District's Policy violated Appellants' substantive due process rights by mandating that information be withheld about whether their child has taken any action concerning his or her gender identity. Unfortunately, this is no isolated occurrence: school districts across the country have adopted similar policies under the mistaken belief that to do otherwise would violate federal law. However this Court resolves the liability questions on appeal, it should make it plain that such policies violate parents' longstanding, fundamental right to direct the care and custody of their minor children by withholding vital information about the mental and emotional well-being of their children.

ARGUMENT

## I. Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children.

Under the Fourteenth Amendment, States may not "deprive any person of … liberty … without due process of law." U.S. Const. amend. XIV. The Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights

6

and liberty interests," *see Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))—including those unenumerated rights that are "deeply rooted in this Nation's history and tradition," *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Glucksberg*, 521 U.S. at 721).

The right of parents to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65; *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) (declaring that "the child is not the mere creature of the State," but rather "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations"). And over the last century, the Supreme Court has reaffirmed that right time and again. *See Meyer*, 262 U.S. at 399 (the Due Process Clause protects parents' right to "establish a home and bring up children"); *Pierce*, 268 U.S. at 534–35 (the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary

7

function and freedom include preparation for obligations the state can neither supply nor hinder."); *Stanley*, 405 U.S. at 651 (raising one's children has been deemed an "essential" and "basic civil right[] of man" (citation and quotation marks omitted)); *see Dobbs*, 142 S. Ct. at 2257 (identifying, among a list of longstanding rights, "the right to make decisions about the education of one's children"). Nearly a century after *Meyer*, this much is clear: "Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). And although some have raised questions about whether precedents recognizing those rights are correctly decided, the Supreme Court has not overruled them. *See Troxel*, 530 U.S. at 80 (Thomas, J., concurring in the judgment).

That parental authority is based on the commonsense recognition "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. The law thus makes a basic assumption about children as a class: "[It] assumes that they do not yet act as adults do, and thus [it] act[s] in their interest by restricting certain choices

8

that … they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S. 815, 826 n.23 (1988). That basic assumption restricts minor children's rights in myriad ways, such as restricting their right to vote, *see* U.S. Const. amend. XXVI, their right to enlist in the military without parental consent, *see* 10 U.S.C. § 505, or their right to drink alcohol, *see, e.g.,* 23 U.S.C. § 158. The same principle is traditionally at work in public schools, which routinely require parental consent before a student can receive medication or participate in certain school activities.

But parental authority is not absolute—parents have no license to abuse or neglect their children. *See Parham*, 442 U.S. at 602–04. Nor does the parental relationship give parents the right to disregard lawful limits on the use of medical procedures or drugs. *See Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) ("John Doe's rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself."). Relatedly, some parental decisions concerning their child's medical care may be "subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604; *but see id.* ("[Yet parents] retain a substantial, if not the dominant, role in the

decision, absent a finding of neglect or abuse, and the traditional presumption that the parents act in the best interests of their child should apply."). But parents are not stripped of their authority to act in the best interest of their children "[s]imply because the[ir] decision … is not agreeable to a child." *See id.* at 603–04 ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments."). Rather, "a fit parent"—*i.e.*, one who "adequately cares for his or her children"—is presumed to "act in the best interest of his or her child." *Troxel*, 530 U.S. at 68–69.

## II. The District's Policy Violated Appellants' Fundamental Right to Care for Their Child.

### A. The Policy authorized school officials to make decisions about a child's gender identity behind parents' backs.

The District's Policy authorizes school personnel to conceal information about a student's gender identity issues from parents—and to reject parental guidance relating to their child's gender-identity issues—unless the student consents to their parents' involvement. *See* DE-38, at 12–14 ¶¶ 47–51. The Policy provided for the creation of a "Student Support Plan" for students experiencing gender identity issues, and parents

10

would only be able to participate in the creation of that plan if they were "supportive" of their child's asserted gender identity. *See id.* at 14 ¶¶ 50–53. The support plan includes decisions on the student's preferred name and pronouns, the restrooms, locker rooms, and showers the student would use, and rooming arrangements for overnight school trips—decisions the Policy allows students to make without parental involvement. *See id.* at 14–15 ¶¶ 54–55. So, under Ludlow's policy, students of any age can insist that their parents are kept in the dark about their transgender status, even when they must get parental consent for lesser matters.[2]

The District's Policy gives ultimate decisionmaking authority to children and displaces parents from their longstanding, primary role in ensuring their child's safety and well-being. Now, the question is, do schools have an obligation to facilitate the immediate transition of a student who believes they are transgender and to hide this change from parents who aren't on board? The answer is obviously: No. As a recent review of youth gender treatments recognized, "[s]ocial transition" is "an

---

[2] One rightly fears what's next. *See After Being Denied Tattoo, Sixth Grader Decides to Have Gender Reassignment Surgery Instead*, THE BABYLON BEE (Apr. 13, 2022). After all, today's satire too often becomes tomorrow's reality.

active intervention because it may have significant effects on the child or young person in terms of their psychological functioning."[3]  The District presumably does not treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress either.

Worse still, the Policy's immediate transition approach lacks any solid, scientific foundation.  Many medical professionals believe that this approach "can become self-reinforcing and do long term harm."  Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, at 3, (Mar. 2022).[4]  Given the recent explosion of students dealing with gender identity issues, there is a greater need for caution.  *See id.*  Not only that, but existing research suggests that these feelings eventually recede for most children—that is, for those who do not transition.  *See id.*  Even

---

[3] *Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022, at 62, https://perma.cc/D5XP-EXAL.

[4] *See, e.g.*, Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), INT'L J. OF TRANSGENDERISM, at 7 (arguing that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence").

so, there are a growing number of "detransitioners," which further supports a cautious, rather than hasty, approach. *See id.* (citing Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. HOMOSEXUALITY 1602 (2021)).

Such policies inflict serious harm on students grappling with gender identity issues *and* on their parents. By withholding information from parents about whether their children have sought those plans or have otherwise contemplated transitioning, the Policy directly infringes on their right to help their child navigate these rough waters. And once that bell has been rung, it cannot be un-rung.

## B. School districts across the country have adopted parental exclusion policies.

Regrettably, the District's policy is neither groundbreaking nor unique. In recent years, school districts nationwide have quietly implemented similar gender transition guidelines. These parental exclusion policies differ in execution—*i.e.*, whether they place students or school officials in the driver's seat—but they both relegate parents to the back seat. All such policies thus prevent parents from helping their children make crucial decisions about their identity and mental health, in direct violation of parents' fundamental rights. *Parham*, 442 U.S. at 603.

13

Some policies condition parental involvement on the student's discretion. These policies forbid school officials from disclosing information about a student's transgender status to parents unless the student has authorized the disclosure. Policies like this have shown up in large cities like Washington, D.C.,[5] Philadelphia,[6] Chicago,[7] and Los Angeles,[8] as well as smaller cities like Eau Claire, Wisconsin.[9] And the New Jersey

---

[5] *See* D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance*, at 8 (2015) (instructing educators to not share transgender status with parents without permission from the child), https://perma.cc/G94K-YQ9C.

[6] *See* Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students*, at 3 (June 16, 2016) ("School personnel should not disclose … a student's transgender identity … to others, including parents … unless the student has authorized such disclosure."), https://www.philasd.org/src/wp-content/uploads/sites/80/2017/06/252.pdf.

[7] *See* Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students*, at 4 (2019) (asserting that children have a right to keep their transgender status from their parents), https://perma.cc/WT5W-E52T.

[8] *See* L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy / Nondiscrimination Complaint Procedures*, at 18 (Aug. 14, 2020) (describing gender identity as confidential), https://perma.cc/2LLZ-5XAH.

[9] *See* M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, FEDERALIST (Mar. 9, 2022), https://thefederalist.com/2022/03/08/wisconsin-school-district-parents-are-not-entitled-to-know-if-their-kids-are-trans/.

Department of Education has issued similar guidance to all public-school districts in the State.[10]

Other policies require school officials to determine whether it is appropriate to disclose the student's transgender status to their parents. To one degree or another, these policies give school officials discretion to determine whether parents should be involved in a student's transition plan. Policies like this have shown up in school districts in Charlotte[11] and New York,[12] as well as Hawaii's Department of Education.[13] While these policies condition parental involvement on school officials' consent, they still impair parents' fundamental right to raise their children.

---

[10] *See* N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, at 2–3 ("A school district shall accept a student's asserted gender identity; parental consent is not required.), https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf.

[11] *See* Charlotte-Mecklenburg Schs., *Supporting Transgender Students*, at 34 (June 20, 2016) (describing a case-by-case approach to involve parents in transition plans), https://perma.cc/3GAV-UHHM.

[12] *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ("[S]chools [must] balance the goal of supporting the student with the requirement that parents be kept informed about their children."), https://perma.cc/RT86-YQXT.

[13] *See* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students*, at 5 ("[I]nitial meeting[s] may or may not include the student's parents."), https://perma.cc/ECZ6-NJGE.

The explosion of these policies appears to be the product of ideologically driven advocacy groups claiming that federal law requires this result.[14]  One such group, the Gay, Lesbian, and Straight Education Network (GLSEN), promotes a so-called "model" policy—similar to Linn-Mar's—which falsely claims that disclosing a student's "gender identity and transgender status" without the student's consent may violate the Family Education Rights Privacy Act (FERPA).  *See* GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students*, at 4 (Rev. Oct. 2020).  Even if that strained interpretation of FERPA had any merit (it doesn't), rights created by federal statute yield to those grounded in the U.S. Constitution whenever there is a conflict.  *See, e.g.,* M*arbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.").  These

---

[14] *See, e.g.*, Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights*, at 19–20 (2016) (arguing that FERPA precludes sharing transgender status in most circumstances), https://perma.cc/V7U5-ZXGK; GLSEN & ACLU, *Know Your Rights: A Guide for Transgender and Gender Nonconforming Students*, at 5 (2016) ("If your school reveals [transgender status] to anyone without your permission, it could be violating federal law."), https://perma.cc/RPD4-UFJJ.

federal statutes of recent vintage—no matter how laudable their aims—cannot displace parents' longstanding right to care for their children.

## CONCLUSION

When a student considers transitioning gender, parents have a fundamental, constitutional right to be involved in that decisionmaking process. *Troxel*, 530 U.S. at 65. Yet school districts across the country, strong-armed by ideologically driven advocacy groups, have shut parents out of the process and trampled on their fundamental rights. No matter how this Court resolves the liability questions, it should reaffirm parents' longstanding, and fundamental, right to be informed of critical information about their child's mental health and well-being.

DATED this 30th day of May, 2023.

Austin Knudsen
MONTANA ATTORNEY GENERAL
Christian B. Corrigan
  *Solicitor General*
*s/Peter M. Torstensen, Jr.*
Peter M. Torstensen, Jr.
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
peter.torstensen@mt.gov

*Counsel for Amicus Curiae*
*State of Montana*

Ashley Moody
ATTORNEY GENERAL OF FLORIDA
*s/Henry C. Whitaker*
Henry C. Whitaker
  *Solicitor General*
Daniel W. Bell
  *Chief Deputy Solicitor General*
PL-01, The Capitol
Tallahassee, FL 32399-1050
Phone: (850) 414-3300
Fax: (850) 410-2672
henry.whitaker@myfloridalegal.com

*Counsel for Amicus Curiae*
*State of Florida*

### ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of*
*Alabama*

TREG TAYLOR
*Attorney General of*
*Alaska*

TIM GRIFFIN
*Attorney General of*
*Arkansas*

CHRISTOPHER M. CARR
*Attorney General of*
*Georgia*

RAÚL R. LABRADOR
*Attorney General of*
*Idaho*

BRENNA BIRD
*Attorney General of*
*Iowa*

KRIS KOBACH
*Attorney General of*
*Kansas*

DANIEL CAMERON
*Attorney General of*
*Kentucky*

JEFF LANDRY
*Attorney General of*
*Louisiana*

LYNN FITCH
*Attorney General of*
*Mississippi*

ANDREW BAILEY
*Attorney General of*
*Missouri*

MICHAEL T. HILGERS
*Attorney General of*
*Nebraska*

ALAN WILSON
*Attorney General of*
*South Carolina*

MARTY J. JACKLEY
*Attorney General of*
*South Dakota*

JONATHAN SKRMETTI
*Attorney General and*
*Reporter of Tennessee*

BRENT WEBSTER
*First Assistant Attorney General*
*Texas*

SEAN D. REYES
*Attorney General of*
*Utah*

JASON MIYARES
*Attorney General of*
*Virginia*

PATRICK MORRISEY
*Attorney General of*
*West Virginia*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,379 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

/s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: May 30, 2023          /s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

21