No. 23-10385

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

JANUARY LITTLEJOHN; JEFFREY LITTLEJOHN,

*Plaintiffs-Appellants,*

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA; ROBIN OLIVERI,
Individually and in her Official Capacity as Assistant Principal of
Deerlake Middle School; RACHEL THOMAS, Individually and in her
Official Capacity as Counselor at Deerlake Middle School; ROCKY
HANNA, Individually and in his Official Capacity as Superintendent
of Leon Schools; DR. KATHLEEN RODGERS, Individually and in her
Official Capacity as Former Assistant Superintendent Equity Officer
and Title IX Compliance Coordinator for the Leon County Schools,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida
The Honorable Mark E. Walker
Case No. 4:21-cv-00415-MW-MJF

**BRIEF OF ALLIANCE DEFENDING FREEDOM AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-
APPELLANTS AND REVERSAL**

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

Vincent M. Wagner
Tina Seideman
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
vwagner@ADFlegal.org
tseideman@ADFlegal.org

*Counsel for Amicus Curiae*

*January Littlejohn v. School Board of Leon County, Florida*,
No. 23-10385

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the undersigned certifies his belief that the Certificate of Interested Persons filed with Plaintiffs-Appellants' Opening Brief is complete, subject to the following amendments:

1. Alliance Defending Freedom – *Amicus Curiae*

2. Anderson, Katherine L. – Counsel for *Amicus Curiae*

3. Seideman, Tina – Counsel for *Amicus Curiae*

4. Wagner, Vincent M. – Counsel for *Amicus Curiae*

The undersigned will enter this information in the Court's web-based CIP contemporaneously with filing this brief.

*Amicus curiae* Alliance Defending Freedom ("ADF") is a nonprofit organization, does not have a parent corporation, and does not issue stock. ADF is not aware of any publicly owned corporation, not a party to the appeal, with a financial interest in the outcome of this case.

*/s/ Vincent M. Wagner*

Vincent M. Wagner
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
vwagner@ADFlegal.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................ii

INTEREST OF *AMICUS CURIAE*.........................................................1

STATEMENT OF THE ISSUES..............................................................4

SUMMARY OF THE ARGUMENT ........................................................4

ARGUMENT ..........................................................................................6

I.   Parental rights are fundamental, so strict scrutiny applies to state action infringing them. ...........................................................6

    A.   The Supreme Court has held the Due Process Clause treats parental rights, which are deeply rooted in this Nation's history and tradition, as fundamental.....................7

    B.   Like other fundamental rights protected by the Due Process Clause, parental rights trigger strict scrutiny........12

    C.   The district court did not explain its failure to apply strict scrutiny. ...................................................................15

II.  At a bare minimum, parents have a fundamental right to receive notification that their child's school has decided to counsel and treat their child for gender dysphoria. ......................19

CONCLUSION .....................................................................................25

CERTIFICATE OF COMPLIANCE........................................................26

CERTIFICATE OF SERVICE................................................................27

# TABLE OF AUTHORITIES

## Cases

*Alfonso v. Fernandez,*
606 N.Y.S.2d 259 (N.Y. App. Div. 1993) .................................... 24, 25

*Arnold v. Board of Education,*
880 F.2d 305 (11th Cir. 1989) .................................................. passim

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ............................................................ 16, 17, 18

*Dobbs v. Jackson Women's Health Organization,*
142 S. Ct. 2228 (2022) ........................................................................ 11

*Ex parte E.R.G.,*
73 So. 3d 634 (Ala. 2011) ................................................................. 14

*Florida Department of Children & Families v. F.L.,*
880 So. 2d 602 (Fla. 2004) ............................................................... 14

*Gruenke v. Seip,*
225 F.3d 290 (3d Cir. 2000) ............................................................. 13

*Hiller v. Fausey,*
904 A.2d 875 (Pa. 2006) ................................................................... 14

*Hodgson v. Minnesota,*
497 U.S. 417 (1990) .......................................................................... 23

*In re A.A.L.,*
927 N.W.2d 486 (Wis. 2019) ........................................................... 14

*In re M.F.,*
780 S.E.2d 291 (Ga. 2015) ............................................................... 14

*Jones v. Jones,*
359 P.3d 603 (Utah 2015) ................................................................. 14

*Lofton v. Secretary of Department of Children & Family Services,*
358 F.3d 804 (11th Cir. 2004) ...................................................... 6, 12

*McKinney v. Pate,*
  20 F.3d 1550 (11th Cir. 1994) ..................................................... 17, 18

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ............................................................ 2

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ...................................................................... 6, 9

*Morrow v. Wood,*
  35 Wis. 59 (1874) .............................................................................. 9

*New York Trust Co. v. Eisner,*
  256 U.S. 345 (1921) ............................................................................ 8

*Parham v. J.R.,*
  442 U.S. 584 (1979) ...................................................................... 19, 20

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary,*
  268 U.S. 510 (1925) ............................................................................ 9

*Reno v. Flores,*
  507 U.S. 292 (1993) .......................................................................... 12

*Ricard v. USD 475 Geary County School Board,*
  No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan. May 9, 2022) ........ 1, 2

*Rochin v. California,*
  342 U.S. 165 (1952) .......................................................................... 16

*Seal v. Morgan,*
  229 F.3d 567 (6th Cir. 2000) ............................................................ 13

*Seegmiller v. LaVerkin City,*
  528 F.3d 762 (10th Cir. 2008) ..................................................... 17, 18

*State ex rel. Sheibley v. School District No. 1 of Dixon County,*
  48 N.W. 393 (Neb. 1891) .................................................................... 9

*Stewart v. City of Oklahoma City,*
  47 F.4th 1125 (10th Cir. 2022) ......................................................... 13

*Tatel v. Mt. Lebanon School District,*
    No. 2:22-cv-00837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022) ..... 14

*Troxel v. Granville,*
    530 U.S. 57 (2000) ..................................................................... passim

*Vlaming v. West Point School Board,*
    No. 211061 (Va. argued Nov. 4, 2022) .................................................. 2

*Waldman v. Conway,*
    871 F.3d 1283 (11th Cir. 2017) ......................................... 6, 12, 16, 17

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................... passim

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ............................................................................. 9

## **Statutes**

Ala. Stat. § 22-8-4 ..................................................................................... 19

Fla. Stat. § 743.064 .................................................................................. 19

Ga. Stat. § 31-9-2 ...................................................................................... 19

## **Other Authorities**

1 William Blackstone,
    *Commentaries on the Laws of England* ............................................ 7

Eric A. DeGroff, *Parental Rights & Public School Curricula:*
    *Revisiting Mozert after 20 Years,*
    38 J.L. & Educ. 83 (2009) .................................................................. 8

Rosalie Berger Levinson, *Time to Bury the Shocks the*
    *Conscience Test,*
    13 Chap. L. Rev. 307 (2010) ............................................................ 16

Russell B. Toomey et al., *Transgender Adolescent*
    *Suicide Behavior,*
    142 Pediatrics 1 (2018) .............................................................. 21, 22

WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People* (2022 v.8), http://bit.ly/3JkBDc7 ............................................................................ 21

WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (2011 v.7), https://bit.ly/2Qfw2Lx ............................................................... 21

Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child and Adolescent Mental Health 36 (2020) ..................... 21, 23

# INTEREST OF *AMICUS CURIAE**

Alliance Defending Freedom ("ADF") is a nonprofit, public-interest legal organization that provides strategic planning, training, funding, and litigation services. ADF works to protect parents' fundamental right to direct the education and upbringing of their children, among other constitutional rights.

In this work, ADF represents both parents and teachers. For example, as co-counsel with the Wisconsin Institute for Law and Liberty, ADF represents parents challenging a school district policy much like the policy challenged by the Littlejohns. It requires staff—without parental consent and even over an express objection—to treat students as though they were a gender identity different from their sex. *See* Compl. ¶ 1, *T.F. v. Kettle Moraine Sch. Dist.*, No. 2021CV001650 (Wis. Cir. Ct. Waukesha Cnty. filed Nov. 17, 2021), ECF No. 2, https://bit.ly/3JQRLUc.

ADF also represents teachers challenging actions by schools that threaten parental rights. In *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan. May 9, 2022), ADF represented a teacher whose school forced her to deceive parents about

---

* No counsel for a party authored this brief in whole or in part; no one, other than *amicus* and its counsel, made a monetary contribution for its preparation or submission; and Plaintiffs have consented to its filing. Because Defendants have not yet consented despite multiple requests for consent, *amicus* is also filing a motion for leave to file this brief.

their child's gender identity and expression at school. ADF secured a preliminary injunction, in part based on the district court's holding that the policy was "intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit," including the right to "have a say" in what their minor children were called at school. *Id.* at *8. And in Indiana, ADF represents a former high school counselor challenging a school district's policy requiring employees to use one set of pronouns at school for some students while using other pronouns in communications with their parents. *See* Verified Compl. 1–3, *McCord v. S. Madison Cmty. Sch. Corp.*, No. 1:23-cv-00866 (S.D. Ind. filed May 18, 2023), ECF No. 1, https://bit.ly/45pAKJt. When ADF's client gave truthful answers to a reporter's questions about that policy, the district fired her. *Id.*

ADF also regularly represents teachers and professors challenging similar policies that force them to use pronouns in violation of their core beliefs. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021) (reinstating complaint claiming that university had "violated [a professor's] free-speech rights" by rejecting his proposed "win-win" solution of using the student's last name in place of pronouns); *Vlaming v. W. Point Sch. Bd.*, No. 211061 (Va. argued Nov. 4, 2022) (representing high-school French teacher fired after school officials rejected his request to refer to a student using new chosen name while avoiding the use of pronouns altogether).

2

In these cases, ADF explains that it is both possible and constitutionally required to find a solution to the challenges posed by competing views of sex and gender identity that respects the rights of parents, students, and teachers. Here, the actions of the school board and the other defendants do not honor parents' rights—expressly so. Defendants ignored instructions from the Littlejohns *not* to subject their daughter to the controversial psychotherapeutic intervention sometimes called "social transition." *See, e.g.*, Order Granting Mot. to Dismiss 2–4, Dist. Ct. ECF No. 66 [hereinafter, "MTD Order"].

Defendants' actions deliberately cut the Littlejohns out of important decisions about their daughter's education and wellbeing. And the claims challenging those actions arise under longstanding constitutional principles. Parents' right to "direct the education and upbringing of [their] children" is no less fundamental than any other unenumerated right the Supreme Court has recognized as such. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing the right alongside other "fundamental rights and liberty interests"). It "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).

This Court should hold that the district court's failure to apply strict scrutiny to Plaintiffs' parental-rights claim was error, *see* MTD Order 24, reverse the judgment below, and remand for further proceedings.

## STATEMENT OF THE ISSUES

Whether the district court erred by applying an incorrect level of scrutiny due to its failure to recognize this Nation's history and tradition of treating parental rights as fundamental.

## SUMMARY OF THE ARGUMENT

By failing to apply strict scrutiny to the Littlejohns' parental-rights claims, the district court failed to treat those rights as fundamental. Because of that error, this Court should reverse.

The district court erred at each of the two steps in the analysis of an unenumerated right protected by the Fourteenth Amendment. First, the district court did not acknowledge the centuries of precedent—from the Supreme Court and this Court, and from the common-law courts of England and America—protecting parental rights. As a result of missing how deeply rooted parental rights are in our Nation's history and tradition, the district court downplayed the protection these rights receive under the Fourteenth Amendment.

That led to its second error: failing to apply strict scrutiny. This Court and many others have held that fundamental rights receive strict scrutiny. Instead of applying strict scrutiny to the Littlejohns' claims, the district court applied the "shocks the conscience" test. But that test, this Court has said, applies to Fourteenth Amendment claims that do *not* implicate a fundamental right. Despite noting that this case does involve the Littlejohns' fundamental rights, the district court did not

4

explain why it chose not to apply strict scrutiny, which is the test this Court has required for fundamental-rights claims.

The high stakes of the Littlejohns' claims compound the error of the district court's failure to treat their rights as fundamental. Defendants here denied the Littlejohns the right to be notified about school administrators' decision to intervene in their child's mental healthcare. Parents cannot exercise their fundamental right to direct their children's upbringing and education if public schools withhold important information from them about their own children. This right includes the right to receive notification from a school that officials have decided to counsel and treat a child for gender dysphoria.

Worse than just providing inadequate disclosure, Defendants intervened in the mental healthcare of the Littlejohns' daughter knowing that they objected to this particular intervention and already had their daughter in private counseling. Defendants contravened the Littlejohns' decisions about how best to care for their own child. And in so doing, Defendants jeopardized the success of the Littlejohns' chosen course of treatment. Schools cannot knowingly act to undermine parents' efforts to address their children's mental health.

This Court should hold that the Littlejohns' claims fall within this Nation's history and tradition of guaranteeing parents the right to direct the upbringing and education of their children. And it should reverse the district court's failure to protect that fundamental right.

## ARGUMENT

### I. Parental rights are fundamental, so strict scrutiny applies to state action infringing them.

For claimed violations of unenumerated rights protected by the Fourteenth Amendment to the U.S. Constitution, the analysis has two steps: First, a court should ask whether the asserted right is one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (cleaned up). Second, if the government action "burden[s] the exercise of a fundamental right" it "require[s] strict scrutiny." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004); *see Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) ("The Fourteenth Amendment forbids the government from infringing fundamental liberty interests at all, unless the infringement is narrowly tailored to serve a compelling state interest.").

Although the district court used the word "fundamental" once to describe parental rights in general, *see* MTD Order 11, it failed to properly analyze the Littlejohns' parental-rights claim. Its error began with its suggestion that this Court and the Supreme Court disfavor parental rights. *See id.* at 20–21. Quite the opposite, a century of constitutional precedent—buttressed by centuries more of common-law history—demonstrates the fundamental nature of a parental-rights claim. *See Troxel*, 530 U.S. at 65–66 (plurality opinion) (tracing that precedent back to *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also* 1

6

William Blackstone, *Commentaries on the Laws of England* *446–53 (describing the rights of parents at common law), http://bit.ly/3leX7za.

Next, because the district court treated parental rights as disfavored instead of fundamental, it failed to ask whether Defendants' actions were narrowly tailored to serve any compelling state interest, as strict scrutiny requires. *Glucksberg*, 521 U.S. at 721. Finally, the district court chose to dismiss the Littlejohns' claims based on an alternate Fourteenth Amendment test, without explaining its decision to apply that test and not the fundamental-rights test.

This Court should confirm that parents' rights are fundamental. And it should reaffirm that state action infringing parents' rights receives strict scrutiny, as it would if it infringed any other fundamental right. Accordingly, this Court should reverse.

### A.    The Supreme Court has held the Due Process Clause treats parental rights, which are deeply rooted in this Nation's history and tradition, as fundamental.

At its heart, the Littlejohns' challenge to Defendants' policy and practice of treating their daughter as a gender different than her sex without their consent—indeed, over their *express objection*—rests on their right to "direct the education and upbringing of [their] children." *Glucksberg*, 521 U.S. at 720 (citation omitted). *See, e.g.*, First Am. Compl. ¶¶ 164–66, Dist. Ct. ECF No. 23. Despite the district court's belief that federal courts disfavor parental rights, *see* MTD Order 20–

7

21, the fundamental nature of parental rights is well settled and has been for more than a century. As Justice Holmes said in another context, "Upon this point a page of history is worth a volume of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921).

At common law, parents had "both the responsibility and the authority to guide their children's development and make important decisions on their behalf." Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting Mozert after 20 Years*, 38 J.L. & Educ. 83, 108 (2009). This common-law parental right included a right to make educational decisions. Early authorities "established the right of parents to make educational choices for their children," even against "the preferences of civil authorities." *Id.* at 110 & n.178. "[B]y the nineteenth century, legal scholars were describing the right of parents to control the education of their children as 'practically . . . absolute' or 'absolute against all the world.'" *Id.* at 111–12 (footnotes omitted; omission in original).

American courts also freed "parents to exercise those duties"— namely, the duties "to provide for their [children's] support and education"—"largely unhindered by the state." *Id.* at 112. This principle held true even as public schooling became the norm. In the late 19th century, "courts held that parents had a common law right to exempt their children from courses established by, and in some cases even required by, the state legislatures or local school districts." *Id.* at 113;

*see, e.g.*, *State ex rel. Sheibley v. Sch. Dist. No. 1 of Dixon Cnty.*, 48 N.W. 393, 395 (Neb. 1891) ("[N]o pupil attending the school can be compelled to study any prescribed branch against the protest of the parent that the child shall not study such branch . . . ."); *Morrow v. Wood*, 35 Wis. 59, 65 (1874) ("[T]he parent has the right to make a reasonable selection from the prescribed studies for his child to pursue, and this cannot possibly conflict with the equal rights of other pupils.").

These common-law principles led the Supreme Court a century ago—almost to the day (June 4, 1923)—to acknowledge that the Fourteenth Amendment protects "the power of parents to control the education of their own." *Meyer*, 262 U.S. at 401. For "[t]he child is not the mere creature of the state," as the Court would elaborate two years later. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925). "[T]hose who nurture him and direct his destiny," that is, a child's *parents*, "have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* And this duty or right, the Court would go on to say, "must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

Given this historical backdrop, when the Court in *Glucksberg* foregrounded the question whether a right is "deeply rooted in this Nation's history and tradition," it unsurprisingly left no doubt about

parental rights. 521 U.S. at 721 (cleaned up). The Court listed the "fundamental rights and liberty interests" for which the Due Process Clause "provides heightened protection." *Id.* at 720 (citation omitted). And it *expressly included* the right to "direct the education and upbringing of one's children." *Id.* (citation omitted). Because this right is fundamental, the government may not infringe it "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* at 721 (cleaned up).

Three years after *Glucksberg*, the Supreme Court in *Troxel* reaffirmed that parents have a "fundamental liberty interest[]" in the "care, custody, and control of their children." *Troxel*, 530 U.S. at 65 (plurality opinion); *see id.* at 80 (Thomas, J., concurring in the judgment) (agreeing with "plurality that [the] Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case"). That liberty interest "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Id.* at 65 (plurality opinion). And as the *Troxel* plurality expressly acknowledged, the Due Process Clause "provides heightened protection against government interference with [such] fundamental rights and liberty interests." *Id.* (citation omitted); *accord id.* at 80 (Thomas, J., concurring in the judgment) (endorsing "strict scrutiny" as the correct test for infringements on the "fundamental right of parents to direct the upbringing of their children").

Finally, the district court cited the Supreme Court's most recent pronouncement on unenumerated rights as evidence that lower courts ought to view claims like the Littlejohns' skeptically. *See* MTD Order 20–21 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2301 (2022) (Thomas, J., concurring)). But *Dobbs* doesn't support this idea. The Court there worked within *Glucksberg*'s framework to demonstrate why the defunct "right to abortion" was neither "deeply rooted in this Nation's history and tradition" nor "implicit in the concept of ordered liberty." *Dobbs*, 142 S. Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 721). Indeed, the *Dobbs* Court contrasted abortion with unenumerated rights that in fact *had* a historical pedigree in our legal tradition, expressly including "the right to make decisions about the education of one's children." *Id.* at 2257.

The Supreme Court has used numerous formulations to describe the historically grounded, fundamental right central to the Littlejohns' claims: the right to "direct the education and upbringing of one's children," *Glucksberg*, 521 U.S. at 720 (citation omitted); the liberty "interest of parents in the care, custody, and control of their children," *Troxel*, 530 U.S. at 65 (plurality opinion); and, "the right to make decisions about the education of one's children," *Dobbs*, 142 S. Ct. at 2257. Whatever the phrasing, though, the Littlejohns' parental rights easily qualify as "fundamental rights and liberty interests" for purposes

11

of determining the appropriate level of review. *Glucksberg*, 521 U.S. at 720 (citation omitted).

### B. Like other fundamental rights protected by the Due Process Clause, parental rights trigger strict scrutiny.

Once the fundamental nature of the right is established, the standard of review clicks into place—strict scrutiny. This Court has been unequivocal: "Laws that burden the exercise of a fundamental right require strict scrutiny and are sustained only if narrowly tailored to further a compelling government interest." *Lofton*, 358 F.3d at 815; *accord Waldman*, 871 F.3d at 1292. And the Supreme Court has been no less clear: "[T]he Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The Littlejohns' "freedom to inculcate [their] children with values and standards which the[y] deem desirable," therefore, falls within "a private realm of family life which the state cannot enter without compelling justification." *Arnold v. Bd. of Educ.*, 880 F.2d 305, 313 (11th Cir. 1989).

Other federal courts and state courts agree. They regularly discuss how strict scrutiny protects fundamental rights, including parental rights. Federal courts hold that "[g]overnment actions that burden the exercise of those fundamental rights or liberty interests are

12

subject to strict scrutiny." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000); *see id.* at 574–75 (including the right "to direct the education and upbringing of one's children" in a "list of fundamental rights"); *accord, e.g.*, *Stewart v. City of Okla. City*, 47 F.4th 1125, 1138 (10th Cir. 2022) (recognizing parental rights as fundamental and acknowledging this would trigger strict scrutiny but for the plaintiffs' "fail[ure] to introduce any evidence of a direct and substantial burden on any family or marital interests").

The Third Circuit has even applied strict scrutiny to a claim like the Littlejohns' claims. That court said "[i]t is not unforeseeable . . . that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). "But when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a *compelling interest*." *Id.* (emphasis added).

In *Gruenke*, a swim coach violated the rights of a girl's parents by failing to notify them or seek their consent before forcing her to undergo a pregnancy test, though the Third Circuit granted him qualified immunity. *See* 225 F.3d at 306–07. Today, however, "the contours of Third Circuit precedent put a reasonable defendant on notice that" allegations like those in *Gruenke* (and like those of the Littlejohns in this case) "would—absent a compelling interest—plausibly infringe"

13

parental rights. *Tatel v. Mt. Lebanon Sch. Dist.*, No. 2:22-cv-00837, 2022 WL 15523185, at *28 (W.D. Pa. Oct. 27, 2022).

State courts, like their federal counterparts, routinely apply the rule that, when the government "impinges on fundamental parental rights, the strict scrutiny standard applies." *Fla. Dep't of Child. & Fams. v. F.L.*, 880 So. 2d 602, 607 (Fla. 2004); *see Ex parte E.R.G.*, 73 So. 3d 634, 646 (Ala. 2011) ("[A] parent's right is fundamental, and a limitation on that right must be subject to strict scrutiny."); *accord In re M.F.*, 780 S.E.2d 291, 297 (Ga. 2015) ("The Constitution secures the fundamental 'right of parents to direct the upbringing of their children,' [*Troxel*, 530 U.S. at 65], and it 'protects a private realm of family life which the state cannot enter without compelling justification.' [*Arnold*, 880 F.2d at 313]."). In fact, "the majority of courts" have understood that Supreme Court precedent, like *Troxel*, requires strict-scrutiny protections for parental-rights claims. *In re A.A.L.*, 927 N.W.2d 486, 494 (Wis. 2019) (collecting cases from state courts of last resort); *accord Jones v. Jones*, 359 P.3d 603, 610 n.10 (Utah 2015) ("Other courts have reached similar conclusions."); *Hiller v. Fausey*, 904 A.2d 875, 885 & n.18 (Pa. 2006) (same).

In short, the Supreme Court, this Court, other federal courts of appeals, and many state courts of last resort have held that fundamental rights—and parental rights, in particular—receive strict scrutiny. And the Littlejohns have alleged a parental-rights claim. Though the

14

district court purported to analyze this as a fundamental right, *see* MTD Order 11 (citing *Troxel*, 530 U.S. at 66 (plurality opinion)), it did not explain its refusal to follow the reams of authority, both binding and persuasive, requiring strict scrutiny here. Far from distinguishing *Glucksberg*, *Waldman*, or the other decisions applying strict scrutiny to fundamental parental-rights claims, the district court didn't even cite them in its opinion.

## C.   The district court did not explain its failure to apply strict scrutiny.

The closest the district court came to explaining its failure to apply strict scrutiny was in a single footnote. That footnote does not mention strict scrutiny, attempting instead to distinguish the facts of this Court's decision in *Arnold*. *See* MTD Order 13 n.3. In that case, this Court held that the government may not infringe parental rights "without compelling justification"; in other words, it applied strict scrutiny. *Arnold*, 880 F.2d at 313. The district court's answer is that "subsequent Supreme Court and Eleventh Circuit cases have made it clear that the 'conscience-shocking' standard is used to determine if conduct rises to the level of a substantive due process violation." MTD Order 14 n.3. But this misunderstands the nature of the shocks-the-conscience standard for Fourteenth Amendment claims.

The "shocks the conscience" test was devised to hold executive officers—usually police officers—accountable for "conduct that shocks

15

the conscience," no matter whether it implicates a fundamental right. *Rochin v. California*, 342 U.S. 165, 172 (1952); *see* Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience Test*, 13 Chap. L. Rev. 307, 319 (2010) ("[C]onscience-shocking behavior that deprives a person of liberty itself violates substantive due process."). As this Court has said, even "[w]here a fundamental liberty interest does not exist," an official's conduct is unconstitutional "when it 'shocks the conscience.'" *Waldman*, 871 F.3d at 1292.

In *County of Sacramento v. Lewis*, for example, the Supreme Court considered "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. 833, 836 (1998). Despite issuing only a year after *Glucksberg*, *Lewis* never asked whether the police officer's deliberately or recklessly indifferent action violated a fundamental right; in fact, the term "fundamental rights" appears only in a concurrence. *See* 523 U.S. at 860–61 (Scalia, J., concurring in the judgment). *Lewis* only asked whether the high-speed chase in question was an "abuse of power" that "shocks the conscience." *Id.* at 846 (majority opinion).

This Court has not seen any tension between *Lewis* and *Glucksberg*. Proving a violation of a fundamental right, or proving that official conduct shocks the conscience—these are two independent

16

theories of liability under the Due Process Clause. *See Waldman*, 871 F.3d at 1292–93 (contrasting these two analyses); *see also McKinney v. Pate*, 20 F.3d 1550, 1556 & n.7 (11th Cir. 1994) (en banc) (referring to these as "alternate substantive due process test[s]").

Understood this way, the shocks-the-conscience test operates to expand officials' potential liability under the Due Process Clause, not limit it. So, when challenging "executive" actions—in contrast to a broader "legislative" policy—under the Due Process Clause, the plaintiff's failure to invoke a fundamental right does not automatically consign the claim to the lenient rational-basis test. *See McKinney*, 20 F.3d at 1557 n.9 (distinguishing "executive" and "legislative" actions based on *nature* of the action, rather than *identity* of the actor as a member of executive or legislative branch of government). A plaintiff can still obtain more searching constitutional review if the officer's conduct shocks the conscience. *Lewis*, 523 U.S. at 846–47.

The Tenth Circuit agrees with this Court's approach to harmonizing *Lewis* and *Glucksberg*. According to that court, there are "two strands of the substantive due process doctrine." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (Tymkovich, J.). "One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience." *Id.* Fundamental-rights claims receive strict scrutiny. *See id.* (citing *Glucksberg*, 521 U.S. at 721). "Conduct that shocks the

17

judicial conscience, on the other hand, is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Id.* (quoting *Lewis*, 523 U.S. at 845). A plaintiff can state a Fourteenth Amendment claim "[b]y satisfying either" test. *Id.*

The district court here, however, did not even acknowledge the existence of "alternate . . . test[s]." *McKinney*, 20 F.3d at 1556 n.7. It ruled that the Littlejohns' claims failed because Defendants' choice to treat their daughter as a different "gender identity" did "not shock the conscience as defined by binding case law." MTD Order 13. The district court thus committed the same error as the district court in *Seegmiller*. It ruled "that the *only* appropriate standard with which to measure [the Littlejohns'] claim is the shocks the conscience standard." 528 F.3d at 767. That ruling misapplies this Court's precedent and creates unnecessary tension between *Lewis* and *Glucksberg*.

Because the Littlejohns have invoked a fundamental right, *see Troxel*, 530 U.S. at 65 (plurality opinion); *Glucksberg*, 521 U.S. at 720, the appropriate test is strict scrutiny. The district court failed to apply that test here. That error requires reversal.

II.    **At a bare minimum, parents have a fundamental right to receive notification that their child's school has decided to counsel and treat their child for gender dysphoria.**

This case asks whether parents' fundamental right to direct the education and upbringing of their child includes the right to receive notification from their child's school that officials have decided to counsel and treat the child for gender dysphoria. *See* First Am. Compl. ¶¶ 226–76.

The dual principles that (1) minor children are not capable of making certain decisions—especially medical decisions—without a parent's consent, and (2) parents are entrusted and presumed to act in their children's best interest, are well established principles of common law, deeply embedded in statutory law, and have been recognized repeatedly by the Supreme Court. "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.*

That explains why even today most minors cannot unilaterally consent to most forms of medical and mental healthcare. *See* Fla. Stat. § 743.064 (outlining emergency exceptions to general rule requiring parental consent for minor healthcare); *accord, e.g.*, Ga. Stat. § 31-9-2; Ala. Stat. § 22-8-4 (minors under 14 generally cannot consent to medical

care). Included within parents' fundamental right and duty to prepare their children for life's challenges and obligations is the duty "to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. For centuries, our laws have operated based on the assumption "that natural bonds of affection lead parents to act in the best interests of their children." *Id.* (citing Blackstone and Kent).

Importantly, that has remained true despite the unfortunate reality that *some* parents may at times act against the best interests of their children. *Id.* "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603. And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.* "Parents can and must make those judgments." *Id.* And "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* at 604.

All of that applies with equal force here. The World Professional Association for Transgender Health (WPATH), is a transgender advocacy organization that has produced guidelines for medical and surgical interventions related to gender. *See generally* WPATH,

20

*Standards of Care for the Health of Transgender and Gender Diverse People* (2022 v.8), http://bit.ly/3JkBDc7. Those guidelines define "gender dysphoria" as the "distress or discomfort that may be experienced because a person's gender identity differs from that which is physically and/or socially attributed to their sex assigned at birth." *Id.* at S252. And a "gender social transition in prepubertal children," like Defendants' use of new chosen names and pronouns for students who identify as transgender, is a "form of psychosocial treatment that aims to reduce gender dysphoria" in children. Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child and Adolescent Mental Health 36 (2020).

Many studies have found that the vast majority of children (roughly 80–95%) who experience gender dysphoria during childhood ultimately find comfort with their biological sex as they enter into adulthood; such children are said to "desist." WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 11 (2011 v.7), https://bit.ly/2Qfw2Lx. At the same time, children who *have* transitioned report significantly higher rates of suicidal ideation, suicide attempts, and suicide. *See* Russell B. Toomey et al., *Transgender Adolescent Suicide Behavior*, 142 Pediatrics 1, 1–3 (2018), perma.cc/3Q5B-CCKG. A heartbreaking 50.8% of adolescents in the study who identified as "female to male transgender" reported having attempted suicide. *Id.* By comparison, 27.9% of all respondents

21

who were "not sure" about their gender identity reported having attempted suicide, and 17.6% of female respondents who did not identify as transgender or questioning reported the same. *Id.*

*Amicus curiae* ADF has seen equally troubling research findings in its own cases. For example, in Virginia state court, ADF proffered an expert report from Dr. Stephen B. Levine, former WPATH committee chairman, detailing the findings of one "cohort study by authors from Harvard and Boston Children's Hospital" finding that youth and young adults who self-identified as transgender "had an elevated risk of depression (50.6% vs. 20.6%) and anxiety (26.7% vs. 10.0%)," and a "higher risk of suicidal ideation (31.1% vs. 11.1%), suicide attempts (17.2% vs. 6.1%), and self-harm without lethal intent (16.7% vs. 4.4%) relative to the matched controls." Report of Stephen B. Levine, MD, at 45, *Figliola v. Sch. Bd. of Harrisonburg*, No. CL22-1304 (Va. Cir. Ct. Rockingham Cnty. filed Aug. 30, 2022), http://bit.ly/42hdcVt.

Summarizing the results of numerous studies, Dr. Levine warned that, "as we look ahead to the patient's life as a young adult and adult, the prognosis for the physical health, mental health, and social well-being of the child or adolescent who transitions to live in a transgender identity is not good." *Id.* at 47. "Meanwhile, *no studies* show that affirmation of pre-pubescent children or adolescents leads to more positive outcomes" later in life compared to other forms of ordinary therapy. *Id.* (emphasis added). Not surprisingly then, parents often

"hold different philosophical views on what is the best way to help reduce [their child's] gender dysphoria," and those views "require both respect and understanding." Zucker, *Different Strokes*, *supra*, at 36.

Against this backdrop, Defendants' policy of counseling and treating students for gender dysphoria *without ever notifying their parents* infringes not only sound medical practice but also parents' fundamental right to "direct the education and upbringing of [their] children." *Glucksberg*, 521 U.S. at 720. As shown above, "[t]he common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting).

By denying parents the right to be notified about the decision to intervene in their child's mental health, the policy here closely resembles the one in *Arnold*. There, this Court held that "[c]oercing a minor to obtain an abortion or to assist in procuring an abortion and to refrain from discussing the matter with the parents unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." 880 F.2d at 313.

A school cannot encourage a student to make a medical decision apart from that student's parents—whether to obtain an abortion, as in *Arnold*, or, as here, to pursue a psychotherapeutic intervention for a child's gender confusion. With issues like these, which are both issues

23

that "raise[] profound moral and religious concerns," *id.* at 314, parents'
right to be involved in their children's lives is at its apex. Cutting them
out of decisions about such issues "deprives the parents of the
opportunity to counter influences on the child the parents find inimical
to their religious beliefs or the values they wish instilled in their
children." *Id.* at 313; *cf. Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 266
(N.Y. App. Div. 1993) (finding parental-rights violation where New York
"made a judgment that minors should have unrestricted access to
contraceptives, a decision which is clearly within the purview of the
petitioners' constitutionally protected right to rear their children, and
then has forced that judgment on them").

This is even more true here: the Littlejohns' daughter was
receiving mental health treatment *outside* of school, *with* their support.
Defendants' choice to disregard the Littlejohns' instructions regarding
their own daughter's mental healthcare was diametrically opposed to
and jeopardized the success of her private counseling. Schools cannot
actively work against the express wishes of parents, especially when
doing so jeopardizes the physical and mental health of a child.

This last point highlights the stakes of this case. The Littlejohns
don't merely object to their daughter being taught ideas they disagree
with. They don't simply oppose "an aspect of education." *Alfonso*, 606
N.Y.S.2d at 263. Instead, they object to the "means" Defendants have

chosen to socially transition their child to a different gender identity without their knowledge or consent. *Id.* at 263.

As in *Alfonso*, the solution here is simple: the school's policy "can go forward without interfering with the [Littlejohns'] rights simply by allowing [them and any other] parents who are interested in providing appropriate guidance and discipline to their children to 'opt out' by instructing the school not to [socially transition] their children without their consent." *Id.* at 267. The Constitution demands nothing less.

## CONCLUSION

This Court should reverse the judgment below and remand for further proceedings.

Dated: May 30, 2023                     Respectfully submitted,

                                        */s/ Vincent M. Wagner*
Katherine L. Anderson                   Vincent M. Wagner
ALLIANCE DEFENDING FREEDOM              Tina Seideman
15100 N. 90th Street                    ALLIANCE DEFENDING FREEDOM
Scottsdale, Arizona 85260               44180 Riverside Parkway
(480) 444-0020                          Lansdowne, Virginia 20176
kanderson@ADFlegal.org                  (571) 707-4655
                                        vwagner@ADFlegal.org
                                        tseideman@ADFlegal.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word-count limitation of Fed. R. App. P. 29(a)(5) because, according to the word-count feature of the program used to prepare it and excluding the items listed in Fed. R. App. P. 32(f), it contains 5,723 words and does not exceed 6,500 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ *Vincent M. Wagner*

Vincent M. Wagner
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Vincent M. Wagner*

Vincent M. Wagner
*Counsel for Amicus Curiae*

27