No. 23-10385-HH

# In the United States Court of Appeals
## FOR THE ELEVENTH CIRCUIT

―――――――

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,
PLAINTIFFS-APPELLANTS,

*v.*

SCHOOL BOARD OF LEON COUNTY, FLORIDA, ROCKY HANNA, DR. KATHLEEN
RODGERS, RACHEL THOMAS, ROBIN OLIVERI,
DEFENDANTS-APPELLEES.

―――――――

On appeal from the United States District Court for the Northern
District of Florida, Case No. 4:21-cv-415-MW-MJF

―――――――

**AMICUS BRIEF OF DR. ERICA E. ANDERSON, PhD,
SUPPORTING APPELLANTS AND REVERSAL**

―――――――

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

LUKE N. BERG
*Counsel of Record for Amicus*
RICHARD M. ESENBERG
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
rick@will-law.org
(414) 727-7367

No. 23-10385-HH, *Littlejohn v. School Board of Leon County*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules, in addition to those persons and entities listed in Appellants' opening brief, the following person has an interest in the outcome of this appeal:

1. Anderson, Erica E.

Amicus Curiae Dr. Erica E. Anderson is a person, and is not publicly traded company or corporation.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ................................................................. C-1

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICUS ........................................................................... 1

INTRODUCTION ..................................................................................... 2

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ............................................................................................. 4

   I.  Whether a Minor Experiencing Gender Incongruence Should
      Transition Socially Is a Major and Potentially Life-Altering
      Mental-Health Treatment Decision That Requires Parental
      Involvement, for Many Reasons. ....................................................... 4

  II.  Parental Decision-Making Authority Over Their Minor
      Children Includes the Right to be Involved in How School
      Staff Refer to Their Child While at School. ................................... 16

 III. "Shock the Conscience" Is Not an Overarching Requirement
      for All Due Process Claims, But Rather an Alternative Test to
      a Fundamental Rights Analysis. ................................................... 26

CONCLUSION ....................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Brokaw v. Mercer Cnty.*,

    235 F.3d 1000 (7th Cir. 2000) ........................................................ 28

*C.N. v. Ridgewood Bd. of Educ.*,

    430 F.3d 159 (3d Cir. 2005) ..................................................... 16, 21

*Chavez v. Martinez*,

    538 U.S. 760 (2003) ................................................................ 26, 27

*County of Sacramento v. Lewis*,

    523 U.S. 833 (1998) ................................................................ 25, 26

*Crowe v. Cnty. of San Diego*,

    608 F.3d 406 (9th Cir. 2010) ........................................................ 27

*DePoutot v. Raffaelly*,

    424 F.3d 112 (1st Cir. 2005) ......................................................... 25

*Doe 1 v. Madison Metro. Sch. Dist.*,

    2022 WI 65, 403 Wis. 2d 369, 976 N.W.2d 584 .............................. 20

*Doe v. Heck*,

    327 F.3d 492 (7th Cir. 2003) ........................................................ 28

*Dubbs v. Head Start, Inc.*,

    336 F.3d 1194 (10th Cir.2003) .......................................................27

*Grendell v. Gillway*,

    974 F.Supp. 46 (D.Me.1997)...........................................................29

*Gruenke v. Seip*,

    225 F.3d 290 (3d Cir. 2000)..................................................18, 19, 28

*Khan v. Gallitano*,

    180 F.3d 829 (7th Cir. 1999) .........................................................26

*Kolley v. Adult Protective Servs.*,

    725 F.3d 581 (6th Cir. 2013) .........................................................28

*Kosilek v. Spencer*,

    774 F.3d 63 (1st Cir. 2014)...............................................................7

*Lambert v. Bd. of Trustees*,

    793 F. App'x 938 (11th Cir. 2019)..................................................29

*May v. Anderson*,

    345 U.S. 528 (1953) .......................................................................15

*McConkie v. Nichols*,

    446 F.3d 258 (1st Cir. 2006)...........................................................29

*Parham v. J. R.*,

    442 U.S. 584 (1979) ................................................................. passim

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*,

    No. 5:22-CV-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) ....... 20

*Rochin v. California*,

    342 U.S. 165 (1952) ........................................................................ 26

*Seegmiller v. LaVerkin City*,

    528 F.3d 762 (10th Cir. 2008) ........................................................ 27

*Skinner v. Oklahoma*,

    316 U.S. 535 (1942) ........................................................................ 15

*T.F., et al. v. Kettle Moraine School District*, No. 21-CV-1650

    (Waukesha Cnty. Wis., Cir. Ct., filed Nov. 17, 2021) .................... 22

*Troxel v. Granville*,

    530 U.S. 57 (2000) ............................................................. 15, 16, 18

*United States v. Salerno*,

    481 U.S. 739 (1987) ........................................................................ 25

*Waldman v. Conway*,

    871 F.3d 1283 (11th Cir. 2017) ...................................................... 28

*Wisconsin v. Yoder*,

> 406 U.S. 205 (1972) .................................................................. 15, 16

**Other Authorities**

*Britain changes tack in its treatment of trans-identifying children*,

> The Economist (Nov. 17, 2022) ........................................................7

Dr. Hilary Cass, *Independent review of gender identity services for*

> *children and young people: Interim report* (February 2022) ........... 7

Elie Vandenbussche, *Detransition-Related Needs and Support: A*

> *Cross-Sectional Online Survey*, 69(9) Journal of

> Homosexuality 1602–1620 (2022).................................................. 13

Expert Affidavit of Dr. Stephen B. Levine, Dkt. 31, *Doe v. Madison*

> *Metropolitan Sch. Dist.*, No. 20-CV-454 (Dane County Wis.

> Cir. Ct., filed Feb. 19, 2020).............................................................7

*Guidelines for Psychological Practice With Transgender and*

> *Gender Nonconforming People*, American Psychological

> Association, 70(9) APA 832–64 (2015).......................................11, 14

*Independent review into gender identity services for children and*

> *young people*, NHS England, https://www.england.nhs.uk/

> commissioning/spec-services/npc-crg/gender-dysphoria-

clinical-programme/gender-dysphoria/independent-review-into-gender-identity-services-for-children-and-young-people/ ........ 6

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019) .......................................... 4

James R. Rae, et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681 (2019) .......... 4, 8

Jesse Singal, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016) ................................ 6

Kenneth J. Zucker, *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2) International Journal of Transgenderism 231–245 (2018) ...................................................... 6

Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022) ....................................... 5

Ryan Mills, *A Mom's Fight to Save Her Daughter from Trans Orthodoxy at School*, National Review (Apr. 5, 2022) ............. 23, 24

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258 (2022)..................................... passim

*Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People,* The World Professional Association for Transgender Health (Version 7, 2012) ......... 4, 9, 11

T. D. Steensma, et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590 (2013)........................... 5, 8

*What is Gender Dysphoria?* American Psychiatric Association, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria ............................................. 13

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dyshporic / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society 102(11) J Clin. Endocrinol. Metab. 3869–3903 (2017) .............. 9, 14

## INTEREST OF AMICUS[1]

Dr. Erica E. Anderson, PhD, is a clinical psychologist practicing in Berkeley, California, with over 40 years of experience, and is transgender herself. Between 2019 and 2021, Dr. Anderson served as a board member for the World Professional Association for Transgender Health (WPATH) and as the President of USPATH (the United States arm of WPATH). Since 2016, Dr. Anderson's work has focused primarily on children and adolescents dealing with gender-identity-related issues, at the Child and Adolescent Gender Clinic at Benioff Children's Hospital at the University of California, San Francisco (2016 to 2021), and at her private consulting and clinical psychology practice (2016 to present). She has seen hundreds of children and adolescents for gender-identity-related issues in that time, many of whom transition, with her guidance and support.

As a practitioner serving children and adolescents experiencing gender incongruence, Dr. Anderson has a strong interest in ensuring that such children receive the best possible support and assistance (whether

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

or not they ultimately transition), which, in her view, requires involving their parents.

## STATEMENT OF THE ISSUE

Whether the District Court erred in dismissing Appellants' complaint, which alleges a violation of their fundamental right to parent their child.

## INTRODUCTION

The Leon County School District, like some other school districts around the country, previously had a policy allowing minor children to secretly adopt a new gender identity at school, requiring all staff to treat them as though they were the opposite sex, without parental notice or consent, and even directing staff to conceal this from parents in various ways. Many mental-health professionals believe that a gender-identity transition during childhood is a profound and difficult treatment decision, and that parental involvement is critical for many reasons: to properly assess the underlying sources of the child's feelings; to evaluate the risks and benefits of a transition; to identify and address any coexisting issues; to provide ongoing support; and ultimately, to decide whether a transition will be in their child's best interests.

The District applied its Policy to Appellants' child, facilitating a social transition at school without notice to them or their consent, in violation of their long-established right to make health-related decisions for their minor child. Yet the District Court nevertheless dismissed their complaint on the grounds that usurping their parental role over this major decision was not "conscience shocking." That is not the test for violations of a parent's fundamental rights, but regardless, the District's actions here *were* conscience-shocking. This Court should reverse.

## SUMMARY OF ARGUMENT

I. A social transition to a different gender identity during childhood or adolescence is a significant and psychologically impactful health-related decision. And social transition is not the best approach for all children experiencing gender incongruence. A child or adolescent who exhibits a desire to change name and pronouns should receive a careful professional assessment prior to transitioning. Given the significance of this decision, parents must be involved and must ultimately decide what is best for their child.

II. Parents have a well-established, fundamental right under the Fourteenth Amendment to make decisions for their minor children. A

school district violates that right when it usurps the parents' role in significant, health-related decisions, like how their child will be addressed at school.

III. The "shocks-the-conscience" test does not apply to claims of a violation of an established, fundamental right, including the parental right to make decisions for one's own children. Even if that test does apply in this context, a school district secretly making decisions reserved for parents, over their objection, *does* shock the conscience.

## ARGUMENT

### I. Whether a Minor Experiencing Gender Incongruence Should Transition Socially Is a Major and Potentially Life-Altering Mental-Health Treatment Decision That Requires Parental Involvement, for Many Reasons.

When children and adolescents express a desire to socially transition to a different gender identity (to change their name and pronouns to ones at odds with their natal sex), there is a major fork in the road, a decision to be made about whether a transition will be in the youth's best interests. Parents must be involved in this decision, for many reasons.

First, there is an ongoing debate in the mental health community about how quickly and under what conditions children and adolescents

who experience gender incongruence (a mismatch between their natal sex and perceived or desired gender identity) should transition socially. Childhood social transitions were "[r]elatively unheard-of 10 years ago," but have become far more frequent in recent years.[2] Before the recent trend, in some circles, to immediately "affirm," without question, every child's and adolescent's expression of a desire for an alternate gender identity, a robust body of research—multiple studies across different locations and times—had found that, for the vast majority of children (roughly 80-90%), gender incongruence does not persist.[3] As one researcher summarized, "*every* follow-up study of GD [gender diverse] children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition."[4]

---

[2] Rae, James R., et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681, at 669–70 (2019), https://doi.org/10.1177/0956797619830649.

[3] *See*, *e.g.*, The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC7") at 11 (Version 7, 2012), *available at* https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

[4] Cantor, James M., *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698481.

These studies were conducted before the recent trend to quickly transition, whereas some newer studies of youth who *have* socially transitioned show much higher rates of persistence. A study in 2013 found that "[c]hildhood social transitions were important predictors of persistence, especially among natal boys."[5] Another recent study of 317 transgender youth found that 94% continued to identify as transgender 5 years after transitioning.[6]

In light of the vastly different rates of persistence between youth who transition and those who do not, many experts in the field are concerned that a social transition may causally affect the likelihood that a child's or adolescent's experience of gender incongruence will persist. Dr. Kenneth Zucker, who for decades led "one of the most well-known clinics in the world for children and adolescents with gender dysphoria," has argued publicly that a social transition can "become[ ] self-

---

[5] Steensma, T. D., et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590, at 588 (2013), https://doi.org/10.1016/j.jaac.2013.03.016.

[6] Olson, Kristina R., et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022), https://doi.org/10.1542/peds.2021-056082.

reinforcing," because "messages from family, peers, and society do a huge amount of the work of helping form, reinforce, and solidify gender identities."[7] Dr. Zucker elsewhere has written that, in his view, "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence."[8]

The U.K.'s NHS is currently reconsidering its model of transgender care,[9] and the doctor in charge of the review, Dr. Hilary Cass, wrote in her interim report: "[I]t is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning. There are

---

[7] Singal, Jesse, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016), https://www.thecut.com/2016/02/fight-over-trans-kids-got-a-researcher-fired.html.

[8] Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2) International Journal of Transgenderism 231–245 (2018), available at https://www.researchgate.net/publication/325443416.

[9] *See Independent review into gender identity services for children and young people*, NHS England, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/gender-dysphoria/independent-review-into-gender-identity-services-for-children-and-young-people/.

- 7 -

different views on the benefits versus the harms of early social transition. Whatever position one takes, it is important to acknowledge that it is not a neutral act, and better information is needed about outcomes."[10] Based on her report, "Britain now appears to be changing tack," moving away from the "affirmative approach" and the "hurry to affirm gender identity," instead recognizing that "gender incongruence ... may be a transient phase" for young people.[11]

Dr. Stephen Levine, another well-known practitioner in the field,[12] in an expert report for a related case, writes that "therapy for young children that encourages transition cannot be considered to be neutral, but instead is an experimental procedure that has a high likelihood of

---

[10] Cass, H., *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://cass.independent-review.uk/publications/interim-report/.

[11] *Britain changes tack in its treatment of trans-identifying children*, The Economist (Nov. 17, 2022), https://www.economist.com/britain/2022/11/17/britain-changes-tack-in-its-treatment-of-trans-identifying-children.

[12] Dr. Levine was the court-appointed expert in the first major case to reach a federal court of appeals—this Court—about surgery for transgender prisoners. *Kosilek v. Spencer*, 774 F.3d 63, 77 (1st Cir. 2014).

changing the life path of the child, with highly unpredictable effects on mental and physical health, suicidality, and life expectancy."[13]

The authors of the 2013 study mentioned above expressed concern that "the hypothesized link between social transitioning and the cognitive representation of the self" may "influence the future rates of persistence," while noting that this "possible impact of the social transition itself on cognitive representation of gender identity or persistence" had "never been independently studied," Steensma (2013), *supra* n.5, at 588–89.

Another group of researchers recently wrote that "early childhood social transitions are a contentious issue within the clinical, scientific, and broader public communities. [citations omitted]. Despite the increasing occurrence of such transitions, we know little about who does and does not transition, the predictors of social transitions, and whether *transitions impact children's views of their own gender*." Rae (2019), *supra* n.2, at 669–70 (emphasis added).

---

[13] Expert Affidavit of Dr. Stephen B. Levine, Dkt. 31, *Doe v. Madison Metropolitan Sch. Dist.*, No. 20-CV-454 (Dane County Wis. Cir. Ct., filed Feb. 19, 2020), available at https://will-law.org/wp-content/uploads/2021/02/affidavit-stephen-levine-with-exhibit.pdf.

The Endocrine Society's guidelines similarly recognize that "[s]ocial transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence."[14]

The World Professional Association for Transgender Health (WPATH), which takes a decidedly pro-transitioning stance, has acknowledged that "[s]ocial transitions in early childhood" are "controversial," that "health professionals" have "divergent views," that "[f]amilies vary in the extent to which they *allow* their young children to make a social transition to another gender role," and that there is insufficient evidence "to predict the long-term outcomes of completing a gender role transition during early childhood." WPATH SOC7, *supra* n.3,

---

[14] Hembree, Wylie C., et al., *Endocrine Treatment of Gender-Dyshporic/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society, 102(11) J Clin. Endocrinol. Metab. 3869–3903, at 3879 (2017), https://doi.org/10.1210/jc.2017-01658.

at 17.[15] WPATH encourages health professionals to *defer to parents* "as they work through the options and implications," *even* "[i]f parents do not allow their young child to make a gender role transition." *Id.*

In short, when a child or adolescent expresses a desire to change name and pronouns to an alternate gender identity, mental health professionals do not universally agree that the best decision, for *every such* child or adolescent, is to immediately "affirm" their desire and begin treating that child or adolescent as the opposite sex. And whether transitioning will be helpful or harmful likely depends on the individual child or adolescent. As WPATH emphasizes, "an individualized approach to clinical care is considered both ethical and necessary." WPATH SOC8, *supra* n.15, at S45.

While the mental-health community continues to debate whether socially transitioning is generally beneficial or not, it is beyond dispute

---

[15] The latest version of WPATH's standards of care guidelines (version 8), which was released last fall, continues to acknowledge that "there is a dearth of empirical literature regarding best practices related to the social transition process." *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258, at S76 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

that there is currently little solid evidence about who is right, given how recent of a trend this is. *See supra* n.15

Even setting aside the debate about socially transitioning, there is near universal agreement that, when a child or adolescent exhibits signs of gender incongruence (and a request to change name/pronouns would certainly qualify), each should be considered separately and individually and can benefit from the assistance of a mental-health professional, for multiple reasons.

Every major professional association recommends a thorough professional evaluation to assess, among other things, the underlying causes of the child's or adolescent's feelings and consider whether a transition will be beneficial. The American Psychological Association, for example, recommends a "comprehensive evaluation" and consultation with the parents and youth to discuss, among other things, "the advantages and disadvantages of social transition during childhood and adolescence."[16] The Endocrine Society likewise recommends "a complete

---

[16] American Psychological Association, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70(9) APA 832–64, at 843 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.

psychodiagnostic assessment." *Supra* n.14, at 3877. WPATH, too, recommends a comprehensive "psychodiagnostic and psychiatric assessment," covering "areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement," "an evaluation of the strengths and weaknesses of family functioning," any "emotional or behavioral problems," and any "unresolved issues in a child's or youth's environment." WPATH SOC7, *supra* n.3, at 15.[17] WPATH also recommends that mental health professionals "discuss the potential benefits and risks of a social transition with families who are considering it." WPATH SOC8, *supra* n.15, at S69.

A professional assessment is especially important given the "sharp increase in the number of adolescents requesting gender care" recently, particularly among adolescent girls ("2.5-7.1 times" adolescent boys). WPATH SOC8, *supra* n.15, at S43. As WPATH acknowledges, an increasing number of "adolescents [are] seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender

---

[17] WPATH SOC8, *supra* n. 15, at S45, likewise states that "a comprehensive clinical approach is important and necessary," "[s]ince it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person."

diversity during their childhood years," indicating that "social factors also play a role," including "susceptibility to social influence." *Id*. at S44–S45.

There is also growing awareness of adolescents who come to "regret gender-affirming decisions made during adolescence" and later "detransition," which many find to be a "difficult[ ]" and "isolating experience." *Id*. at S47. In one recent survey of 237 detransitioners (over 90% of which were natal females), 70% said they realized their "gender dysphoria was related to other issues," and half reported that transitioning did not help.[18]

Another reason for professional involvement is to assess whether the child or adolescent needs mental-health support. Many transgender youth experience dysphoria—psychological distress—associated with the mismatch between their natal sex and perceived or desired gender identity. Indeed, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders' (DSM-V) official diagnosis for

---

[18] Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) Journal of Homosexuality 1602–1620, at 1606 (2022), https://doi.org/10.1080/00918369.2021.1919479.

"gender dysphoria" is *defined by* "clinically significant distress" associated with the mismatch. *See What Is Gender Dysphoria?*, American Psychiatric Association.[19]

Gender incongruence is also frequently associated with other mental-health issues. WPATH's SOC8 surveys studies showing that transgender youth have higher rates of depression, anxiety, self-harm, suicide attempts, eating disorders, autism spectrum disorders, and other emotional and behavioral problems than the general population. *Supra* n.15, at S62–63. All major professional organizations recommend screening for these coexisting issues and treating them, if needed. *Id.*; APA Guidelines, *supra* n.16, at 845; Endocrine Society Guidelines, *supra* n.14, at 3876.

Finally, professional support can be vital *during* any transition. A transition can "test [a young] person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports," and "[d]uring social transitioning, the person's feelings about the social transformation (including coping with the

---

[19] American Psychiatric Association, *What is Gender Dysphoria?* https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

responses of others) is a major focus of [ ] counseling." Endocrine Society Guidelines, *supra* n.14, at 3877.

It should go without saying, but parents cannot obtain a professional evaluation, screen for dysphoria and other coexisting issues, or provide professional mental-health support for their children, if their school hides from them what is happening at school.

To summarize, no professional association recommends that teachers and school officials, who have no expertise whatsoever in these issues, should facilitate a social transition while at school, treating minors as if they are really the opposite sex, in secret from their parents.

## II. Parental Decision-Making Authority Over Their Minor Children Includes the Right to be Involved in How School Staff Refer to Their Child While at School.

A long line of cases from the United States Supreme Court establishes that parents have a constitutional right "to direct the upbringing and education of children under their control." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925)). This is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *Troxel*, 530 U.S. at 65 (plurality op.), and is "established beyond debate

as an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Indeed, it is a "basic civil right[ ] of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), "far more precious … than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953),

This line of cases establishes four important principles with respect to parents' rights that are relevant to the case at hand.

*First,* parents are the primary decision-makers with respect to their minor children—not their school, or even the children themselves. *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected … broad parental authority over minor children."); *Troxel*, 530 U.S. at 66 (plurality op.) ("[W]e have recognized the fundamental right of parents to *make decisions* concerning the care, custody, and control of their children.") (emphasis added); *Yoder*, 406 U.S. at 232 (emphasizing the "primary role of the parents in the upbringing of their children"). Parental decision-making authority rests on two core presumptions: "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *Parham*, 442 U.S. at 602, and that "natural bonds of affection lead parents to act in the best interests of their children," far more than

anyone else. *Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.")

*Second*, parental rights reach their peak, and thus receive the greatest constitutional protection, on "matters of the greatest importance." *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (calling this "the heart of parental decision-making authority"); *Yoder*, 406 U.S. at 233–34. One such area traditionally reserved for parents is medical and health-related decisions, as the United States Supreme Court recognized long ago: "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 603.

*Third*, a child's disagreement with a parent's decision "does not diminish the parents' authority to decide what is best for the child." *Parham*, 442 U.S. at 603–04. *Parham* illustrates how far this principle goes. That case involved a Georgia statute that allowed parents to voluntarily commit their minor children to a mental hospital (subject to review by medical professionals). *Id*. at 591–92. A committed minor

argued that the statute violated his due process rights by failing to provide him with an adversarial hearing, instead giving his parents substantial authority over the commitment decision. *Id.* at 587. The Court rejected the minor's argument, confirming that parents "retain a substantial, if not the dominant, role in the [commitment] decision." *Id.* at 603–04. "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority." *Id.* at 604.

*Fourth*, the fact that "the decision of a parent is not agreeable to a child or … involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham,* 442 U.S. at 603. Likewise, the unfortunate reality that some parents "act[ ] against the interests of their children" does not justify "discard[ing] wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id.* at 602–03. The "notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children" is "statist" and "repugnant to American tradition." *Id.* at 603 (emphasis in original). Thus, as long as a parent is fit, "there will normally be no

reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69 (plurality op.).

In accordance with these principles, courts have recognized that a school violates parents' constitutional rights if it attempts to usurp their role in significant decisions. In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), for example, a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with other coaches, guidance counselors, and teammates, and eventually pressured her into taking a pregnancy test. *Id.* at 295–97, 306. The mother sued the coach for a violation of parental rights, explaining that, had she been notified, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id.* at 306. "[M]anagement of this teenage pregnancy was a family crisis," she argued, and the coach's "failure to notify her" "obstruct[ed] the parental right to choose the proper method of resolution." *Id.* at 306. The court found that the mother had "sufficiently alleged a constitutional violation" against the coach and condemned his

"arrogation of the parental role": "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id.* at 306–07.

Three Justices of the Wisconsin Supreme Court, in a case similar to this one, recently recognized that "allowing a school to reassign a child's gender" "without parental consent" violates parents' constitutional rights. *Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶¶ 77–95, 403 Wis. 2d 369, 976 N.W.2d 584 (Roggensack, J., dissenting). "[S]ocial transitioning is a healthcare choice for parents to make," and putting a school district "in charge of enabling healthcare choices without parental consent," especially on such a "fundamental decision," deprives parents of their constitutionally protected "decision-making [authority] for their children." *Id.* ¶¶ 89, 92, 94. Although this was a dissent, the four Justices in the majority remanded to the trial court for procedural reasons, without commenting on the merits. *Id.* ¶¶ 30–40.

A federal district court has granted a preliminary injunction against a similar policy, recognizing that parents' decision-making authority necessarily "includes the right … to have a say in what a minor

child is called and by what pronouns they are referred." *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). The Court added, "[i]t is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns."

The Leon County School District's actions alleged in this case violated Appellants' constitutional right to make the major decision about whether a social transition was in their child's best interest. When children or adolescents experience gender dysphoria, the decision whether they should socially transition is a significant and impactful healthcare-related decision that falls squarely within "the heart of parental decision-making authority," *C.N.*, 430 F.3d at 184; *Parham*, 442 U.S. at 603. As described in more detail above, there is an ongoing debate among mental health professionals over how to respond when a child experiences gender incongruence, and, in particular, whether and when

children should socially transition by being addressed as though they were the opposite sex.

The District took this life-altering decision out of the parents' hands and placed it with educators and a minor child, who lacks the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. By enabling Appellants' child to transition at school, in secret from them, without parental involvement, the District effectively made a treatment decision without the legal authority to do so and without informed consent from the parents. Given the significance of changing gender identity, especially at a young age, parents "can and must" make this decision. *Parham*, 442 U.S. at 603.

Teachers and staff do not have the training and experience necessary to properly diagnose children with gender dysphoria or to opine and advise on the treatment options. They cannot provide professional assistance for children dealing with these issues, and they undermined the professional assistance the Appellants were providing by facilitating a transition at school.

A child's fear that his or her parents might not support a transition is not sufficient to override their decision-making authority. Parents' role

is sometimes to say "no" to protect their children from decisions against their long-term interests.

The recent experience of some parents in Wisconsin illustrates the point.[20] During COVID, their 12-year-old daughter began to have a serious mental health crisis, and, for a time, believed she was transgender and expressed a desire to adopt a male name and pronouns while at school.[21] Everyone around her rushed to "affirm" her new identity, but her parents decided that an immediate transition was not in her best interest, at least not until she met with a professional to understand what she was feeling and to "educat[e] herself about what gender transitioning really entails." *Supra* n.21. The mother told her daughter, "I'm not telling you that you can't be transgender. … I'm telling you that you can't change your name and your gender *right now*. You

---

[20] Undersigned counsel represents these parents; their story is described in the complaint, and in the article cited in footnote 21 below. *T.F., et al. v. Kettle Moraine School District*, No. 21-CV-1650 (Waukesha Cnty. Wis., Cir. Ct., filed Nov. 17, 2021), *complaint available at* https://will-law.org/wp-content/uploads/2021/11/Kettle-Moraine-Complaint-Redacted.pdf.

[21] Mills, Ryan, *A Mom's Fight to Save Her Daughter from Trans Orthodoxy at School*, National Review (Apr. 5, 2022), https://www.nationalreview.com/news/a-moms-fight-to-save-her-daughter-from-trans-orthodoxy-at-school/.

have a lot of underlying issues that need to be addressed before you make the decision that you were born in the wrong body. I understand that all these people around you are appeasing you and giving you want you want, and I'm not doing that, and that makes you angry. But I am your best friend. I am looking out for your best interest." *Id*. They communicated their decision to the school, but the school responded that they would call their daughter whatever she wanted at school, regardless of the parents' decision, forcing them to immediately withdraw her from the District. *Id*. Just a few weeks later, after being removed from those "affirming" that she was really a boy, their daughter realized that her parents were right, and told her mother that "affirmative care really messed me up." *Id*. This story powerfully illustrates that immediately transitioning is not *always* the best option for *every* child, that parents know and love their children better than anyone else, and that school districts must defer to parents about what is best for their children.

### III. "Shock the Conscience" Is Not an Overarching Requirement for All Due Process Claims, But Rather an Alternative Test to a Fundamental Rights Analysis.

The District Court erroneously dismissed this case on the grounds that any due process claim must meet a "shocks the conscience" test, and that the conduct alleged does not. It was wrong on both points.

The "shocks the conscience" language found in some substantive due process cases is not an overarching requirement for any claim under the Fourteenth Amendment, but rather an alternative test when the conduct is alleged to be so arbitrary or unreasonable as to violate due process. The United States Supreme Court has said this explicitly: "'Substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' *or* interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987). Parental rights cases, like this one, fall into the latter category—they implicate a fundamental right, long recognized by the Supreme Court. *Supra* Part II. And the Supreme Court has never applied a "shocks the conscience" requirement to a parental rights case.

While some lower courts have interpreted *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), as imposing a "shock the conscience"

requirement for any substantive due process claim involving executive action,[22] this is a misreading of *Lewis*. Indeed, *Lewis* favorably quoted *Salerno* for its alternative framing, that the Fourteenth Amendment is violated *either* by "conduct that 'shocks the conscience,' ... *or* interferes with rights 'implicit in the concept of ordered liberty.'" 523 U.S. at 847. *Lewis* only had in mind "cases dealing with abusive executive action" where the claim is that government conduct is so arbitrary or egregious as to be "arbitrary in the constitutional sense." *Id*. at 846. The shocks-the-conscience test was first articulated, and is most often applied, in police brutality cases, where it is hard to define the boundaries of any fundamental right due to the variety of ways government actors can behave arbitrarily or oppressively. *Rochin v. California*, 342 U.S. 165, 169 (1952). And, as the Seventh Circuit has recognized, "the Court [in *Lewis*] made clear that its shocks-the-conscience analysis was not generally applicable to all substantive-due-process claims." *Khan v. Gallitano*, 180 F.3d 829, 836 (7th Cir. 1999) (listing examples, and concluding that a "fundamental rights analysis," rather than a "shocks-

---

[22] Most notably, the First Circuit. *See, e.g.*, *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005). *But see the discussion of McConkie, infra.*

the-conscience" test, would apply to a tortious-interference-with-contract claim involving executive action).

Moreover, the Supreme Court *itself* has not understood *Lewis* as broadly as the District Court, even in subsequent cases involving executive action. In *Chavez v. Martinez*, 538 U.S. 760 (2003), for example, a challenge to a "coercive interrogation"—classic executive action—the plurality opinion (joined by Justices Thomas, O'Connor, and Scalia), treated the "shocks-the-conscience" test as an alternative theory of liability to a violation of a fundamental right. They first analyzed whether the conduct was "egregious" or "conscience shocking," *id*. at 774–75, and then *separately* analyzed whether it violated a fundamental right, *id*. at 775 (emphasizing that "the Due Process Clause *also* protects certain 'fundamental liberty interest[s]' from deprivation"). Justice Stevens, in his dissent, agreed that these are alternative theories of liability, stating so explicitly: "The Due Process Clause of the Fourteenth Amendment protects individuals against state action that *either* 'shocks the conscience,' *or* interferes with rights 'implicit in the concept of ordered liberty.'" *Id*. at 787. Notably, no Justice in *Chavez* disagreed with this framing—not even Justice Souter, who authored *Lewis*.

Multiple cases have rejected a "shocks the conscience" test when the alleged violation is of a fundamental right—and some even in the context of parents' rights claims involving executive action. *E.g.*, *Seegmiller v. LaVerkin City*, 528 F.3d 762, 768–69 (10th Cir. 2008) (rejecting defendants' argument for an executive/legislative distinction, explaining that "the 'shocks the conscience' and 'fundamental liberty' tests are but two separate approaches to analyzing governmental action under the Fourteenth Amendment," and giving, as an example, a parental rights claim, where the court reversed on that basis (discussing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir.2003)); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 441 n.23 (9th Cir. 2010) ("Defendants argue that the correct standard is whether defendants' conduct 'shocked the conscience.' There is no support in the relevant case law for this assertion. The standard for deprivation of familial companionship is 'unwarranted interference,' not conduct which 'shocks the conscience.'"); *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013) ("There are two types of deprivations that support substantive due process claims: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.' [ ] This claim deals with the first type

of deprivation—deprivation of a constitutional guarantee, particularly the right to the maintenance of a parent-child relationship.") (citations omitted).

Multiple other lower court decisions have found a violation of parents' constitutional rights without applying any "shocks-the-conscience" test, even in cases post-*Lewis* involving executive action. *E.g.*, *Doe v. Heck*, 327 F.3d 492, 517–26 (7th Cir. 2003); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1017–19 (7th Cir. 2000); *Gruenke*, 225 F.3d at 303–07.

As Appellants explain, this Circuit has also treated the "shocks the conscience" test as an alternative to a violation of a fundamental right. *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) ("Where a *fundamental liberty interest does not exist*, substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power."); *see also Lambert v. Bd. of Trustees*, 793 F. App'x 938, 943 (11th Cir. 2019) ("In the *absence of a fundamental right*, executive action constitutes an actionable violation of substantive due process only if it shocks the conscience.");.

Even the First Circuit, which admittedly does apply a shocks-the-conscience test to all claims against executive action, has attempted to fuse the two tests by explaining that a "significant interference with a protected relationship, such as the parent-child relationship," is the kind of thing that *does* shock the conscience. *McConkie v. Nichols*, 446 F.3d 258, 261 (1st Cir. 2006) (citing *Grendell v. Gillway*, 974 F.Supp. 46, 51 (D.Me.1997)).

Even if a shocks-the-conscience test does apply in this context, school officials disregarding the parents' decision about what is best for their child and usurping their decision-making role is exactly the kind of thing that *does* shock the conscience. As the Supreme Court has emphasized, the idea that government actors can override parents solely because they believe they know better is "statist" and "repugnant to American tradition," *Parham*, 442 U.S. at 603—i.e., conscience-shocking.

## CONCLUSION

This Court should reverse the judgment of the District Court.

- 31 -

Dated: May 30, 2023

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

/s/ Luke N. Berg

LUKE N. BERG
*Counsel of Record*
Richard M. Esenberg
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
rick@will-law.org
(414) 727-7367
*Attorneys for Amicus Curiae*
*Dr. Erica E. Anderson, PhD*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 5,877 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: May 30, 2023

/s/ Luke N. Berg
LUKE N. BERG

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, I filed the foregoing Amicus

Brief with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to all registered CM/ECF users.

Dated: May 30, 2023

/s/ Luke N. Berg

Luke N. Berg