No. 23-10385

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

*Plaintiffs-Appellants*,

*v.*

SCHOOL BOARD OF LEON COUNTY, FLORIDA, et al.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida
Case No. 4:21-CV-00415-MW-MJF

---

**BRIEF OF AMICUS CURIAE**
**ALABAMA CENTER FOR LAW AND LIBERTY**
**IN SUPPORT OF PLAINTIFFS-APPELLANTS SEEKING REVERSAL**

---

Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
P.O. Box 680979
Prattville, AL 36068
Tel.: (256) 510-1828
matt@alabamalawandliberty.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for *Amicus Curiae* Alabama Center for Law and Liberty represents that this organizations does not issue stock but has one parent company, the Alabama Policy Institute.

For the sake of ease, Counsel for *Amicus Curiae* will first list persons or entities that he knows has an interest in this appeal that have not yet been listed in the parties CIP's. Those people are:

1. Alabama Center for Law and Liberty LLC – *Amicus Curiae*

2. Alabama Policy Institute – Parent company of *Amicus Curiae*

3. Clark, Matthew James – Counsel for *Amicus Curiae*

Counsel further certifies that, to the best of his knowledge, the following persons and entities, which have already been listed in Plaintiffs'-Appellants' opening brief, have an interest in this appeal:

1. Broyles, Vernadette - Counsel for Appellants

2. Child & Parental Rights Campaign, Inc. - Counsel for Appellants

3. Hanna, Rocky – Defendant-Appellee

4. Harmon, Terry J. – Counsel for Appellees

5. Jones, Darryl - School Board Member

6. Lawson Cox, Laurie - School Board Member

7.  Littlejohn, January – Appellant

8.  Littlejohn, Jeffrey – Appellant

9.  McAlister, Mary E. – Counsel for Appellants

10. Nicolas, Marcus - School Board Member

11. Oliveri, Robin – Appellee

12.  Rodgers, Kathleen – Appellee

13. School Board of Leon County - Appellee

14. Slanker, Jeffrey D. – Counsel for Appellees

15. Sniffen & Spellman, P.A. – Counsel for Appellees

16. Spellman, Michael P. – Counsel for Appellees

17. Swafford Smith, Alva - School Board Member

18. Thomas, Rachel - Appellee

19. Trakas, Ernest G. - Counsel for Appellants

20. Walker, Hon. Mark E. - Chief United States District Judge

21. Wood, Rosanne - School Board Member

Respectfully submitted,

/s/ Matthew J. Clark
Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
P.O. Box 680979
Prattville, AL 36068
(256) 510-1828
matt@alabamalawandliberty.org
*Counsel for Amicus Curiae*

C-2 of 2

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..............................................................................C-1

TABLE OF AUTHORITIES .................................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE ..........................................1

SUMMARY OF THE ARGUMENT .....................................................................1

ARGUMENT.....................................................................................................3

I.      The Supreme Court's Decisions Concerning Parental Rights........................3

II.     The Historical Origins of Parental Rights ....................................................7

        A.      Blackstone and the Common Law........................................................7

        B.      Chancellor Kent and Early American Law .......................................10

        C.      Parental Rights in 1868 ....................................................................11

        D.      Conclusion........................................................................................12

III.    This Court Recognizes the Parents' Rights for Accommodations ..............14

IV.     Vindicating Parental Rights Is Not an Exercise in Judicial Activism ..........14

CONCLUSION ..................................................................................................15

CERTIFICATE OF COMPLIANCE.....................................................................16

CERTIFICATE OF SERVICE..............................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                                  **Pages**

*Arnold v. Bd. of Educ.*, 880 F. 2d 305 (11th Cir. 1989) ..........................................14

*Bridges v. California*, 314 U.S. 252 (1941)....................................................11

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................11

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)................................................5

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................................. 3-7, 12-15

*N.Y. St. Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ...............................7

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)...............................................5

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020)..................6

*Schick v. United States*, 195 U.S. 65 (1904) .....................................................8, 10

*Troxel v. Granville*, 530 U.S. 57 (2000) ...........................................................6, 15

*Washington v. Glucksberg*, 521 U.S. 702 (1997)..............................................6, 15

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...............................................6

**Constitutions and Statutes**

U.S. Const., amend. XIV ...............................................................*passim*

**Other Authorities**

James Kent, *Commentaries on American Law* (1827) ...................................... 10-12

Leila Sadat Wexler, *Official English, Nationalism and Linguistic Terror: A French Lesson*, 71 Wash. L. Rev. 285 (1996)...................................................3

Matthew J. Clark, *Let the Parents Decide: Alabama Parents' Right to Decide Whether to Mask Their Children or Not in the Age of COVID* (2023)...............3

Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (6th ed. 1890) ...................................................................................................... 11-12

William Blackstone, *Commentaries*................................................................. 7-15

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Alabama Center for Law and Liberty is a nonprofit law organization based in Birmingham, Alabama, that advocates for limited government, free markets, and strong families. ACLL has an interest in this case because whatever precedent it sets here will affect the parents and children of Alabama in future cases. Moreover, since the U.S. Supreme Court has held that the Fourteenth Amendment protects the right of parents to direct the upbringing of their children, ACLL believes that interpreting that right as it was understood historically is key to preserving limited government instead of engaging in the abuses of substantive due process that the U.S. Supreme Court has cautioned against. ACLL believes that the Court will find this brief helpful because it examines the historical understanding of parental rights as it existed at the founding of this Country and at the time of the Fourteenth Amendment's ratification.

## SUMMARY OF THE ARGUMENT

In 1923, the United States Supreme Court held that the Fourteenth Amendment protects parental rights as they were recognized at common law. The

---

[1] Plaintiff-Appellants have consented to the filing of this brief. ACLL has not received a response from Defendants-Appellees as to whether they consent or not. Rule 29, Fed. R. App. P. Counsel for a party did not author this brief in whole or in part, and no such counsel or party made any monetary contribution to fund the preparation or submission of this brief. No person or entity other than *Amicus Curiae* and their counsel made a monetary contribution to fund the preparation or submission of this brief.

Court continued to apply that precedent through the beginning of the 21st Century, and it remains binding precedent today. The key to understanding the scope of those parental rights, according to *Meyer*, is understanding what the common law recognized as parental rights.

According to Sir William Blackstone, there were three broad categories of parental rights: (1) care, (2) protection, and (3) education. Blackstone wrote that if parents sent children to school, then parents delegated some of their authority to restrain and correct the children to the school. But the common law never presumed that parents delegated the other rights to schools. Thus, if a school's idea of how to care for and protect a student conflicted with the parents' ideas of how to do that, then the parents won. There is no evidence that there were any material changes in the 19th Century in America leading up to the Fourteenth Amendment's ratification that would change that framework.

In this case, the question is whether guiding children through gender-identity crises is a matter of care and protection for the parents or restraint and correction for the schools. Because this is plainly a matter of childcare, it fits within the rights that parents retain under the Fourteenth Amendment. Thus, in this case, the parents should prevail instead of the schools. This Court already recognized that parents are entitled to reasonable accommodations under the Fourteenth Amendment, but the trial court failed to grasp that key precedent. Vindicating parental rights in this

2

case would not be judicial activism, as the trial court seemed to presume, but would instead be following binding precedent in a historically sound way.

## ARGUMENT[2]

### I.    The Supreme Court's Decisions Concerning Parental Rights

Beginning with *Meyer v. Nebraska*, 262 U.S. 390 (1923), the United States Supreme Court held that the Fourteenth Amendment's Due Process Clause protected the fundamental rights of parents to control the education of their children. In *Meyer*, a teacher was convicted of breaking a Nebraska criminal law that prohibited teaching a foreign language to students before they entered high school. *Id.* at 396-97. Nebraska attempted to justify this law under the claim that "an emergency exist[ed]." *Id.* at 397. The nature of the so-called emergency is unknown. However, since the teacher was convicted of teaching German, and because the law was passed during World War I, Nebraska apparently believed that teaching the languages of our enemies could be a gateway to children gaining sympathy for the countries that the United States had spilled so much blood to defeat.[3] The Court appeared to believe so, noting that the purpose of the statute

---

[2] Much of the argument in this brief is taken from the author's new law review article examining this subject. *See* Matthew J. Clark, *Let the Parents Decide: Alabama Parents' Right to Decide Whether to Mask Their Children or Not in the Age of COVID*, 4 Faulkner U. L. Rev. 33, 34-42, 44-47 (2023).

[3] ACLL is choosing to interpret Nebraska's actions charitably. For a dissenting view attributing the law to "anti-German hysteria," *see* Leila Sadat Wexler,

was to "foster a homogenous people with American ideals . . . ." *Meyer*, 262 U.S. at 402. Even though the legislature found that an emergency necessitated this law during the bloodiest war the world had seen in modern times, the Supreme Court still took the case to determine "whether the statute as construed and applied unreasonably infringe[d] the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment: 'No State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Id.* at 399 (quoting U.S. Const. amend. XIV, § 1).

While the Court did not attempt to "define with exactness the liberty thus guaranteed," it held that the Fourteenth Amendment guaranteed the right "*generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men*." *Id.* (emphasis added). Finding that "[m]ere knowledge of the German language cannot reasonably be regarded as harmful," the Court held the teacher's "right thus to teach and the right of parents to engage him so to instruct their children . . . are within the liberty of the Amendment." *Id.* at 400.

---

*Official English, Nationalism and Linguistic Terror: A French Lesson*, 71 Wash. L. Rev. 285, 340 (1996).

Two years later, the Court heard a similar case in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). In *Pierce*, the State of Oregon passed a compulsory education law requiring parents to send their children to public schools with very limited exceptions. *Pierce*, 268 U.S. at 530-31. The law was challenged by a Catholic society wishing to raise children in parochial schools and by a private military academy. *Id.* at 531-33. Considering whether this law violated the Fourteenth Amendment, the Court reasoned:

> Under the doctrine of *Meyer v. Nebraska* . . . we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control . . . . The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public school teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Id.* at 534-35. Thus, *Meyer* and *Pierce* stand for the proposition that parents have fundamental rights to control the upbringing of their children because the child is not "the mere creature of the State." *Id.* at 535; *see also Meyer*, 262 U.S. at 400.

At this point, it is appropriate to note that the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), was already on the books when *Pierce* and *Meyer* were decided. The courts have often interpreted *Jacobson* as standing for the proposition that the judiciary should defer to the political branches during a state of emergency. *See, e.g.*, *S. Bay United Pentecostal Church v.*

*Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring). However, the Court itself did not give any deference to the Nebraska legislature in *Meyer* despite finding that an emergency existed. *Meyer*, 262 U.S. at 397, 403. Thus, the Court considered parental rights to be so strong that it did not even grant deference during wartime to the states. The Court's zeal for parental rights even during a crisis should be instructive here as well.

The Court continued to recognize parental rights into the 2000's. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (holding that the Fourteenth Amendment protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *id.* at 77 (Souter, J., concurring in judgment) ("[A] parent's interest in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment."); *id.* at 80 n* (Thomas, J., concurring in judgment) (reasoning that the Privileges and Immunities Clause may protect parental rights and that parental-right infringements should get strict scrutiny review); *see also Wisconsin v. Yoder*, 406 U.S. 205 (1972). The Court refined its substantive due process jurisprudence in *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) as protecting only those rights that are deeply rooted in our Nation's history and tradition. *Troxel* did not call *Meyer* or its progeny into

6

question, perhaps because parental rights are so obviously rooted in our Nation's history and tradition.

Thus, the Court's parental-rights jurisprudence continues to be binding precedent today. That precedent, in turn, is based on the common-law rights of parents over their children. *Meyer*, 262 U.S. at 399. Therefore, to understand the scope of parental rights protected by the Fourteenth Amendment, it is necessary to examine what the common law held about parental rights and to examine whether any material changes occurred between the common law and the Fourteenth Amendment's ratification in 1868. *See N.Y. St. Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2136 (2022).

## II.    The Historical Origins of Parental Rights

### A.    Blackstone and the Common Law

The Supreme Court has long held that the best source for understanding the common law at the time the Constitution was adopted is Sir William Blackstone's *Commentaries on the Laws of England*.

> Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution, it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England, so that undoubtedly the framers of the Constitution were familiar with it.

7

*Schick v. United States*, 195 U.S. 65, 69 (1904). Thus, as a general rule, when evaluating the state of the common law at the time of the original Constitution's ratification, Blackstone's Commentaries should be viewed as the gold standard.

### 1.    Care

Blackstone wrote that the duties of parents to children "principally consist in three particulars; their maintenance, their protection, and their education." 1 William Blackstone, *Commentaries* *446. As for the care, or maintenance, of children, Blackstone said,

> The duty of parents to provide for the maintenance of their children is a principle of natural law; an obligation, says Puffendorf, laid on them not only by nature herself, but by their own proper act, in bringing them into the world: for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have the perfect right of receiving maintenance from their parents . . . .

> The municipal laws of all well-regulated states have taken care to enforce this duty: though Providence has done it more effectually than any laws, by implanting in the breast of every parent that natural στοργη, or insuperable degree of affection, which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish.

*Id.* at 447. Note here that the common law both charged the care of children to their parents and presumed that they were more competent, by means of natural affection, to care for their children than the government was.

### 2.    Protection

Regarding the duty of protecting children, Blackstone wrote less, but it was still compelling:

> From the duty of maintenance we may easily pass to that of protection, which is also a natural duty, but rather permitted than enjoined by any municipal laws: nature, in this respect, working so strongly as to need rather a check than a spur. A parent may by our laws maintain and uphold his children in their lawsuits, without being guilty of the legal crime of maintaining quarrels. A parent may also justify an assault and battery in defence of the persons of his children: nay, where a man's son was beaten by another boy, and the father went near a mile to find him, and there revenged the son's quarrel by beating the other boy, of which beating he afterwards unfortunately died, it was not held to be murder, but manslaughter merely. Such indulgence does the law show to the frailty of human nature, and the workings of parental affection.

*Id.* at *450. In summary, the common law presumed that the parental instinct to protect their children was so strong that the law rarely needed to compel parents to protect their children. If anything, the law needed to stop parents from going too far in protecting their children. Blackstone would have laughed at the proposition that schools would take the protection of their children more seriously than the children's parents.

### 3.    Education

Regarding the authority of schools over children, Blackstone wrote that a

parent

> may also delegate *part* of his parental authority, during his life, to
> the tutor or schoolmaster of his child; who is then *in loco parentis*,
> and has such a portion of the power of the parent committed to his
> charge, viz. *that of restraint and correction*, as may be necessary to
> answer the purposes for which he is employed.

*Id.* at *453 (emphasis added). Thus, if parents enrolled their children in schools,

they delegated some of their authority to the school—that is, only the powers of

"restraint and correction"—in order to accomplish the purpose for which the

school was established.

Because the Constitution is supposed to be interpreted against the backdrop

of the common law,[4] the parental right recognized by the Supreme Court under the

Fourteenth Amendment includes the right of parents to care for and protect their

children. As Blackstone explained, while parents delegate some authority to

schools, it is a limited delegation for the purpose of "restraint and correction." 1

William Blackstone, *Commentaries* *453. It is not a wholesale delegation of

parental authority to make childcare decisions that the parents should make.

### B.    Chancellor Kent and Early American Law

Chancellor James Kent followed in Blackstone's footsteps by summarizing

---

[4] *See Schick*, 195 U.S. at 69.

the state of the common law, except that he summarized how it stood in America. *See Bridges v. Cal.*, 314 U.S. 252, 285-86 (1941) (holding that the works of Chancellor Kent and Justice Joseph Story had a similar effect on shaping American law as Blackstone's *Commentaries*). Chancellor Kent observed: "The duties that reciprocally result from this connexion [between parent and child], are prescribed, as well by those feelings of parental love and filial reverence which Providence has implanted in the human breast, as by the positive precepts of religion, and of our municipal law."2 James Kent, *Commentaries on American Law* 159 (1827). "The duties of parents to their children . . . consist in maintaining and educating them during the season of infancy and youth, and in making reasonable provision for their future usefulness and happiness in life, by a situation suited to their habits, and a competent provision for the exigencies of that situation." *Id.*

It does not appear that American law deviated from English law in any material way. *See id.* at 160-73. Thus, it appears that both the letter and spirit of the common law as articulated by Blackstone were in effect in the American states in the early 19th Century.

### C.    Parental Rights in 1868

Perhaps the best source discussing the state of American municipal law in 1868 was Thomas Cooley's *Constitutional Limitations*. *See District of Columbia v. Heller*, 554 U.S. 570, 616-17 (2008) (noting the significance of Cooley's

11

*Constitutional Limitations*). Cooley wrote little about parental rights, saying: "The father of an infant, being obliged by law to support his child, has a corresponding right to control his actions, and to employ his services during the continuance of legal infancy." Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 414 (6th ed. 1890) (1868). Nothing in this restatement of American law deviates from what the common law or Chancellor Kent taught. In light of what Cooley taught about Christianity's effect on the laws of domestic relations, which fit well with what Blackstone and Kent said about the rights and duties of parents arising from God-given obligations, there is no reason to think that either the scope or spirit of the law had changed.

### D.    Conclusion

Thus, given the common-law background that *Meyer* invoked, the parental rights protected by the Fourteenth Amendment include at least three broad categories of rights: care, protection, and education. In this case, Plaintiffs-Appellants believe strongly that encouraging their children to change genders is not in their best interests and will harm the children. Opponents of this view assuredly feel strongly about it too, believing that the parents' refusal to affirm their children's "gender identity" will be harmful to them. But when the parents

and the schools cannot agree, *Meyer* and its progeny make it clear who wins: the parents.

Assisting a child in mental or emotional turmoil is clearly a matter of childcare. Furthermore, if encouraging a child to embrace a gender identity other than the one assigned by his or her biological sex is harmful to children (as ACLL believes that it is), then it is well within a parent's rights to oppose a school's efforts to secretly encourage the children to change genders against their parents' wishes.

The only possible leg that the schools could invoke to try to stand on would be the doctrine of *in loco parentis*, arguing that the parents delegated their right to educate to the schools. But such an argument mises the nuance in that important common-law doctrine. As Blackstone said, parents delegate part of their authority to restrain and correct children to the school when they send them to school. 1 William Blackstone, *Commentaries* *453. While schools therefore have the authority to impose reasonable discipline on the children if they are being unruly, parents have never delegated the power of maintenance (or care) to the schools.

The parents retain the right to decide how to direct their children through the fog of gender confusion. Willfully misleading the children against their parents' wishes violates the Fourteenth Amendment right that *Meyer* protects.

13

### III.    This Court Recognizes the Parents' Rights for Accommodations

Applying *Meyer* and its progeny, this Court has already recognized that "a reasonable accommodation must be found by balancing the traditional rights of parents in the rearing of their children and the interest of the state in controlling public schools." *Arnold v. Bd. of Educ.*, 880 F. 2d 305, 314 (11th Cir. 1989). Plaintiffs-Appellants have already demonstrated how the trial court erred by disregarding *Arnold*, so ACLL will not rehash those arguments here. However, in this case, there is no need for the schools to go against the parents' wishes on gender identity. Calling people by certain pronouns is not necessary to the administration of schools. Furthermore, *Arnold*'s balancing should be understood in light of the three types of parental rights articulated by Blackstone. If the matter goes more to the maintenance or protection of children, then the balancing scales should tip in favor of what the parents wish. That is the case here. This is not a dispute about curriculum; it's about who gets to instruct the children about a core aspect of who they are. That right clearly belongs to the parents.

### IV.    Vindicating Parental Rights Is Not an Exercise in Judicial Activism

The trial court appeared skeptical about the parental-rights arguments, seeming to base its skepticism on the problematic jurisprudence of substantive due process. ACLL agrees with the concerns that Justice Thomas has raised about substantive due process being an excuse for courts to read their own preferences

14

into the Constitution. However, as the Supreme Court has held, *Glucksberg*'s history and traditions test is an important limiting factor on ensuring the Courts do not manufacture rights out of whole cloth. But as the writings of Blackstone, Kent, and Cooley demonstrate, this is a right that is deeply rooted in our Nation's history and traditions. Thus, by following the Supreme Court's precedents in *Meyer* and its progeny, this Court need not worry about whether it is engaging in judicial activism. It is simply applying Supreme Court precedent that has stood for 100 years that protects a common-law right that is much older than that. *See also Troxel*, 530 U.S. at 80 (Thomas, J., concurring in judgment) (postulating that the Privileges or Immunities Clause could protect parental rights).

## CONCLUSION

Because the historical analysis of parental rights reveals that the rights of care and protection belong to parents and not the schools, this Court should reverse the judgment of the trial court and remand the cause for further proceedings.

Respectfully submitted,

/s/ Matthew J. Clark
Matthew J. Clark
ALABAMA CENTER FOR LAW AND LIBERTY
P.O. Box 680979
Prattville, AL 36068
(256) 510-1828
matt@alabamalawandliberty.org
*Counsel for Amicus Curiae*

May 30, 2023

15

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4, this brief contains 3,600 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ Matthew J. Clark
Matthew J. Clark
*Counsel for Amicus Curiae*

16

## CERTIFICATE OF SERVICE

I certify that on May 30, 2023, I electronically filed this document using the

Court's CM/ECF system, which will serve all counsel of record.


/s/ Matthew J. Clark
Matthew J. Clark
Counsel for *Amicus Curiae*

17