NO. 23-10385-HH

# In the United States Court of Appeals for the Eleventh Circuit

JANUARY LITTLEJOHN AND JEFFREY LITTLEJOHN,
*Plaintiffs-Appellants*,

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA, ROCKY HANNA, DR. KATHLEEN RODGERS, RACHEL THOMAS, AND ROBIN OLIVERI,
*Defendants-Appellees*.

On Appeal from the U.S. District Court
Northern District of Florida, Tallahassee Division
Case No. 4:21-CV-00415-MW/MJF

**BRIEF OF *AMICUS CURIAE* ABIGAIL MARTINEZ IN SUPPORT OF APPELLANTS AND REVERSAL**

Jeffrey C. Mateer
Keisha T. Russell
Holly M. Randall
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
(972) 941-4444

May 30, 2023

Kayla A. Toney
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
(202) 921-4105
ktoney@firstliberty.org

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3, Appellant certifies that the following persons have an interest in the outcome of this appeal:

Martinez, Abigail – Amicus Curiae

Mateer, Jeffrey M. – Counsel for Amicus Abigail Martinez

Randall, Holly M. – Counsel for Amicus Abigail Martinez

Russell, Keisha T. – Counsel for Amicus Abigail Martinez

Toney, Kayla A. – Counsel for Amicus Abigail Martinez

First Liberty Institute is a nonprofit corporation. It does not issue stock and are neither owned by nor are the owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public.

Respectfully submitted,

*s/ Kayla A. Toney*
Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
(202) 921-4105
ktoney@firstliberty.org

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
DISCLOSURE STATEMENT ................................................................. ii

TABLE OF CITATIONS ........................................................................iv

INTEREST OF *AMICUS CURIAE*...........................................................1

STATEMENT OF THE ISSUES..............................................................6

SUMMARY OF ARGUMENT ................................................................6

ARGUMENT ......................................................................................8

I.    Public school gender-transition policies that exclude parents are
      devastating to families, as amicus Abigail Martinez' story illustrates...........8

II.   The Free Exercise Clause protects parents' freedom to direct their
      children's education and their ability to impart their sincere religious
      beliefs without government interference .......................................12

III.  Leon County's Policy substantially burdens the sincerely held religious
      beliefs of families from many different faith groups, including Jewish,
      Hindu, Muslim, and Christian families .......................................19

CONCLUSION....................................................................................28

CERTIFICATE OF COMPLIANCE......................................................30

CERTIFICATE OF SERVICE .............................................................31

# TABLE OF CITATIONS

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
611 F.3d 248 (5th Cir. 2010) ..................................................................25

*\*Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*,
880 F.2d 305 (11th Cir. 1989) ...............................................................15

*Ben-Levi v. Brown*,
136 S. Ct. 930 (2016) ............................................................................25

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) ..............................................................................14

*C.N. v. Ridgewood Bd. of Educ.*,
430 F.3d 159 (3d Cir. 2005) ..................................................................17

*Doe 1 v. Madison Metropolitan Sch. Dist.*,
976 N.W.2d (Wis. 2022) .........................................................................7

*Elrod v. Burns*, 427 U.S. 347 (1976)…………………………………………10, 11

*Espinoza v. Montana Dep't of Revenue*,
140 S. Ct. 2246 (2020) ..........................................................................13

*Figliola v. Harrisonburg City Public School Board*,
No. CL22-1304 (Va. Cir. Ct. filed June 1, 2022)....................................7

*Gonzales v. Mathis Indep. Sch. Dist.*,
No. 2:18-cv-43, 2018 WL 6804595 (S.D. Tex. Dec. 27, 2018)...........25

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ...........................................................15, 19

*Holt v. Hobbs*,
574 U.S. 352 (2015) .........................................................................25, 26

*John and Jane Parents 1 v. Montgomery County Sch. Bd. of Educ.*,
622 F. Supp.3d 118 (D. Md. Aug. 18, 2022) ...…………………………………7

*McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994)…………………....……11, 12

*Morse v. Frederick*,
    551 U.S. 393 (2007) .......................................................................................27

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ................................................................. 13, 24

*Parents Defending Education v. Linn-Marr Community Sch. Dist.*,
    No. 22-cv-78 CJW-MAR, 2022 WL 4356109 (N.D. Iowa Sept. 20, 2022) . 7, 8, 9

*Parents Protecting Our Children v. Eau Claire Sch. Dist.*,
    No. 22-cv-508-slc, 2023 WL 2139501 (W.D. Wis. Feb. 21, 2023) ………….7, 8

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925)……………………………………………....…11, 12

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984)……………………………………………....……27, 28

*\*Tatel v. Mt. Lebanon School District*,
    No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)....... 16, 17, 18, 27

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981) ...................................................................... 21, 26

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) …………………….…….9

*Waldman v. Comm'r*, 871 F.3d 1283 (11th Cir. 2017)………………....……11, 12

*West Virginia Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)…………………………………………………………14

 *\*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)……………………………………,,,,………………*passim*

**Other Authorities**

Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and Possibilities*, 44 J. CATH. LEGAL STUDIES 143 (2005) .........................................24

Marwan Ibrahim Al-Kaysi, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB (1986) ......................................................................24

Baptist Faith and Message (2000).................................................................20

Dr. Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (February 2022)…………………………...…10

Catholic Catechism, No. 2333 .................................................................20

Catholic Catechism, No. 2361 .................................................................21

*Chastity, Chaste*, The Church of Jesus Christ of Latter-Day Saints.......................21

*Deuteronomy* 6:7.................................................................................22

*Dharma Sastra*, Vol. 6 Manu Sanskrit ....................................................... 22, 23

Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May-Jun. 2013).................................................................21

*The Evidence to Support Medicalized Gender Transitions in Adolescents Is Worryingly Weak*, The Economist (Apr. 5, 2023)…………………………...10

First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022)....20

"Gender and Sexuality," *Religion Library: Hinduism*, PATHEOS............................23

*Genesis* 1:27 ................................................................................. 20, 21

*"In the Beginning…" Healing our Misconceptions,* Orthodox Church of America ................................................................................................20

*Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY .....................21

Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7……….……………...…………………3

Maimonides, Mishne Torah, Hilkhot Talmud Torah..............................................22

*Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017)............................................................24

*Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015) .............. 21, 24

*Raising Children as Good Hindus*, HINDUISM TODAY (Apr. 1, 2021) ...................23

Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org .............................................................................................................22

*Surah Al-Hujurat* 49:13 ........................................................................................23

*Surah Nur* 24:31...................................................................................................24

"Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015) ....................................................2

*Women are the Twin Halves of Men*, OBSERVER NEWS SERVICE, (March 9, 2017) ............................................................................................................................21

Christopher Yuan, *Gender Identity and Sexual Orientation,* THE GOSPEL COALITION..........................................................................................................19

## INTEREST OF *AMICUS CURIAE*[1]

*Abigail Martinez* is a bereaved mother from Monrovia, California, who lost her daughter Yaeli Galdamez to suicide in September 2019. Ms. Martinez is a devout Christian who immigrated from El Salvador as a teen and raised four children as a single mother in southern California. She shares her family's tragic story in hopes that other families will not experience similar heartache from harmful school policies that exclude parents and pressure vulnerable minors to pursue gender transitions, often at the expense of their mental and physical health.



*Yaeli (right) and her mother Abigail Martinez.*
*Photos courtesy of Abigail Martinez.*

Ms. Martinez urges this Court to consider the consequences of its decision for the Littlejohn family, especially their minor child A.G., and for families around the country who face similar situations.

In 2015, the Arcadia Unified School District adopted a policy requiring staff to use preferred names and pronouns for transgender students without parental notification or permission, or any "medical or mental health diagnosis or treatment threshold."[2] Similar to Leon County's policy in this case, the district directed staff to keep students' actual or perceived gender identity "private" from parents.

Also in 2015, Ms. Martinez' teenage daughter Yaeli, a student in Arcadia Unified School District, began questioning her sexuality. She was bullied in middle school and struggling with depression, but this questioning was new. School staff told Yaeli to clandestinely join the LGBTQ club, where she was persuaded that the only way to be happy was to change her gender. An older transgender student, also a female transitioning to male, convinced Yaeli that her depression was because she was transgender. Doubling down on the social pressure, Yaeli's school psychologist also encouraged her to pursue a gender transition instead of treating her depression,

---

[1] All parties received timely notice and Plaintiffs-Appellants have consented to the filing of this brief pursuant to Fed. R. App. 29(a)(2). Defendants-Appellees have neither consented nor withheld their consent. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than amicus' counsel—contributed money that was intended to fund preparing or submitting the brief.

[2] "Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015), https://1.cdn.edl.io/93AmzJRTCq6suoldNojjDs08MNuS39NaH7QaZaDgRKhXY2 pU.pdf.

which was now severe. Ms. Martinez tried to advocate for her daughter's mental health and recalls, "the school staff should have helped me, but they became my worst enemy." When Yaeli was hospitalized after attempting suicide, her former principal came to the hospital and pressured Ms. Martinez to call her daughter "Andrew," blaming Ms. Martinez and scornfully asking, "Is it too hard for you to call your child a new name?"[3]

At age 16, Yaeli ran away from home. The people at school pushing Yaeli's gender transition convinced her that the only way to get cross-sex hormones was to accuse her mother of abuse. Those accusations would land Yaeli in in foster care, where the state would pay for gender-transition treatments without parental consent. Soon after, the California Department of Child and Family Services (DCFS) placed Yaeli in a group home. DCFS simultaneously placed Ms. Martinez on a child abuse registry even though it allowed her to continue raising her other three children.

---

[3] "The 'transition or die' narrative, whereby parents are told that their only choice is between a 'live trans daughter or a dead son' (or vice-versa), is both factually inaccurate and ethically fraught. Disseminating such alarmist messages hurts the majority of trans-identified youth who are not at risk for suicide. It also hurts the minority who are at risk, and who, as a result of such misinformation, *may forgo evidence-based suicide prevention intervention in the false hopes that transition will prevent suicide*." Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7, 713, https://www.tandfonline.com/doi/pdf/10.1080/0092623X.2022.2046221 (emphasis added).

After a recommendation from the school psychologist, a judge ruled that Yaeli could receive cross-sex hormones, ignoring Ms. Martinez' pleas to instead treat her underlying depression. Meanwhile, Ms. Martinez was shut out of Yaeli's life, only allowed one hourly visit per week, and her visits were heavily monitored by members of RISE, an activist group from the Los Angeles LGBT Center who told her to "have a funeral for your daughter and adopt your son." "I was told not to talk about God,'"

 

Martinez recalls. "They told me if you do that, you'll never see your daughter."

4

*Family visit at the group home for Yaeli's 17th birthday.*
*Photos courtesy of Abigail Martinez.*

By age 19, Yaeli was sent to an independent living situation but continued to struggle with deep depression and poverty. Desperate for food, she reached out to her mom who immediately brought her groceries. In response, Yaeli texted, "Mom, I wanted to cry because no matter what you're always there for me." Yaeli also told her mom she understood that she would never be able to become a boy, and that the cross-sex hormone treatments were causing her severe pain in her bones. Yet instead of receiving the care and medical treatment that Yaeli needed for her severe depression, the state gave her testosterone and took her away from her mom – the one source of support she knew she could always count on.

After a grueling legal battle, Ms. Martinez was absolved of all claims of abuse and removed from the child abuse registry. But it was too late. Two months later, Yaeli committed suicide by lying down on the tracks in front of a train. Her death was so gruesome that the funeral home was not able to show her body to Ms. Martinez.

After Yaeli's tragic death, Ms. Martinez requested meetings with the school staff and state workers who advised Yaeli, but no one responded. She eventually

filed a civil lawsuit against the school district and DCFS. In response, DCFS admitted that they "aggressively pursued the implementation of inclusive, gender-affirming laws, policies, and supportive services for LGBTQ+ youth." According to the Arcadia Unified School District, "a claim suggesting our school or a staff member did not properly treat a student's severe depression is both completely inaccurate and troubling as our schools and staff would not be authorized or medically qualified to treat clinical depression." Yet the district thought itself medically qualified to facilitate Yaeli's transition behind her mother's back and even advocate that she be removed from her home absent any evidence of abuse.

The legal system's utter failure to provide any adequate response, let alone remedy, only compounded the Martinez' family's grief. "To them, my child was a number in the system. It's all political," said Ms. Martinez. "I want them to change this broken system, not to play with our children's lives, to give them what they really need. Not to go for what they believe. I don't want any other parent to suffer and go through what I've been going through. This pain doesn't have a beginning or end."

## STATEMENT OF THE ISSUES

1. Whether the trial court erred in applying the "shock the conscience" standard to Plaintiffs' substantive due process claims challenging conduct that directly interfered with fundamental parental rights.

2. Whether the trial court erred in ruling that the fundamental right of parents to direct the upbringing of their children is not clearly established.

## SUMMARY OF ARGUMENT

Government policies that exclude parents from their children's lives have devastating consequences. When these policies influence a child's sexuality and gender, fundamental First and Fourteenth Amendment rights are at stake. And it's even more devastating that the law requires parents to wait to challenge such policies until their children are physically and mentally impacted beyond repair. Families must be able to challenge unconstitutional policies before losing their children to custody battles and suicide.

For amicus Abigail Martinez, whose daughter was unduly and undoubtedly influenced by an agenda-driven public school; for the Littlejohn family, who are Plaintiffs here; and for parents in districts around the country adopting similar policies,[4] their concerns are neither speculative nor hypothetical. But courts can

---

[4] *See, e.g., John and Jane Parents 1 v. Montgomery County Sch. Bd. of Educ.*, 622 F. Supp.3d 118 (D. Md. Aug. 18, 2022), *appeal docketed*, No. 22-2034 (4th Cir. Oct. 3, 2022); *Parents Defending Education v. Linn-Marr Community Sch. Dist.*, No. 22-cv-78 CJW-MAR, 2022 WL 4356109 (N.D. Iowa Sept. 20, 2022), *appeal docketed*, No. 22-2927 (8th Cir. Sept. 13, 2022); *Parents Protecting Our Children v. Eau Claire Sch. Dist.*, No. 22-cv-508-slc, 2023 WL 2139501 (W.D. Wis. Feb. 21, 2023), *appeal docketed*, No. 23-1534 (7th Cir. 2023); *Doe 1 v. Madison Metropolitan Sch. Dist.*, 976 N.W.2d (Wis. 2022); *Figliola v. Harrisonburg City Public School Board*, No. CL22-1304 (Va. Cir. Ct. filed June 1, 2022).

protect these parents' concerns by vigorously safeguarding their First and Fourteenth Amendment rights – before it's too late.

The First Amendment provides robust protection for religious exercise, which includes parents' ability to bring up their children in accordance with their sincere religious beliefs. Leon County's Policy imposes a substantial burden on the sincere religious beliefs of families from a wide variety of faith traditions, including Muslim, Jewish, Hindu, and Christian families. Amicus urges this Court to uphold free exercise rights and consider the impact of such policies on religious families nationwide.

## ARGUMENT

### I. Public school gender-transition policies that exclude parents are devastating to families, as amicus Abigail Martinez' story illustrates.

The district court reasoned that the Littlejohn's story did not "shock the conscience" because A.G.'s story did not result in a loss of custody, self-harm, or suicide. App. at 189. Yet courts should not require parents to wait until they lose custody or their child commits suicide to seek redress. By then, it is too late to help the struggling child or restore the shattered family, as Yaeli's tragic experience illustrates.

Dozens of concerned parents have filed lawsuits all over the nation, because they want to raise their children without school officials keeping their child's life-

altering decisions secret from them. To protect the privacy and safety of their children, many plaintiffs sue anonymously or sue as members of organizations. Yet these plaintiffs are struggling to establish standing. *See, e.g., Parents Protecting Our Children, UA v. Eau Claire School District, Wisconsin*, No. 22-cv-508-slc, 2023 WL 2139501, at *6 (W.D. Wis. Feb. 21, 2023), *appeal docketed*, No. 23-1534 (7th Cir. 2023) (finding plaintiffs lacked standing because they could not prove whether school district had concealed information from them yet regarding their children's identity); *Parents Defending Education v. Linn-Mar Community School District*, No. 22-CV-78 CJW-MAR, 2022 WL 4356109, at *9 (N.D. Iowa Sept. 20, 2022), *appeal docketed*, No. 22-2927 (8th Circuit 2023) (finding plaintiffs lacked standing despite their "genuine fears" because they did not "sufficiently show the parents or their children have been injured or that they face certainly impending injury").

How many children must be injured before a legal challenge survives? These court decisions send a message to parents that they are unable challenge a policy that excludes them from sensitive medical decisions about their own child – until it's too late. By the time a child expresses a desire to change genders, with parents cut out of that process, it could be too late to restore the damaged relationship between parent and child, or to prevent the confusion and mental health crisis exacerbated by teachers and staff who direct the child on a path of social transition leading to medical transition.

Here, standing is undisputed. The Littlejohns have clearly shown concrete harm and an injury-in-fact. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203-04 (2021). The Littlejohn's 13-year-old daughter was labeled "non-binary," school staff held secret meetings outside the parents' knowledge, and school staff directed each other to keep the preferred name and pronouns hidden from the parents. App. at 39-40, ¶¶ 96-97. If not for A.G.'s own comment revealing her conversation with school officials about using the opposite restroom, the Littlejohns would still be in the dark. *Id.* at ¶¶ 97-98. Indeed, their story may have ended as tragically as the Martinez family's; the school district policies at issue were eerily similar. Both the Arcadia Unified School District Policy and the Leon County Policy require staff to (1) use names and pronouns corresponding to gender identity, not biological sex, without needing parent permission; (2) conceal the student's gender identity, preferred name, and pronouns from their parents unless the student specifically requests otherwise; and (3) requiring no medical or mental health threshold or screening before socially transitioning a student by changing their name and pronouns.[5] In fact, Leon County's Policy, established by the 2018 "Gender Nonconforming and Questioning Support Guide," is *more* hostile to parents than Arcadia's, because it requires a specific "support plan" to be created within 48 hours of a student's notification that may not

---

[5] *Compare* "Transgender Students – Ensuring Equity and Nondiscrimination," *supra* note 2, with App. at 151–54, 157–58.

be shared with parents. App. at 157-58. These policies are causing actual harm and injuries to minor students and their families nationwide.[6]

Yet the district court's ruling sends the Littlejohn family a message that until their daughter is removed from their custody, seriously harmed, or lost forever due to suicide, they have no legal remedy because they have not shown a violation of fundamental rights. App. at 189 ("This is not a case where Plaintiffs allege that their child was singled out by [school] staff and forced to adopt a support plan against their child's will. Nor is this a case where Plaintiffs allege that [school] staff publicly accused Plaintiffs of abusing their child or tried to cause Plaintiffs to lose custody of their child. This is also not a case where [school] staff were forewarned that a child's support plan was exacerbating the child's mental health concerns, but they pursued it regardless of such warning, resulting in the child's self-harm or suicide.")

---

[6] For example, over 42,000 U.S. youth were diagnosed were gender dysphoria in 2021. This dramatic increase comes at the same time that European clinics are rejecting the "gender-affirming" approach, because of the actual physical and mental harms that minors have experienced due to gender-transition drugs and procedures. *The Evidence to Support Medicalized Gender Transitions in Adolescents Is Worryingly Weak*, The Economist (Apr. 5, 2023), https://archive.ph/IaCvu#selection-1039.0-1039.88; *see also* Dr. Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://cass.independent-review.uk/publications/interimreport/./ (finding that social transition is an "active intervention because it may have significant effects on the child" and that Britain is moving away from the "hurry to affirm gender identity.")

By this faulty logic, as long as a worse scenario exists that would "shock the conscience" more dramatically, the Littlejohns lack a remedy under the Due Process Clause. But that is not the law. Our Constitution guarantees more. As Plaintiffs' opening brief makes clear (Dkt. 22 at 13-17, 35-37), the "shock the conscience" standard does not apply when fundamental rights are involved. *Waldman v. Comm'r*, 871 F.3d 1283, 1292 (11th Cir. 2017); *see also McKinney v. Pate*, 20 F.3d 1550, 1556 n.7 (11th Cir. 1994) (finding that "shock the conscience" is "[a]n alternate substantive due process test" used when fundamental rights are not at stake). Here, both First and Fourteenth Amendment rights are at stake. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "The Fourteenth Amendment forbids the government from infringing fundamental liberty interests at all, unless the infringement is narrowly tailored to serve a compelling state interest." *Waldman*, 871 F.3d at 1292. While Plaintiffs-Appellants did not bring a First Amendment claim directly, the district's unconstitutional actions impinge on the Littlejohn's free exercise of religion.

## II.    The Free Exercise Clause protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs without government interference.

Plaintiffs-Appellants argue that the Fourteenth Amendment protects the fundamental rights of parents to direct their children's upbringing. (Dkt. 22 at 13-

17, 39-41). Amicus believes that the Littlejohns have an additional claim under the Free Exercise Clause, because it provides robust protection for the religious liberty of families seeking to raise their children in accordance with their sincere religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (parental rights regarding religious upbringing are "specifically protected by the Free Exercise Clause," "[l]ong before . . . universal formal education"). *Yoder* reaffirmed the Court's holding in *Pierce v. Society of Sisters*, describing it "as a charter of the rights of parents to direct the religious upbringing of their children."[7] *Yoder*, 406 U.S. at 233 (citing *Pierce*, 268 U.S. 510, 534-35 (1925)) ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.") The Court in *Yoder* drew a direct connection between parental rights and religious beliefs, explaining that "[t]he duty to prepare the child for 'additional obligations,' referred to by the Court, must be read to include the inculcation of moral standards, [and] religious beliefs." *Id.* at 233.

Parental rights are closely linked with free exercise rights and are especially strong for religious families seeking to teach their faith to the next generation. For

---

[7] Although Plaintiffs did not raise a Free Exercise claim here, they share the Christian religious beliefs of amicus Abigail Martinez. Leon County's Policy has a disproportionately harmful impact on religious parents' free exercise rights, which this Court must consider in its parental rights analysis.

nearly 100 years, the Supreme Court has reaffirmed the "enduring American tradition" of "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (quoting *Yoder*, 406 U.S. at 213–214); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065–66 (2020) (describing how many religious traditions entrust parents with primary responsibility for imparting their faith to their children without government interference). Not only does the First Amendment protect parents' freedom to teach their faith to their children, but for many this is a religious obligation at the core of the parents' own religious exercise.

Any infringement of these First Amendment rights is subject to strict scrutiny. *See Yoder*, 406 U.S. at 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). While the Court in *Yoder* did not face a situation where minor children disagreed with their Amish parents' decision to forgo the later years of public education, the Court observed that "such an intrusion by a State into family decisions in the area of religious training would give rise to grave questions of religious freedom comparable to those raised here." *Id.* at 231–32.

Courts have consistently recognized the link between parental rights and free exercise rights in the context of public-school policies, especially regarding religious families. The Supreme Court has recognized that "the discretion of the States and

local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982); *see also West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual[.]").

Especially in cases involving gender identity or pregnancy—where "the situation raises profound moral and religious concerns"—public schools may not "depriv[e] the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305, 313–14 (11th Cir. 1989) (holding that school officials violated the Constitution when they coerced minor into abortion without parents' knowledge); *see also Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (recognizing that "[i]t is not educators, but parents who have primary rights in the upbringing of children," when swim coach revealed student's pregnancy against family's wishes). While the district court attempted to

15

distinguish these cases based on minor factual differences,[8] their principles are directly applicable here. Public schools may not interfere with the foundational relationship between parents and children, especially in areas such as sexuality where religious beliefs are at stake. Simply because policies like Leon County's are new and unprecedented in their dramatic scope does not give courts a free pass to explain away or ignore constitutional law that has protected parental rights for nearly a century. And the district court even acknowledged that Leon County officials interfered with the Littlejohn family's liberty interest, "as Defendants implemented a Support Plan for A.G. that contradicted Plaintiffs' decisions regarding A.G.'s alleged gender confusion." App. at 180 n.2. Like the school officials in Arcadia Unified School District who refused to provide the mental health support that Ms. Martinez knew her daughter needed and pushed Yaeli toward gender transition instead, Leon County officials willfully went against the Littlejohns' wishes, creating a direct conflict between the parents and the district. Like Yaeli, A.G. was caught in the crossfire, which damaged the family relationship potentially beyond

---

[8] The district court attempted to distinguish *Arnold* because it did not use the "shock the conscience" standard when addressing a parental rights violation. App. at 180 n.3. Yet this bolsters Plaintiffs-Appellants' argument that the "shock the conscience" standard should not apply here. Instead, the violation of parental rights that occurred when school officials met with A.G., did not ask her whether she wanted a parent present (despite their obligation to do so), and then proceeded to implement a gender-transition plan without her parents' knowledge or consent amounts to a coercive violation of their fundamental rights.

repair. App. at 53, ¶¶ 159–62. The district court turned a blind eye to such actions, but this Court must not. Policies that exclude parents from sensitive medical and mental health decisions regarding their minor children violate the law with devastating consequences.

In *Tatel v. Mt. Lebanon School District*, a federal court recently vindicated parents' Free Exercise claims based on their "sincerely held religious beliefs about sexual or gender identity and the desire to inculcate those beliefs in their children." No. CV 22-837, 2022 WL 15523185, at *26 (W.D. Pa. Oct. 27, 2022). There, a first-grade teacher advocated her own agenda and beliefs about gender identity despite parents' objections. She told her six-year-old students to keep conversations secret, and the school district refused to provide notice and opt-out rights regarding the classroom discussions, as it did for other non-religious topics. *Id.* at *24. Contrasting the parents' religious teachings that "humans are created beings who must accept their place in a larger reality" with the transgender movement's assertion that "human beings are autonomous, self-defining entities who can impose their internal beliefs about themselves on the exterior world," the court recognized the "contradictions between these worldviews." *Id.* at *18. The court emphasized that "parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship," especially "[w]ith respect to important matters that strike at the heart of parenting (such as inculcation of religious

17

beliefs or teachings contrary to the parents' religious beliefs)." *Id.* at *20 (citing *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005)). The district court in this case brushed *Tatel* aside, writing that the *Tatel* parents challenged a *policy* while the Littlejohns are challenging *conduct* by school officials. App. at 192. Yet the school officials' conduct is based on Leon County's Policy, both of which the Littlejohns repeatedly challenge as requiring parental exclusion and causing harm to minor students and their families. Dkt. 22, p. 13–16, 39.

Here, Leon County's Policy and practice of excluding parents from sensitive decisions about their children's physical and mental health interferes with religious exercise in multiple ways: (1) school staff are instructed to "affirm" a child's questioning of their gender identity or desire to change genders, in direct conflict with the religious beliefs their family may hold; (2) school staff are prevented from disclosing a child's experimentation with gender identity unless the child *and staff* deems the parents supportive enough, thus excluding parents from any involvement; and (3) school staff interfere with the instruction that religious parents seek to provide to their children, by allowing and encouraging students to undergo gender transitions without their parents' knowledge or consent. This Policy violates the Free Exercise Clause by interfering with religious parents' historically rooted and constitutionally protected ability to raise their children in accordance with their sincere beliefs. The Leon County School Board might wish to be "empowered, as

18

parens patriae, to 'save' a child from himself or his [religious] parents" so that "the State will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232. But that is a power the Constitution does not permit the government to wield. The Policy sets students and parents at odds by *requiring* parental exclusion and allowing the staff and student total control over sensitive decisions about gender identity. App. at 153. Like the teacher's actions in *Tatel*, the Policy sends the message that students can define their own gender and reality, apart from their parents' knowledge or guidance, and it does not accommodate students who believe in biological sex. App. at 152–53. These actions violate the Supreme Court's holding that that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. As the Third Circuit held in *Gruenke*, "when such collisions [between parental rights and public school policies] occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." 225 F.3d at 305. Here, Leon County's Policy triggers strict scrutiny, and it cannot hope to pass muster because its parental exclusion policy is maximally restrictive of parents' First Amendment rights. Thus, the Policy violates the Free Exercise Clause.

### III. Leon County's Policy substantially burdens the sincerely held religious beliefs of families from many different faith groups, including Jewish, Hindu, Muslim, and Christian families.

Religions from diverse cultures and geographic regions assert—as they have for millennia—that sex is an objective, binary category that cannot be changed by self-perception or medical intervention.[9] Millions of Christians worldwide hold to this belief. Catholic teaching makes clear that "[e]veryone, man and woman, should acknowledge and accept his sexual identity" and that "[p]hysical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life."[10] The Orthodox Church of America teaches that "[o]ur sexuality begins with our creation," and "[t]he Bible says 'Male and female He created them' (Gen. 1:27)."[11] Within the Protestant tradition, most denominations believe the Bible's teaching that God created humans male and female in His image, and that this reality cannot be changed based on perceived gender identity, including but not limited to the Anglican Church, Assemblies of

---

[9] *See, e.g.,* Christopher Yuan, *Gender Identity and Sexual Orientation,* The Gospel Coalition, https://www.thegospelcoalition.org/essay/gender-identity-and-sexual-orientation/.

[10] Catholic Catechism, No. 2333, https://www.usccb.org/sites/default/files/flipbooks/catechism/562/#zoom=z.

[11] *"In the Beginning…" Healing our Misconceptions*, Orthodox Church of America, https://www.oca.org/the-hub/two-become-one/session-2-in-the-beginning-.-.-.-healing-our-misconceptions (quoting *Genesis* 1:27).

God, the Church of God in Christ, the Lutheran Church, the Presbyterian Church in America, and Southern Baptists.[12] For millions of Christians, including amicus Ms. Martinez and the Littlejohn family, "[p]arents are to teach their children spiritual and moral values and to lead them, through consistent lifestyle example and loving discipline, to make choices based on biblical truth."[13]

But these religious beliefs are not just the province of traditional trinitarian Christianity. Sacred texts that define beliefs on marriage, sexuality, chastity, and sex as binary (male and female) include not only the Catholic Catechism[14] and the Bible, but also the Quran,[15] Hadith,[16] the Torah,[17] and the Book of Mormon.[18] The First

---

[12] For a complete list of sources, *see* First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 faith groups on sex and gender).

[13] Baptist Faith and Message (2000), https://bfm.sbc.net/bfm2000/#xviii.

[14] Catholic Catechism, No. 2361, https://www.usccb.org/sites/default/files/flipbooks/catechism/569/#zoom=z.

[15] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/; *Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017), https://kashmirobserver.net/2017/03/09/women-are-the-twin-halves-of-men/.

[16] Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May–Jun. 2013), at 2028, https://www.iosrjournals.org/iosr-jhss/papers/Vol12-issue2/C01222028.pdf.

[17] *Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/homosexuality-in-judaism.

[18] *Chastity, Chaste,* The Church of Jesus Christ of Latter-Day Saints, https://www.churchofjesuschrist.org/study/scriptures/tg/chastity?lang=eng.

Amendment provides robust protection for religious believers who adhere to these faiths, as well as for individuals who do not participate in a specific religious tradition but who hold sincere religious beliefs about the body, sexuality, marriage, and gender.[19]

For example, millions of Jewish Americans follow traditional *halachic* teaching that is rooted in Jewish law dating back three millennia. The Torah is very clear about the divine creation of human beings as distinctly male and female.[20] Observant Jews are careful to follow the timeless prescriptions of the Torah and Talmud and to respect their specific commands regarding sexual purity and holiness. The Torah does not recognize the possibility of changing the sex or gender. "This distinction between women and men is also reflected in the role parents have in determining the identity of their child. The essence of Jewishness is determined by the mother, whereas the particulars of Jewishness, such as tribal identity, are determined by the father."[21] Jews also believe they are under a biblical obligation to

---

[19] *See Thomas* v. *Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

[20] *Genesis* 1:27, The Contemporary Torah, Sefaria ("And God created humankind in the divine image, creating it in the image of God—creating them male and female.") https://www.sefaria.org/Genesis.1.27?lang=bi&aliyot=0.

[21] Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org, https://www.chabad.org/library/article_cdo/aid/4407982/jewish/Why-Are-Women-Exempt-From-Certain-Mitzvahs.htm.

teach their children God's commandments.[22] This is an obligation of the highest order, for "the world exists only by virtue of the breath coming from the mouths of children who study Torah."[23]

For Hindu Americans, their sacred texts, culture, and values emphasize marriage and child-rearing as a parent's highest righteous (*Dharmic*) duty. Hindu teaching makes clear that men and women have distinct identities and roles, and that sexual activity belongs within the confines of heterosexual marriage.[24] It is only within heterosexual marriage that sexual behavior aligns with *dharma* or righteous living.[25] Hindus also believe that a parent's rights and responsibilities in child-rearing are sacred and must be protected against government infringement. "Parents are indeed the first guru . . . [t]he child's deepest impressions come from what the

---

[22] *See Deuteronomy* 6:7, The Contemporary Torah, Sefaria ("Impress them upon your children. Recite them when you stay at home and when you are away, when you lie down and when you get up.") https://www.sefaria.org/Deuteronomy.6.7?lang=bi&aliyot=0.

[23] Maimonides, Mishne Torah, Hilkhot Talmud Torah 1:2; 2:1, 3, https://www.sefaria.org/Mishneh_Torah%2C_Torah_Study.2?lang=bi.

[24] *See, e.g.,* Dharma Sastra, Vol. 6 Manu Sanskrit, Chapter III, pp. 80–93, https://archive.org/details/dharmasastra-with-english-translation-mn-dutt-6-vols-20-smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page/80/mode/2up.

[25] "Gender and Sexuality," Religion Library: Hinduism, PATHEOS, https://www.patheos.com/library/hinduism/ethics-morality-community/genderand-sexuality.

parents do and say."[26] Hindu legal texts (*Dharmaśāstras*) dating back two millennia provide detailed instructions regarding the rights and responsibilities of both parents in child-rearing and the importance of child welfare in society. Thus, parental instructions on a *Dharmic* life, without government interference, are essential to a child's education.

For Muslim Americans, both sacred writings and specific teachings make clear that men and women are two distinct biological sexes with important differences and relationships toward one another. The Quran makes this clear: "O humanity! Indeed, We created you from a male and a female."[27] Both Shi'ah and Sunni Muslims hold to the words of the Prophet Mohammad (pbuh) who has stated that "men and women are twin halves of each other."[28] Muslims' belief that sex is binary, fixed, and immutable is closely linked to the creation narrative. Islamic teaching does not recognize alternate gender identities, because even when someone changes his or her outer appearance or receives hormones or surgery, there is no fundamental change in biology at the cellular level and thus "the rulings of that

[26] *Raising Children as Good Hindus*, HINDUISM TODAY (Apr. 1, 2021), https://www.hinduismtoday.com/magazine/apr-may-jun-2021/raising-children-asgood-hindus/.

[27] Surah Al-Hujurat 49:13, https://quran.com/en/al-hujurat/13.

[28] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/.

[biological] sex continue to apply."[29] As a matter of religious obedience, Muslims must observe decency (*ihtisham*), which prevents a Muslim female from sharing a restroom with the opposite biological sex, modesty (*hijab*), which includes behavior as well as dress, and seclusion (*khalwa*), which means a man and woman who are unrelated and unmarried cannot be alone together in an enclosed space.[30] Muslims also believe that "the acquisition of at least rudimentary knowledge of religion and its duties [is] mandatory for the Muslim individual."[31] This obligation, which applies to parents as they raise children, comes from the Prophet Muhammad, who proclaimed that "'[t]he pursuit of knowledge is incumbent on every Muslim.'"[32]

Government officials are likely to misunderstand the beliefs and practices of religious families, and public-school administrators are no exception. *See, e.g., A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 260–61 (5th Cir. 2010) (school officials questioned Native American student's belief in "keep[ing] his] hair long and in braids as a tenet of [his] sincere religious beliefs"); *Gonzales v.*

---

[29] *Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017), http://fiqhacademy.com/res03/.

[30] *See, e.g.*, Surah Nur 24:31 (describing concept of hijab); Marwan Ibrahim Alkaysi, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB 60-61 (1986) (describing restroom obligations).

[31] *Our Lady of Guadalupe*, 140 S. Ct. at 2065 (citing Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and Possibilities*, 44 J. CATH. LEGAL STUDIES 143, 143–44 (2005)).

[32] *Id.*

*Mathis Indep. Sch. Dist.*, No. 2:18-cv-43, 2018 WL 6804595, at *4 (S.D. Tex. Dec. 27, 2018) (school officials argued that students' traditional religious promesa (promise) was not "religious" or "an established tenet of their Catholic faith"). It is unconstitutional for government officials to question the merits of an individual or family's sincerely held religious beliefs. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015); *see also Ben-Levi v. Brown*, 136 S. Ct. 930, 934 (2016) (Alito, J., dissenting from cert. denial) ("[T]he government cannot define the scope of personal religious beliefs.").

Leon County's Policy allowing government officials to decide (along with impressionable minors) whether parents will be "supportive" of a child's perceived gender identity creates a very clear danger of making false or unfair assumptions based on the family's religious beliefs. App. at 157–58. Chairwoman Georgia Bowen described parents as obstacles to be overcome, discussing the "stress of living in a non-affirming household" and "parent/community pushback on LGBTQ+ inclusion" as challenges the Board should address. Dkt. 23, p. 35–36. The Policy not only invites but *requires* government officials to evaluate parents' moral and religious beliefs. Such an analysis violates the First Amendment under *Holt* and *Thomas*, 450 U.S. at 715–16 (1981) (government actors must not second-guess or "undertake to dissect" sincere religious beliefs, because they "are not arbiters of scriptural interpretation").

Religious parents are increasingly labeled as "non-affirming" or "non-supportive" by school officials. Ms. Martinez experienced these *ad hominem* attacks when school officials repeatedly shut her out of Yaeli's life. Despite Ms. Martinez' consistent, loving support of Yaeli and her advocacy that Yaeli receive the mental health support she desperately needed, Arcadia Unified resorted to personal attacks instead of reasoned logic. This is a dangerous trend that is having an unconstitutional chilling effect on the religious expression of students and families. For example, parents may discourage a student from wearing religious attire or disclosing his or her family's religious tradition at school, in fear that school officials will determine the parents will not be "supportive" of their child because of their religious beliefs.

This practice erodes the crucial, formative relationship between children and their parents, which the Supreme Court has protected for nearly 100 years. *Yoder*, 406 U.S. at 213–14. And it ignores the fact that most religious parents are uniquely equipped to provide helpful guidance and support for their child, as they know their child best and can better address influences such as peer pressure and mental health challenges. Yet, if their children's most difficult struggles are concealed from them by the government, loving parents like Ms. Martinez and the Littlejohns *cannot* provide the support that their children need, especially when encountering bullying or harassment at school. For all these reasons, the Policy violates the Free Exercise Clause in a way that disproportionately harms religious families.

As many courts have recognized, parental rights do not evaporate when parents send their children to public school. *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities.") Indeed, such an approach would "be fundamentally unfair to parents who in reality do not have that choice." *Tatel*, 2022 WL 15523185, at *21. As Justice Alito observed, "[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." *Morse*, 551 U.S. at 424. And "[c]onstitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons," that is, parents who can afford private school or homeschooling on a single income. *Tatel*, 2022 WL 15523185, at *21.

The Supreme Court has consistently recognized that "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619–20 (1984). These strong "personal bonds" "act as critical buffers between the individual and the power of the State." *Id.* When school policies and practices destroy these bonds by actively concealing critical information from parents and creating conflict between parents and their minor

28

children, not only is the Constitution violated, but families are torn apart. This Court should heed the concerns of religious parents like Ms. Martinez, and the dire consequences of policies and practices that destroy the trust and bond between a child and her parents, so that Yaeli's tragic story is never repeated again.

## CONCLUSION

For all these reasons, the Court should reverse the district court's ruling.

May 30, 2023

Respectfully submitted,

Jeffrey C. Mateer
Keisha T. Russell
Holly M. Randall
First Liberty Institute
2001 West Plano Parkway,
Suite 1600
Plano, TX 75075
(972) 941-4444
krussell@firstliberty.org

*Counsel for Amicus Curiae*

/s/ Kayla A. Toney
Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
(202) 921-4105
ktoney@firstliberty.org

**CERTIFICATE OF COMPLIANCE**

I, Kayla A. Toney, hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

May 30, 2023

/s/ *Kayla A. Toney*
_____

30

Kayla A. Toney
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

May 30, 2023

*/s/ Kayla A. Toney*

Kayla A. Toney
*Counsel for Amici Curiae*

31