No. 23-10385

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

PLAINTIFFS-APPELLANTS,

V.

SCHOOL BOARD OF LEON COUNTY, *ET AL.*,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court for the
Northern District of Florida, Tallahassee Division

Case No. 4:21-CV-415

# BRIEF OF *AMICI CURIAE* OUR DUTY
# SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

May 30, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth

Circuit Rule 26.1(a), *Amicus Curiae* Our Duty is a non-profit 501(c)(3)

organization. Our Duty has no parent companies, subsidiaries, or

affiliates and does not issue shares to the public.


Dated: May 30, 2023                    s/ Eric N. Kniffin
                                       Eric N. Kniffin
                                       *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................. iv

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ...................................................... 5

    I.  Parents' constitutional right to direct their children's upbringing and medical care includes the right to determine whether their children will undergo a social transition. ................................................. 5

    II.  The Florida Department of Health, consistent with the U.S. Constitution, requires that school districts let parents direct their children's medical care ................................. 7

    III. Stories from Our Duty's members illustrate the irreparable harm school districts cause when they interfere with parents' right to direct their children's upbringing and medical care. ................................................. 9

        A.  Sue Y, Mother of Detransitioned Female .............................. 11

        B.  Erin Friday, Mother of Desisted Female ............................... 14

        C.  Ann M., Lesbian Mother of a Desisted Male ......................... 16

        D.  Aurora Regino, Mother of a Desisted Female ....................... 20

        E.  Beth Bourne, Mother who Lost Physical Custody of Female Child ........................................................ 22

        F.  Wendell Perez, Father of Desisted Female ........................... 25

G.  Jessica M., Mother of Desisting Female................................27

H.  Brette Smith, Mother of Desisted Female...........................28

I.  Gaby Clark, Mother of Desisted Female ..............................30

CONCLUSION .......................................................................32

CERTIFICATE OF COMPLIANCE.......................................33

# TABLE OF AUTHORITIES

## Cases

*Littlejohn v. School Board of Leon County Florida*,
--- F.Supp.3d ---- (2022), 2022 WL 18670372 (N.D. Fla. Dec. 22,
2022) ................................................................................................ 6

*May v. Anderson*,
345 U.S. 528 (1953) ........................................................................ 6

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ........................................................................ 6

*Prince v. Commonwealth of Massachusetts*,
321 U.S. 158 (1944) ........................................................................ 6

*Troxel v. Granville*,
530 U.S. 57 (2000) .......................................................................... 6

*Whitaker v. Kenosha Unified Sch. Dist.*,
858 F.3d 1034 (7th Cir. 2017) ........................................................ 6

## Other Authorities

Celeste Philip, State Surgeon Gen. and Secretary, *School Health
Administrative Resource Manual* (Rev. 2017) ................................ 7, 8

Colin Wright, *BREAKING: New Documents Reveal Shocking Surge
in Trans-Identified Students in Davis, CA Schools*, Reality's Last
Stand, (Jan. 17, 2023) ..................................................................... 23

CommuniCare, LGBTQ+ Care, https://communicarehc.org/lgbtq-
care/ ................................................................................................ 23

Dianna Kenny, *Children and young people seeking and obtaining
treatment for gender dysphoria in Australia: Trends by state over
time (2014-2018)*, (Sept. 4, 2019) .................................................. 19

Jennifer Murray, et al., *Autism and transgender identity: Implications for depression and anxiety*, 69 Rsch. in Autism Spectrum Disorders 101466 (Jan. 2020) ............................................. 30

Joanne Sinai, *Rapid onset gender dysphoria as a distinct clinical phenomenon*. J. of Pediatrics (March 2022), ......................................... 9

Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+ youth in Yolo County: ElevateYouth works with residents aged 12 to 36*, Daily Democrat (March 26, 2021) ............................................. 23

Kenna Cook, *Be a Better Butt Slut*, Medium.com (Sept. 20, 2017) ........ 24

Kenna Cook, *It's not Weird to Fuck Your Friends*, Medium.com (Sept. 13, 2017) .................................................................... 23

Kenna Cook, *Spanksgiving: Impact Play 101*, Eventbrite.com (Nov. 22, 2017) ................................................................................... 24

Michele Mandel, *Decision upheld against surgeon's social media posts on transgender top surgery*, Toronto Sun, Nov. 11, 2011 .......... 19

The Trans Train and Transgender Regret Documentaries, Bayswater Support Group, https://www.bayswatersupport.org.uk/the-trans-train-and-transgender-regret-documentaries/ .................................................... 19

The Trevor Project: About Us, https://www.thetrevorproject.org/strategic-plan/ ............................... 29

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Our Duty is an international nonprofit organization founded in 2018 to support parents eager to protect their children from the dangers of gender ideology. The organization has over 900 parent members in 17 countries. It has no religious or political affiliation. Its mission is:

- To support the families of children who identify as transgender;

- To help families find alternative resolutions to gender dysphoria other than "gender affirmation" approaches, especially hormonal and surgical interventions;

- To provide information to these families and the wider society about the dangers of gender ideology; and

- To pressure government and health services to develop public policies and treatments that serve the best interests of children struggling with their gender identity.

Gender ideology has permeated the culture with stunning speed, influencing medical, government, and family decisions and creating an urgent need for clarity, education, and public discourse. Our Duty exists to help parents navigate these difficult issues. However, Our Duty

---

[1] All parties received timely notice to the filing of this brief. Plaintiffs-Appellants have given their consent; Defendants-Appellees have neither consented nor refused their consent. No party's counsel authored any part of this brief and no person other than *amicus* made a monetary contribution to fund its preparation or submission.

understands that its mission fundamentally depends on parents being empowered to know about and make informed decisions regarding their children's care. As such, Our Duty and its members have a profound interest in the outcome of this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-Appellants have alleged that the Defendants-Appellees, a Florida school district, unilaterally diagnosed their middle school daughter with "gender confusion," developed and implemented a "support plan" that treated their daughter as though she were a male, and kept them in the dark about these plans.

The Florida Department of Health, which has authority over public school health departments, says that schools must "consult[] with a student's parent or guardian regarding the need for health attention . . . when definitive diagnosis or treatment is indicated." Schools cannot even give children sunscreen without parental consent.

Under these facts, has the Defendants-Appellees violated the Plaintiffs-Appellants' "substantive due process right in the care, custody, and control of their child"? The district court below said no.

*Amicus* Our Duty submits this brief to help the Court better understand why the district court's decision must be overturned. As

shown in Part I, this case does not ask the Court to expand the concept of substantive due process. To the contrary, social transition is a treatment protocol for a medically diagnosed and documented condition. As such, a long line of Supreme Court cases makes plain that parents have the constitutional right to decide whether their minor child should undergo such a transition.

Part II highlights the absurdity of the Defendants-Appellees' arguments. Florida law, consistent with parents' constitutional rights, requires school districts to involve parents and seek their consent before making the most minor medical decisions. *School officials cannot even unilaterally whether a student should apply sunscreen.* It is impossible to reconcile this general deference to parents' rights with the Defendants-Appellees' claim, upheld below, that our constitutional order allows government officials to treat a middle school girl as though she were a boy, and even assign her a male roommate on overnight trips, without even informing a minor child's parents.

Part III offers personal testimony from *Amicus* Our Duty's members to show why it is critical that the Court use this opportunity to affirm parents' rights to control their minor children's upbringing,

including any decisions about how to treat issues related to their child's gender identity. These compelling stories illustrate the harm that can come from even well-meaning school officials excluding parents from important medical and mental health decisions. They show the heroic lengths parents have gone through to understand, love, and protect their children. These accounts also show that school officials can get diagnoses terribly wrong, ignoring critical mental health issues in favor of a trendy diagnosis that, unless corrected, could permanently sterilize and disfigure minor children.

Caselaw, Florida law, and testimony from Our Duty's members all affirm the same truths that should be common sense: Excluding abusive behavior, parents have the fundamental right to raise their children in the manner that they see fit. Teachers, however well-intentioned, have limited exposure to their students.

Parents, on the other hand, care for their children from birth. Parents are present not only during the school year, but all summer, over school breaks, before and after school hours, and when their child is sick. Parents' relationship with their children doesn't cease when the child moves to another classroom or grade. Parents painstakingly

research their child's doctor, dentist, and orthodontist, leaving nothing to chance. Parents choose their cars based upon safety features for their child.

Nothing about "rapid onset gender dysphoria" changes these basic facts or longstanding Supreme Court caselaw recognizing parents' fundamental rights. For the reasons set out in Plaintiffs-Appellants' opening brief, and for the additional reasons set out below, this Court must reverse the decision below and affirm parents' fundamental rights to raise and protect their children.

## ARGUMENT

### I. Parents' constitutional right to direct their children's upbringing and medical care includes the right to determine whether their children will undergo a social transition.

As the district court recognized, "A parent's substantive due process right in the care, custody, and control of their child is a fundamental liberty interest that is protected by the U.S. Constitution." *Littlejohn v. School Board of Leon County Florida*, --- F.Supp.3d ----

(2022), 2022 WL 18670372 at *4 (N.D. Fla. Dec. 22, 2022) (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)).[2]

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. It is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.

*Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166 (1944) (cleaned up).

The decision below presumes that the case as pled by Appellants asks the Court to "expand[] the concept of substantive due process." *Littlejohn*, 2022 WL 18670372 at *5. This is incorrect. To the contrary, the social transition approved by the School District in this case—which allowed A.G. to choose a preferred name, pronouns, restroom, and overnight housing assignments, *id*. at *1—is a treatment protocol for a "medically diagnosed and documented condition." *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1050 (7th Cir. 2017). As such,

---

[2] See also *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (the right to "establish and bring up children" is among the privileges "long recognized at common law as essential to the orderly pursuit of happiness by free men"); *May v. Anderson*, 345 U.S. 528, 533 (1953) (the right to the "care, custody, management and companionship" of one's minor children is "far more precious . . . than property rights").

Appellants—and similarly situated parents like Our Duty's members—have the constitutional right to determine whether their children will undergo a social transition.

## II. The Florida Department of Health, consistent with the U.S. Constitution, requires that school districts let parents direct their children's medical care.

The Florida Department of Health's rules reflect the Supreme Court's judgment that state entities may not interfere with parents' fundamental right to control their minor children's medical care. The Department has "statutory responsibility . . . for supervising the administration of the school health services program."[3] Pursuant to that authority, the Department issued its School Health Administrative Resource Manual, which states that public schools must "consult[] with a student's parent or guardian regarding the need for health attention . . . when definitive diagnosis or treatment is indicated." *Id*. at 46. The

---

[3] Celeste Philip, State Surgeon Gen. and Secretary, *School Health Administrative Resource Manual* at 9 (Rev. 2017), https://www.floridahealth.gov/programs-and-services/childrens-health/school-health/_documents/2017-school-health-resource-manual1.pdf. ("Section 381.0056, Florida Statutes and Florida Administrative Code Rule 64-F provide the statutory authority and rules to plan, implement and monitor school health services provided in Florida schools.").

Department makes clear that "[s]chool health services supplement, rather than replace, parental responsibility and encourage parents' attention to student health." *Id*. at 8.

The Resource Manual moves beyond these general statements with specific examples that unmistakably constrain a school district's discretion. School health officials must secure "written parental permission" before administering medication during the school day. *Id*. at 19. "[W]ritten parental and physician authorization" is required before students can "carry metered dose inhalers," "carry and self-administer an epinephrine auto-injector," or "carry and self-administer a prescribed pancreatic enzyme supplement." *Id*. at 20.

The Manual affirms that parents are a necessary element of a school's "interdisciplinary team" *Id*. at 42. Schools may not develop an Individualized Health Plan (IHP) for a student without parental involvement. *Id*. at 24. Schools must notify parents and give them a chance to opt out before teaching students about "reproductive health or any disease, including HIV/AIDS." *Id*. at 43 (citing Fla. Stat. § 1003.42(5)). School personnel *cannot even give students sunscreen* without parental permission. *Id*. at 20-21.

8

III. **Stories from Our Duty's members illustrate the irreparable harm school districts cause when they interfere with parents' right to direct their children's upbringing and medical care.**

*Amicus* Our Duty exists to support parents like Appellants who are struggling to raise children amidst an epidemic of gender confusion that is unlike anything in recorded human history.[4] Our Duty and its parent-members believe that parents are in the best position to know what is in their children's best interests. Moreover, they believe that as parents they have the natural duty and constitutional right to make such decisions and give their children the tools they will need to thrive and live long, healthy, independent lives.

In this section, Our Duty provides the Court with stories from a representative cross-section of its members. Each of these parents, like Appellants, had to fight their children's schools for the right to know how government employees were influencing their children and for the right the right to control their children's mental health care.

---

[4] *See, e.g.*, Joanne Sinai, *Rapid onset gender dysphoria as a distinct clinical phenomenon.* J. of Pediatrics (March 2022), https://doi.org/10.1016/j.jpeds.2022.03.005.

9

Our Duty offers these accounts to help the Court better understand the way overzealous teachers and counselors can use their authority to pressure children into adopting a transgender identity and the lengths that parents have had to go to assert their rights to control their children's care. These stories also show that school officials, who know much less about a student than his or her parents, are often overconfident in their ability to determine whether a social transition is in a child's best interests. Finally, these stories demonstrate how drastically a child's well-being and self-understanding can change once a parent reclaims primary management over the child's care and finds the child proper mental health care.

Testimony from Our Duty's members also proves that the battle over transgender issues does not fall neatly along political lines. All but one of the parents in these accounts identified with the Democratic Party before their children fell captive to gender ideology. These parents are generally supportive of progressive causes and were open to the idea that their children were same-sex attracted. But nothing prepared them for the way that officials at their children's schools claimed the right to displace their parental authority and determine

10

that their children were not "born in the right body" and should socially transition to the other sex. Their experiences have taught them how critical it is for parents to fight for the right to know about and direct their child's care.

Our Duty hopes that these stories help the Court better understand the critical nature of a parent's constitutional right to direct his or her child's upbringing and the devastating injuries that parents and children incur when this fundamental right is not recognized.

### A.    Sue Y,[5] Mother of Detransitioned[6] Female

Sue Y and her eighteen-year-old daughter, G, live in California. When G started puberty at the age of twelve, Sue saw her daughter's entire demeanor change. G started to dress in dark and oversized clothes, her personality went from pleasant to agitated, and she became

---

[5] Due to the frequent and intense animus that is often directed at parents or children who resist the push to pursue a "gender transition," many Our Duty members use pseudoymns in this brief to protect themselves and their children from retaliation. The identity of each member whose story is told here is known to Our Duty.

[6] The term "detransitioned" as used in this brief indicates that a person pursued medical treatment in some fashion in furtherance of a transgender identity—e.g. puberty blockers, hormones, and/or surgeries—but then ceased such treatments and embraced his or her biological sex.

suicidal. Amidst all these changes, G told her mom she was transgender.

Sue promptly took G to a gender clinic at a Kaiser Permanente mental health facility. There, outside her mom's presence, a clinic representative told G about hormonal treatments and surgeries she could have "to make her authentic." Afterwards, the clinic told Sue she had to choose whether to have "a dead daughter or a live son." The professionals offered Sue no alternative treatment options.

Terrified, Sue followed the gender clinic's advice and placed her daughter on puberty blockers. Sue communicated with G's school about her diagnosis and treatment plan, and the school agreed to cooperate with G's social transition.

For two-and-a-half-years, Sue was fully committed to G's social and medical transition. But G's "authentic" self did not, as promised, emerge. Instead, G's mental health deteriorated. G was cutting herself, suicidal, and borderline anorexic, in and out of psychiatric hospitals. Sue eventually brought G to an out-of-state psychiatrist who determined that G was not making progress because she was not suffering from gender dysphoria but underlying mental health issues.

In the psychiatrist's judgment, it was best for G to discontinue identifying as trans.

With a new diagnosis in hand, Sue contacted G's public school again to give them an update and tell the staff to cease all counseling and stop referring to her daughter as a boy. G's psychiatrist sent the school a letter informing them that he was now managing G's care, and that in his judgment G would be confused and her progress impeded should she receive conflicting advice from another counselor.

The school counselor was furious, refused to follow Sue's and the psychiatrist's directives, and called Child Protective Services ("CPS"). Soon thereafter, school staff ambushed G at school, pulled her into a "safe space," and told her she would be arrested if she did not speak to the CPS officer waiting in the next office over. CPS investigated Sue, but she avoided the anticipated emotional abuse charges by showing the agent photos of the whole family clad in LBGTQ gear from the time frame when G was transitioned.

Sue removed G from the public school and at G's behest enrolled her in an all-girl's high school. G is now a well-adjusted young woman who will be enrolled in an all-girls college in the fall.

### B.    Erin Friday, Mother of Desisted[7] Female

Erin Friday's daughter, P, was just 11 when a sex-ed presentation at her California public school suggested that students "could have been born in the wrong body." Within a week, five of P's classmates had adopted labels from the LGBTQ community. P started with pansexual, then identified as a lesbian. During the COVID-19 lockdowns, P adopted a transgender identity.

Erin learned that following the sex-ed class, P had had secretly spent hours on pornography-filled websites conversing with "trans-identified" adults and older minors who advised P that her depression, anxiety, and loneliness were because she was a transboy. The online chats were filled with young girls who were teaching even younger girls to dissociate from their bodies and send men provocative pictures in exchange for gifts.

When online high school started in the fall of 2019, P's teachers encouraged her to share her pronouns and chosen name with the class.

---

[7] The term "desisted" as used in this brief indicates that a person identified as something other than their sex, did not pursue medical interventions in furtherance of that belief, and then embraced his or her biological sex.

14

Like many of her female classmates, P chose a male name and male pronouns. The school adopted P's new male identity without informing Erin or seeking her permission.

When Erin found out, she was outraged. She called P's school, furious that counselors that had never met her daughter in person believed it was their prerogative to undermine Erin's parental rights and solidify P's trans identity. The administration did not justify its conduct but merely insisted that the school was a "safe space."

The school then reported Erin to public authorities. First CPS and then the police knocked on her door. Not only did the school declare itself the "safe" space; it judged Erin "unsafe" because she disagreed with their zeal to declare P transgender. Fortunately, Erin was able to avoid official abuse claims.

Erin removed P from her public school, but the damage was already done: P was now solidly invested in her trans identity. Her teachers, the second most influential group of adults in her life, had created a schism between child and parent. P was barely getting out of bed, not eating, showering, or brushing her teeth. Erin scoured her house for anything P might use to end her life. Erin also bought a safe

to lock away money, passports, and credit cards to prevent P from attempting to run away.

It took almost two years to repair the damage that P's school had done by telling her that she was transgender and that her mother was a hateful bigot. P is now happy in her female body and wishes she could forget her "trans" stage.

### C.    Ann M., Lesbian Mother of a Desisted Male

Ann M. is a public school teacher in a Chicago suburb, where she lives with her wife and her 16-year-old biological son, D.

D had a normal childhood with no signs of gender dysphoria. He was socially awkward and most comfortable with a small, tight-knit group of friends. But D was comfortable in his male body and enjoyed stereotypical male activities like playing sports. In seventh grade, D was diagnosed with attention-deficit disorder and anxiety, and his parents took him to a psychologist for treatment.

In eighth grade, D told his parents he was transgender through a text message. But when D did not follow up with any further conversations or requests, Ann figured D was simply exploring various identities and left the matter to D's psychologist.

Over the next year, Sue saw D's mental health decline. Just as D was adjusting to high school, COVID-19 lockdowns left him cut off from friends. D stayed in his room most of the time, gained significant weight, and was rude and aggressive toward his parents.

Ann thought D might be struggling with his sexual identity. So she took him to a Gay Straight Alliance (GSA) outing, a student group she had once led. Ann was surprised to find that the group was no longer focused on supporting same-sex attracted youth but instead encouraging gender transitions.

Before D started 10th grade, he asked his mom to tell the school to use his new female name. Ann refused, concerned that social transition would only further solidify his false identity. D, however, went behind his mom's back and asked all his teachers to use his female name. They complied; none informed Ann or her wife. One of D's teachers reached out to D privately through Microsoft Teams to avoid his parents' detection. The teacher told D that she was working together with the school counselor and encouraged D to "stay true to yourself" by maintaining a female identity.

17

When Ann found out that D's school was socially transitioning her son behind her back, she felt undermined and betrayed. Not only did they proceed without Ann's consent, they also cut themselves off from the important context Ann would have provided about D's underlying mental health issues and the online grooming Ann had uncovered.

D's therapist, who had been working with him for years, and his pediatrician, who knew him since birth, suspected that his trans identity was a maladaptive coping mechanism stemming from his depression.

Fortunately, after Ann confronted the school district and demanded that they stop undermining her parental authority, D's school reversed course and returned to addressing D son by the name his mother had given him.

Ann spent a great deal of time with D to help him understand why she did not believe he was transgender and why a social transition would be harmful. She showed him research on the exponential increase in children identifying as trans.[8] She showed him how Dr.

---

[8] See., e.g., Dianna Kenny, *Children and young people seeking and obtaining treatment for gender dysphoria in Australia: Trends by state*

McEvenue, a plastic surgeon in Canada, had bragged on social media about how much breast tissue he had removed from healthy teenage girls.[9] She sat down with D and watched "The Trans Train,"[10] a Swedish documentary about the harms that puberty blockers, hormones, and surgeries cause and relaying stories from detransitioners.

After talking things through with his mom, D cut his hair and returned to exclusively wearing male clothing. D not only tolerated his male name, but he also told his mom it was a relief. His mother's leadership had given him the cover he needed to walk back his trans identity.

---

*over time (2014-2018)*, (Sept. 4, 2019), https://web.archive.org/web/20230323100819/https://diannakenny.com.au/k-blog/item/12-children-and-young-people-seeking-and-obtaining-treatment-for-gender-dysphoria-in-australia-trends-by-state-over-time-2014-2018.html.

[9] Michele Mandel, *Decision upheld against surgeon's social media posts on transgender top surgery*, Toronto Sun, Nov. 11, 2011, https://torontosun.com/news/local-news/mandel-decision-upheld-against-surgeons-social-media-posts-on-transgender-top-surgery.

[10] *See* The Trans Train and Transgender Regret Documentaries, Bayswater Support Group, https://www.bayswatersupport.org.uk/the-trans-train-and-transgender-regret-documentaries/.

Although D did nothing permanent to his body, he wears the scars of embarrassment because he had been taken in by the notion that his distress and loneliness would disappear if he transitioned.

Ann will always be grateful that she trusted her maternal instincts and D's therapist and that she had the courage to stand up to D's school. She is haunted by the thought that if she had not intervened forcefully, D might not have escaped his trans identity without bodily harm or worse. One of Anne's friends had a child going through the same transgender issues; that mother affirmed her child's gender identity, and the boy soon thereafter took his own life.

### D.    Aurora Regino, Mother of a Desisted Female

Aurora Regino lives with her twelve-year-old daughter, A.S., in California. When A.S. was in the fifth grade, she was dealt a series of tough blows: her mom was battling breast cancer, her dad remained debilitated from a terrible car accident, her beloved grandfather passed away, and she started puberty early.

A.S. turned to her public school's wellness center for solace. But instead of helping A.S. process through her grief and trauma, the center suggested that she could be a different gender, and offered to support

20

her regardless of how she identified. The school counselor invited A.S. to a girl's arts and crafts group. After one meeting, A.S. told the school counselor she felt like a boy. The counselor sprang into action and asked A.S. if she had a boy's name she wanted the teachers to use. A.S. felt pressure from the counselor and said she did.

A.S.'s teachers clandestinely started referring to her as a boy. Moreover, the "arts-and-crafts club" dropped crafts altogether: the counselor spent entire meetings talking to 10 to 12-year-old girls in depth about gender and sexuality. Additionally, without Aurora's knowledge or permission, the school counselor started meeting with A.S. one-on-one, coaching her to affirm a transgender identity and introducing her to chest binding.

A.S. told the counselor that she wanted her mom to know about what was going on, but the counselor encouraged her to keep it a secret. Eventually, A.S. confided in her grandmother, who in turn told Aurora.

When Aurora heard some of what A.S.'s school had been up to, she called and demanded an explanation. The school was evasive, telling Aurora—falsely—that it was required by law to keep its actions secret

21

from parents. Aurora had to retain a lawyer and file suit to try and pry information from her child's school.

After Aurora removed A.S. from the offending school, A.S. began to heal and embrace her sex. Today, A.S. has returned to her true self: a happy, feminine girl who loves her mom and family.

### E.    Beth Bourne, Mother who Lost Physical Custody of Female Child

Beth Bourne is the mother of S, a 17-year-old female who began identifying as a transgender boy four years ago.

Based on her research and maternal instincts, Beth has identified several factors that she believes has contributed to her daughter's decision to identify as transgender. First, Beth suspects that S believes that presenting as male will shield her from the type of terrible sexual assault her best friend experienced in sixth grade. Second, S is gifted in STEM subjects, which S sees as a stereotypically male interest. Third, S has long-standing comorbid mental health issues that professionals have ignored in favor of a gender dysphoria diagnosis.

Finally, Beth believes S's school has been a major contributing factor in her identifying as transgender. S attends Davis Joint Unified High School, where one in twenty-five students identify as transgender,

2.8 times the national average.[11] Additionally, counseling services at S's school are provided through CommuniCare, a contracted provider that focusses on providing "affirming services for Yolo County's LGBTQ+ Community."[12]

Kenna Cook, the CommuniCare project coordinator for S's school, wants CommuniCare to serve as a "***chosen family***," where transgender "7th through 12th graders" can find a "safe pace to 'be themselves' and talk to ***trusted adults***."[13] Before Ms. Cook was hired to work with minor children, she had a "sex-positive" blog where she wrote articles such as "It's Not Weird to F*** Your Friends"[14] and "Be a Better Butt

---

[11] Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand, (Jan. 17, 2023), https://www.realityslaststand.com/p/breaking-new-documents-reveal-shocking.

[12] CommuniCare, LGBTQ+ Care, https://communicarehc.org/lgbtq-care/.

[13] Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+ youth in Yolo County: ElevateYouth works with residents aged 12 to 36*, Daily Democrat (March 26, 2021) (emphasis added), https://www.dailydemocrat.com/2021/03/25/communicare-expands-services-for-lgbtq-youth-in-yolo-county/.

[14] Kenna Cook, *It's not Weird to Fuck Your Friends*, Medium.com (Sept. 13, 2017) ("There is a grave misconception that sex is restricted only to couples in love and meaningless hookups found on Tinder," https://web.archive.org/web/20191219021805/https://medium.com/@mamacookling/its-not-weird-to-fuck-your-friends-8f3c141c3bc0.

Slut."[15] Ms. Cook also organized events like "Spanksgiving,"[16] where people invited to "learn about spanks before you give thanks."[17]

Beth raised concerns about whether CommuniCare and Ms. Cook should be providing confidential counseling to minors. But Beth's efforts only succeeded in getting her labeled by the district as a parent who did not have her daughter's best interests in mind.

Custody issues have prevented Beth from moving S to another school, but fortunately S is showing signs of desistence. S is wearing makeup and dresses and is no longer wearing a chest binder. However, Beth believes that S will not be safe so long as school districts are

---

[15] Kenna Cook, *Be a Better Butt Slut*, Medium.com (Sept. 20, 2017) ("Let's talk about the final frontier of penetrative sex. The boss level. The position of the professionals." https://web.archive.org/web/20191123092157/https://medium.com/@mamacookling/be-a-better-butt-slut-c8c123512bbc.

[16] Kenna Cook, *Spanksgiving: Impact Play 101*, Eventbrite.com (Nov. 22, 2017) ("Ever been interested in learning how to find the pleasure in a good spanking or want to know how to handle a paddle like a pro?" https://www.eventbrite.com/e/spanksgiving-impact-play-101-tickets-39629296292.

[17] Kenna Cook, Facebook (Nov. 22, 2017), https://www.facebook.com/photo.php?fbid=10159613335705483&set=pb.562380482.-2207520000.&type=3.

allowed to give those like CommuniCare and Ms. Cook confidential access to minor children.

### F.    Wendell Perez, Father of Desisted Female

Wendell Perez is the father of AP, a seventh grade female at a Florida public school. Last year, when AP was twelve years old and in sixth grade, Wendell and his wife were summoned to a meeting at AP's school.

There, they learned their daughter had just attempted suicide for the *second time* that school year. *The school had not told the Perezes about AP's first attempt.*

But that was not the only thing AP's school was hiding from her parents. At the same meeting, the Perezes learned a school counselor had been meeting with AP weekly for months. The counselor believed that AP's struggles stemmed from her issues with her gender identity— another thing the Perezes knew nothing about. The school also said that the counselor had told the administration and AP's teachers to use her "chosen" male name in class. This public "out"-ing led to AP being bullied at school. All of this embarrassment, confusion, and stress culminated in AP's suicide attempts.

A public school employee had essentially told everyone in AP's world about her gender distress, except for the two most crucial people in her life and the only two with a constitutionally protected interest in caring for her well-being: AP's parents.

AP's parents removed her from school and placed her in a mental health facility. Her inpatient treatment helped AP gain a deeper and clearer understanding of her troubles, which convinced her to drop her transgender identity. AP told her parents that she had wanted to flee girlhood because she lacked physical strength and thought that male hormones would be the best way to shield herself from male taunts. The "cool" LGBTQ posters and materials in the school counselor's office had also convinced her that her interest in sports and video games indicated that she was a boy trapped in a girl's body.

AP was just another adolescent, struggling to fit in and wanting to be "special." The school counselor's attention, prodding, and selective praise turned made AP want to be a special "transboy" instead of an ordinary girl. Though AP already had loving parents, the school counselor presented herself as a caring pseudo-parent. AP's actual

parents are now left to repair the damage school counselors did to their child.

### G.    Jessica M., Mother of Desisting Female

J is the mother of M, a 15-year-old female. When M was 13 and in eighth grade, she was subjected to California's mandated sex education curriculum for public schools, which exposes children to a wide range of sexual and gender identities. After the sex-ed class, M and her friends each selected sexual and gender identities; M came out to her parents as bisexual. Shortly thereafter, M started cutting herself. J immediately sought out a mental health therapist for M.

During ninth grade, a school counselor approached M. The counselor saw that M had been dressed in anime clothes—skirts, cat ears, chokers, and long socks—and redirected her to a group of trans-identifying older students. The counselor frequently held lunch meetups for the trans-identified females and even pulled them out of class for counselor-initiated meetings. M's mental health reached its nadir, and she came out as trans.

J naively thought M would receive support from the school counselor, but quickly learned that this person was the instigator,

covering for the older students who supplied her daughter with drugs and a replacement phone after J took M's away. Given that gender ideology has so thoroughly saturated California schools, J decided to homeschool M.

Since leaving school, M's mental health has steadily improved. She has started smiling again, no longer self-harms, and is showing signs of desistance from her trans identity. J is making plans to move her family away from California to further protect her daughter from pressure to identify as transgender.

### H.    Brette Smith, Mother of Desisted Female

Brette Smith's sixteen year-old daughter Anna had a tough time with during the COVID pandemic. To escape the loneliness of lockdowns, she found community in online chat groups and social media, where she quickly discovered transgender identities.

In June 2021, before Anna's freshman year of high school, Brette discovered that Anna was identifying as a transgender boy: her peers and a handful of "trusted" teachers had been socially affirming Anna behind her mother's back.

Brette sprang into action, removing Anna's access to social media and separating her from the peers that had been pushing towards this new male identity. Anna was furious. Based on what she had been fed by at school, she thought her mom was a transphobe. Teachers at school had also drilled into her that teens whose parents will not affirm them being their "authentic" trans self often commit suicide.[18] Anna decided that that was the best way out for her, too: she attempted suicide by swallowing a handful of Xanax. Thankfully, Anna survived.

Brette stood by Anna's side as she recovered and arranged for her to stay at an inpatient mental health facility. There, Anna's care team determined she had major depressive disorder and was likely on the autism spectrum. *Gender dysphoria was never diagnosed or suggested at all.* Anna had tried to kill herself because teachers at her school had coached her into as coached into believing that she was transgender and that a parent who disagreed was a hateful parent. To the contrary, Brette saw her little girl as perfect, with no need of "fixing." Fortunately, Anna's care team agreed.

---

[18] Anna's teachers participated in The Trevor Project, a pro-trans that seeks to "end[] LGBTQ youth suicide." The Trevor Project: About Us, https://www.thetrevorproject.org/strategic-plan/.

29

Brette was one of the rare parents who found mental health providers willing to explore the root causes behind Anna's sudden trans pronouncement. Anna was diagnosed with autism—a predominate factor in adolescents who announce a transgender identity.[19] Anna's care team determined that her trans identity was a maladaptive response to feeling different how she perceived other girls she knew.

Today, Anna is once again comfortable in her female body. She is courageously speaking out publicly about how she was captivated by what she calls the "trans cult," and how it is wrong and dangerous to keep secrets from parents. Her honesty about her experience now puts her on the receiving end of bullying and threats by trans-identified classmates.

## I.    Gaby Clark, Mother of Desisted Female

In 2021, Gabrielle Clark noticed that her 12-year-old daughter J and her friends were acting strangely. J had been a cheerful girl and an

---

[19] *See, e.g.*, Jennifer Murray, et al., *Autism and transgender identity: Implications for depression and anxiety*, 69 Rsch. in Autism Spectrum Disorders 101466 (Jan. 2020), https://doi.org/10.1016/j.rasd.2019.101466. ("An online study of 727 individuals revealed a substantial overlap between transgender identity and autism").

extrovert, but during the COVID lockdowns J became withdrawn and obsessed with TikTok and her appearance

Gabrielle learned that J's public school had, without her consent or knowledge, been calling J a boy's name and using male pronouns. Gabrielle believes, but the school has refused to confirm or deny, that school staff was meeting with J to discuss transgenderism and identity, and that this counseling pushed her daughter towards her eighth-grade announcement that she was transgender.[20]

When J told her mom she was planning on getting a radical double mastectomy, Gabrielle vociferously objected. This made J irate and even more rebellious. J began to self-harm by scratching, cutting, and biting herself.

Gabrielle knew that the school was undermining her parental rights and that she needed to take bold action to save her daughter. She decided to give up her life in Las Vegas and move the family to Texas.

---

[20] Like Appellee School Board of Leon County, J's school has a policy that promotes social gender transition plans without parental knowledge. Because of the school's intransience, Gabrielle has had to hire an attorney to help her learn the extent to which a public school has been undermining her parental authority and advocating that J adopt a transgender identity.

Gabrielle made sure that J's new school would not circumvent her rights as J's mom.

Gabrielle did a great deal of research to understand J's troubles and developed a plan on how to bring her daughter back from what she had some to call "the transgender cult." After six months away from her old school and off the internet, and with a great deal of parental love and compassion, J has slowly returned to being comfortable in her female body.

## CONCLUSION

For the foregoing reasons, and those stated by Plaintiffs-Appellants, the judgment below should be reversed.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

MAY 30, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 6,055 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2304 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: May 30, 2023

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae
