**APPEAL NO. 23-10385**

─────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

─────────────────────────────

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

Plaintiffs-Appellants,

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA, ROCKY HANNA, DR. KATHLEEN RODGERS, RACHEL THOMAS, ROBIN OLIVERI,

Defendants-Appellees.

─────────────────────────────

On Appeal from the United States District Court
Northern District of Florida, Tallahassee Division
District Court No. 4:21-CV-00415-MW-MJF

─────────────────────────────

**APPELLEES' SUPPLEMENTAL APPENDIX
VOLUME I**

─────────────────────────────

Jeffrey D. Slanker (FBN: 100391)        Terry Harmon (FBN: 0029001)
jslanker@sniffenlaw.com                 tharmon@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
(850) 205-1996

Appellees' Attorneys

## Index of Supplemental Appendix

Docket/Tab #

**Volume I**

[Doc. 1] Complaint ............................................................................. 1

[Doc. 13] Defendants' Motion to Dismiss Plaintiffs' Complaint....................... 13

[Doc. 15] Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss .......................................................... 15

[Doc. 37] Order Granting in Part Motion to Dismiss ................................. 37

[Doc. 56] Defendants' Consolidated Motion to Dismiss
Plaintiffs' Amended Complaint ........................................................... 56

**Volume II**

[Doc. 57] Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss First Amended Complaint ............................. 57

[Doc. 67] Plaintiffs' Notice in Response to The Court's Order
Granting Defendants' Motion to Dismiss................................................ 67

[Doc. 70] Notice of Appeal ................................................................ 70

Certificate of Service

Respectfully submitted this 28th day of July 2023.

/s/ Jeffrey D. Slanker

**JEFFREY D. SLANKER**
Florida Bar No.: 0100391
E-mail: jslanker@sniffenlaw.com
**TERRY J. HARMON**
Florida Bar Number: 0029001
tharmon@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, FL 32301
Telephone: (850) 205-1996
Fax:   (850) 205-3004

*Counsel for Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I CERTIFY that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times New Roman.

/s/ *Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

Doc. 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### (TALLAHASSEE DIVISION)

| | | |
|---|---|---|
| January Littlejohn, | ) | |
| Jeffrey Littlejohn, | ) | |
| Plaintiffs | ) | Case No. 4:21-CV-00415 |
| v. | ) | |
| School Board of Leon County, | ) | |
| Florida, Rocky Hanna, individually, | ) | |
| and in his official capacity as | ) | Jury Trial Demanded |
| Superintendent of Leon County | ) | |
| Schools, Dr. Kathleen Rodgers, | ) | |
| individually, and in her official | ) | |
| capacity as Assistant Superintendent, | ) | |
| Equity Officer and Title IX | ) | |
| Compliance Coordinator for Leon | ) | |
| County Schools, | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

Plaintiffs, January Littlejohn and Jeffrey Littlejohn ("Plaintiffs") by and through counsel, file this civil action and respectfully request this Court to issue injunctive relief, a declaratory judgment and award damages for violations of the United States Constitution, Florida Constitution, and Florida Statutes by Defendants, School Board of Leon County, Rocky Hanna, and Dr. Kathleen Rodgers.

In support thereof, Plaintiffs state:

1

## INTRODUCTION

1.      Plaintiffs bring this action to vindicate their fundamental rights to direct the upbringing of their children as established by the United States and Florida constitutions and by Florida Statutes, Chapter 1014 and. § 743.07. Defendants have violated Plaintiffs' fundamental rights by, *inter alia*, implementing a protocol which explicitly circumvents parental notification and involvement in critical decisions affecting their children's mental, emotional and physical health, *i.e.,* the children's assertion of a discordant gender identity and accommodations to facilitate asserting the discordant gender identity at school.

2.      Defendants further violated Plaintiffs' fundamental rights by implementing a protocol and training district staff to conceal from parents information regarding their children's assertion of a discordant gender identity, including, *inter alia*, assumption of a new name, use of different pronouns, use of opposite sex privacy facilities and use of opposite sex lodging on off campus trips.

3.      Defendants further violated Plaintiffs' fundamental rights by directing staff to deceive parents by using the children's birth name and corresponding pronouns in the presence of or communication with the parents while using the children's new chosen name and pronouns at all other times.

## JURISDICTION AND VENUE

4.     This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered by Plaintiffs from deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the United States Constitution, by the laws of the United States and the laws of Florida. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in Leon County, Florida, which is situated within the district and divisional boundaries of the Northern District of Florida.  Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

6.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57, and to issue injunctive relief under Federal Rule of Civil Procedure 65.

7.     An actual controversy exists between the parties involving substantial constitutional issues, in that Plaintiffs allege that Defendants' policies, procedures, directives and actions taken in accordance with them, on their face and as applied, violate the United States Constitution and have infringed Plaintiffs' rights, while

Defendants allege that their policies, procedures, directives, and actions comport with the Constitution.

8.    This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

## PARTIES

9.    Plaintiffs January and Jeffrey Littlejohn are residents of Leon County, Florida and parents of children attending Leon County Schools.

10.    Defendant School Board of Leon County is the governing body for public schools in Leon County, Florida, with the authority to sue and be sued, and was at all times material acting within the course and scope of its authority pursuant to Article IX, § 4 of the Florida Constitution, Fla. Stat. §§ 1001.41-1001.42 and further under color of law.

11.    Defendant Rocky Hanna is the Superintendent of Leon County Schools ("LCS"), having been elected by the citizens of Leon County pursuant to Article IX, § 5 of the Florida Constitution. He is and was at all times relevant herein, acting within the course and scope of his constitutional authority as Superintendent and his duties under Fla. Stat. §§ 1001.49, 1001.51, and other applicable Florida law and consistent with the customs, policies, and practices of Leon County Schools. He is sued in his individual and official capacities.

12.    Defendant Dr. Kathleen Rodgers is the Assistant Superintendent, Equity Officer and Title IX Compliance Coordinator for LCS. She is and was at all times relevant herein, acting within the course and scope of her employment, under color of state law and consistent with the customs, policies, and practices of LCS. She is sued in her individual and official capacities.

## STATEMENT OF FACTS

### Defendants' Transgender Student Support Directives

13.    Plaintiffs are informed and believe and based thereon allege that the District's LGBTQ+ Equity Committee created the "LCS Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide" (the "Guide"). A true and correct copy of the Guide is attached hereto, marked as Exhibit A and incorporated herein by reference.

14.    Plaintiffs are informed and believe and based thereon allege that the Guide was prepared under the supervision of Defendant Rodgers as part of the course and scope of her employment as Assistant Superintendent and Equity Officer for Leon County Schools. Dr. Rodgers is listed as a contact person on page 28 of the Guide.

15.    Plaintiffs are informed and believe and based thereon allege that Defendant Hanna was aware of and approved of the committee's preparation of the Guide and its contents as part of the exercise of his duties as Superintendent of Leon

5

County Schools under, *inter alia,* Fla. Stat. §§ 1001.49, 1001.51 and 1012.27. Mr. Hanna is listed as a contact person on page 28 of the Guide.

16.     Plaintiffs are informed and believe and based thereon allege that the School Board was aware of, authorized and approved of the development of the Guide and its contents. Plaintiffs are informed and believe and based thereon allege that Board Chairwoman Georgia "Joy" Bowen listed development of the Guide as a "success story" for LCS's efforts to promote equity and access for LGBTQ+ students during a presentation at "All Together Now 2021: School Board Policies: Procedures that Promote Equity and Access for LGBTQ+ Students" hosted by Equality Florida February 25-26, 2021.[1]

17.     Ms. Bowen is listed as the vice-chair of the Equity Committee for the Florida School Board Association. The Equity Committee meets monthly with Equality Florida.

18.     Plaintiffs were not aware of the Guide or the protocols and directives contained within the Guide until November 6, 2020 after LCS staff had used the protocols with Plaintiffs' child without Plaintiffs' knowledge or consent, in violation of their parental rights, as described *infra,* and Plaintiffs had repeatedly requested that LCS staff provide legal justification for the actions taken.

---

[1]     https://m.youtube.com/watch?v=m1-djGJpXI&list= PLUWXEguBhw7y BHiPXADDAc6tGtsvkNlDe&index=17 at 29:19.

19.     Plaintiffs were not notified about, and are informed and believe and based thereon allege that other parents were not notified about, directed to, or provided with copies of the Guide as part of communications and notifications from LCS staff to parents. Nevertheless, the Guide purports to "be a tool for schools, students and their parents and legal guardians to effectively navigate existing laws, regulations and policies that support LGBTQ+ LCS students." (Exhibit A, p. 3).

20.     The Guide "effectively navigates," that is, it directs, LCS administrators and staff away from communicating with and involving parents in critical decisions regarding their children's physical, emotional, and mental health in contravention of rights established under the United States and Florida constitutions and Florida statutes.

21.     For example, the Guide states:

 Under the Family Educational Rights and Privacy Act (FERPA), students, current or former, have a right to seek to amend their school records if said records are "inaccurate, misleading, or in violation of the student's rights of privacy." (34 C.F.R. § 99.7(a)(2)(ii)). Transgender students wishing to change their name and gender marker on their educational records can seek such an amendment of certain records under this federal law. (Exhibit A, p. 14).

In fact, FERPA provides that it is **parents**, not students, who have the right to review and request amendments to misleading or inaccurate school records until the student reaches age 18 or is legally emancipated. 20 U.S.C. § 1232g(7)(d); 34 C.F.R. § 99.7(a)(2)(ii). The Guide therefore falsely directs and instructs administrators and

7

staff that under FERPA they can change a student's records at the student's request without notifying parents.

22.     The Guide's false assertion that administrators and staff can change a student's name at the student's request under FERPA represents a *de facto* policy sanctioned by the School Board, as reflected and affirmed in Chairwoman Bowen's listing of the directive as one of the "success stories" for LCS's efforts to increase equity and access for LGBTQ+ students at the All Together Now conference and Chairwoman Bowen's statements: "We have allowed students to have diplomas with their affirmed names at their request." "We have put measures in place to allow students to use their 'affirmed' name at school. Students' affirmed name is placed in the system at their request so that substitute teachers are aware that they go by a name different from their legal name."[2]

23.     The Guide further directs and instructs administrators and staff to deliberately and intentionally conceal from parents information related to their children's assertion of a discordant gender identity:

> Q: A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified?
> A: No. Outing a student, especially to parents, can be very dangerous to the students [sic] health and well-being. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+, many of whom have been rejected by their families for being LGBTQ+. Outing

---

[2]     *Id.* at 32:40

students to their parents can literally make them homeless. (Exhibit A, p. 15).

24.     Plaintiffs are informed and believe and based thereon allege that the directive to not tell parents about their children's gender identity issues represents a *de facto* policy sanctioned and authorized by the School Board, in accordance with Chairwoman Bowen's statement at the "All Together Now" conference:[3]

> There are some segments of the community that would be more receiving and accepting of LGBTQ students than others. And in those pockets in which parents don't have that understanding, and parents won't accept, I think one of the challenges that we have to deal with is to find a way to help the parents see who these students are and there is a great need. I know there are a lot of pockets here in Leon County, a lot of African-American parents who say, "There's nothing wrong with you. You just need to leave it alone." They just dismiss it. I don't mean to point fingers but we need to deal with the elephant in the room and have the kind of training and understanding to have these parents see that these children are important.

25.     The Guide further directs and instructs administrators and staff to deliberately disregard the rights of parents in a document labeled "Leon County School District Transgender/Gender Nonconforming Student Support Plan." ("Student Support Plan") (Exhibit A, pp. 19-27).

26.     Part A of the Student Support Plan includes an intake checklist that asks whether the student's parents are aware of the student's asserted discordant gender identity, whether the parents are "supportive," and whether they should be notified. The Guide authorizes the minor student to decide whether his or her parents will be

---

[3]     *Id.* at 23:00.

notified of something as significant as the child's belief that he is not a boy or she is not a girl or distress concerning his or her biological sex. (Exhibit A, p. 19).

27.    Part B of the Student Support Plan, which is completed during a meeting with the student, LCS staff, and —only if the student consents— the parents, includes the question:

> Are guardians(s) of this student aware and supportive of their child's gender transition? __Y __N. If not, what considerations must be accounted for in implementing this plan? (Exhibit A, p. 20).

It is the child who determines whether his or her parents are "supportive" of his or her "gender transition," and, therefore "entitled" to be notified and involved in addressing the issues surrounding the child's belief.

28.    Part B of the Student Support Plan includes questions regarding which name and pronoun the child will use, which communal sex-separated restroom, locker room or shower they will use and with which sex-separated group the child will room on overnight trips. If the child has indicated that his or her parents are not "supportive" and therefore not present at the meeting, then the Student Support Plan authorizes minor children to make these mature, consequential decisions with no notification to or input from parents.

29.    Plaintiffs are informed and believe and based thereon allege that LCS administrators and staff were provided with the Guide and trained and instructed by Dr. Rodgers and her staff to follow the directions in the Guide whenever a child

10

announced that he or she believed that he was not a boy or she was not a girl, or expressed distress with his or her biological sex (expressed a discordant "gender identity.").

30.     Plaintiffs are further informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that students who express a discordant gender identity are protected by law from having their parents notified without the child's consent. Plaintiffs are further informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that under the law parents were not permitted to attend gender support plan meetings unless the child agreed.

31.     Plaintiffs are informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that parents could not by law be told anything about their child's expression of a discordant gender identity unless the child consented.

32.     The Guide directs LCS staff that children are to be permitted to use any sex-separated privacy facility that the child says corresponds to the "gender identity" the child asserts regardless of concerns raised by other children.

> Q: A student has complained about a person of the wrong sex in the bathroom or locker room area. What action should be taken?
> A: As part of LCS policy against discrimination based on gender identity, any student may use restroom and locker room facilities in accordance with their gender identity. Students cannot be singled out, such as requiring them to use a separate bathroom from their peers (i.e., using the nurse's bathroom or single occupancy bathroom only). Students may request additional privacy in locker rooms and should be

provided with a private area where they can change clothes for gym class or athletic activities. Again, LGBTQ+ students cannot be singled out. The privacy areas should be offered to all students who wish to change with a higher level of privacy for any reason. Toilet stalls are not changing areas. (Exhibit A, p. 14).

33. The Guide claims that children's choice of privacy facility is part of LCS's non-discrimination policy. LCS's Nondiscrimination and Equal Educational Opportunity Policy, 2260, provides in pertinent part:

> Any form of discrimination or harassment can be devastating to an individual's academic progress, social relationship, and/or personal sense of self-worth. As such the School Board will not discriminate nor tolerate harassment in its educational programs or activities on the basis of race, color, national origin, sex, disability (including HIV, AIDS, or sickle cell trait), marital status, age (except as authorized by law), religion, military status, ancestry, or genetic information, which are classes protected by State and/or Federal law (Protected Classes). In addition, the Board will not discriminate nor tolerate harassment in its educational programs or activities on the basis of sexual orientation or gender identity.

Neither Policy 2260 nor any other published School Board policy, nor published School Board Administrative Procedure, contains language alerting parents and students that children will be permitted to unilaterally choose which sex-separated privacy facility they will use based on their asserted gender identity.

34. Nevertheless, Defendant Rodgers and other administrators directed LCS staff to permit children who assert a discordant gender identity to unilaterally choose which sex-separated privacy facility they will use without parental input and to disregard other students' privacy and safety concerns.

35.   Plaintiffs are informed and believe and based thereon allege that the directive granting children the choice of privacy facility represents a *de facto* policy sanctioned by the School Board as reflected by Chairwoman Bowen listing facility choice as a "success story" for LCS's efforts to increase access and equity for LGBTQ+ students at the "All Together Now" conference: "We have worked with students on a case-by-case basis for bathroom usage when they bring to our attention issues on identity."[4]

36.   Plaintiffs were not notified and are informed and believe that other parents and students were not and are not notified that children could encounter and would be required to accept opposite sex students in their privacy facilities without regard for their privacy and safety concerns.

37.   The Guide also states that the LCS nondiscrimination policy requires that LCS staff and students comply with a child's assertion that he or she must be called by a new name and/or pronouns or face a harassment charge:

> Q: A student has complained that a teacher, student, or school employee has intentionally "misgendered" them. What does this mean and what should be done about it?
> A: Misgendering a student is intentionally using the wrong gender pronouns. As part of LCS policy against discrimination based on gender identity, misgendering is considered harassment. Students, faculty and staff are expected to treat their peers with respect, including using their preferred gender pronouns, even if those pronouns are gender neutral, (i.e., "they", "them"). Similarly, consistent, intentional "deadnaming", or using the discarded birth name of a student, faculty,

---

[4]   *Id.* at 32:40.

or staff member that is not the preferred name of that person is considered harassment. (Exhibit A, p. 14).

Neither Policy 2260 nor any other published School Board policy, nor published School Board Administrative Procedure contains language alerting parents and students that children will be permitted to unilaterally choose a new name and/or pronouns and demand that other children, teachers, and staff use the new name/pronouns under penalty of a harassment charge and attendant discipline.

38.    Nevertheless, Defendant Rodgers and other administrators directed LCS staff to permit children who assert a discordant gender identity to assert a new name and new pronouns and require that fellow students, teachers, staff, and other adults use the new identifiers or face harassment charges and attendant discipline.

39.    Plaintiffs were not notified and are informed and believe that other parents and students were not and are not notified that children could be required to use a new name or pronoun for a classmate, *i.e.,* utter something that is false, or be subject to a harassment charge and attendant discipline, with no consideration given for the children's First Amendment rights.

40.    Plaintiffs are informed and believe and based thereon allege that the directive granting children the choice of name and pronouns represents a *de facto* policy sanctioned by the School Board as reflected by Chairwoman Bowen's statement at the "All Together Now" conference that name and pronoun choice was a challenge facing LGBTQ+ students that LCS had addressed: "Affirmed names and

14

pronouns are a central part of a student's identity. We want to get those right, so we include our pronouns in Zoom, or in class we say, 'Hi I am Mr. Stewart and I use the pronouns he/him.'"[5]

41.     Chairwoman Bowen also listed "rising family tensions," "stress of living in a non-affirming household," and "parent/community pushback on LGBTQ+ inclusion" as challenges LGBTQ+ students face that the LCS Board had to address.[6]

42.     Chairwoman Bowen stated that "unmet medical needs" including puberty blockers (medications that arrest pubertal development in children) were a challenge for LGBTQ+ students that "hopefully we can" have remedies in place for.[7] Chairwoman Bowen did not mention parental involvement in providing such medical "remedies" to minor students.

**Defendants Secretly Create Transgender Support Plan for Plaintiffs' Child**

43.     Plaintiffs' child, A.G., was a student at Deerlake Middle School during the 2019-2020 school year. A.G. had been diagnosed with ADHD and had in place an accommodation plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et.seq.*

---

[5]     *Id.* at 15:11.
[6]     *Id.*
[7]     *Id.*

15

44.     During spring 2020 A.G. was having difficulty adjusting to the remote learning that was in place because of the COVID-19 pandemic. Online learning was not conducive to A.G.'s ADHD and she began to get agitated and depressed sitting at the computer all day.

45.     By late spring 2020, A.G. told her parents that she was confused about her gender and believed she might be non-binary. Mrs. Littlejohn learned that earlier in the year, three of A.G.'s friends had stated that they were transgender. She also observed that A.G. was receiving text messages from transgender friends.

46.     LCS counselors were available for students who were having difficulty with COVID-19 remote learning. A.G. began working with Shellie Rogers, one of the LCS counselors, in spring 2020.

47.     When A.G. expressed confusion about her gender, Plaintiffs informed Mrs. Rogers, who agreed to continue working with A.G. while Plaintiffs looked for another counselor.

48.     Plaintiffs found a new counselor who began seeing A.G. in summer 2020. Mrs. Littlejohn informed Mrs. Rogers about the new counselor.

49.     As the school year approached, A.G. asked her parents to permit her to change her name to "J." and to use "they/them" pronouns. Plaintiffs did not agree to make those changes at home. Plaintiffs said that A.G. could use J. as a "nickname" at school but would continue to be referred to as A.G. and a female.

50.    On August 27, 2020, Mrs. Littlejohn emailed A.G.'s new math teacher, Rima Kelley. Mrs. Littlejohn told Mrs. Kelley that A.G. had expressed confusion about her gender last spring, that the family was working on the issue including seeing a private counselor, that Plaintiffs did not consent to A.G.'s request to change her name and pronouns, but that A.G. could use J. as a "nickname" with classmates and teachers if she desired. Mrs. Littlejohn also told Mrs. Kelley she thought A.G.'s gender confusion was a direct result of her friend group.

51.    Mrs. Kelley replied that she would "try my very best to call them [sic.] J. Would you like me to share this with J.'s other teachers? Or are you telling them?" Mrs. Kelley further said that if A.G. really wanted to "do this we really need to tell them.  I can do it for you if you'd like. I am even the SAFE SPACE ally for Deerlake for LGBTQ students."

52.    Mrs. Littlejohn did not authorize Mrs. Kelley to tell other teachers, or anyone else, about A.G. using "J." as a nickname.

53.    Mrs. Littlejohn was well-known to the staff at Deerlake Middle School and was frequently at school volunteering in the copy room and events. Mrs. Littlejohn was present at all 504 plan meetings with guidance at Deerlake Middle School. Mrs. Littlejohn was also presented the "Volunteer of the Year" award for Deerlake Middle School in 2019. Nevertheless, no one at Deerlake Middle School,

nor otherwise affiliated with LCS, ever said anything to her or Mr. Littlejohn about their daughter's request to use a different name and pronouns.

54.     Mr. and Mrs. Littlejohn would never have known what was transpiring between LCS staff and her daughter but for an offhand comment A.G. made on September 14, 2020 as she was getting into the car. A.G. told her mother that she had a meeting with several school officials, and she thought it was funny that they asked her what restroom she preferred to use as a result of changing her name.

55.     Mrs. Littlejohn emailed Rachel Thomas, the school counselor, said she had serious concerns about A.G. being asked which restroom she wanted to use, reiterated that she did not want A.G.'s name changed, and asked for a meeting.

56.     Mrs. Thomas and Robin Oliveri, the assistant principal at Deerlake Middle School, called and informed Mrs. Littlejohn that they could not tell her anything about her daughter's September 8, 2020, meeting with LCS staff. Mrs. Thomas told Mrs. Littlejohn that she was not invited to the meeting because A.G., "by law" had to be the one to request her parents' attendance.  Mrs. Thomas told Mrs. Littlejohn that A.G. was now "protected" under a non-discrimination law that does not include parental notification or input. Mrs. Thomas told Mrs. Littlejohn that her only recourse was to "contact Dr. Kathleen Rodgers at the district who oversees the policy."

57.     On September 18, 2020, Mrs. Littlejohn sent an email to Dr. Rodgers,

saying in pertinent part:

> My daughter had a transgender meeting last week with multiple school
> officials.  Her father and I were not invited or notified of the meeting,
> which Mrs. Thomas explained is due to a state statute protecting
> transgender individuals.  My daughter told me she was not asked if she
> wanted a parent there, which is extremely upsetting to me as her parent.
> She has a 504 plan for her ADHD and we have been very involved in
> that process due to her inattention and focus issues.
>
> Her father and I have been supportive since she told us she was having
> gender identity issues in March and she has been seeing a counselor to
> help her process her feelings and seek help in understanding what she
> is going through.  My child is not opposed to having a parent involved
> so what do we need to do moving forward for her father or I to be
> present at these meetings and be involved in the plans? Just so you are
> aware, she is the fourth child in her friend group at Deerlake to change
> her name and gender identity. She has never expressed these feelings
> before March during quarantine. Her father and I are taking this very
> seriously and would like to be involved in any school plans.

58.     Dr. Rodgers responded to Mrs. Littlejohn that she was not familiar with

her child's case but that based on what Mrs. Littlejohn said the parents would be

permitted to be in the meetings. She said she trusted that LCS staff would work to

include the parents in future meetings.

59.     After hearing nothing further from LCS for nearly a month, on October

14, 2020, Mr. Littlejohn sent an email to Dr. Rodgers reiterating the facts as he knew

them at the time. He also expressed the parents' concerns raised by LCS's

interactions with A.G.:

19

I have several significant concerns about this situation. Our daughter is 13 years old and a minor. We are her natural parents and legal guardians. Our daughter is diagnosed with ADHD and has an active "504 Plan" on file with the school. Our daughter is also in counseling as a result of a referral by, or at least in consultation with, the school's guidance counselor. My wife and I have met with her counselor, and we have learned from her that it is common in children with ADHD to experience developmental delays in emotional maturity, among other things. In fact, our counselor believes that our daughter exhibits the emotional maturity of a typical 10 or 11 year old child.

For all of these reasons, we find it incredible that she was given the opportunity to advocate for herself in this instance, without our knowledge or opportunity to participate. If it is in fact the school's position that it has the legal authority to conduct such business directly and confidentially with minors and without parental notice or consent, please send us the specific law, rule, or published policy reference that supports such a position. Further, we would like to be provided with any and all school records and other documents related to the meeting, a copy of the minutes of the meeting or, absent such minutes, a written summary of the meeting provided by a school official who was present at the meeting. If there is a law, rule, or published policy that prevents these records from being provided to us, please cite the specific authority.

Finally, regarding the physical safety of our female child while at Deerlake, we have significant concerns and many questions related to her being given the opportunity to use the boy's restrooms. I realize that this statement is based only on our daughter's account of the meeting, and the reality may be different. Regardless, we would like to know exactly what was offered to our 13 year old female child on this subject, along with any additional limitations, conditions or precautions the school offered or was prepared to provide for our child, without our knowledge or consent. If there is a written school or District policy on the subject of "restroom preference," please provide it to us.

60.    Dr. Rodgers did not respond to the email. Mr. Littlejohn called Dr.

Rodgers on October 29, 2020 and again asked for the specific Leon County school

policy that allowed school officials to meet with their minor daughter without their consent. Dr. Rodgers said she would get the guideline to him. Mr. Littlejohn reiterated the parents' discontent and concern that the school spoke with their minor daughter about her bathroom preference, which is a safety issue.

61.    In response to Mr. Littlejohn's expression of concern about school staff meeting privately with his daughter, Dr. Rodgers requested permission to continue to have LCS staff meet privately with A.G. in order to get more information. Mr. Littlejohn said no.

62.    Later that day, Dr. Rodgers emailed Mr. Littlejohn to say that she had spoken to Deerlake Middle School principal Stephen Mills who agreed to meet with the Littlejohns.

63.    Meanwhile, Mr. and Mrs. Littlejohn learned that A.G. was getting a lot of positive attention and reinforcement for her "gender identity choice" to be called "J." and use they/them pronouns. They learned that several teachers, including Mrs. Kelley, were praising A.G. for being "brave."

64.    On November 2, 2020, Mr. and Mrs. Littlejohn met with Mr. Mills who provided them with a copy of the Student Support Plan that had been created for A.G. by LCS staff on September 8, 2020 without her parents' knowledge, participation, or consent. Mr. Mills did not provide Mr. and Mrs. Littlejohn with the requested legal authority that permitted LCS to meet with their daughter or create

such a plan without their knowledge or consent. Notably, Mr. Mills did not refer Mr. and Mrs. Littlejohn to the LCS Website for a digital copy of the Guide, nor print out a copy of the Guide for them.

65.     Mr. Mills told Mr. and Mrs. Littlejohn that, again without notifying them and in disregard of the extensive correspondence that had transpired between Plaintiffs and LCS staff, LCS had scheduled a private follow up meeting with their daughter for November 3, 2020 to further discuss her Student Support Plan. Scheduling this meeting without notifying the Littlejohns was a further disregard of their parental rights and their explicit directions that they be included in any future meetings. It also contradicted Dr. Rodgers' promise that LCS staff would work to include the parents in any further meetings.

66.     Mr. Mills told Mr. and Mrs. Littlejohn that they could be present at the meeting. Mr. and Mrs. Littlejohn requested that the meeting be cancelled and requested that no further meetings regarding her gender identity be scheduled.

67.     Mrs. Littlejohn informed Mr. Mills that LCS's actions had harmed their relationship with their daughter and that they did not want any more private meetings that might disrupt their attempt to repair the relationship. Mrs. Littlejohn specifically requested that she be informed if A.G. expressed anything about gender identity to the teachers or counselors.

68.     Since Mr. Mills had failed to respond to their request for legal authority for LCS's actions, Mr. Littlejohn emailed Dr. Rodgers and again requested "any written law, rule, policy and/or guidance on the process of school officials meeting with children about LGBTQ (or any other) issues without parental knowledge or consent."

69.     Dr. Rodgers did not respond. On November 6, 2020 Mr. Littlejohn sent another email repeating the request and indicating that he was ready to take further action to obtain the information.

70.     Dr. Rodgers responded and told Mr. Littlejohn, "We currently do not have any Florida specific law **that obligates us to inform the parents or says we cannot listen to the student without their parent present**. However, we do want to create a safe space for the student and honor their right to privacy while at the same time encourage their parent involvement in their support system as it relates to their issue – in this case one that is an orientation of non-binary." Dr. Rodgers did not explain how LCS intended to encourage parent involvement without informing parents that there is an issue related to their child's gender identity.

71.     After receiving the copy of A.G.'s Student Support Plan on November 2, 2020 Mr. and Mrs. Littlejohn for the first time learned what had been transpiring without their knowledge between LCS staff and their 13-year-old daughter since August 27, 2020 when Mrs. Littlejohn told Mrs. Kelley that A.G. was experiencing

confusion about her gender identity, which was being addressed by her parents through work with a private counselor. Mrs. Littlejohn had told Mrs. Kelley that they had not consented to A.G.'s request to change her name and pronouns but said that A.G. could use "J." as a "nickname" while the family was working through the issue.

72.     Unbeknownst to Mr. and Mrs. Littlejohn until November 2, 2020, A.G.'s request to change her name with the guidance counselor unleashed a flurry of activity aimed at secretly affirming A.G.'s belief that she was nonbinary and was to be called "J." and be referred to by the pronouns "they/them" by all of A.G.'s teachers in direct contravention of her parents' decisions and direction to school staff.

73.     Mr. and Mrs. Littlejohn learned that their daughter met with Veronica France, Taita Scott, and Rachel Thomas on September 8, 2020. The Student Support Plan indicated A.G.'s parents were not aware and supportive of A.G.'s "gender transition," so that staff needed to "engage in privacy" when speaking with them. In other words, LCS staff were directed to conceal from Mr. and Mrs. Littlejohn that their daughter was claiming to be "nonbinary."

74.     Mr. and Mrs. Littlejohn also learned that as of September 8, 2020 teachers and staff at Deerlake Middle School had been told that A.G. identified as "nonbinary" and of her preferred name and pronouns. Staff had also been directed

to not use her preferred name or gender specific pronouns when talking to A.G.'s parents.

75.    Mr. and Mrs. Littlejohn learned that their daughter indicated on September 8, 2020, that she wanted to use the female restroom. However, Dr. Rodgers had already directed staff that it was up to the child to make the choice, so A.G. could change her mind and could begin using the male restroom at any time without her parents' knowledge.

76.    Mr. and Mrs. Littlejohn were also shocked to learn that their 13-year-old daughter indicated at the September 8, 2020, meeting with LCS staff, that she was "comfortable with" rooming with either boys or girls on overnight trips.

77.    On or about November 6, 2020, Mr. and Mrs. Littlejohn for the first time became aware of the existence and contents of the Guide and the attached Student Support Plan form.

78.    Despite numerous requests for the authority under which LCS was operating in meeting with children without parental notice and consent, Mr. and Mrs. Littlejohn were never provided with a link to the Guide on the LCS Website. Mr. Mills emailed excerpts from the Guide on November 2, 2020 but did not offer a copy or a link. In her November 2, 2020 and November 6, 2020 emails Dr. Rodgers did not provide a link or even inform the Littlejohns that the Guide was available online. Instead, Dr. Rodgers sent a hard copy of the Guide through the mail. After receiving

the hard copy, Mr. Littlejohn did a search on the LCS website and discovered a link to the Guide on Dr. Rodgers' Equity and Diversity Department page.

79.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide deliberately and intentionally directed LCS staff and personnel to disregard parental rights by NOT telling parents when their children asserted a discordant gender identity.

80.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide and Plan gave children like their 13-year-old daughter authority to determine whether their parents would be informed of their gender identity decisions, including giving children the authority to decide which sex-separated privacy facilities they would use and with which sex they would room on overnight trips.

81.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide and Plan actually directed LCS staff to deceive parents by telling staff to use different names and pronouns to refer to children in the presence of their parents than were used to refer to the children at school.

82.    On November 9, 2020, Mr. Littlejohn emailed Mr. Hanna to request a meeting regarding the Guide and the unconsented to interactions with their daughter. Mr. Littlejohn said "[W]e cannot understand the District's current policies regarding students changing their gender identities without parental notice or consent. It is particularly troubling to us that the District policy also prohibits school staff from

disclosing this information to parents and in some circumstances, actually directs the deception of parents by using different names and pronouns around parents than at school."

83.    Mr. and Mrs. Littlejohn met with Mr. Hanna on December 14, 2020. They informed Mr. Hanna about what had transpired with their daughter at Deerlake Middle School. They provided Mr. Hanna with information regarding Rapid Onset Gender Dysphoria, a social contagion phenomenon in which teenagers, particularly young girls who had never expressed confusion about their gender suddenly, like A.G., join with other friends in declaring that they no longer identify as a girl.[8]

84.    Mr. and Mrs. Littlejohn also provided Mr. Hanna with information regarding parental rights laws in Florida and told him that what transpired with their daughter was a huge violation of their parental rights.

85.    Mrs. Littlejohn is a licensed mental health counselor. She quoted statistics from the Guide to Mr. Hanna that indicate the transgender population is at an increased risk of suicide, yet nowhere on the Student Support Plan is there a question about whether the student is having thoughts of self-harm or seeking therapy for potential mental health issues. Mrs. Littlejohn told Mr. Hanna that by not notifying the parents of transgender/discordant gender children about their child's

---

[8]    Lisa Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE 13(8): e0202330 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330

gender identity issues, LCS is assuming responsibility for the mental health and physical health of those children. She then pointed out the inherent conflict between the policy of willful shielding of a child's LGBTQ status from their parents in the name of privacy, while simultaneously recognizing the increased suicide risk of LGBTQ-identified children. This policy of secrecy stands in stark contrast to the fundamental principles of suicide prevention and effectively prevents potentially at-risk children from accessing mental health services, which necessitate parental guidance and require parental consent.

86.   Mr. and Mrs. Littlejohn told Mr. Hanna that LCS is unjustifiably assuming that all parents are non-supportive of their children's gender identity issues and letting children decide whether their parents are "supportive," without defining "supportive" or investigating whether what the children are saying is accurate. Statements by Board Chairwoman Bowen and Dr. Rodgers, as well as the Guide confirm that LCS is indeed granting minors the authority to make what are essentially mental health decisions without consulting their parents.

87.   Mr. and Mrs. Littlejohn expressed concern that LCS's directives and practice are cutting parents out of very important, potentially life-altering decisions about their children in derogation of the constitution and Florida law.

88.   Mr. Hanna apologized for how the situation was handled. He told the Littlejohns he would consult with legal counsel and follow up.

28

89.     Mr. Hanna and Dr. Rodgers met with Mr. and Mrs. Littlejohn on January 25, 2021. Mr. Hanna said that he would revise the Guide to say that if any student wants to change his/her name and/or gender identity, the parent must be notified unless there is concern the child is being abused, defined by imminent physical danger.  Mr. Hanna said that the revision would say that in the case of suspected abuse, the school official will contact the Department of Children and Families ("DCF"). Mr. Hanna represented to the Littlejohns that he had already given his administrators the change verbally and would be providing training within 30 days.

90.     Mr. and Mrs. Littlejohn asked to see the proposed amendment in writing and that it be posted on the LCS website as an amendment to the existing Guide.

91.     Mr. and Mrs. Littlejohn did not receive any written confirmation of the amended directive promised by Mr. Hanna, and there were no changes made to the Guide on the LCS website by March 3, 2021. Mr. and Mrs. Littlejohn were also informed that LCS counselors and teachers were not told that the directive regarding parental notification had been changed to provide that parents would be notified.

92.     Meanwhile, unbeknownst to Mr. and Mrs. Littlejohn, on February 25 and 26, 2021, Ms. Bowen was touting the development of the Guide, Student Support Plan, and the associated district protocols as success stories and non-

affirming parents as challenges for LCS with respect to LGBTQ+ students at the All Together Now conference.

93.     Dr. Rodgers also participated in the All Together Now conference and stated that teachers create culture and climate in the classroom to make students feel accepted. She said that students need to be able to show their "identities" to their teachers and for their peers to embrace those identities.[9] She did not say anything about parental consent to their children's "identities" being announced and embraced.

94.     Having received no response from Mr. Hanna, on March 3, 2021, Mrs. Littlejohn emailed Dr. Rodgers who, in turn, offered the following response:

> As previously discussed, there is no specific policy that addresses our transgender or nonconforming population, but they are covered under our nondiscrimination policy as well as any student that identifies in the LGBTQ+ population. Our nondiscrimination policy basically states that we do not discriminate against individuals based on sex/sexual orientation. In keeping in that vein, we strive to make sure that all of our students and employees feel safe and supported within our school district.
>
> I have addressed with principals, assistant principals for administration and deans that unless there is some imminent danger to the student's wellbeing (physical harm, abuse, etc.) they are **encouraged** to inform parents and convene a meeting with them and their student when they have been apprised of a name change or other request related to LGBTQ+ population.

---

[9]     https://www.youtube.com/watch?v=KnCG2qJCc1s&list=
PLUWXEguBhw7yBHiPXADDAc6tGtsvkNlDe&index=10 at 7:50.

We continue to engage our administrators in collegial conversations that are germane to the LGBTQ+ population focusing on nondiscriminatory practices that would create an inclusive and tolerate [sic.] culture and climate. Administrators in turn would share this information with their teachers and staff to make sure that compliance with district's expectations are met.

95.    On March 8, 2021, Mr. Littlejohn emailed Mr. Hanna, saying, *inter alia*:

We were under the clear impression from our last meeting that the written support guide and transgender support plan would be revised to remove the current instructions to exclude parents and replace them with instructions to contact parents when any student requests to change his/her name and/or gender. We further understand that, in the rare cases of suspected or imminent harm to the student from his/her parents, the school would first contact DCF.

Being verbally "encouraged" to inform parents is not sufficient, in our minds, when published guidance still clearly directs the exclusion of parents....

Our clear understanding from you is that the above guidance would be repealed or amended to indicate that informing the parents would be mandatory, with the sole exception noted above, and this mandate would be reflected in any/all District publications on this matter. Please let us know if we misunderstood your intention regarding the attached guidance at the last meeting.

96.    On March 9, 2021, Mr. Hanna responded that he would speak with Dr. Rodgers and follow up. Mr. Hanna never followed up.

97.    On May 11, 2021, Mr. and Mrs. Littlejohn's counsel sent a letter to Mr. Hanna and Board Chairwoman Bowen. By this time, the Parents' Bill of Rights, HB 241, had passed the Florida Legislature and was awaiting Governor DeSantis'

signature. The letter referenced HB 241, pointing out that the Guide and LCS's actions in accordance with the Guide, particularly the interactions with A.G., would be violations of the Parents' Bill of Rights. The letter also described the other statutory and constitutional violations arising from LCS's actions and requested that LCS rescind the Guide and publish amended guidance that parents will be notified when their children express issues with their gender identity.

98.    As stated in the letter, the actions of Defendants have caused great harm to Plaintiffs and their daughter, including exacerbation of psychological challenges for A.G., and disruption of the privacy and integrity of their family.

> The district has driven a wedge between A.G. and her parents, sending the message that her parents cannot be trusted and do not support her best interests. The rift created by the district between A.G. and her parents is profound and unlikely to be fully rectified. By cutting the Littlejohns out of the decision-making process for A.G., the district has made itself responsible for the risks to A.G.'s mental health resulting from the district's affirmation of A.G.'s gender confusion. the district has profoundly harmed a teenage girl whom the district knew to have learning difficulties and emotional delays. District staff have reinforced A.G.'s belief that she is "non-binary," even telling the whole class to reaffirm her announcement that she is "non-binary." This powerful reinforcement of a discordant psychological belief furthers the rift between A.G. and her parents, whom she will perceive as unloving, non-supportive and "transphobic. It will be nearly impossible to fully reverse this profound psychological and emotional damage.

99.    Mr. Hanna responded in a letter dated May 25, 2021, stating that the Guide was being revised and the question and answer section which contains the directive regarding parent notification was being revised. Mr. Hanna represented that

administrators had been given a revised version of the section that provided for parental notice. However, there was nothing posted on the website nor sent to parents regarding the amendment. As of June 30, 2021, the Guide remained posted on the website without change.

100.   The Parents' Bill of Rights was signed by Governor DeSantis and became law on July 1, 2021. On that same day, Mr. and Mrs. Littlejohn and their counsel met with Mr. Hanna, Dr. Rodgers and their counsel.

101.   At the meeting, Dr. Rodgers represented that the Guide had been removed from the website to be revised. However, it was still on the site unchanged when the meeting began. Mr. and Mrs. Littlejohn's counsel informed Dr. Rodgers that it was still on the site. Within the next few minutes, the Guide was removed from the publicly accessible portion of the website.

102.   The Littlejohns repeated their request that the Guide be rescinded, that LCS publish on the Website a written statement that parents would be notified when their child/children express a discordant gender identity and included in meetings or discussions with their child/children regarding their gender identity. The Littlejohns also requested that as Mr. Hanna promised, LCS staff would be trained on the new guidance providing for parental notification.

103.   LCS staff and counsel stated that they were working on new guidance and on procedures to comply with the Parents' Bill of Rights.

104.   The Littlejohns' counsel offered to provide some proposed language for LCS to consider, and to provide resources on addressing transgender issues. That information was sent to Mr. Hanna, Dr. Rodgers, and their counsel on July 26, 2021.

105.   Defendants did not respond, and on August 9, 2021, Plaintiffs' counsel asked about the status. Dr. Rodgers responded on August 10, 2021 that LCS would provide a response the next day. No response was ever received.

106.   There is no indication on the website or otherwise that the Guide has been rescinded, only a notation that it is being revised. No revised guidance regarding parental notification has been published or provided to Plaintiffs.

107.   Plaintiffs are informed and believe and based thereon allege that LCS counselors have not been instructed by LCS administration that the Guide has been rescinded and have not been instructed of any interim alternative guidance requiring that parents be notified when their children claim to have a discordant gender identity.

108.   To the contrary, Plaintiffs are informed and believe and based thereon allege, that Defendants are continuing to disregard parental rights by encouraging teachers and other staff to participate in Equality Florida's "Safe Space" initiative under which teachers and counselors promise that if a child expresses a discordant gender identity the staff member will "be familiar with a student's right to privacy, where you do not disclose identity to others."

109.   Plaintiffs are informed and believe and based thereon allege that as recently as September 28, 2021, LCS staff were instructing other staff that "privacy laws" prohibited teachers from revealing to parents that their child has expressed a discordant gender identity.

110.   Plaintiffs are informed and believe and based thereon allege that as recently as September 29, 2021, LCS staff were being instructed that they should not "out" children to their parents by notifying parents when their children state a belief that they have a discordant gender identity.

111.   Ongoing email correspondence between LCS staff members demonstrates that Defendants have failed to train staff that parents are to be notified when their children express confusion about their gender identity. This failure to train staff is an ongoing violation of the Parents' Bill of Rights, other Florida statutes and the state and federal constitutions.

112.   Despite the enactment of the Parents' Bill of Rights, Defendants have failed and refused, and continue to refuse, to publicly rescind the Guide and its directives prohibiting parental notification and promoting concealment and deception.

113.   Despite the enactment of the Parents' Bill of Rights, Defendants have failed and refused, and continue to refuse, to publicly rescind the use of the Student Gender Support Plan that conditions notification of parents of their child/children

expressing gender confusion or a desire to use privacy facilities or sleeping quarters used by the opposite sex on a minor student's authorization.

114.   Despite enactment of the Parents' Bill of Rights Defendants have failed and refused, and continue to refuse, to provide Plaintiffs and other parents of children in LCS schools written confirmation that they will be notified when their children express distress or confusion regarding their sex or gender identity and request changes to their identification, privacy facility usage, or sleeping quarters on field trips.

115.   Unless and until Defendants publicly a) rescind the Guide, b) cease distributing the Guide to staff, including through third parties c) cease using the Student Support Plan, d) cease communicating to LCS staff that parents are not to be notified, and e) confirm that parents will be notified of gender identity issues related to their children, Plaintiffs' fundamental rights to direct the upbringing of their children, to make decisions regarding their children's medical and mental health, and right of familial privacy will continue to be violated.

116.   Defendants' ongoing violation of Plaintiffs' fundamental parental rights have caused and will continue to cause irreparable harm unless and until Defendants: a) rescind the Guide, b) cease distributing the Guide to LCS staff directly or indirectly through third parties, c) cease using the Student Support Plan, d) put in place a policy directing that LCS staff will notify parents when their

children claim to have a discordant gender identity and include parents in all discussions regarding their children's gender identity, e) train all staff in the alternative guidance, and f) notify all parents whose children have expressed confusion about their gender identity and had a Student Support Plan developed without parental notice and involvement of the actions taken with their children.

117.   As a direct result of Defendants' actions and their deliberate indifference to Plaintiffs' parental rights, Plaintiffs and their daughter have suffered and are continuing to suffer, *inter alia,* a) emotional distress, b) exacerbation of A.G.'s psychological and educational challenges requiring increased counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) increased costs for providing alternatives for A.G. in order for her to receive an appropriate education untainted by ideological distractions which exacerbate her developmental challenges and diminish her academic potential.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Right to Direct the Education and Upbringing of Their Children under the U.S. Constitution)**
**(Against all Defendants)**

118.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

119.    The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 68 (2000)

120.    Defendants' violated Plaintiffs' fundamental right to make decisions regarding the custody, care and control of their children when it adopted the Guide, Student Support Plan and their directives, *inter alia*, that a) parents are not to be notified if their children express confusion regarding their  sex or gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, gender identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children, in that staff are to use the children's legal name when communicating to or around parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use and with which sex they will room on overnight trips.

121.    Adoption of the Guide and its directives represent a *de facto* policy of Defendant School Board that affects the entire school district, as affirmed by

38

Chairwoman Bowen's statement that the Guide and its directives were among the successes that the Board enjoyed in its efforts to increase equity and access for LGBTQ+ students.

122. Implementation of the Guide and its directives with respect to Plaintiffs' daughter and continuing implementation of the Guide with other LCS students result from the School Board's *de facto* policy, practice and custom and the actions of Superintendent Hanna, who was elected by the people of Leon County to oversee the administration of Leon County Schools.

123. Implementation of the Guide and its directives with respect to Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of Dr. Kathleen Rodgers, who as Assistant Superintendent for Equity and Diversity had the authority, under the supervision of Superintendent Hanna, to develop and implement district policies related to LGBTQ+ students and to train district staff regarding said policies. Dr. Rodgers did in fact instruct LCS staff to conceal information related to their children's gender identity from parents, that state and federal law prevented parents from being informed of their children's gender identity issues without the children's consent, and that staff would be subject to harassment charges if he or she notified parents or otherwise failed to maintain secrecy regarding a minor child's gender identity issues.

124. Defendants acted with deliberate indifference to Plaintiffs' fundamental parental rights enacting the Guide and its directives which explicitly and intentionally excluded parents from significant decision-making related to their children.

125. Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by disregarding Plaintiffs' instructions that no further meetings were to be scheduled with their daughter without their knowledge and consent.

126. Defendant Rodgers acted with deliberate indifference to Plaintiffs' fundamental rights by requesting a private meeting with Plaintiffs' daughter immediately after being informed that Plaintiffs did not consent to further meetings with their daughter

127. Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by failing and refusing to rescind the Guide and revise the directives that excluded parents from decisions regarding their children's gender identity even after promising to do so and after being informed that they violated Plaintiffs' rights.

128. Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights.

129. Plaintiffs' constitutionally protected right to direct the upbringing and education of their children was violated as the plainly obvious consequence of

Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children expressed a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

130.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing and education of their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

131.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

132.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## SECOND CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

**(Violation of Plaintiffs' Fundamental Right to Direct the Medical and Mental Health Decision-making for Their Children Under the U.S. Constitution) (Against all Defendants)**

133.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

134.   The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to direct the medical and

mental health decision-making for their children. *Parham v. J. R.*, 442 U.S. 584 (1979).

135.   By excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

136.   Defendants have usurped Plaintiffs' responsibility for the health and well-being of their children and sought to supplant their authority for Plaintiffs' authority as fit parents to be the ultimate decisionmakers regarding the physical and mental health of their child, including decisions related to their child's confusion or distress about her sex or gender identity.

137.   Defendants violated Plaintiffs' fundamental right to make decisions regarding the mental health of their children by adopting the Guide, Student Support Plan and their directives, *inter alia,* that a) parents are not to be notified if their children express a discordant gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the child consents; d) parents are not

to be told about changes to their children's names, pronouns, other identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children, in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use and with which sex they will room on overnight trips.

138.   Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences. Therefore, by excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

139.   Plaintiffs incorporate by reference the allegations of Paragraph 121 as if set forth in full.

140.   Plaintiffs incorporate by reference the allegations of Paragraph 122 as if set forth in full.

141.   Plaintiffs incorporate by reference the allegations of Paragraph 123 as if set forth in full.

142. Defendants acted with deliberate indifference to Plaintiffs' fundamental parental rights by enacting the Guide and its directives which explicitly and intentionally excluded parents from decision-making related to their children's mental health, *i.e*., their children's belief that they have a gender identity that differs from their sex.

143. Plaintiffs incorporate by reference the allegations of Paragraph 127 as if set forth in full.

144. Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights to direct the medical and mental health decision-making for their children.

145. Plaintiffs' constitutionally protected right to direct the medical and mental health decision-making for their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said they had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

146. Defendants cannot assert a compelling state interest for disregarding Plaintiffs' long-established fundamental constitutional right to make medical and

mental health care decisions for their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

147.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

148.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## THIRD CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

**(Violation of Plaintiffs' Right to Familial Privacy Under the U.S. Constitution)**
**(Against all Defendants)**

149.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

150.   The Due Process Clause in the 14th Amendment to the United States Constitution protects the sanctity of the family as an institution deeply rooted in this Nation's history and tradition through which moral and cultural values are passed down. *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

151.   In adopting and implementing the directives in the Guide, and particularly in implementing the directives with Plaintiffs' daughter with no notice to or consent by Plaintiffs, Defendants have impermissibly injected themselves into

the private realm of Plaintiffs' family by usurping Plaintiffs' rights to make decisions regarding their children's well-being.

152.   Defendants have violated Plaintiffs' constitutional right to privacy in familial matters by adopting and implementing the Guide, Student Support Plan, and their directives, *inter alia,* that a) parents are not to be notified if their children express confusion regarding their  gender identity unless their children consent; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, other identifiers, and school records unless the children consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children have the unilateral authority to decide which privacy facilities they will use  and with which sex they will room on overnight trips.

153.   Defendants have infringed Plaintiffs' right to family privacy by prompting Plaintiffs' daughter to consider whether her parents "support" her sufficiently to participate in decision-making related to her belief that she is not a girl. Defendants have sown seeds of doubt within Plaintiffs' daughter's mind about

whether her parents are acting in her best interest, thereby creating a rift in the parent-child relationship that infringes Plaintiffs' right to family privacy.

154.   Plaintiffs incorporate by reference the allegations of Paragraph 121 as if set forth in full.

155.   Plaintiffs incorporate by reference the allegations of Paragraph 122 as if set forth in full.

156.   Plaintiffs incorporate by reference the allegations of Paragraph 123 as if set forth in full.

157.   Defendants acted with deliberate indifference to Plaintiffs' parental rights to family privacy by enacting the Guide, Student Support Plan, and their directives which explicitly and intentionally cast doubt on parents' support and ability to respond appropriately to their child's expression of a discordant gender identity and excluded parents from decision-making related to their child's proclaimed discordant gender identity.

158.   Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their constitutional right to family privacy.

159.   Plaintiffs' constitutionally protected right to familial privacy was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and associated staff training that intentionally and explicitly directed that parents were not to be notified when

their children said that they had a discordant gender identity, information related to their children's gender identity was to be concealed from parents and that parents were to be lied to by staff when talking about their children.

160.   Defendants cannot assert a compelling state interest for disregarding Plaintiffs' constitutional right to familial privacy, and Defendants' explicit prohibitions against parental notification and involvement in children's mental and emotional health decisions are not narrowly tailored.

161.   Defendants' violation of Plaintiffs' constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

162.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

### FOURTH CAUSE OF ACTION
### Violation of Plaintiffs' Right to Privacy Under Article 1, § 23 of the Florida Constitution.
### (Against all Defendants)

163.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

164.   Plaintiffs, as Floridians, enjoy an explicit right of privacy under Article 1, § 23 of the Florida Constitution, which provides in pertinent part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life."

165.   Under Article 1, § 23 of the Florida Constitution, "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm." *Von Eiff v. Azicri*, 720 So.2d 510 (FL 1998).

166.   As set forth more fully *supra,* Defendants have intentionally intruded upon Plaintiffs' fundamental right to raise their children by drafting and implementing the Guide and its directives that exclude parents from decision-making about their children's assertion of a discordant gender identity, conceal information from parents regarding actions taken by LCS staff related to their child's asserted discordant gender identity, deceive parents about identifiers used to describe their children at school and other matters related to their child's asserted discordant gender identity and otherwise interfere with parents' ability to direct their children's upbringing.

167.   Defendants have intruded upon Plaintiffs' fundamental rights without any evidence that Plaintiffs' daughter is or will be threatened with harm if Plaintiffs are permitted to participate in decision-making related to her assertion of a discordant gender identity.

168.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' fundamental constitutional right to raise their children, and Defendants'

explicit prohibition against parental notification and involvement is not narrowly tailored.

169.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

170.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## FIFTH CAUSE OF ACTION
### (Violation of Plaintiffs' Right to Substantive Due Process under Art. I § 9 of the Florida Constitution)
### (Against all Defendants)

171.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

172.   Art. I, § 9, Fla. Const., like the 14th Amendment to the U.S. Constitution, provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

173.   Substantive due process under Art. I, § 9 of the Florida Constitution protects the "full panoply of individual rights" and in particular, the long-established fundamental right of parents to direct the upbringing of their children, from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 768 So. 2d 1060, 1063 (Fla. 2000).

174.   Defendants have encroached on Plaintiffs' fundamental right to make decisions regarding the custody, care and control of their children by adopting the

Guide, Student Support Plan, and its directives, *inter alia*, that a) parents are not to be notified if their children express a discordant gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, other identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use  and with which sex they will room on overnight trips.

175.   Adoption of the Guide and its directives represent a *de facto* policy of Defendant School Board, as affirmed by Chairwoman Bowen's statement that the Guide and its directives were among the successes that the Board enjoyed in its efforts to increase equity and access for LGBTQ+ students.

176.   Implementation of the Guide and its directives with Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of

51

Superintendent Hanna, who was elected by the people of Leon County to oversee the administration of Leon County Schools.

177.   Implementation of the Guide and its directives with Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of Dr. Kathleen Rodgers, who as Assistant Superintendent for Equity and Diversity had the authority, under the supervision of Superintendent Hanna, to develop and implement district policies related to LGBTQ+ students and to train district staff regarding said policies. Dr. Rodgers did in fact instruct LCS staff to conceal information related to their children's gender identity from parents, that state and federal law prevented parents from being informed of their children's gender identity issues without the children's consent, and that staff would be subject to harassment charges if he or she notified parents or otherwise failed to maintain secrecy regarding a minor child's gender identity issues.

178.   Defendants acted with deliberate indifference to Plaintiffs' fundamental parental rights enacting the Guide and its directives which explicitly and intentionally excluded parents from decision-making related to their children.

179.   Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by disregarding Plaintiffs' instructions that no further meetings were to be scheduled with their daughter without their knowledge and consent.

180.   Defendant Rodgers acted with deliberate indifference to Plaintiffs' fundamental rights by requesting a private meeting with Plaintiffs' daughter immediately after being informed that Plaintiffs did not consent to further meetings with their daughter.

181.   Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by failing and refusing to rescind the Guide and revise the directives that excluded parents from decisions regarding their children's gender identity even after promising to do so and after being informed that they violated Plaintiffs' rights.

182.   Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights.

183.   Plaintiffs' constitutionally protected right to direct the upbringing and education of their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said that they had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

184.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing

and education of their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

185.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

186.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## SIXTH CAUSE OF ACTION
### (Violation of the Parents' Bill of Rights, Florida Statutes, Chapter 1014)
### (Against Defendant School Board)

187.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

188.   Effective July 1, 2021, The Parents' Bill of Rights reserves all parental rights, including the rights to direct education, upbringing, moral or religious training and to make health care decisions for their minor children to parents "without obstruction or interference from the state, any of its political subdivisions, any other governmental entity, or any other institution. Florida Statutes § 1014.04.

189.   Florida Statutes § 1014.03 provides:

The state, any of its political subdivisions, any other governmental entity, or any other institution may not infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means.

54

190.   Defendant School Board is a political subdivision of the state and a governmental agency subject to the Parents' Bill of Rights.

191.   Defendant School Board has enacted and implemented a *de facto* policy with directives that obstruct and infringe on the fundamental rights of Plaintiffs to direct the upbringing, education, health care and mental health of their children, as set forth more fully *supra*.

192.   Defendant School Board has not rescinded the directives in the Guide nor provided notification to Plaintiffs that the directives are no longer effective.

193.   Defendant School Board has not provided alternative directives to LCS staff which respect parental rights as required under the statute.

194.   Defendant School Board's agents are continuing to act in accordance with the infringing directives in, *inter alia*, inviting staff members to participate in a Safe Space program under which staff members promise to not reveal to parents when a student expresses a discordant gender identity and seeks accommodations unless permission is granted by the student.

195.   Defendant School Board, acting through Equality Florida, is continuing to distribute Student Support Plans with directives that students are a) authorized to determine whether their parents are "supportive" and thereby permitted to engage with school officials; b) authorized to unilaterally determine which sex-segregated privacy facilities and overnight accommodations they will use; c) authorized to

assume new name and pronoun preferences and insist that such preferences are concealed from parents. In so doing, LCS is using third parties to bypass parental notice and consent on issues related to children's upbringing and mental health, in violation of the Parents' Bill of Rights.

196.    Defendant School Board cannot assert a compelling interest for disregarding Plaintiffs' fundamental right to direct the upbringing and education of their children, and Defendant's prohibitions against parental notification are not narrowly tailored.

197.    Defendant School Board's violation of the Parents' Bill of Rights has caused and is continuing to cause harm to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### (Violation of Plaintiffs' Right to Choose Medical Treatment for their Children Under Florida Statutes § 743.07)

### (Against all Defendants)

198.    Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

199.    Under Fla. Stat. § 743.07 parents are responsible for selecting the manner of medical/mental health treatment received by their children until the children reach age 18. That fundamental right cannot be diminished or eliminated by state, city, or, in this case, school board enactments without a compelling state interest. *Vazzo v. City of Tampa*, 415 F.Supp.3d 1087, 1098 (M.D. Fla. 2019).

200.  By  excluding  parents  from  discussions  regarding  their child's/children's assertion of a discordant gender identity and adopting protocols aimed  at  secretively  affirming  the  discordant  gender  identity,  Defendants  are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

201.  Defendants have usurped Plaintiffs' responsibility for the health and well-being  of  their  children  and  sought  to  supplant  their  authority  for  Plaintiffs' authority as fit parents to be the ultimate decisionmakers regarding the physical and mental health of their child, including decisions related to their child's confusion or distress about her sex or gender identity.

202.  As set forth more fully, *supra*, Defendants' adoption of the Guide, Student Support Plan, and their directives, *inter alia,* that a) parents are not to be notified  if  their  children  express  a  discordant  gender  identity;  b)  parents  are presumed to pose a danger to their child's health and well-being if notified of their child's  gender  confusion  or  discordant  gender  identity;  c)  parents  are  not  to  be included in meetings with their children to discuss changes made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns and other identifiers without the children's consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name

when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use  and with which sex they will room on overnight trips violates Plaintiffs' fundamental right to make decisions regarding the mental health of their children.

203.   Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences. Therefore, by excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

204.   Plaintiffs' right to direct the medical and mental health decision-making for their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said that had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

205. Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established right to make medical and mental health decisions for their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

206. Defendants' violation of Plaintiffs' fundamental rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

207. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. A declaration that Leon County Schools' Guide and associated policies and procedures violate Plaintiffs' fundamental rights as parents, under the United States and Florida constitutions, the Florida Parents' Bill of Rights and other statutes to the extent that they: (a) enable children to change gender identity at school by, *inter alia,* selecting a new "affirmed name and pronouns," without parental notification and consent; (b) prohibit teachers and other staff from communicating with parents about their children's gender dysphoria, including any desired change in name and pronouns, educational records, privacy facilities use, and overnight accommodations, without first obtaining the children's consent; and (c) instruct or

permit teachers and other staff to deceive parents by, *inter alia,* using different names and pronouns around parents than are used in school;

2. A declaration that teachers and staff: (a) may not facilitate a child's social transition to a different gender identity at school without parental notification and consent; (b) may communicate with parents if they have reason to believe their child may be dealing with gender confusion or dysphoria without first obtaining the child's consent; and (c) may not attempt to deceive parents by, among other things, using different names and pronouns around parents than are used in school;

3. A declaration that the Guide and attendant Student Support Plans prepared in accordance with the Guide are to be publicly rescinded and parents notified that said Guide and associated Student Support Plans affecting their children have been rescinded.

4. Preliminary and permanent injunctions prohibiting Defendants, their employees, agents and third parties acting at their direction from: (a) Using, referencing, relying on, or otherwise acknowledging the Guide and associated Student Support Plan as a resource for LCS staff, administrators, parents or students; (b) Distributing the Guide and associated Student Support Plan to LCS staff directly or indirectly through third parties; (c) Training staff to exclude parents from discussions, meetings, and other interventions with the parents' children related to the children's assertion of a discordant gender identity; (d) Failing to notify parents

when their children express the belief that they have a discordant gender identity and want to take actions to affirm that identify; (e) Failing to notify parents that LCS staff previously engaged with their children regarding a claim of a discordant gender identity without notifying the parents.

5.      Preliminary and permanent injunctions prohibiting Defendants, their employees, agents and third parties acting at their direction from instructing, directing, or encouraging LCS staff to participate in programs, initiatives, activities, or discussions in which LCS staff promise children that their parents will not be told about children's disclosures related to a belief that they have a discordant gender identity.

6.      For nominal damages;

7.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omission, including  a) emotional distress, b) exacerbation of A.G.'s psychological and educational challenges requiring increased counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) increased costs for providing alternatives for A.G. in order for her to receive an appropriate education untainted by ideological distractions which exacerbate her developmental challenges and diminish her academic potential, and other injuries as proven at trial;

8.      For attorneys' fees and costs under 42 U.S.C. § 1988;

9.      For such other relief as the Court deems proper.


Dated October 18, 2021.


                         /s/Mary E. McAlister
                         Mary E. McAlister (FL Bar No. 0010168)
                         CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
                         P.O. Box 637
                         Monroe, VA 24574
                         770.448.4525
                         mmcalister@childparentrights.org

                         Vernadette R. Broyles (GA Bar No. 593026)*
                         CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
                         5805 State Bridge Rd., Suite G310
                         Johns Creek, GA 30097
                         770.448.4525
                         vbroyles@childparentrights.org

                         Ernest G. Trakas (MO Bar 33813)*
                         Evans & Dixon, LLC
                         211 N. Broadway
                         St. Louis, MO 63102
                          (314) 552-4188
                         etrakas@evans-dixon.com
                         * pro hac vice admissions pending

                         Attorneys for Plaintiffs

Verification

I, January Littlejohn, am over the age of 18 and the Plaintiff in this action, and I declare under penalty of perjury, pursuant to 28 U.S.C Section § 1746, that I have read the foregoing Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this 18th day of October, 2021 at Tallahassee, Florida

_____
January Littlejohn

Verification

I, Jeffrey Littlejohn, am over the age of 18 and the Plaintiff in this action, and I declare under penalty of perjury, pursuant to 28 U.S.C Section § 1746, that I have read the foregoing Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this 18th day of October, 2021 at Tallahassee, Florida

_____
Jeffrey Littlejohn

63

Doc. 13

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JANUARY LITTLEJOHN AND**
**JEFFREY LITTLEJOHN,**

      Plaintiffs,

**v.**                         **Case No.: 4:21-cv-00415-MW-MJF**

**SCHOOL BOARD OF LEON COUNTY**
**FLORIDA, ROCKY HANNA,**
**individually and in his official capacity as**
**Superintendent of Leon County Schools,**
**and KATHLEEN RODGERS,**
**individually and in her official capacity as**
**Assistant Superintendent Equity Officer**
**and Title IX Compliance Coordinator for**
**Leon County Schools,**

      Defendants.

_____/

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

    Defendants, **SCHOOL BOARD OF LEON COUNTY FLORIDA,**

**ROCKY HANNA**, individually and in his official capacity as Superintendent of

Leon County Schools, and **KATHLEEN RODGERS**, individually and in her

official capacity as Assistant Superintendent Equity Officer and Title IX Compliance

Coordinator for Leon County Schools, pursuant to Rule 12(b)(6), Fed. R. Civ. P.,

move to dismiss the Complaint and, in support hereof, state as follows:

## *Introduction*

The Complaint alleges that the Plaintiffs were not notified of discussions had with their child concerning gender identity issues at school in violation of the law. Taking the facts alleged as true, no action of the Defendants violated any law.

There are many bases for dismissal of the Complaint. First, the Complaint is a shotgun pleading. Each count incorporates every preceding allegation rendering it a classic shotgun pleading that must be dismissed.

While a defendant should not be required to plead a plaintiff's case to respond to it, repleading here is futile. Plaintiffs assert claims under 42 U.S.C. § 1983, against the School Board, Superintendent Hanna and Assistant Superintendent Rodgers in their individual and official capacities. The official capacity claims are nothing more than against the School Board, and therefore they must be dismissed as redundant.

Substantively, Plaintiffs' Section 1983 claims, which argue that the Defendants' actions abridged their rights to substantive due process under the Fourteenth Amendment, and specifically infringe on their rights to familial privacy, and to direct their child's education and mental health and welfare, fail because none of the actions alleged in the Complaint actually burdened any of Plaintiffs' rights. Plaintiffs do not allege any behavior that is "conscience-shocking" in a constitutional sense sufficient to establish a substantive due process violation. Similarly, Plaintiffs are unable to establish that any right they enjoy under the Fourteenth Amendment

2

extends to a constitutional obligation on the part of School Board staff to affirmatively inform parents of their child's name and pronoun preferences or of their child's gender identity.

If anything, that right was not clearly established at the time of the purported violations, meaning Superintendent Hanna and Assistant Superintendent Rodgers should be dismissed from this action entirely under the doctrine of qualified immunity.

Plaintiffs' claims under Florida Statutes and the Florida Constitution fair no better. Plaintiffs' state statutory claims, brought pursuant to the newly-enacted Florida Parents' Bill of Rights and a statute that removed the disability of nonage for persons aged 18 and 21, are not viable because neither statute creates a private enforcement action. Plaintiffs' claims under the Florida Constitution seek improper relief, name inappropriate parties, and fail to raise viable claims for an invasion of their right of privacy or a violation of their substantive due process rights.

### ***Facts[1]***

Plaintiffs are the parents of A.G., a minor child enrolled in a school in the School Board's district. (Doc. 1, p. 15). A.G. was enrolled at, and attended, Deerlake Middle School during the most relevant time periods to the Complaint. (*Id*.). A.G. is

---

[1] The following facts are from the Complaint. No part of this motion or its factual recitation should be deemed an admission the facts pled are true.

not a named party. (*Id.* at p. 1). Rather, A.G.'s parents are suing the Defendants for violations of their own rights purportedly held under state and federal law. (*Id.*).

As the 2020-2021 school year approached, A.G. asked Plaintiffs to be referred to by the name "J" and by "they/them" pronouns. (*Id.* at p. 16). Plaintiffs said A.G. could use the "J" as a nickname at school but not be referred to by the pronouns "they/them." (*Id.*). A.G. had previously come out to Plaintiffs as potentially non-binary. (*Id.*).

The crux of the Complaint revolves around the fall semester of the 2020-2021 school year, after this conversation between A.G. and Plaintiffs took place, and principally on a meeting at school on September 8, 2020 involving A.G. and School Board staff, but not the Plaintiffs. (*Id.* at pp. 17-25). Plaintiffs assert that at the September 8th meeting, Deerlake staff, including A.G.'s school counselor, developed a support plan for A.G. that touched on topics including preferred names, pronoun use, and room sharing on field trips. (*Id.* at pp. 24-25). Plaintiffs assert that teachers and staff at Deerlake had been told refer to A.G. as "J" and with the pronouns "they/they" without their involvement or consent and contrary to their requests. (*Id.* at p. 17-18, 21, 23-25). There is no allegation in the Complaint that this was contrary to the wishes of Plaintiffs' child or that any School Board employee coerced, encouraged, or forced Plaintiffs' child to participate in the meeting or coerced, encouraged, or forced Plaintiffs' child to keep anything from Plaintiffs.

Plaintiffs allege the actions of School Board staff in this regard were taken pursuant to a version of Leon County Schools Lesbian, Gay, Bisexual, Gender Nonconforming and Questioning Support Guide ("Guide"). (Doc. 1-1). The Guide states that the Leon County School District strives to "ensure that students are healthy, present, and positive members of a safe learning community." (Doc. 1-1, p. 3).

Plaintiffs characterize the Guide's content in varying ways, but its actual contents provide its best evidence. Plaintiffs primarily take issue with one of the questions-and-answers in the guide which provides:

> **Q. A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified?**
>
> A. No. Outing a student, especially to parents, can be very dangerous to the students health and well-being. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+ many of whom have been rejected by their families for being LGBTQ+. Outing students to their parents can literally make them homeless.

(*Id*. at p. 15). Plaintiffs also object to various portions of the "Leon County School District Transgender/Gender Nonconforming Student Support Plan" attached to the Complaint. Plaintiffs object to portions of this document purporting to task School Board staff with inquiring whether parents or legal guardians are aware of a student's gender transition and whether they support it, and also take that information into account when considering the student's privacy interests. (*Id.* at pp. 19-24). The

Complaint's majority recounts dialogue between Plaintiffs and Superintendent Hanna and Assistant Superintendent Rodgers concerning updates to this Guide's question-and-answer portion.

Plaintiffs do not allege the School Board did not sufficiently involve them in any aspect of their child's education post-dating the September 8th meeting or that any other meeting occurred involving their child without their involvement. (*See* Doc. 1). With respect to that meeting, and the core of Plaintiffs' claims, Plaintiffs essentially argue that they should have been informed and involved in these gender identity discussions had at school and that the failure to inform violated their rights under the United States and Florida Constitutions, and provisions of Florida law. (*See id.*).

The following charts the Complaint's counts:

| Count | Title | Defendants |
|-------|-------|------------|
| I | Violation of Section 1983 and specifically of Plaintiffs' Substantive Due Process Right to Direct the Education and Upbringing of Their Children under the U.S. Constitution | All |
| II | Violation of Section 1983 and specifically of Plaintiffs' Fundamental Right to Direct the medical and Mental Health Decision-making for their Children Under the U.S. Constitution | All |
| III | Violation of Section 1983 and specifically Plaintiffs' Right to Familial Privacy Under the U.S. Constitution | All |
| IV | Violation of Plaintiffs' Right to Privacy Under Article 1, §23 of the Florida Constitution | All |

| V | Violation of Plaintiffs' Right to Substantive Due Process under Art. I, §9 of the Florida Constitution | All |
| VI | Violation of Chapter 1014 of the Florida Parents Bill of Rights | School Board |
| VII | Violation of §743.07, Fla. Stat., for abridging Plaintiffs' right to choose medical treatment for their child | All |

None of the counts have merit and the Complaint should be dismissed.

### *Argument[2]*

### I.   *The Complaint is a Shotgun Pleading*

Rule 8 of the Federal Rules of Civil Procedure sets forth the general rules of pleading. Rule 8(a)(2) instructs pleaders to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(d)(1) instructs that "each allegation must be simple, concise, and direct ..." The purpose of Rule 8 is to provide a defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Under Rule 10(b) of the Federal Rules of Civil Procedure a party must "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances" and "[i]f doing so would

---

[2] Because this Court is well-versed in the standard for adjudicating a motion to dismiss, it is omitted.

promote clarity, each claim founded on a separate transaction or occurrence ... must be stated in a separate count or defense."

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings "wreak havoc on the judicial system" by "divert[ing] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) (quotation and citation omitted).

"Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action or claim for relief into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act." *McDonough v. City of Homestead*, 771 F. App'x 952, 955 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1321–23). Shotgun pleadings are disfavored because they make it difficult, if not impossible, for a defendant to have fair notice of the claims against it and to respond in kind. *See Weiland*, 792 F.3d at 1323. Compliance with Rules 8(a)(2) and 10(b) is necessary so "the court can determine which facts support which claims and whether the plaintiff has stated any

claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not." *Id.* at 1320-21.

Here, Plaintiffs' Complaint is a classic shotgun pleading because it incorporates each and every factual allegation along with each and every one of the paragraphs contained in the preceding counts into each count. (*See* Doc. 1 at pp. 37, 41, 45, 48, 50, 54, 56). Complaints, like this one, where each count incorporates each preceding count, are textbook examples of a shotgun pleading. *Weiland*, 792 F.3d at 1321 (explaining that complaints incorporating the preceding counts into each count are not in compliance with the Rules of Civil Procedure); *Davis v. Main St. Fam. Pharmacy, LLC*, No. 5:16CV45-MW/GRJ, 2016 WL 9185284, at *1 (N.D. Fla. Apr. 18, 2016) (dismissing complaint as a shotgun pleading where each count incorporated all of the allegations of the counts before it).

Truth be told, the Complaint arguably qualifies as a shotgun pleading for numerous other reasons. For example, six of the seven counts are brought against all defendants, but those counts fail to specify whether they are brought against the individual defendants in their individual or official capacities or both. There is only one *ad damnum* clause that conceivably encompasses and incorporates all of the preceding counts, but as will be set forth herein, the damages pled are not available under each and every cause of action. Such prayers for relief indicate a shotgun pleading. *See Allen v. Cypress Vill., Ltd.*, No. 3:10-CV-994-WKW, 2011 WL

1667055, at *2 (M.D. Ala. May 3, 2011)(citing *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Comty. Coll.*, 77 F.3d 364, 366 (11th Cir.1996) and holding that complaint that incorporated every claim into the prayer for relief was a shotgun pleading.). Finally, the Complaint is 63 pages and contains 207 paragraphs, exclusive of the prayer for relief. Many of these paragraphs contain legal conclusions, belabored recitations of elements of Guide and back and forth between School Board staff and the Plaintiffs about the Guide, and excerpts of correspondence.

In any event, Plaintiffs' Complaint is at the very least a shotgun pleading because it incorporates into each count every factual allegation of the Complaint, including all of the preceding counts. Dismissal is therefore warranted. *See U.S. ex rel. Atkins v. McInteer*, 470 F. 3d 1350, 1354 n.6 (11th Cir. 2006) ("When faced with a shotgun pleading, the trial court, whether or not requested to do so by the party's adversary, ought to require the party to file a repleader."); *see also Vibe Micro, Inc. v. Shabanets*, 87 8 F.3d 1291, 1296 (11th Cir. 2018) ("When a litigant files a shotgun pleading, is represented by counsel, and fails to request leave to amend, a district court must sua sponte give him one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds.").[3]

---

[3] To the extent a more definite statement is the appropriate remedy, Defendants also move for a more definite statement under Fed. R. Civ. P. 12(e).

II.   *Plaintiffs' Claims Against Superintendent Hanna and Assistant Superintendent Rodgers in their Official Capacities are Duplicative of their Claims Against the School Board*

"[O]fficial capacity suits generally represent only another way of pleading an action against the entity of which an officer is an agent." *Brandon v. Holt,* 469 U.S. 464, 472 n. 21 (1985). Suits against an individual acting in his official capacity impose liability on the governmental entity the official represents. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991) "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (citing *Brandon,* 469 U.S. at 471–72).

"Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly...." *Busby,* 931 F.2d at 776. Thus, when a suit is filed against both a governmental entity and its officers and employees in their official capacities, it is appropriate for a court to dismiss the named individual defendants in their official capacities as "redundant and possibly confusing to the jury." *Id.* The same rationale applies to the state law claims pled against the individual defendants in their official capacities. *See Braden Woods Homeowners*

11

*Ass'n, Inc. v. Mavard Trading, Ltd.*, 277 So. 3d 664, 671 (Fla. 2d DCA 2019). *See also Kubany by Kubany v. School Bd. of Pinellas County*, 818 F. Supp 1504, 1507 (M.D. Fla. 1993) (filing a Section 1983 claim against school board members and principal in their official capacities was improper, because the plaintiff had sued the school board directly).

Here, all of the counts brought against the individual defendants, ostensibly in their official capacities, are also lodged against the School Board. These redundant claims in Counts I-V and VII should be dismissed.

III.   *Defendants are not Liable for any Alleged Violation of Section 1983*

Plaintiffs' substantive due process claims brought pursuant to Section 1983 contained in counts I through III fail to state a claim with respect to any defendant. While Plaintiffs' Complaint contains buzzwords sounding in a substantive due process claim, the facts pled in support fall short of establishing any Constitutional violation.

Plaintiffs bring claims for interference with parental rights secured by the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 65-66 (2000); *see also Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925) (recognizing "liberty of parents and guardians to direct the upbringing and education

of children under their control"). State interference with the parent-child relationship may give rise to a Section 1983 action for damages. *See Morrison v. Jones*, 607 F.2d 1269, 1275-76 (1979). "Absent a 'compelling state interest' and an infringement 'narrowly tailored' to serve that interest, the government may not violate" a fundamental right. *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1297 (11th Cir. 2019). However, "[s]ubstantive due process challenges that do not implicate fundamental rights are reviewed under the 'rational basis' standard." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014) (citing *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013)).

Nevertheless, Plaintiffs face a high bar because they are asserting a substantive due process violation. *Maddox v. Stephens,* 727 F. 3d 1109, 1119 (11th Cir. 2013)*.* Indeed, "the Constitution does not protect against all encroachments by the state onto the interests of individuals," *Robertson v. Hecksel*, 420 F.3d 1254, 1262 (11th Cir. 2005). "[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Maddox*, 727 F.3d at 1119 (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) (internal quotation marks omitted). "A deprivation is of constitutional stature if it is undertaken for

improper motive and by means that were pretextual, arbitrary and capricious, and without rational basis." *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016) (citation omitted).

"Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious – that is, shock the conscience – the time the government actor made the decision." *Waddell*, 329 F.3d at 1305. Conduct intended to injure and unjustified by any government interest is most likely to be conscience-shocking. *Id.* Courts must conduct an "exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Cnty. of Sacramento*, 523 U.S. at 850.

Significantly, "the Supreme Court 'has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Maddox*, 727 F.3d at 1120 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). The Eleventh Circuit explained in *Maddox v. Stephens* that cases involving the assertion of a violation of parental liberty interests is a murky area of unenumerated constitutional rights and that courts thus must be careful and exercise the utmost care in analyzing claims in this subject area because the judiciary's constitutionalizing purported violations of parental liberty interests takes

governmental decisionmaking outside the arena of public debate and legislative action. *Id.*

That is especially true here because the case involves school administration. Public education of children is unquestionably entrusted to the control, management, and discretion of school boards. *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968). "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Id*. And the state of course, separate from any parental interest, has an interest in the wellbeing of its youth. *Ginsberg v. New York*, 390 U.S. 629, 640 (1968).

Plaintiffs' Section 1983 claims must be dismissed as to all Defendants because no constitutional rights of the Plaintiffs are implicated by any of Defendants' alleged actions. The crux of this case is Plaintiffs' contention they had the right to be informed of discussions had between School Board personnel and their child concerning gender identity issues, such as preferred names and pronouns. The problem is there is no Constitutional liberty interest requiring such notification. Indeed, in cases involving a viable allegation of interference with parental liberty interests the state has either required or prohibited some activity. These cases focus on an element of state coercion missing here.

Take for instance the cases cited by Plaintiffs for the purposes of establishing the existence of a parental liberty interest. *Troxel v. Granville*, involved parental liberty interests but in the context of the state's interference with the visitation rights of a minor child. 530 U.S. at 67-73. Similarly, *Parham v. J. R.*, involved state procedures governing the admission of children to psychiatric hospitals. 442 U.S. 584 (1979). *Prince v. Massachusetts*, involved a situation where child labor laws were construed to prohibit sales of religious tracts by children which the Supreme Court found unreasonably interfered with parental rights to raise those children. 321 U.S. at 166. There are numerous other cases, and the central point of them, is that the interference of parental rights is only actionable where the state is requiring or prohibiting some activity. *See*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, (1923)(striking down state's prohibition on teaching any language other than English).

Here, there is no allegation in the Complaint that Plaintiffs' child was forced to participate in a meeting with school personnel to discuss gender identity issues. There is no allegation school personnel directed, coerced, or encouraged, Plaintiffs' child to conceal anything from Plaintiffs, or that there was any attempt to do so. There is no allegation Plaintiffs' child requested parental involvement in meetings with school personnel. This sets this case apart from others finding interference with parental liberty interests secured by the Fourteenth Amendment. Indeed, Plaintiffs'

claims fail for the simple reason that they cannot show how their rights were burdened by state action.

*Doe v. Irwin*, a case out of the Sixth Circuit Court of Appeals, is instructive. 615 F.2d 1162 (6th Cir. 1980). At issue in *Doe*, was a condom distribution program for minors set up by a state-run clinic. Parents challenged the program arguing it interfered with their parental rights secured by the Due Process clause because it provided no notice to parents their minor children were using the clinic's services. The Sixth Circuit found there was no unconstitutional interference with parental rights stressing the fact the program was completely voluntary and there was no requirement minors avail themselves of the services of the birth control clinic, nor was there any prohibition on parents participating in decisions related to sexual activity or birth control concerning their minor children. *Id*. at 1166–69. Cogently, the Sixth Circuit summed up the issue thusly:

> In the absence of a constitutional requirement for notice to parents, it is clearly a matter for the state to determine whether such a requirement is necessary or desirable in achieving the purposes for which the Center was established. There is no basis for a federal court to impose conditions in the absence of an overriding constitutional requirement.

> The desire of the parents to know of such activities by their children is understandable. However the only issue before the district court and this court is whether there is a constitutional obligation on the Center to notify them. The record before us does not establish that the Center infringes a constitutional right of the plaintiffs by its practice of distributing contraceptive devices and medication to unemancipated minors without notice to their parents.

*Id*. at 1169.

There are numerous cases that stand for the proposition that a failure on the part of school staff to notify parents of issues involving their children does not amount to an infringement of parental liberty unless there is an element of coercion involved. *See, e.g.*, *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749, 754–60, 652 N.E.2d 580, 584–87 (1995)(holding that voluntary condom distribution program in schools did not violate parental liberty interests under the Fourteenth Amendment because there was no coercion by the state, and no requirement that anyone participate in the program or prohibition of a constitutional nature); *Reardon v. Midland Cmty. Sch.*, 814 F. Supp. 2d 754, 767–72 (E.D. Mich. 2011)(holding that alleged counseling by school counselors that encouraged minor child to run away did not violate parents substantive due process rights because counselors did not exert coercive influence over minor child but merely provided counseling to her upon her request). *Doe v. Irwin, supra,* illustrates this point, as it involved coercion that is lacking in the allegations of the Complaint.

Parents certainly have liberty interests in the upbringing and education of their children, but it is not unlimited. Cases that touch upon where these rights merge with the state's provision of education have interpreted the right only to mean that the state could not make public education mandatory. *See*, *e.g.*, *Runyon v. McCrary*, 427 U.S. 160 (1976)(holding that constitutional parental liberty rights do not interfere with school rights to determine the values and standards underlying educational

programs). Indeed, courts have rejected attempts by parents to establish a fundamental right to dictate curriculum and program choices at public schools where they send their children. *Thomas v. Evansville-Vanderburgh School Corp.*, 258 Fed.Appx. 50, 53-54 (7th Cir. 2007) ("We agree that [plaintiff] has a fundamental right, secured by the due process clause, to direct the upbringing and education of her child.... But a right to choose the type of school one's child attends, or to direct the private instruction of one's child, does not imply a parent's right to control every aspect of her child's education at a public school.") (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204-07 (9th Cir. 2005); *Leebaert v. Harrington*, 332 F.3d 134, 140-42 (2d Cir. 2003); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995); *cf. Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972)). Indeed, both the Sixth and Ninth Circuits have held that nothing in the Constitution prohibits public schools from making curriculum choices or to even direct the school administration more generally. *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1230– 33 (9th Cir.), cert. denied, 141 S. Ct. 894 (2020)

An Eleventh Circuit case that did find "conscience-shocking" behavior in the context of a school official's actions sufficient to support a substantive due process violation of parental liberty interests highlights show how different that case is from this one. In *Arnold v. Bd. of Educ. of Escambia Cnty. Alabama,* a school official coerced a child into seeking an abortion. 880 F.2d 305 (11th Cir.1989), *abrogated*

*in part by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993). The minor children that conceived a child, along with their parents, sued the school district contending that their constitutional rights were infringed.

Crucially, the parents alleged that the school official coerced the minor mother into obtaining an abortion and to refrain from discussing it with her parents, assisted in procuring the abortion, and hired the students for menial jobs so that they could pay for the abortion. While the Eleventh Circuit held these actions could constitute infringement on the substantive due process rights of the parents, the key to that holding was the school officials' coercive pressure on a child to seek an invasive and controversial medical procedure, and to conceal that procedure and the condition that led to it from the child's parents. *Id.* at 312-314.[4]

No coercion has been alleged here. There is no allegation that Plaintiffs' child was required to do anything or coerced into taking any action. Plaintiffs' child was not required, coerced, or encouraged to conceal anything from Plaintiffs.

Frankly, no action of the School Board or its staff or officials burdened or infringed on any rights that Plaintiffs enjoy under the Due Process clause. Certainly,

---

[4] Indeed, the Eleventh Circuit's holding in *Arnold* reinforces that coercion is necessary to establish a substantive due process violation in this context. *See Doe,* 615 F.2d at 1168.

no action of the School Board or its staff was "conscience-shocking" sufficient to establish a Constitutional violation, warranting dismissal of the Section 1983 claims. *See Doe*, 615 F.2d at 1169 (finding no need to consider whether there was a compelling state interest involved because there was no unconstitutional infringement of parental liberty interests).

IV.  *Superintendent Hanna and Assistant Superintendent Rodgers are Entitled to Qualified Immunity on Plaintiffs' Section 1983 Claims*

Qualified immunity offers complete protection for government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Critical public policy considerations, such as the "social costs [associated with claims against public officials] including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office" are bedrock principles of the qualified immunity defense. *Id.* at 814. Thus, "courts should think long and hard before stripping defendants of immunity." *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*). "Because qualified immunity is a defense not only from liability, but also from suit," it must be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*,

555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

Qualified immunity protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law," *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002). It is a "muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate—*before* they act or do not act—if their conduct will give rise to damage liability for them." *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996) (citing *Davis v. Scherer,* 468 U.S. 183, 195 (1984)). "If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." *Id.* (citing *Elder v. Holloway,* 510 U.S. 510, 513–15 (1994)).

Qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231. Qualified immunity "operates as a shield against civil damages due to mistaken judgments." *Harris v. Coweta Cty.*, 21 F.3d 388, 390 (11th Cir.1994). Stated differently, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Carroll v.*

*Carman*, 574 U.S. 13, 17 (2014) (per curiam).

To receive qualified immunity, a public official must first establish they were "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194. Superintendent Hanna and Assistant Superintendent Rodgers were acting within their discretionary authority as to the acts alleged in the Complaint. "[A] government official proves that he acted within his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks omitted); *see also*, *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (stating an official acts within her discretionary authority where she "perform[s] a legitimate job-related function…through means that [are] within his power to utilize"). The actions alleged by Plaintiff all implicate the discretionary authority of the individual defendants as they focus on actions core to their duties as public officials, managing the affairs of schools within the District, interpreting and applying school practice and policies, and interacting with parents concerning the education of a student in District schools.

Because Superintendent Hanna and Assistant Superintendent Rodgers were acting within their discretionary authority, the burden shifts to Plaintiffs to establish that qualified immunity is inappropriate. *Lumley v. City of Dade City, Fla.*, 327 F.3d

1186, 1194 (11th Cir. 2002). To do so, Plaintiffs must satisfy the following two-part test: (1) that they have alleged a violation of a constitutional right; and (2) that the right was "clearly established" at the time of the misconduct. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 236 and *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)). The steps in the test may be considered in whatever order is deemed appropriate for the case. *Pearson*, 555 U.S. at 241-242. Meaning, this Court can determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all. *See, e.g.*, *Loftus v. Clark–Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012); *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).

Superintendent Hanna and Assistant Superintendent Rodgers are entitled to qualified immunity under this framework. As already explained, no constitutional right was violated. At the very least, any such right was not "clearly established" at the time of the violation. A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis,* 561 F.3d at 1291–92 (internal citations omitted). Plaintiffs cannot establish that any purported

constitutional right violated was clearly established in any way.

First, the undersigned can identify no case establishing that the alleged actions of the defendants, as pled, give rise to a constitutional violation. The cases cited in the Complaint purporting to establish these rights are distinguishable as discussed.

Second, the undersigned can similarly identify no broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right of Plaintiffs that was abridged. It is certainly relevant to both inquiries that there are a multitude of cases, already cited and analyzed herein, that hold the exact kind of conduct purported to be unconstitutional was completely lawful. Also relevant is the historical deference that courts give to educational institutions and administrators to make decisions governing school administration. If anything, it is established that school administrators and school boards are typically given wide latitude to run schools, accountable to the will of the local electorate, and that constitutionalizing administrative decision-making in the school sphere is not done lightly.

Finally, no conduct alleged in the Complaint is so egregious that a constitutional right was clearly violated, in the total absence of case law that would put Superintendent Hanna and Assistant Superintendent Rodgers on notice that their conduct was unlawful. Indeed, this third category is "narrow" and "encompasses those situations where 'the official's conduct lies so obviously at the very core of

what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Loftus,* 690 F.3d at 1205 (quoting *Terrell v. Smith,* 668 F.3d 1244, 1257 (11th Cir. 2012)). As discussed, no conduct of any School Board staff "shocked the conscience" in a constitutional sense, and none of the conduct lies at the core of due process clause of the Fourteenth Amendment sufficient for the Plaintiffs to establish that Superintendent Hanna and Assistant Superintendent Rodgers are not entitled to qualified immunity.

"The inquiry whether a federal right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Loftus*, 690 F. 3d at 1204 (quoting *Coffin v. Brandau,* 642 F.3d 999, 1013 (11th Cir.2011) (en banc)). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* 577 U.S. ——, 136 S.Ct. 305, 308 (2015)). No reasonable person would have known that any action pled in the Complaint violated Plaintiffs' constitutional rights warranting dismissal of the Section 1983 claims against Superintendent Hanna and Assistant Superintendent Rodgers in their individual capacities.

V.   *Plaintiffs' Claims for Violations of Florida Statutes Fail Because those Statutes do not Create a Private Right of Action*

Plaintiffs bring two claims under Florida Statutes. One is lodged against the School Board under Chapter 1014, Florida Statutes, the Florida Parents' Bill of Rights. The second is brought under Section 743.07, Florida Statutes against all Defendants. Neither of these statutes creates a private right of action, warranting dismissal with prejudice of both counts.

The Florida Supreme Court instructs that "[w]hether a violation of a statute can serve as the basis for a private cause of action is a question of legislative intent" and courts "must determine legislative intent from the plain meaning of the statute." *Aramark Uniform & Career Apparel, Inc. v. Easton*, 894 So. 2d 20, 23 (Fla. 2004) ("A statute creates a new cause of action if it provides a remedy unavailable under the common law.") (citing *Fla. E. Coast Ry. Co. v. McRoberts*, 111 Fla. 278, 149 So. 631, 632 (1933)). "To discern legislative intent, [courts] look 'primarily' to the actual language used in the statute." *Borden v. East–European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006). "Further, '[w]hen the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent.'" *Id.* (quoting *Daniels v. Fla. Dep't of Health*, 898 So. 2d 61, 64 (Fla. 2005)); *Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1197 (Fla. 4th DCA 2006) (courts may imply a private cause of action "only

where the statutory scheme and statute itself indicate a legislative purpose to do so.").

Here, neither statute forming the basis of Plaintiffs' claims creates a private cause of action. First, Section 743.07, Florida Statutes, merely removes the disability of nonage as to those over 18 except with respect to the consumption of alcoholic beverages. Nothing in the statutory language remotely suggests that parents would have a cause of action under statute to enforce their own rights with respect to the family unit and the rearing of their children.

Similarly, nothing in the language of Chapter 1014, the Parents Bill of Rights, suggests the Legislature intended to permit parents a private cause of action under the statute. In fact, the language suggests otherwise. Section 1014.04(3) states: "[a]n employee of the state, any of its political subdivisions, or any other governmental entity who encourages or coerces, or attempts to encourage or coerce, a minor child to withhold information from his or her parent may be subject to disciplinary action." The Legislature's inclusion of a specific non-private remedy for a statutory violation, here a disciplinary action, and its exclusion of language that even suggests the creation of a private right of action, undercuts any argument that such a private right exists. *See Gunn v. Robles*, 100 Fla. 816, 817, 130 So. 463, 463 (Fla. 1930) ("Where a particular remedy is conferred by statute, it can be invoked only to the extent and manner prescribed."); *Dep't of Professional Regulation v. Florida Society of*

*Professional Land Surveyors*, 475 So. 2d 939 (Fla. 1st DCA 1985) (noting same as *Gunn*); *City of Miami v. Cosgrove*, 516 So. 2d 1125, 1127 (Fla. 3d DCA 1987) (holding that a statute granting a right to injunctive relief did not thereby grant a right to collect damages).

It should also be noted that Section 1014.06(5) imposes criminal liability for some statutory violations. Where a statute imposes criminal liability for violations, this is further evidence of the legislative intent to not create a private civil cause of action to remedy violations of its provisions. *See Mallery v. Norman L. Bush Auto Sales & Serv., Inc.*, 301 So. 3d 361, 363-66 (Fla. 2d. DCA 2020); *Mantooth v. Richards*, 557 So. 2d 646, 646 (Fla. 4th DCA 1990) (holding that a violation of a criminal statute did not afford a civil remedy).

Of course, the Legislature knows how to pass a law that provides for a civil remedy or cause of action and "courts must presume that the Legislature passes statutes with the knowledge of prior existing statutes...." *Knowles v. Beverly Enterprises-Florida, Inc.*, 898 So. 2d 1, 9 (Fla. 2004) (citation omitted). Indeed, the Legislature has provided for private enforcement rights in very similar statutory schemes in language or purpose. *See, e.g.*, § 393.13(5), Fla. Stat. (creating a private cause of action for violations of The Bill of Rights of Persons with Developmental Disabilities).

Surely, the Parents' Bill of Rights was intended to inure to parents' benefit. That is not enough to create a private right of action though. "[L]egislative intent, rather than the duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists where a statute does not expressly provide for one." *Murthy v. N. Sinha Corp.*, 644 So.2d 983, 984 (Fla. 1994). What controls is the Legislature intention to create a private action and nothing in the language of the Parents' Bill of Rights, or Section 743.07 for that matter, remotely indicates the Legislature intended to create such a right. *See Horowitz v. Plantations Gen. Hosp. Ltd. P'ship*, 959 So.2d 176, 182 (Fla. 2007)("The primary guide to our analysis of whether the Legislature intended to impose civil liability is, as in all cases of statutory construction, the actual language used in the statute.").[5] Accordingly, the Court should dismiss Counts VI and VII with prejudice.[6]

---

[5] To the extent Plaintiffs are asserting a common law claim in these counts, they still fail. Common law claims cannot be based on violations of a statute where that statute does not create a private right of action. *Buell v. Direct Gen. Ins. Agency, Inc.*, 267 Fed.Appx. 907, 909 (11th Cir. 2008) (noting that a statute which lacks a cause of action for its violation does not establish civil liability on common law claims); *Curtis v. City of West Palm Beach*, 82 So. 3d 894 (Fla. 4th DCA 2011) (explaining that remedy is limited to what is set forth in the statute and the violation of a statute lacking a private cause of action cannot be a premise for some type of broader claim for damages based solely on the violation of the statute).

[6] There are other bases to dismiss these claims. At least with respect to claims under the Parents' Bill of Rights, Plaintiffs do not plead any facts establishing a violation occurring after the effective date of the statute, July 1, 2021.

VI.    *Plaintiffs' State Constitutional Claims are Not Viable*

Counts IV (Article 1, §23 – Right to Privacy) and V (Article I, §9 – Substantive Due Process) are claims brought directly under the Florida Constitution. (Doc. 1, pp. 50-54). Plaintiffs seek, among other forms of relief, nominal and compensatory damages as well as attorneys' fees and costs. (Doc. 1, p. 61-62). These claims are subject to dismissal for a myriad of reasons.

First, it is axiomatic that a claim for damages for a violation of the Florida Constitution cannot be maintained. *Holcy v. Flagler County Sheriff,* 3:05-CV-1324J-32HTS, 2007 WL 2669219, at *6 (M.D. Fla. Sept. 6, 2007) (Florida constitutional claims do not support claims for damages absent a separate enabling statute). *See also Smith v. Bell*, No. 06-60750, 2008 WL 868253, at **2, 9-10 (S.D. Fla. Mar. 31, 2008) (concluding that "no private cause of action exists under the constitutional right to due process" and no claim for money damages can be maintained for violations of the Florida Constitution); *Hill v. Dep't of Corrs.*, 513 So. 2d 129, 133 (Fla. 1987). Likewise, Article I, §§9 and 23 of the Florida Constitution contain no right to an award of attorneys' fees and costs for a prevailing party. Generally, attorneys' fees are not recoverable in the absence of a statute or contractual agreement authorizing their recovery. *See Bidon v. Dep't of Prof'l Regulation, Florida Real Estate Com'n*, 596 So. 2d 450, 452 (Fla. 1992). There is no such authority for fees here. As such, Counts IV and V should be dismissed.

Second, the Florida Constitution does not create a cause of action against private persons. Therefore, the individual capacity claims in Counts IV and V against Superintendent Hanna and Assistant Superintendent Rodgers should be dismissed. *Blanco v. City of Clearwater, Fla.*, 9 F. Supp. 2d 1316, 1319 (M.D. Fla. 1998). *See also Riggins v. Beseler*, 3:10-CV-1187-J-25JBT, 2013 WL 12086790, at *17 (M.D. Fla. Mar. 26, 2013), *aff'd*, 568 Fed. Appx. 850 (11th Cir. 2014)("a violation of the privacy provision of the Florida Constitution does not serve as a basis for a cause of action against an individual…"); *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. 4th DCA 1997)(affirming dismissal of claim under Article I, §9 of the Florida Constitution against and holding, "[t]o allow Garcia to bring a cause of action based on a violation of our state's constitution, where no concomitant duty arises for private citizens, would extend the waiver of sovereign immunity beyond the stated intent of the statute. It would also create a duty of care arising from the state constitution where none has previously existed").

Third, Defendants recognize that parents have a fundamental right to parent their children and that such right is protected through the Florida Constitution. *D.M.T. v. T.M.H.*, 129 So. 3d 320, 335 (Fla. 2013). But nothing about the Defendants' alleged actions interferes with Plaintiffs' right to parent their child. Instead, Count IV surmises that school personnel in Florida have an affirmative duty under the Florida Constitution to notify parents every time their child requests that

their school treat them as a particular gender, refer to them by a preferred name, or address "other matters" related to their gender identity regardless of the circumstances. (Doc. 1 at p. 49, ¶166). The Florida Constitution does not create such a broad duty to provide such notification. *See In re T.W.*, 551 So. 2d 1186 (Fla. 1989)(finding Florida law that required minors to obtain parental consent before getting an abortion to be a violation of minors' rights of privacy under the Florida Constitution). Therefore, Count IV should be dismissed.

Finally, as it pertains to Count V, Florida courts recognize that the due process clause in the Florida Constitution provides no greater protection than the U.S. Constitution. *See Barrett v. State*, 862 So. 2d 44, 47 (Fla. 2d DCA 2003)(case involving alleged procedural due process violation); *Fla. Canners Ass'n v. Fla. Dep't of Citrus*, 371 So. 2d 503, 513 (Fla. 2d DCA 1979) ("We consider the federal and Florida constitutional guarantees as imposing the same standard"). Thus, substantive due process claims arising under the Florida Constitution and U.S. Constitution are analyzed under the same framework. As such, Count V fails for the same reasons as Counts I through III.

## ***Conclusion***

For the foregoing reasons, the Complaint should be dismissed with prejudice.

### *Request for Oral Argument*

Defendants request oral argument on this motion. Defendants estimate that one hour is needed for argument.

Respectfully submitted this 29th day of November 2021.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**
Florida Bar No. 100391
jslanker@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 937975
mspellman@sniffenlaw.com
**TERRY J. HARMON**
Florida Bar No. 0029001
tharmon@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for Defendants*

## WORD COUNT CERTIFICATION

This document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), and contains 7,902 words, which includes headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 29th day of November 2021, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

Doc. 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### (TALLAHASSEE DIVISION)

| | | |
|---|---|---|
| January Littlejohn, | ) | |
| Jeffrey Littlejohn, | ) | |
| Plaintiffs | ) | Case No. 4:21-CV-00415-MW/MJF |
| | ) | |
| v. | ) | |
| | ) | |
| School Board of Leon County, | ) | |
| Florida, Rocky Hanna, individually, | ) | |
| and in his official capacity as | ) | |
| Superintendent of Leon County | ) | |
| Schools, Dr. Kathleen Rodgers, | ) | |
| individually, and in her official | ) | |
| capacity as Assistant Superintendent, | ) | |
| Equity Officer and Title IX | ) | |
| Compliance Coordinator for Leon | ) | |
| County Schools, | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, January and Jeffrey Littlejohn, by and through their attorneys of record, submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss:

# TABLE OF CONTENTS

INTRODUCTION AND FACTUAL SUMMARY ................................................1

LEGAL ARGUMENT ........................................................................................4

  I.  Plaintiffs' Complaint Is Not A "Shotgun" Pleading. ......................................4

  II.  Claims Against Defendants Hanna and Rodgers In Their Official Capacities Are Not Duplicative of Claims Against the School Board..................6

  III.  Plaintiffs Sufficiently Allege Violations of Section 1983. .........................7

    A.  Plaintiffs Sufficient Allege Infringement of Their Fundamental Right to Make Medical and Mental Health Decisions for Their Children. .....................8

    B.  Plaintiffs Have Stated A Claim for Interference with their Fundamental Parental Rights Despite Defendants' Concealment of Facts Regarding Interactions with Their Daughter. .....................................................................12

  IV.  Defendants Are Not Entitled To Qualified Immunity. ..............................17

    A.  Defendants Cannot Meet Their Burden of Showing They Were Engaged in Discretionary Functions. ...............................................................................18

    B.  Plaintiffs' Allegations Show Defendants Violated Clearly Established Constitutional Rights...........................................................................................21

  V.  Florida's Parents Bill Of Rights Includes An Implied Private Right Of Action. .................................................................................................................24

  VI.  Plaintiffs Allege Viable State Constitutional Claims...................................30

    A.  Plaintiffs State A Viable Claim for Violation of the Right of Privacy Under Article 1, §23 of the Florida Constitution...............................................31

    B.  Plaintiffs State A Viable Claim for Violation of the Right to Substantive Due Process Under Article 1, §9 of the Florida Constitution...........................32

CONCLUSION....................................................................................................33

WORD COUNT CERTIFICATION ...................................................................35

i

CERTIFICATE OF SERVICE .................................................................36

## TABLE OF AUTHORITIES

### Cases

*Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th Cir.1989).... 15, 22

*Beagle v. Beagle,* 678 So.2d 1271 (1996)..................................................31

*Blau v. Fort Thomas Public School District*, 401 F.3d 381 (6th Cir. 2005) ...........10

*Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995)......2, 9

*Busby v. City of Orlando* 931 F.2d 764 (11th Cir. 1991) ........................................6

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)...................................................25

*Cort v. Ash*, 422 U.S. 66  (1975)..............................................................................25

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)...........................................12

*Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991)................................. 19, 24

*D.M.T. v. T.M.H.,* 129 So. 3d 320 (Fla. 2013)........................................................31

*Dream Defenders v. De Santis*, 4:21cv191-MW/MAF (N.D. Fla. Aug. 9, 2021).4, 5

*Epperson v. Arkansas*, 393 U.S. 97 (1968)...............................................................8

*Girard Trust Co. v. Tampashores Development Co.*, 117 So. 786 (Fla. 1928).......26

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...........................................................18

*Hatcher v. Desoto Co. Sch. Dist. Bd. of Ed.* 939 F.Supp.2d 1232 (M.D. Fla. 2013) 7

*Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292 (11th Cir. 2019) ................12

*Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) ....................................12

*Hollis v. School Bd. of Leon County*, 384 So. 2d 661(Fla. Dist. Ct. App. 1980) ......7

*Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004) ................ 3, 17-19

*J.B. v. Fla. Dep't of Child. & Fam. Servs*., 768 So. 2d 1060 (Fla. 2000)...............32

*Johnson v. Dade County* 1992 WL 466902  (S.D. Fla. 1992)................................15

*Johnson v. Darnell* CASE NO. 1:17-cv-87-MW-GRJ (N.D. Fla. Jul. 13, 2018)......5

*Keating v. City of Miami,* 598 F.3d 753 (11th Cir. 2010)..........................23

*Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014)....................12

*Kentucky v. Graham*, 473 U.S. 159 (1985)............................................6, 7

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002).............................. 18, 21

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ................................9

*Loftus v. Clark–Moore*, 690 F.3d 1200 (11th Cir. 2012)........................23

*Maddox v. Stephens,* 727 F. 3d 1109 (11th Cir. 2013) ...........................12

*McDonough v. City of Homestead*, 771 Fed.Appx. 952 (11th Cir. 2019)................5

*McGowan v. Maryland*, 366 U.S. 420 (1961) ........................................15

*Meyer v. Nebraska*, 262 U.S. 390, (1923) .................................... 2, 14, 15

*Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979) ...................................12

*N.R. v. Sch. Bd. of Okaloosa Cnty*. 418 F. Supp. 3d 957 (N.D. Fla. 2019) ..............5

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ....................9

*Parham v. J.R.,* 442 U.S. 584 (1979)....................................... 2, 11, 14, 22

*Pearson v. Callahan*, 555 U.S. 223 (2009)............................................23

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ............................. 14, 22

*Reese v. JPMorgan Chase & Co*., 686 F. Supp. 2d 1291 (S.D. Fla. 2009)............25

*Robertson v. Hecksel*, 420 F.3d 1254 (11th Cir. 2005) ...........................12

*School Bd. of Orange Cty. v. Coffey*, 524 So. 2d 1052 (Fla. Dist. Ct. App. 1988) ...6

*Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182 (Fla. 1983). ................ 25, 26

*Thomas v. Evansville-Vanderburgh Sch Corp.*, 258 Fed.Appx. 50 (7th Cir. 2007) .9

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................ 22, 33

*Vazzo v. City of Tampa*, 415 F.Supp.3d 1087 (M.D. Fla. 2019) ............................25

*Von Eiff v. Azicri*, 720 So.2d 510 (1998).................................................31

*Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300 (11th Cir. 2003)..........12

*Weiland v. Palm Beach*, 792 F.3d 1313 (11th Cir. 2015)..........................5

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................................................14

**Statutes**

Fla. Stat § 743.07 ................................................................................24

Fla. Stat. §1014.03 ..............................................................................27

Fla. Stat. §1014.04 ......................................................................... 27, 28

## INTRODUCTION AND FACTUAL SUMMARY

Eschewing their roles as school board members and educators, Defendants took on the role of parents and mental health professionals to undercut the decisions of Plaintiffs, one of whom is a mental health professional (Complaint, ¶85), and their retained professional, regarding care for their 13-year-old daughter. Surreptitious meeting(s) with a special needs student developmentally age 10 or 11 (Complaint, ¶59) —in which she was permitted to decide whether her parents would be invited, what name and pronouns she would use, and whether she would use the restroom, undress with, and room with boys or girls—are cast by Defendants as "educational decisions" outside the purview of parental decision-making. (Motion to Dismiss, "MTD," pp. 18-19). However, Defendant Rodgers and School Board member Georgia Bowen have publicly stated that gender identity issues, including names and pronouns, are not merely academic decisions but are critical to children's identity, *i.e.,* their mental health, must be respected by teachers and peers, and must be the subject of advocacy efforts with "unsupportive" parents. (Complaint, ¶¶24, 93). Defendants' written guidance regarding LGBTQ+ children also explicitly states that questions about a child's gender identity are matters of personal and psychological well-being, not matters affecting a child's academic performance. (Complaint, Exhibit A). That being the case, they fall squarely within the parents' fundamental right to make medical and mental health decisions for their child, *Parham v. J.R.,*

442 U.S. 584 (1979), not curriculum choices or school discipline which are the purview of educators, *Meyer v. Nebraska*, 262 U.S. 390, (1923); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995). Nevertheless, Defendants now claim that creating written guidance and training staff that **under the law** parents are not to be told when their children express questions about their sex or gender identity and are to be deliberately deceived about their children's gender identity "in no way burdened or infringed on any rights Plaintiffs enjoy under the Due Process clause." (MTD, p. 20).

Having prevented Plaintiffs from being informed about meeting(s) with their minor daughter, Defendants are now claiming that Plaintiffs' claims should be dismissed because there are no allegations about whether their daughter was coerced or required to conceal information from her parents. (MTD, p. 20). Defendants directed staff that they could not tell Plaintiffs anything about their daughter's meeting(s) with LCS staff, or the decisions made during the meeting(s), and that the young girl was "protected" under a non-discrimination law that does not include parental notification or input. (Complaint, ¶56). Consequently, Defendants provided Plaintiffs no information regarding who instituted the meeting(s), how many meetings there were, what was said by their daughter or by others in attendance. The only information provided to Plaintiffs after repeated requests was a Transgender Student Support Plan given to them on November 2, 2020. (Complaint ¶¶ 57-64).

That document offered information on a meeting on September 8, 2020, the participants, and decisions purportedly made by Plaintiffs' daughter at that meeting. (Complaint ¶¶ 71-76). Plaintiffs were told that another private meeting between their daughter and staff was scheduled for November 3, 2020. (Complaint, ¶¶ 65-66). They were not informed whether there had been other meetings with their daughter, let alone who was present or what was said or decided. Nevertheless, Defendants now allege that Plaintiffs' claims should be dismissed because "Plaintiffs' child was not required, coerced, or encouraged to conceal anything from Plaintiffs." (MTD p. 20). It is readily conceivable that a middle school child could feel required, encouraged, or compelled to participate without her parents in a meeting initiated by adults in authority during the school day. Nevertheless, it remains to be disclosed during discovery the extent to which Plaintiffs' daughter "was required to do anything or coerced into taking any action" (*Id.*) because Defendants concealed that information from Plaintiffs. Defendants are not entitled to benefit from their bad faith actions.

Similarly, Defendants cannot hide behind qualified immunity without having to demonstrate, not just assert, that they were acting within their discretionary authority. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). At this stage in the litigation they cannot meet that burden, particularly since they have concealed much of what they did from Plaintiffs. Furthermore, Mr. Hanna cannot escape

liability as a party in his official capacity by alleging that claims against him are duplicative of claims against the School Board. Mr. Hanna is a constitutional officer elected by the people of Leon County, not an employee of the School Board, so there is no duplication of claims that would confuse a jury. (Complaint, ¶11).

Defendants' conclusory allegations regarding the availability of a private right of action under the Parents' Bill of Rights do not comport with Florida Supreme Court precedent, and allegations that Plaintiffs did not allege facts regarding conduct occurring after July 1, 2021 are contradicted by the allegations of the Complaint. (Complaint ¶¶ 108-110). Finally, Defendants' claim that Plaintiffs' Complaint is a "shotgun pleading" strains credulity.

Defendants' motion should be denied. Alternatively, Plaintiffs must be granted leave to amend.

## LEGAL ARGUMENT

### I.    Plaintiffs' Complaint Is Not A "Shotgun" Pleading.

As was true of the complaint in *Dream Defenders v. De Santis*, 4:21cv191-MW/MAF (N.D. Fla. Aug. 9, 2021), "Plaintiffs' Complaint is not a shotgun pleading." "Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action or claim for relief into distinct counts; or (4) combining multiple

claims against multiple defendants without specifying which defendant is responsible for which act." *Id.* (citing *McDonough v. City of Homestead*, 771 Fed.Appx. 952, 955 (11th Cir. 2019)). The Eleventh Circuit has explained that incorporating all the factual allegations into each claim can constitute a shotgun pleading when it is nearly impossible for defendants and the Court to determine with any certainty which factual allegations give rise to which claims for relief. *Id.* (citing *Weiland v. Palm Beach*, 792 F.3d 1313, 1325 (11th Cir. 2015)). As the Eleventh Circuit held in *Weiland,* the key feature of shotgun pleadings that will subject a complaint to dismissal is that they fail to give defendants "adequate notice" of the claims being bought against them and the supporting factual allegations for each claim. *Id.* (citing *Weiland*, 792 F.3d at 1323).

That is not the case here, as it was not in *Dream Defenders.* Defendants' lengthy and detailed motion to dismiss "belie[s] any assertion that it is virtually impossible for Defendants to understand which allegations of fact are intended to support which claims for relief." *Id.* A multi-count complaint that incorporates the preceding allegations by reference does not *ipso* facto constitute a "shotgun pleading." *Johnson v. Darnell* CASE NO. 1:17-cv-87-MW-GRJ (N.D. Fla. Jul. 13, 2018). "Neither dismissal as a shotgun pleading nor further delay of discovery for re-pleading is justified." *N.R. v. Sch. Bd. of Okaloosa County* 418 F. Supp. 3d 957, 976 n.13 (N.D. Fla. 2019).

## II.   Claims Against Defendants Hanna and Rodgers In Their Official Capacities Are Not Duplicative of Claims Against the School Board.

Defendants disingenuously claim that Mr. Hanna and Dr. Rodgers must be dismissed as defendants in their official capacities because a "§1983 suit against an official of the government in his official capacity is deemed to be a suit against the entity that employs the official." *Busby v. City of Orlando* 931 F.2d 764, 776 (11th Cir. 1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). In fact, precedent is not nearly so conclusive as Defendants claim it is.

Defendants' argument that Mr. Hanna should be dismissed pursuant to *Busby* and *Graham* is fatally flawed because Mr. Hanna is not an employee of the School Board. Pursuant Article IX, § 5 of the Florida Constitution, Mr. Hanna has been elected to the position of Superintendent of Leon County Schools by the citizens of Leon County. (Complaint, ¶11). "The school superintendent was not a mere agent or employee of the school board improperly joined as a defendant. He was properly sued as an agency separate from the school board." *School Bd. of Orange County v. Coffey*, 524 So. 2d 1052, 1054 (Fla. Dist. Ct. App. 1988).

> The district school superintendent, like members of the school board, is a constitutional officer. Article IX, § 5, Florida Const. (1968). While the superintendent may be appointed by the school board in a district in which the people by resolution approve the appointive system, Section 230.24, the Leon County School Superintendent has at all times been elected by the people of Leon County.

*Hollis v. School Bd. of Leon County*, 384 So. 2d 661, 664 (Fla. Dist. Ct. App. 1980). Therefore, Mr. Hanna cannot be dismissed in his official capacity.

Even as to Dr. Rodgers, who is employed by the School Board, *Busby* and *Graham* do not require dismissal, particularly at this stage in the litigation. *Hatcher v. Desoto County Sch. Dist. Bd. of Educ.* 939 F. Supp. 2d 1232, 1236 (M.D. Fla. 2013). "It is true that an official capacity claim may be redundant when the entity is also a named defendant." *Id.* (citing *Busby*). "The School Board, however, is contesting any liability based on Fusco's conduct, and therefore it remains plausible at this stage of the proceedings that a separate official capacity claim can be maintained against Fusco." *Id.* Similarly here, discovery may reveal questions regarding whether Dr. Rodgers was acting within her authority, *see discussion infra,* and the School Board might contest liability for her actions. Until the factual record is developed, it remains plausible that a separate official capacity claim can be maintained against Dr. Rodgers. Therefore, precedent does not require dismissing her in her official capacity.

### III.     Plaintiffs Sufficiently Allege Violations of Section 1983.

Defendants' assertion that "Plaintiffs' Section 1983 claims must be dismissed as to all Defendants because no constitutional rights of the Plaintiffs are implicated by any of Defendants' alleged actions" (MTD, p. 15), is breathtaking in its misrepresentation of the allegations of the Complaint, misstatement of the "crux" of

7

Plaintiffs' claims, and misinterpretation of constitutional principles. It is also breathtakingly specious and disingenuous. Defendants have deliberately and actively concealed facts from Plaintiffs (Complaint, ¶¶43-59, 63, 65, 71-76), refused to provide authority for their assertion that the law prohibits disclosure of children's gender identity issues (Complaint, ¶¶60, 64, 68-70), refused to provide promised remedies for their acknowledged wrongful failure to involve Plaintiffs in decisions related to their child (Complaint, ¶¶ 88-91, 94-97, 104-106), and are now claiming that Plaintiffs' claims should be dismissed because Plaintiffs did not provide the facts withheld from Plaintiffs under the guise of unsubstantiated legal authority.

### A. Plaintiffs Sufficient Allege Infringement of Their Fundamental Right to Make Medical and Mental Health Decisions for Their Children.

Defendants assert that "there is no Constitutional liberty interest" requiring that parents be notified and involved in decisions related to their child's gender identity "because the case involves school administration," and "public education of children is unquestionably entrusted to the control, management, and discretion of school boards." (MTD, p. 15, citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). More specifically, Defendants claim that Plaintiffs' claims are deficient because "courts have rejected attempts by parents to establish a fundamental right to dictate curriculum and program choices at public schools where they send their children" (MTD, pp. 18-19, citing *Thomas v. Evansville-Vanderburgh School Corp.*, 258

Fed.Appx. 50, 53-54 (7th Cir. 2007); *Leebaert v. Harrington*, 332 F.3d 134, 140-42 (2d Cir. 2003); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995)). Defendants further state that "both the Sixth and Ninth Circuits have held that nothing in the Constitution prohibits public schools from **making curriculum choices or to even direct the school administration more generally**." (MTD p. 19, citing *Parents for Privacy v. Barr*, 949 F.3d 1210, 1230–33 (9th Cir. 2020)) (emphasis added). Implicit in Defendants' argument is that discussions between school officials and children regarding gender identity are merely discussions about curriculum and general school administration solely within the purview of Defendants' authority as educators. The allegations of the Complaint and Defendants' own public statements illustrate the fallacy in that conclusion.

Defendants' written guidance emphasizes that discussions regarding a child's gender identity are related to **the health and well-being** of the child. (Complaint, ¶23) (emphasis added).

> Outing a student, especially to parents, **can be very dangerous to the students [sic] health and well-being**. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+, many of whom have been rejected by their families for being LGBTQ+. Outing students to their parents can literally make them homeless.

(*Id.*, citing Exhibit A, p. 15).

School Board member Bowen publicly stated that "Affirmed names and pronouns are **a central part of a student's identity**. We want to get those right, so

9

we include our pronouns in Zoom, or in class we say, 'Hi I am Mr. Stewart and I use the pronouns he/him.'" (Complaint, ¶40). Something that is "a central part of a student's identity" is not merely a curriculum choice or matter of school administration delegated to the public schools. Mrs. Bowen also stated that "unmet medical needs" including puberty blockers (medications that arrest pubertal development in children) were a challenge for LGBTQ+ students that "hopefully we [the school board] can" have remedies in place for." (Complaint, ¶42). "Unmet medical needs" are not a curriculum choice or matter of school administration within the sole purview of public schools. Defendant Rodgers publicly stated that "students need to be able to show their 'identities' to their teachers and for their peers to embrace those identities," again signaling that gender identity issues including names and pronouns are matters affecting the child's well-being (*i.e.* mental health), not a curriculum choice. (Complaint, ¶92).

In other words, by Defendants' own admissions, gender identity issues are issues critical to the safety and well-being of the child. They are not part of, *e.g.,* the school curriculum, hours of the school day, school discipline, extracurricular activities or a dress code, *i.e.,* the issues of public education generally "committed to the control of state and local authorities." *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 395-96 (6th Cir. 2005). Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-

10

being of children. (Complaint ¶138) As issues critical to the health and well-being of their child, gender identity issues are exclusively within the sole purview of the parents. *Parham v. J.R.,* 442 U.S. 584, 604 (1979). *Parham* affirmed that parents (not public schools) "retain a substantial, if not the dominant, role in medical and mental health care decisions for their children, absent a finding of neglect or abuse." *Id.* If the parent is fit and there are no allegations of neglect or abuse, then courts should apply the traditional presumption that parents act in the best interests of their children. *Id.* Notably, the *Parham* Court affirmed that parental decision-making predominates even when the parents' choice is disagreeable to the child (such as not using a "preferred" name or pronoun). *Id.* at 603.

Plaintiffs have alleged, *inter alia*, that Defendants engaged in private meetings with their daughter in which they discussed A.G.'s gender identity, including her preferred name and pronouns, bathroom and overnight accommodation preferences. Defendants' written guidance and public statements affirm that these are not matters related to curriculum or school administration but are issues that are central to children's identity and well-being. As such, they are not part of the pedagogical interests over which Defendants have authority. Instead, they are part of the child's physical and mental health over which Plaintiffs, as fit parents, have plenary authority. Allegations of Defendants' usurpation of that authority more than sufficiently state a substantive due process claim for violation of Plaintiffs' parental

rights to direct the medical and mental health decision-making of their children. Therefore, contrary to Defendants' argument, there is a "Constitutional liberty interest requiring that parents be notified and involved in decisions related to their child's gender identity, including names and pronouns," and they have violated that interest.

### B. Plaintiffs Have Stated A Claim for Interference with their Fundamental Parental Rights Despite Defendants' Concealment of Facts Regarding Interactions with Their Daughter.

Defendants' remaining arguments regarding substantive due process and parental rights are a hodgepodge of disconnected statements citing cases regarding standards of review,[1] property rights,[2] alleged law enforcement misconduct,[3] and child protective services actions which separated children from parents.[4] (MTD pp. 12-20). Piecing together the statements, Defendants seem to be arguing that Plaintiffs' Section 1983 claims must be dismissed because Plaintiffs have failed to

---

[1]    *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 12927 (11th Cir. 2019); *Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014).

[2]    *Id.*

[3]    *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003); *Robertson v. Hecksel*, 420 F.3d 1254, 1258 (11th Cir. 2005); *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016).

[4]    *Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979); *Maddox v. Stephens,* 727 F. 3d 1109, 1119 (11th Cir. 2013).

alleged concealment of information and failed to allege coercion. Defendants' cases do not support their arguments.

Furthermore, regardless of whether allegations of coercion are necessary (which they are not, *infra*), any asserted insufficiency in such factual allegations arises from Defendants' deliberate concealment of information from Plaintiffs. Defendants' written guidance and continuing actions in implementing it, evidence their intent to conceal information regarding children's gender identity questions from parents, even since passage of the Parents' Bill of Rights. The written guidance unequivocally states that parents are not to be notified if their child "has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+." (Complaint, ¶23). Plaintiffs allege that LCS staff were trained to follow that guidance and to not disclose to parents information regarding their child's gender identity without the child's permission. (Complaint ¶¶29-31). Mrs. Littlejohn was told directly by LCS staff that she could not receive information regarding her daughter's interactions with staff related to her gender identity because "A.G. was now 'protected' under a non-discrimination law that does not include parental notification or input," a policy overseen by Dr. Rodgers. (Complaint, ¶56). Dr. Rodgers told Mr. Littlejohn that LCS was not required by law to inform parents of conversations with their children regarding gender identity and emphasized the need for protecting children's "privacy" against their own parents. (Complaint, ¶70). Even

after Mr. Hanna represented to the Littlejohns that LCS policy would be that parents must be notified, Dr. Rodgers told them she instructed staff only that they were "encouraged" to tell parents. (Complaint, ¶¶89, 94). As recently as September 29, 2021, after the effective date of the Parents' Bill of Rights, LCS staff has been told that "privacy laws" prohibit teachers from revealing to parents that their child has expressed a discordant gender identity, and that they should not "out" children to their parents by notifying parents when their children state a belief that they are something other than their biological sex. (Complaint ¶¶109-110).

These allegations evidence actions by Defendants to prohibit the disclosure of information regarding children's gender identity to parents. This interferes with the parents' right to direct the upbringing and make mental health decisions for their children under *Parham,* 442 U.S. at 604. Therefore, even if, as Defendants claim, "interference of parental rights is only actionable where the state is requiring or prohibiting some activity," (MTD, p.16), Plaintiffs have alleged such a prohibition. Just as Nebraska violated parental rights by prohibiting teaching the German language, *Meyer v. Nebraska*, 262 U.S. 390, (1923); Oregon violated parental rights by prohibiting private schools, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) and Wisconsin violated parental rights by prohibiting parents from disenrolling their children from school before age 16, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), so too, here, the allegations of the Complaint show that Defendants can be found to

have violated Plaintiffs' rights by prohibiting disclosure of gender identity information to parents.

Defendants allege that Plaintiffs must prove "coercion" to establish a violation of their fundamental parental rights but offer no precedential support for their statement. Coercion is a factor for claims based on the Establishment Clause based on the genesis of the right, *i.e.,* prohibition of state-mandated religions present at the founding of the country. *McGowan v. Maryland*, 366 U.S. 420, 563 (1961). However, there is no similar genesis and no need to address coercion for the parental right, which arises from the nature of the family as an institution long recognized at common law as "essential to the orderly pursuit of happiness by free men." *Meyer,* 262 U.S. at 399. In fact, the Southern District of Florida has specifically stated that "government coercion, specifically in the form of inducing children to refrain from communicating with their parents on a given subject, is not a necessary element of a cause of action for infringement with parental rights." *Johnson v. Dade County* 1992 WL 466902 at 5 (S.D. Fla. 1992). In this case, Plaintiffs' parental rights may not be interfered with by LCS staff unless it is related to the pedagogical purposes delegated to Defendants. As discussed in Section IIIA, *supra*, the concealment of information regarding children's gender identity is not so related.

The Eleventh Circuit's use of the term "coercive" to describe the actions of the counselors in *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th

Cir.1989) does not translate into a requirement of coercion to provide a parental rights violation by school staff. While the actions of the counselors in *Arnold* were coercive (convincing the students to obtain an abortion and helping fund it), the court did not determine that plaintiffs had to allege coercion, but that in alleging it they more than satisfied the notice pleading standards for a civil rights claim. *Id* at 312. Notably, *Arnold* involved similar interference with parental notification as is alleged here. *Id.* at 312-13. In *Arnold*, school staff convinced the students not to tell their parents about the pregnancy and abortion. *Id.* That directive "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313. "This deprives the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Id.*

Plaintiffs do not allege specifics of conversations between A.G. and LCS staff regarding communicating with her parents because Defendants have concealed those facts from Plaintiffs. Plaintiffs have alleged that Defendants developed and implemented protocols prohibiting staff from disclosing the information, and in particular from discussing the specifics of conversations with parents. Plaintiffs have alleged that Defendants informed staff that children like A.G. were "protected by law" from having this information revealed to their parents. Plaintiffs have alleged that their special needs daughter participated in at least one private meeting with

authority figures at school who had been instructed not to disclose to parents what occurred. Whether those authority figures actively encouraged or coerced A.G. to refrain from communicating with her parents cannot be known without further discovery. Plaintiffs must be permitted to obtain an answer to that question. Plaintiffs have sufficiently alleged facts showing Defendants deliberately set out to conceal information from them about their daughter's mental health to state a claim that their parental rights have been violated.

## IV.   Defendants Are Not Entitled To Qualified Immunity.

Qualified immunity applies to preclude liability for damages against a governmental actor if he was acting in his discretionary authority and violated a clearly established constitutional right.  Here, Plaintiffs are seeking equitable relief as well as damages, so even if qualified immunity did apply it would not require dismissal of all claims against the individual defendants.

In addition, at this early stage in the litigation Defendants cannot establish they are entitled to qualified immunity. Because determining the questions of discretionary functions and clearly established constitutional rights require factual development, qualified immunity is usually addressed at the summary judgment phase. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). Government officials may seek to have the complaint dismissed on qualified immunity grounds

prior to discovery, but the questions must be answerable based solely on the allegations in the pleadings. *Id.* at 1263 n.6. That is not the case here.

### A. Defendants Cannot Meet Their Burden of Showing They Were Engaged in Discretionary Functions.

To even be potentially eligible for summary judgment due to qualified immunity, Defendants must prove that they were engaged in a "discretionary function" when they performed the acts of which the Plaintiffs complain. *Id.* at 1263-64, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "While a number of our cases omit this step of the analysis, binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter." *Holloman,* 370 F.3d at 1264.

In the qualified immunity context, courts in the Eleventh Circuit do not focus on whether the acts in question involved the exercise of actual discretion, but whether the acts are of a type that fell within the employee's job responsibilities. *Id.* It is a two-fold inquiry: "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1266. The Defendants' acts cannot be characterized and assessed at too high a level of generality. *Id.* Nearly every act performed by a government employee can be described, in general terms,

as ostensibly "furthering the public interest," which make it impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. *Id.* Consequently, courts consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. *Id.* "After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second part of the inquiry and determine whether he is executing that job-related function — that is, pursuing his job-related goals — in an authorized manner." *Id.* at 1266-67.

To meet their initial burden of proof, Defendants must show "objective circumstances which would compel the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). Defendants do not make the necessary showing here. Defendants claim that they have met their burden because the actions alleged by Plaintiffs "focus on actions core to their duties as public officials, managing the affairs of schools within the District, interpreting and applying school practice and policies, and interacting with parents concerning the education of a student in District schools." (MTD, p. 23). That misleading conclusory statement does not provide the objective proof required under *Courson* and disregards the Eleventh Circuit's admonition that a defendant's

duties cannot be characterized at too high a level of generality. *Holloman,* 370 F.3d at 1266.

Most telling in the Defendants' conclusory statement regarding their job-related functions is the assertion that they were "interacting with parents concerning the education of a student in District schools." The allegations in the Complaint describe, and indeed the crux of Plaintiffs' claims are, that Defendants were **not** interacting with them regarding their daughter. Also, the allegations in the Complaint describe interactions with Plaintiffs' daughter that were **not** concerning the education of their daughter, but rather her mental health. Furthermore, Plaintiffs allege that Defendants did far more than merely "interpreting and applying school practice and policies." Defendant Rodgers oversaw creation of a transgender student guidance document that directed school staff that: 1) parents were not to be notified regarding their child's gender identity (Exhibit A, p. 15), 2) non-discrimination laws required that children be permitted to choose which sex-separated privacy facilities and overnight accommodations they would use without parent input (Exhibit A, p.14), and 3) calling a child by their legal name instead of a preferred alternative constitutes actionable harassment. (Exhibit A, p. 14). Defendants offer no objective evidence that Dr. Rodgers was acting within the scope of her authority or competency when she provided legal advice to LCS staff by telling them that parents

could not by law be told anything about their child's expression of a discordant gender identity unless the child consented. (Complaint, ¶31).

Defendants offer no objective circumstances which would compel the conclusion that Mr. Hanna's actions were undertaken pursuant to the performance of his duties and within the scope of his constitutional authority. Since the allegations of the Complaint describe interactions with Plaintiffs' daughter directly affecting mental health decision-making it cannot reasonably be asserted that their actions were "core to their duties" or competencies as neither Defendants Rodgers nor Hanna is a mental health professional.

Finally, since discovery has not occurred, the nature and extent of the Defendants' acts and omissions are not known. This makes it impossible for Defendants to establish that they were acting pursuant to the performance of their duties based upon the allegations of the Complaint. Neither Defendant can meet the burden of demonstrating that he or she was engaged in a "discretionary function" when he or she performed the acts of which the Plaintiffs complain. Therefore, Defendants are not eligible to claim qualified immunity. *Lee v. Ferraro*, 284 F.3d at 1194.

### B. Plaintiffs' Allegations Show Defendants Violated Clearly Established Constitutional Rights

Even if Defendants were able to meet their burden, they still would not be entitled to qualified immunity. Looking at the allegations of the Complaint rather

than Defendants' specious reinterpretation of constitutional precedent leads to the conclusion that Defendants flouted long-established constitutional principles. Defendants acknowledge that "[t]he Due Process Clause of the Fourteenth Amendment 'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (MTD, p. 12), and that parents' fundamental right to parent their children is protected through the Florida Constitution." (MTD p. 32). Defendants also acknowledge that state interference with those rights is actionable when the state is requiring or prohibiting some activity. (MTD p. 16, citing *Meyer,* 262 U.S. 390). In this case, as discussed *supra*, Defendants have prohibited disclosure of children's gender identity information to parents. This is the same type of prohibition the Eleventh Circuit found violative of parental rights in *Arnold,* 880 F.2d at 312-14. The Eleventh Circuit established that a directive to students to not disclose information to their parents "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child," and that schools must refrain from such directives. *Id.* at 313-14. As well as referencing *Meyer, Pierce,* and *Troxell*, the Eleventh Circuit relied on *Parham'*s holding that "[t]he law's concept of the family presumes that parents possess what a child lacks in maturity, experience and capacity for judgment," as authority for its finding that withholding information from parents

unduly interferes with their fundamental rights. *Id*. at 314 (citing *Parham,* 442 U.S. at 602).

At the time that Defendants created the written transgender student guidance, trained staff regarding the guidance and interacted with Plaintiffs' daughter in 2020, it had been clearly established in the Eleventh Circuit for more than 30 years that school officials violate parents' fundamental rights to direct their children's upbringing when they direct that parents not be informed about medical and mental health issues regarding their children. That clearly established right was in turn based on constitutional rights that had been clearly established by the Supreme Court for nearly 100 years in the case of *Meyer* and *Pierce* and more than 40 years in the case of *Parham.* As was true of the police officers in *Keating v. City of Miami,* 598 F.3d 753, 767 (11th Cir. 2010), it should have been obvious to Defendants Rodgers and Hanna that their conduct would violate Plaintiffs' constitutional rights.

Plaintiffs' allegations establish a constitutional violation. *Id.* at 762. This satisfies one part of the two-part test for determining whether a state official is entitled to qualified immunity. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In addition, the long-standing Eleventh Circuit precedent in *Arnold* building on *Meyer, Pierce,* and *Parham* provides a materially similar case that has been decided so as to be clear to reasonable state officials that prohibiting school staff from disclosing gender identity information to parents was unlawful. *Loftus v.*

*Clark–Moore*, 690 F.3d 1200, 1204-05 (11th Cir. 2012). That would satisfy the other prong of the two-prong test. *Id.*

At this pleading stage of the case, Defendants cannot meet their threshold burden of providing "objective circumstances which would compel the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Courson*, 939 F.2d at 1487. Therefore, they are not entitled to qualified immunity. Even if the threshold showing were made, the allegations of the Complaint, if proven, show that their actions violated Plaintiffs' clearly established fundamental parental rights so as to foreclose qualified immunity.

## V.   Florida's Parents Bill Of Rights Includes An Implied Private Right Of Action.

Florida's commitment to protecting parental rights to direct the upbringing, education, and medical decision-making of their children is further established in Florida Statutes § 743.07 and Chapter 1014, known as the Parents' Bill of Rights. In both enactments, the Legislature emphasized the fundamental nature of these parental rights and that actions such as those taken by Defendants here unduly interfere with those rights. Defendants question whether Plaintiffs can seek relief under these statutes. A judicial decision citing Section 743.07 and the language of Chapter 1014 evidence the viability of Plaintiffs' claims under these statutes.

Under Fla. Stat. § 743.07 parents are responsible for selecting the manner of medical/mental health treatment received by their child until the child reaches age

18. The Middle District of Florida utilized that statute to find that municipalities improperly diminished that fundamental parental right when it enacted an ordinance prohibiting talk therapy aimed at helping children struggling with unwanted same-sex attractions and gender identity confusion. *Vazzo v. City of Tampa*, 415 F.Supp.3d 1087, 1098 (M.D. Fla. 2019). Defendants' actions here similarly burden Plaintiffs' rights to direct the mental health treatment of their children.

When analyzed in the context of United States and Florida Supreme Court precedent, the Parents' Bill of Rights, Florida Statutes Chapter 1014, includes an implied private right of action. The United States and Florida supreme courts use a four-part test, first articulated in *Cort v. Ash*, 422 U.S. 66  (1975), to determine whether a private remedy should be implied in a statute that does not expressly provide one: (1) whether the statute was enacted for the benefit of a special class of which the plaintiff is a member, (2) whether there is any indication of legislative intent to create a private remedy, (3) whether implication of such a remedy is consistent with the underlying purposes of the legislative scheme, and (4) whether implying a federal remedy is inappropriate because the subject matter involves an area basically of concern to the States. *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1301 (S.D. Fla. 2009). Florida courts also look at whether the affected statute can serve a useful

purpose without a private remedy. *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983).

In *Smith,* the Florida Supreme Court held that a statute prohibiting employers from discharging an employee in retaliation for asserting a workers' compensation claim implicitly created a statutory cause of action for wrongful discharge. *Id.* at 183–84. "A private right of action may be implied from a statutory provision that would serve no useful purpose in the absence of a private right of action." *Id.* at 184. "[B]ecause the legislature enacted a statute that clearly imposes a duty and because the intent of the section is to preclude retaliatory discharge, the statute confers by implication every particular power necessary to insure the performance of that duty." *Id.* (citing *Girard Trust Co. v. Tampashores Development Co.*, 117 So. 786, 788 (Fla. 1928)). "That which is clearly implied is as much a part of the law and is as effectual as that which is expressed." *Girard Trust*, 117 S. at 788. "Where a statute requires an act to be done for the benefit of another or forbids the doing of an act which may be to his injury, though no action be given in express terms by the statute for the omission or commission, the general rule of law is that the party injured should have an action; for, where a statute gives a right, there, although in express terms it has not given a remedy, the remedy which by law is properly applicable to that right follows as an incident." *Id.*

26

A private right of action may be implied in the Parents' Bill of Rights under *Girard Trust* and *Smith* because absent such a private right of action, the law would serve no useful purpose. The law's extensive recitation of the rights held by parents vis-a-vis their children in the context of education and medical care, Fla. Stat. §1014.04, will be meaningless if parents cannot take legal action against educators and health care providers when those rights are violated. The statute provides for disciplinary action against school employees and health care providers and possible criminal penalties for provision of nonconsensual medical care. However, neither of those provisions provides any remedy for parents whose rights have been and are being violated. Other than speaking at a school board meeting if they are denied access to materials, parents have no explicit administrative or legal remedy available to redress the actions of rogue educators and health care providers. Without a private right of action there would be no motivation on the part of educators to comply with the law if they could not be held accountable to parents whose statutory rights they have violated.

Examining the Parents' Bill of Rights under the *Cort* factors also leads to the conclusion that there is an implied private right of action. The fourth factor is not at issue in a state law context. As to the first factor, there is no doubt that the statute was enacted for the benefit of a special class, *i.e.*, parents, as opposed to the general public at large. As to whether there is any indication of legislative intent to create a

private remedy (the second *Cort* factor), there are numerous indications of such an

intent in the statutory language. Among the strongest is the provision in Section

1014.03:

> The state, any of its political subdivisions, any other governmental
> entity, or any other institution may not infringe on the fundamental
> rights of a parent to direct the upbringing, education, health care, and
> mental health of his or her minor child **without demonstrating that**
> **such action is reasonable and necessary to achieve a compelling**
> **state interest and that such action is narrowly tailored and is not**
> **otherwise served by a less restrictive means.** (emphasis added).

The language in bold is a recitation of the strict scrutiny standard used by

courts to analyze fundamental rights under the Constitution. By including it in the

law, the Legislature is saying that state actors cannot infringe upon the rights listed

in the statute unless they prove that their actions can withstand strict judicial

scrutiny. Implicit in that statement is that state actors will have to make an offer of

proof to a judge which will determine whether the showing is sufficient. Therefore,

implicit in the recitation of the standard of proof for infringement of parental rights

is that an aggrieved party, *i.e.,* the parent, will challenge the state actor's acts or

omissions in court, where the state must make such offer of proof. Since it is the

individual parents' rights, not the public's at large, that are affected by the state's

actions, it is parents who have standing to bring such a lawsuit.

Similarly, the Legislature made clear that "All parental rights are reserved to

the parent of a minor child in this state without obstruction or interference from the

state, any of its political subdivisions, any other governmental entity, or any other institution." Fla.Stat. § 1014.04(1). By stating that the rights are not to be obstructed or interfered with, the Legislature evinces its intent that governmental entities will be held accountable for violations of parental rights. The only way that can be assured is if parents aggrieved by the governmental actions can seek judicial relief.

Analysis of the second *Cort* factor also informs the third, *i.e.*, whether implication of such a remedy is consistent with the underlying purposes of the legislative scheme. The Legislature repeatedly asserts the fundamental, expansive nature of parental rights intended and the prohibition against any infringement or obstruction of them by the state. It makes clear that its purpose in enacting this legislation is to prevent and/or cease governmental interference with parents' decision-making regarding education, religious upbringing, medical or mental health care and other aspects of child-rearing. Accomplishing that prevention or cessation of government action will inevitably require intervention by courts. Therefore, it is consistent with, even necessary to, the purposes of the statute, to imply that aggrieved holders of the rights, *i.e*., parents, may seek judicial relief. Otherwise, the legislature will have created rights without a remedy, and thus effectively no right at all. That cannot be the intent of the legislation.

In exercising their implied private right of action, Plaintiffs have alleged facts showing that Defendants have engaged in actions that violate Plaintiffs' rights under

the statute after its effective date of July 1, 2021. As recently as September 29, 2021, LCS staff were instructing other staff that "privacy laws" prohibited teachers from revealing to parents that their child has expressed a discordant gender identity and that children should not be "outed" to their parents. (Complaint, ¶¶109-110,194-195). It is believed Defendants continue to use the Gender Student Support Plan that conditions notification of parents on a minor child's authorization. (Complaint ¶113). These actions to bypass parental notice and consent on issues related to children's upbringing and mental health, violate the Parents' Bill of Rights.

### VI.    Plaintiffs Allege Viable State Constitutional Claims.

Defendants cannot deny that the Florida Constitution accords equal or superior rights of privacy and substantive due process than are provided under the United States Constitution. Nevertheless, Defendants claim that Plaintiffs' claims for relief should be dismissed based on another potpourri of arguments about private citizens, damages, and attorneys' fees, none of which defeat Plaintiffs' claims for equitable relief and damages against these state actor Defendants. In fact, Defendants' claims that Plaintiffs' state constitutional claims should be dismissed are nothing more than rehashing of their flawed analysis of the federal constitutional claims. Since Plaintiffs have stated claims for federal constitutional violations, they have also stated viable claims for violations of the Florida Constitution.

### A. *Plaintiffs State A Viable Claim for Violation of the Right of Privacy Under Article 1, §23 of the Florida Constitution*

Defendants "recognize that parents have a fundamental right to parent their children and that such right is protected through the Florida Constitution." *D.M.T. v. T.M.H.,* 129 So. 3d 320, 335 (Fla. 2013). The right is not merely "protected" under the Florida Constitution, but is recognized as a fundamental right under the explicit right of privacy enacted by the people of Florida in Article 1, §23 of the Florida Constitution. *Von Eiff v. Azicri*, 720 So.2d 510, 514 (1998). The Florida Supreme Court has determined that this explicit right of privacy "is a fundamental right which we believe demands the compelling state interest standard." *In re T.W*, 551 So. 2d 1186, 1192 (Fla. 1989). Under that standard, state intrusion was justified in some cases dealing with public disclosure of private facts, such as bank records, but no government intrusion has survived review in cases dealing with personal decision-making. *Id.* Parental decisions regarding child rearing and education fall into the latter category so that "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child **is threatened with harm**." *Beagle v. Beagle,* 678 So.2d 1271, 1276 (1996) (emphasis added). "[I]t appears to be an unassailable proposition that otherwise fit parents ... who have neither abused, neglected, or abandoned their child, have a reasonable expectation that the state will not interfere" with their decision-making. *Von Eiff,* 720 So.2d at 515.

Plaintiffs here had the reasonable expectation that Defendants would neither interfere with nor undermine their decision regarding A.G.'s gender identity concerns, which they were addressing as a family and with a mental health professional. (Complaint ¶¶47-50). There are no allegations that A.G. was threatened with harm by her parents' decision, so no basis upon which Defendants could interfere with that decision. Defendants' written guidance and actions show a clear and unequivocal intent to interfere with parental decision-making regardless of a threat of harm, as seen in the guidance's provision unequivocally stating that parents were NOT to be told about a child's gender identity (Exhibit A, p. 15) and their instruction to staff that under the law they could not inform parents. (Complaint, ¶¶30-31). These allegations state a viable claim for violation of Plaintiffs' fundamental parental rights under the Florida Constitution.

### B. Plaintiffs State A Viable Claim for Violation of the Right to Substantive Due Process Under Article 1, §9 of the Florida Constitution.

Likewise, Plaintiffs state a viable substantive due process claim under Article 1, §9 of the Florida Constitution, which protects the "full panoply of individual rights" and in particular, the long-established fundamental right of parents to direct the upbringing of their children, from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 768 So. 2d 1060, 1063 (Fla. 2000). As the Florida Supreme Court said in *J.B.,* "The significance of the rights at

issue here cannot be overstated." *Id.* at 1064. "[I]t is plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Id.* (citation omitted). That is reflected in the Florida Supreme Court's treatment of fundamental parental rights under Article 1, §23, and in the United States Supreme Court's labeling of parental rights as "fundamental" in *Troxel*, 530 U.S. at 65-66.

As discussed more fully in Sections IIIA and IIIB, Plaintiffs have alleged facts that state claims for violation of their fundamental parental rights under the United States Constitution. Since Florida's due process clause incorporates the same "panoply of rights," Plaintiffs have also alleged sufficient facts to state a claim for violation of fundamental parental rights under the Florida Constitution.

## CONCLUSION

Plaintiffs' Complaint states causes of action for violation of Plaintiffs' fundamental parental rights under the United States Constitution, Florida Constitution and Florida Statutes against all Defendants. Defendants Hanna and Rodgers are not subject to dismissal in their official capacities and are not entitled to qualified immunity in their individual capacities.

For these reasons, Defendants' motion to dismiss should be denied.

Alternatively, if this Court determines that there are insufficiencies in the Complaint,

Plaintiffs should be granted leave to amend.

Dated: December 13, 2021.

/s/Mary E. McAlister
Mary E. McAlister (FL Bar No. 0010168)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org

Ernest G. Trakas (MO Bar 33813)*
Evans & Dixon, LLC
211 N. Broadway
St. Louis, MO 63102
 (314) 552-4188
etrakas@evans-dixon.com

* pro hac vice admissions pending

Attorneys for Plaintiffs

**WORD COUNT CERTIFICATION**

This document complies with word limits set forth in N.D. Fla. Local Rule

7.1(F), and contains 7,987 words, which includes headings, footnotes, and

quotations, but does not include the case style, signature block or Certificates of

Word Count and Service.

/s/ *Mary E. McAlister*
MARY E. MCALISTER

## CERTIFICATE OF SERVICE

I certify that on this 13th day of December 2021, a true and correct copy of

the foregoing was electronically filed in the U.S. District Court, Northern District of

Florida, using the CM/ECF system which will send a notice of electronic filing to

all counsel of record.


/s/ *Mary E. McAlister*
MARY E. MCALISTER

Doc. 37

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**JANUARY LITTLEJOHN**
**and JEFFREY LITTLEJOHN**

      *Plaintiffs*,

v.                              **Case No.: 4:21cv415-MW/MJF**

**SCHOOL BOARD OF LEON**
**COUNTY FLORIDA, et al.,**

      *Defendants*.

_____/

## <u>ORDER GRANTING IN PART MOTION TO DISMISS</u>

This Court has considered, without hearing, Defendants' motion to dismiss Plaintiffs' complaint, ECF No. 13, and Plaintiffs' response, ECF No. 15. Defendants seek dismissal on several grounds.

First, Defendants argue that Plaintiffs' complaint is an impermissible shotgun pleading. ECF No. 13 at 7–10. Defendants raise five other grounds for dismissal; namely, that Plaintiffs allege duplicative claims, that there is no constitutional violation under Section 1983, that two of the Defendants are entitled to qualified immunity, that the Florida Statutes in Counts VI and VII do not create a private right of action, and finally, that Plaintiffs are not entitled to relief on their state constitutional claims. *Id.* at 11–33.

For the reasons provided below, this Court finds that Plaintiffs' complaint is a shotgun pleading. Therefore, Defendants' motion, ECF No. 13, is **GRANTED in part** and Plaintiffs' complaint, ECF No. 1, is **DISMISSED without prejudice**. The remainder of Defendants' motion to dismiss is **DENIED without prejudice** to renew, if appropriate, after Plaintiffs file an amended complaint.

I

In evaluating Defendants' motion to dismiss, this Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to Plaintiffs. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). The facts are these.

In late spring of 2020, Plaintiffs' minor child, A.G., told Plaintiffs that A.G. was confused about gender identity and "might be non-binary," which led Plaintiffs to seek counseling for A.G. ECF No. 1 ¶¶ 45–48. A.G. expressed a desire to use "they/them" pronouns and change the name A.G. to "J.", however, Plaintiffs did not agree, and said that A.G. could only use "J." as a "nickname." *Id.* ¶ 49.

Prior to the start of the fall semester that same year, Plaintiffs emailed a teacher to notify them that A.G. expressed gender confusion, that A.G. was working with a private counselor, that Plaintiffs did not consent to a name change and "J." could only be used as a nickname, and that Plaintiffs did not authorize the teacher to tell other staff. *Id.* ¶¶ 50–52.

2

Plaintiffs then learned that School Board staff and A.G. met on September 8, 2020, where they implemented a Student Support Plan including topics such as preferred names, pronoun use, bathroom preference, and room sharing on field trips. *Id.* ¶¶ 73–76. Because A.G. had indicated to school staff at this meeting that Plaintiffs were not "supportive" of A.G.'s gender transition, school staff did not include Plaintiffs in creating the support plan, and were directed to conceal it from Plaintiffs in accordance with the School Board's LGBTQ+ Guide. *Id.* ¶¶ 56, 70, 73–74.

Plaintiffs' complaint, ECF No. 1, is divided into seven counts, as follows:

Count I: § 1983 Claim for Fourteenth Amendment Violation under *Troxel*, against all Defendants, *id.* at 37–41;

Count II: § 1983 Claim for Fourteenth Amendment Violation under *Parham*, against all Defendants, *id.* at 41–45;

Count III: § 1983 Claim for Fourteenth Amendment Violation under *Prince*, against all Defendants, *id.* at 45–48;

Count IV: Violation of Right to Privacy under Florida Constitution Article I, § 23 against all Defendants, *id.* at 48–50;

Count V: Violation of Right to Substantive Due Process under Florida Constitution Article I, § 9 against all Defendants, *id.* at 50–54;

Count VI: Violation of Parents' Bill of Rights, Florida Statutes, Chapter 1014, against Defendant School Board, *id.* at 54–56;

Count VII: Violation of Right to Choose Medical Treatment for Children under Florida Statutes § 743.07, *id.* at 56–59.

II

Defendants raise multiple arguments on why this Court should dismiss Plaintiffs' complaint. Because this Court finds that Plaintiffs' complaint is an impermissible shotgun pleading, however, it need not address Defendants' remaining arguments at this time.

Defendants argue that Plaintiff's amended complaint should be dismissed because it is an impermissible shotgun pleading. ECF No. 13 at 7–10. "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Hunt*, 814 F.3d at 1221 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b) further requires plaintiffs to state their claims in "numbered paragraphs, each limited as far as practicable to a single set of circumstances," and "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence .

4

. . must be stated in a separate count." Fed. R. Civ. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.' " *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015).

> Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action or claim for relief into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act.

*McDonough v. City of Homestead*, 771 F. App'x 952, 955 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1321–23). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

Defendants assert that Plaintiffs' 63-page, 207-paragraph complaint is a shotgun pleading because each count incorporates all preceding paragraphs by reference, alleges six of seven counts against all Defendants—in their official and individual capacities—without clearly delineating which Defendant is responsible for which act, and fails to identify which claims for relief are connected with which causes of action. ECF No. 13 at 7–10. This Court agrees.

Plaintiffs' complaint alleges that each of their seven counts incorporate "all of the preceding allegations by reference as if set forth in full." ECF No. 1 ¶¶ 118, 133, 149, 163, 171, 187, 198. This practice has been condemned because it leads to a "situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002).

In Plaintiffs' response, they claim their complaint is not a shotgun pleading, and compare their allegations to the complaint filed in *Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052 (N.D. Fla. 2021), where this Court found a multi-count complaint that incorporated *some* preceding paragraphs by reference was not a shotgun pleading. ECF No. 15 at 4–5. However, Plaintiffs' comparison to the *Dream Defenders* complaint is misplaced. As this Court stated in *Dream Defenders*, the Dream Defenders' complaint was not a shotgun pleading because it did "not adopt each allegation of all the preceding counts," but instead was the "type of complaint the Eleventh Circuit in *Weiland* did not find to be a shotgun pleading." 553 F. Supp. 3d at 1091. As the Eleventh Circuit stated in *Weiland*, re-alleging general factual allegations at the beginning of each count, but not also incorporating all preceding counts, does not automatically make a complaint a shotgun pleading. 792 F.3d at 1324. In Plaintiffs' complaint, however, they have chosen to include *all* preceding paragraphs in every count, so that Count VII now contains each and every other legal

conclusion from the six preceding counts. ECF No. 1 ¶ 198. What results is a complaint where it is "virtually impossible to know which allegations of facts are intended to support which claim(s) for relief." *Weiland*, 797 F.3d at 1325.

Plaintiffs' complaint further clouds the issue by naming all Defendants in six of the seven counts, in their official and individual capacities, without making it clear which Defendant, and in which capacity, is responsible for the allegedly violative conduct. Especially when each count adopts each preceding paragraph, Plaintiffs' collective treatment of Defendants fails to make clear which Defendant is liable for the alleged conduct.

And finally, creating more confusion, the allegations are further discombobulated by Plaintiffs' Prayer for Relief. ECF No. 1 at 59–62. Plaintiffs ask for, among other things, preliminary and permanent injunctions, nominal damages, and compensatory damages. *Id*. It is not clear which claims of relief are connected with which Defendants, or are supported by which factual allegations.

As a final note, this Court also takes notice of widely reported changes in circumstances that may affect the justiciability of Plaintiffs' claims for prospective relief, and invites Plaintiffs to consider this and other potential infirmities when amending their complaint.[1]

---

[1] Ana Goni-Lessan, *Leon County School District Pushes Pause on LGBTQ+ Guide, Seeks Community Input*, TALLAHASSEE DEMOCRAT (Jan. 25, 2022), https://www.tallahassee.com/story/news/2022/01/25/leon-county-schools-needs-input-lgbtq-

In sum, this Court concludes that Plaintiffs' complaint is an impermissible shotgun pleading due to the defects addressed above. Plaintiffs should tread carefully in drafting an amended complaint, and consider the issues noted by this Court.

III

For the reasons set out above, Defendants' motion, ECF No. 13, is **GRANTED in part**. Plaintiffs' complaint, ECF No. 1, is **DISMISSED** with leave to amend on or before May 27, 2022.

**SO ORDERED on May 13, 2022.**

**s/Mark E. Walker**
**Chief United States District Judge**

---

guide-parent-bill-rights/9211682002/ (noting that the LGBTQ+ Guide has been pulled, and the Leon County School District is seeking "parents, students and community members to consider joining a new advisory committee"); LEON CNTY. SCH. BD., ACTIONS OF THE BOARD FROM JANUARY 25, 2022 SCHOOL BOARD MEETING 3 (Jan. 25, 2022), https://go.boarddocs.com/fla/leon/Board.nsf/files/CB2SMR7348A3/$file/Actions%20of%20the %20Board%20January%2025%2C%202022.pdf ("19.07 PULLED (LGBTQ+ Guide)").

Doc. 56

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JANUARY LITTLEJOHN AND
JEFFREY LITTLEJOHN,**

      Plaintiffs,

**v.**                       **Case No.: 4:21-cv-00415-MW-MJF**

**SCHOOL BOARD OF LEON COUNTY
FLORIDA, ROCKY HANNA,
individually and in his official capacity as
Superintendent of Leon County Schools,
and KATHLEEN RODGERS,
individually and in her official capacity as
Assistant Superintendent Equity Officer
and Title IX Compliance Coordinator for
Leon County Schools, RACHEL
THOMAS, individually and in her official
capacity as counselor at Deerlake Middle
School, ROBIN OLIVERI, individually
and in her official capacity as Assistant
Principal of Deerlake Middle School,**

      Defendants.

_____/

## **DEFENDANTS' CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

All Defendants, pursuant to Rules 12(b)(1) & 12(b)(6), Fed. R. Civ. P., move

to dismiss the Amended Complaint.

### *Introduction*

Much like the initial Complaint, the Amended Complaint alleges Plaintiffs were not notified of a single meeting held between School Board personnel and their child (A.G.) at Deerlake Middle School ("Deerlake") in Leon County, Florida, during which gender identity issues were discussed. The Amended Complaint is substantively the same as Plaintiffs' initial Complaint but adds two new defendants, School Board employees Oliveri (an assistant principal) and Thomas (a guidance counselor). Despite their amendments and accepting as true all the facts alleged in the Amended Complaint, none of the claims against any of the Defendants are viable.

First, this case has always principally centered on Plaintiffs' gripes with the contents of Leon County Schools' ("District") Lesbian, Gay, Bisexual, Gender Nonconforming and Questioning Support Guide ("Guide"). Indeed, Plaintiffs devoted a substantial portion of their Amended Complaint to detailing their objections to the Guide and its implementation.

Well, the Guide has been revised. Specifically, during a June 28, 2022, publicly-noticed meeting of the School Board, the School Board approved a revised Guide that addresses all of the objections asserted by Plaintiffs in the Amended Complaint. The revised Guide is consistent with the pronouncements in Florida's Parents' Bill of Rights (Sections 1014.01-1014.06, Florida Statutes)(2021) and recent amendments to Section 1001.42, Florida Statutes (Ch. 2022-22, Laws of Fla.

(2022)). The School Board's action in this regard moots Plaintiffs' claims for declaratory relief and at the very least merits the dismissal of Plaintiffs' state law constitutional claims for which only declaratory relief and injunctive relief are available.

To be sure, the School Board and Individual and Official Capacity Defendants submit that no provision of the U.S. Constitution or the Florida Constitution protects the right asserted by the Plaintiffs in this case. Plaintiffs' Section 1983 claims assert that the Defendants' actions abridged their rights to substantive due process under the Fourteenth Amendment, and specifically infringe on their rights to familial privacy and to direct their child's education, mental health, and welfare. But no action of any defendant as alleged in the Amended Complaint burdened any of Plaintiffs' rights recognized by the Due Process Clause. In this vein, Plaintiffs do not allege any behavior that is "conscience-shocking" in a constitutional sense or that is sufficient to establish a substantive due process violation. Similarly, Plaintiffs are unable to establish that any right they enjoy under the Fourteenth Amendment extends to a constitutional obligation on the part of School Board staff to affirmatively inform parents of their child's name and pronoun preferences or of their child's gender identity. If anything, that right was not clearly established at the time of the purported violations, meaning the individual defendants should be dismissed from this action entirely under the doctrine of Qualified Immunity.

Plaintiffs' claims under the Florida Constitution fair no better as they seek improper relief, name inappropriate parties, and fail to raise viable claims for an invasion of their right of privacy or a violation of their substantive due process rights. For these reasons, the Amended Complaint should be dismissed.

### *Facts*[1]

Plaintiffs are the parents of A.G., a minor child who at all times relevant to the allegations in the Amended Complaint was enrolled at Deerlake, a school in the School Board's geographical district. (Doc. 38, pp. 4, 6). A.G. is not a party to this case. (*Id.*, p. 1). Rather, A.G.'s parents are suing Defendants for violations of their own rights purportedly held under federal laws, the U.S. Constitution, and the Florida Constitution. (*Id.*, p. 2).

As the 2020-2021 school year approached, A.G. asked Plaintiffs to be referred to by the name "J" and by "they/them" pronouns. (*Id.*, p. 24). Plaintiffs said A.G. could use "J" as a nickname at school but not be referred to by the pronouns "they/them." (*Id.*). A.G. previously expressed "gender confusion" to Plaintiffs. (*Id.*, p. 23).

The crux of the Amended Complaint concerns one meeting at Deerlake on September 8, 2020, involving A.G. and School Board staff without Plaintiffs present.

---

[1] The following facts are from the Amended Complaint. No part of this motion or its factual recitation should be deemed an admission the facts pled are true.

(*Id.,* pp. 24-34). This meeting took place after A.G. expressed "gender confusion" to Plaintiffs and requested to use "they/them" pronouns and go by the name "J." (*Id.*, pp. 23-24). Plaintiffs assert that at the September 8 meeting, Deerlake staff, including A.G.'s school counselor (Thomas), developed a support plan for A.G. that touched on topics including preferred names, pronoun use, and room sharing on field trips. (*Id.,* pp. 32-34). Plaintiffs assert that teachers and staff at Deerlake were told to refer to A.G. as "J" and with the pronouns "they/them" without their involvement or consent and contrary to their requests. (*Id.,* pp. 24-25, 33-34).

There is no allegation in the Amended Complaint that this was contrary to the wishes of A.G. or that any School Board employee coerced, encouraged, or forced A.G. to participate in the meeting or coerced, encouraged, or forced A.G. to keep anything from Plaintiffs. (*See* Doc. 38). The closest thing to such an allegation in the Amended Complaint is the allegation that Thomas "raised with A.G., without the knowledge or consent of [Plaintiffs], the idea of having a 'Transgender Support Plan' meeting with A.G. and other Deerlake Middle School staff." (*See id.* at p. 27). However, this allegation is not based on the Plaintiffs' personal knowledge but rather their information and belief. (*See id.*). In fact, the Amended Complaint states that A.G. approached Thomas requesting to use a different name and certain pronouns. (*See id.*, p. 24).

In any event, Plaintiffs allege the actions of School Board staff were taken pursuant to a version of the Guide that is no longer in effect. (Doc. 38-1). The Guide states, among other things, that the District strives to "ensure that students are healthy, present, and positive members of a safe learning community." (Doc. 38-1, p. 3). Plaintiffs characterize the Guide's content in varying ways but primarily take issue with one of the questions-and-answers in the Guide which provides as follows:

> **Q. A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified?**
>
> A. No. Outing a student, especially to parents, can be very dangerous to the students health and well-being. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+ many of whom have been rejected by their families for being LGBTQ+. Outing students to their parents can literally make them homeless.

(*Id*. at p. 15). Plaintiffs also object to various portions of the "Leon County School District Transgender/Gender Nonconforming Student Support Plan" attached to the Amended Complaint and that was a part of the now-superseded Guide. Their objection is to School Board staff inquiring whether parents or legal guardians are aware of a student's gender transition and whether they support it, and also taking that information into account when considering the student's privacy interests. (Doc. 38-1, pp. 19-24).

Plaintiffs do not allege the School Board failed to involve them in any aspect of A.G.'s education other than the September 8 meeting, and they do not allege that

any other meeting occurred without their involvement. (Doc. 38). Indeed, at the core of Plaintiffs' claims is their contention that they should have been informed and involved in the September 8 meeting and that the failure to inform them violated their rights under the U.S. and Florida Constitutions. (*See id.*).

The following charts the Amended Complaint's counts and the relief requested:

| Count | Title | Defendants | Relief Requested |
|---|---|---|---|
| I | Violation of Section 1983 and specifically of Plaintiffs' Substantive Due Process Right to Direct the Education and Upbringing of Their Children under the U.S. Constitution | All | Declaratory relief, nominal damages, compensatory damages, and attorneys' fees and costs |
| II | Violation of Section 1983 and specifically of Plaintiffs' Fundamental Right to Direct the medical and Mental Health Decision-making for their Children Under the U.S. Constitution | All | Declaratory relief, nominal damages, compensatory damages, and attorneys' fees and costs |
| III | Violation of Section 1983 and specifically Plaintiffs' Right to Familial Privacy Under the U.S. Constitution | All | Declaratory relief, nominal damages, compensatory damages, and attorneys' fees and costs |
| IV | Violation of Plaintiffs' Right to Privacy Under Article 1, §23 of the Florida Constitution | All | Declaratory relief, nominal damages, compensatory damages, and attorneys' fees and costs |

| V | Violation of Plaintiffs' Right to Substantive Due Process under Art. I, §9 of the Florida Constitution | All | Declaratory relief, nominal damages, compensatory damages, and attorneys' fees and costs |
|---|---|---|---|

The Guide though, that underlies and underscores almost every allegation in the Amended Complaint, has been superseded. On June 28, 2022, the School Board adopted a guidance document titled, "Inclusive School Guide for LCS Employees, Lesbian, gay, bisexual, transgender, queer, intersex, and asexual (LGBTQIA+) Students." (*See* Doc 55-1, Inclusive Guide for LCS Employees, Lesbian, gay, bisexual, transgender, queer, intersex, and asexual (LGBTQIA+) Students; and Doc 55-2, Actions of Leon County School Board – June 28, 2022, School Board Meeting, p. 3).[2] On that date, the School Board approved and implemented the revised Guide

---

[2] This Court can consider the revised Guide and School Board meeting agenda attached as exhibits to this motion to dismiss, because they strike to the subject matter jurisdiction of this Court. Under Federal Rule of Civil Procedure 12(b)(1), when a defendant challenges a court's subject matter jurisdiction on a factual basis, the court is not required to take the allegations of the complaint as true but is instead permitted to consider matters outside the pleadings, such as testimony and affidavits. *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir. 1990). Under such a jurisdictional challenge:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court

through a unanimous vote. (*See* Doc 55-2, p. 3). The revised Guide states that it is

"intended to be a tool for school administrators and personnel to effectively navigate

existing laws, regulations and policies that support LGBTQIA+ students." (*See* Doc

55-1, p. 3). As the revised Guide notes in its section on the importance of safe and

supportive school environments, "having a school that creates a safe and supportive

learning environment for all students and having caring and involved parents are

especially important. Positive environments can help all youth achieve good grades

and maintain good mental and physical health." (*Id.*, p. 4).

Pertinently, the revised Guide provides the following with respect to key areas

implicated by Plaintiffs' claims, including the following (*Id.*, pp. 8-10):

<u>Student Expression</u>

| Individual Expression | **First Amendment guarantees** students have a right to individual expression and identity at school. | Schools will respect the rights of students who are open about their sexual orientation or gender identity, or who question their orientation or gender identity.   Also, see Topic **Privacy**. |
|---|---|---|

---

from   evaluating   for   itself   the   merits   of   jurisdictional   claims.

Additionally, a court may take judicial notice of matters of public record and consider those facts in resolving a motion to dismiss. *McDowell Bey v. Vega*, 588 Fed. Appx. 923, 926 (11th Cir. 2014); *see also Long v. Slaton,* 508 F.3d 576, 578 n. 3 (11th Cir. 2007) (recognizing a judge is not always limited to the four corners of the complaint at the Federal Rule of Civil Procedure 12(b)(6) stage and taking judicial notice of facts contained in a report from a state agency).

Names and Pronouns

| Names and Pronouns | **Neither federal nor Florida state law** requires or prohibits schools to call a student by a requested name or use gender pronouns consistent with their gender identity. However, **Chapter 1014, Florida Statutes** does reserve the right to the parent to direct the education and care as well as to direct the upbringing of his or her minor child. | The parent or student of legal age will notify the school of the preferred name and gender pronoun corresponding to their gender identity. The parent or student of legal age can add the preferred name and preferred pronoun into Student Information System portal or request it be done by the school.  Additional services (referral to student services personnel or community resources) may be needed.

Faculty and staff shall use the preferred name and pronoun listed in the Student Information System. |

Official Documentation

| Official Documents | **Official Documentation** is required to reflect a change in name and/or gender in a student's official school records.

FAC 64V-1.003: Birth Certificate Amendment documentary evidence requirements. | School will only modify student records to reflect a change in legal name or gender upon receipt of an official document.  While official student records must contain the student's legal name, schools should permit the use of preferred name on unofficial records to assist staff in calling the student the preferred name.  ***The guardian or student of legal age can add the preferred name and preferred pronoun in the Student Information System.*** |

Overnight Activities

| Overnight activities | **Neither federal nor Florida state law** requires or prohibits school personnel to adhere to the requests of a student. | All students are allowed to attend school overnight activities.  If parents or students have concerns about rooming assignments based on religious or privacy concerns, they may request accommodations.<br><br>If accommodations are desired, decisions should be made on a case-by-case basis, and should be student-focused, with the support of parents, and district and school staff.   School staff who are aware of a transgender student participating in overnight activities should refer to the student's LCS Welcoming and Affirming Plan for preferred accommodations and the student's preferences on who is allowed to know they are transgender.<br><br>*Language to be included in overnight activity permission form district-wide*: "All students are allowed to attend school sponsored overnight activities. Parents or students who have concerns about rooming assignments for their student's upcoming overnight event based on religious or privacy concerns may request an accommodation.  If you are requesting accommodations for your student, please contact school administration to discuss reasonable accommodation options." |

Parent Notification

| Parent Notification | Chapter 1014, Florida Statutes requires the parent to be notified if there is a change in a students' mental, emotional, or physical health or wellbeing. | School personnel will notify a parent if there is a change in a student's services or monitoring related to the student's mental, emotional, or physical health or wellbeing, unless a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect, as those terms are defined in s. 39.01.  Under those circumstances school personnel must report the potential harm to the Florida Department of Children and Families. |

Privacy

| Privacy | **Article 1 Section 23 of Florida constitution recognizes the federal constitutional right to privacy,** which extends to students in a school setting**.** | School personnel will not disclose information about a student's sexual orientation, gender identity or questions they may have about their sexual orientation or gender identity.

A student's sexual orientation, gender identity or gender expression should not be shared with others without their input and permission.  All LGBTQIA+ students have the right to participate in the decision-making process for deciding when and to whom their gender identity or expression and sexual orientation is shared unless it is directly related to concerns about the student's health and safety.  For parents who have concerns about their child's well-being and have contacted the school district, administration and guidance, a meeting will be coordinated with the parent and student. School personnel must not intentionally withhold information from parents unless a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect, as those terms are defined in s. 39.01.  Under those |

| | | circumstances school personnel must report the potential harm to the Florida Department of Children and Families. |
|---|---|---|

### ***Argument***[3]

I. *Plaintiffs' Claims for Declaratory Relief and Nominal Damages under the U.S. Constitution, and for Florida Constitutional Violations have been Mooted by the Adoption of the Revised Guide*

"A case becomes moot—and therefore no longer a 'case' or 'controversy' for purposes of Article III —when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam))(cleaned up). The requirement that a case have an actual, ongoing controversy extends throughout the pendency of the action. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974)).

"[I]f . . . events transpire that make it impossible for this court to provide meaningful relief, the matter is no longer justiciable." *Rich v. Secretary, Florida Dept. of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013) (citing *Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen*, 586 F.3d 908, 915 (11th Cir. 2009)). The Eleventh Circuit has summarized the justiciability requirement as follows:

---

[3] For the sake of brevity and because this Court is well-versed in the standard for adjudicating a motion to dismiss, it is omitted.

> Justiciability is the term of art employed to give expression to this ... limitation placed upon federal courts by the case-and-controversy doctrine. A claim is justiciable if it is definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character .... The justiciability doctrines define the judicial role; they determine when it is appropriate for the federal courts to review a matter and when it is necessary to defer to the other branches of government.

*United States v. Rivera*, 613 F.3d 1046, 1049-50 (11th Cir. 2010) (internal citations omitted) (finding lack of justiciability over challenge to a finding of fact, because the appeal would not remedy a tangible injury and would not affect the government).

"The mootness doctrine is among the justiciability limitations that Article III places on the federal judiciary." *See Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (1lth Cir. 2004) (citing *Vander Jagt v. O'Neill*, 699 F.2d 1166, ll79 (D.C. Cir.1982) (Bork, J., concurring)). "Plainly, if a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it." *Coral Springs St. Sys.*, 371 F.3d at 1328. "Any decision on the merits of a moot case or issue would be an impermissible advisory opinion." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000). As such, a moot claim must be dismissed for lack of subject matter jurisdiction. *See Al Najjar v. Ashcroft*, 273 F. 3d 1330, 1336 (11th Cir. 2001).

Here, the changes implemented by the School Board in the revised Guide go to the very heart of the justiciability of Plaintiffs' claims. This case is about Plaintiffs' complaints regarding the Guide and the alleged violations of their parental rights under the U.S. and Florida Constitutions that occurred when Deerlake staff privately met with A.G. one time to develop a support plan without the knowledge or consent of Plaintiffs. (*See* Doc. 38). Plaintiffs also generally take exception to the contents of the Guide, claiming it to be unconstitutional.[4] Plaintiffs ask for declaratory relief related to the Guide, including a declaration that Defendants violated the state and federal Constitutions:

> through development and implementation of Leon County Schools' 2018 Guide and associated policies and procedures, to the extent that they: (a) enabled Plaintiffs' child to change gender identity at school by, *inter alia,* selecting a new "affirmed name and pronouns," without parental notification and consent; (b) prohibited teachers and other staff from communicating with parents about their children's gender dysphoria, including any desired change in name and pronouns, educational records, privacy facilities use, and overnight accommodations, without first obtaining the children's consent; and (c) instructed or permitted teachers and other staff to deceive parents by, *inter alia,* using different names and pronouns around parents than are used in school.

(*See inter alia* Doc. 38, p. 115).

Regardless of what can be argued about the initial iteration of the Guide, the revised Guide addresses the declaratory relief sought by Plaintiffs. Specifically, it

---

[4] Although, Plaintiffs are not bringing a facial challenge to the Guide.

requires parental involvement to change pronouns (*See* Doc. 53-1, pp. 8-9), has explicit parental notification requirements concerning issues related to a student's sexual orientation, gender identity, or gender expression (*See id.* at pp. 9-10), and contemplates parental involvement in decision-making related to overnight trip accommodations, locker rooms and restroom use, and student records changes. (*See id.* at pp. 8-9). These changes, regardless of their impetus, moot Plaintiffs' claims for declaratory relief.

Indeed, at most, Plaintiffs have a claim for a declaration about an alleged past harm that is no longer presently occurring or has the capability to re-occur. Where past harm has occurred but "the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury." *Adler v. Duval Cty. School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). "Past exposure to illegal conduct does not in itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing, present injury or real and immediate threat of repeated injury." *Stanley v. Broward Cty. Sheriff*, 773 F. App'x 1065, 1069 (11th Cir. 2019) (citing *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985). There is simply no live case or controversy for which declaratory relief is an appropriate remedy and the ordering of such relief would amount to nothing more than an advisory opinion regarding alleged past harm.

Plaintiffs also seek nominal and compensatory damages for the purported constitutional violations. (Doc. 38, pp. 115-121). "The granting of nominal damages—a trivial sum awarded for symbolic, rather than compensatory, purposes—may be closely analogized to that of declaratory judgments." *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia,* 868 F.3d 1248, 1268 (11th Cir. 2017) (abrogated on other grounds). "Nominal damages, like declaratory relief, are a remedy that may be granted by the federal courts upon a proper exercise of our jurisdiction; they are not themselves an independent basis for that jurisdiction." *Id.* Just like Plaintiffs' requests for declaratory relief are mooted by the revised Guide, so too are their requests for nominal damages.

Defendants do not concede that any of their actions ever violated any law. Subject to this reservation, Defendants submit that any suggestion that the voluntary cessation doctrine renders the mootness doctrine inapplicable to this case would be misplaced. Defendants recognize that voluntary cessation of allegedly illegal conduct does not necessarily always moot a case. *Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681, 684 (11th Cir. 1992). Nevertheless, the exception to the mootness doctrine does not apply if the defendant can demonstrate that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged

violation." *Seay Outdoor Advertising, Inc. v. City of Mary Esther, Fla.*, 397 F.3d 943 (11th Cir. 2005) (quoting *City of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

It should be noted that governmental entities and public officials are given more leeway than private parties in the presumption that they are unlikely to resume allegedly illegal activities. *Coral Springs St. System, Inc.*, 371 F.3d at 1328-29. "[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004). "When government law or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Id.; Freedom from Religion Foundation, Inc. v. Orange Cty. Sch. Bd.,* 30 F.Supp.3d 1358, 1364 (M.D. Fla. 2014).

Further, a plaintiff disputing a finding of mootness must present more than "[m]ere speculation that the [governmental entity] may return to its previous ways." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005). The doctrine of voluntary cessation does not apply when there is "no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit." *Keister v. Bell,* 29 F.4th 1239, 1250 (11th Cir. 2022) (quoting *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004)).

Here, the revised Guide adopted by the School Board on June 28, 2022, not only moots the issues complained of in the Amended Complaint, but it is also consistent with the pronouncements in Florida's Parents' Bill of Rights and F.S. §1001.42. There can be no speculation that the School Board will re-enact the provisions of the 2018 Guide upon termination of the suit considering the legal landscape and the fact that the Defendants are public servants. *See Troiano*, 382 F.3d at 1283.

Finally, for all of these reasons, Plaintiffs' Florida Constitutional law claims contained in Counts IV (Article 1, §23 – Right to Privacy) and V (Article 1, §9 – Substantive Due Process) are also moot and subject to dismissal in their entirety. It is axiomatic that a claim for damages for an alleged violation of the Florida Constitution cannot be maintained. *Holcy v. Flagler County Sheriff,* 3:05-CV-1324J-32HTS, 2007 WL 2669219, at *6 (M.D. Fla. Sept. 6, 2007) (Florida constitutional claims do not support claims for damages absent a separate enabling statute). *See also Smith v. Bell*, No. 06-60750, 2008 WL 868253, at **2, 9-10 (S.D. Fla. Mar. 31, 2008) (concluding that "no private cause of action exists under the constitutional right to due process" and no claim for money damages can be maintained for violations of the Florida Constitution); *Hill v. Dep't of Corrs.*, 513 So. 2d 129, 133 (Fla. 1987). Likewise, Article I, §§9 and 23 of the Florida Constitution contain no right to an award of attorneys' fees and costs for a prevailing party. Generally,

attorneys' fees are not recoverable in the absence of a statute or contractual agreement authorizing their recovery. *See Bidon v. Dep't of Prof'l Regulation, Florida Real Estate Com'n*, 596 So. 2d 450, 452 (Fla. 1992). There is no such authority for fees here. Once those potential monetary damages are stricken from Counts IV and V, all that remains is Plaintiffs' request for declaratory relief. Because such relief has been mooted, Counts IV and V should be dismissed.

II.  *Plaintiffs' Claims Against Superintendent Hanna, Rodgers, Oliveri, and Thomas in their Official Capacities are Duplicative of their Claims Against the School Board*

Defendants School Board, Superintendent Hanna, and Rodgers have already explained in their initial motion to dismiss why "[O]fficial capacity suits generally represent only another way of pleading an action against the entity of which an officer is an agent." *Brandon v. Holt,* 469 U.S. 464, 472 n. 21 (1985). Rather than dismissing these clearly redundant claims, Plaintiffs went a step further and sued two more School Board employees in their official and individual capacities.

Suits against an individual acting in their official capacity impose liability on the governmental entity the official represents. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991) "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (citing *Brandon,* 469 U.S. at 471–72).

"Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly...." *Busby,* 931 F.2d at 776. Thus, when a suit is filed against both a governmental entity and its officers and employees in their official capacities, it is appropriate for a court to dismiss the named individual defendants in their official capacities as "redundant and possibly confusing to the jury." *Id.* The same rationale applies to the state law claims pled against the individual defendants in their official capacities. *See Braden Woods Homeowners Ass'n, Inc. v. Mavard Trading, Ltd.*, 277 So. 3d 664, 671 (Fla. 2d DCA 2019). *See also Kubany by Kubany v. School Bd. of Pinellas County*, 818 F. Supp 1504, 1507 (M.D. Fla. 1993) (filing a Section 1983 claim against school board members and principal in their official capacities was improper, because the plaintiff had sued the school board directly).

All the official capacity claims against Superintendent Hanna, Rodgers, Oliveri, and Thomas are also lodged against the School Board and are thus redundant. That is true even of the Superintendent and regardless of the fact he is an elected official. Florida law provides that school board superintendents operate as the secretary and executive officer of the school board. *See* § 1001.32, *Fla. Stat.* ("Responsibility and management of the schools and for the supervision of

instruction in the district shall be vested in the district school superintendent as the secretary and executive officer of the district school board, as provided by law."). Consequently, the Section 1983 claims against the School Board and Superintendent Hanna are duplicative. *Methelus v. Sch. Bd. of Collier Cty., Fla.*, 243 F. Supp. 3d 1266, 1282 (M.D. Fla. 2017)(dismissing official capacity claims brought against superintendent of school board as duplicative of claims brought against school board).

In this case, where the declaratory relief sought is the same as to all defendants, including the School Board, and where the School Board and all the individual defendants are filing a single motion to dismiss directed at the Amended Complaint, the official capacity claims are simply unnecessary. Indeed, the individual defendants would conceivably be bound by or subject to any type of declaratory relief by virtue of their employment with the School Board. *See Braden Woods Homeowners Ass'n, Inc.*, 277 So. 3d at 671 (dismissing official capacity claims and distinguishing *Hatcher ex rel. Hatcher v. DeSoto Cty. Sch. Dist. Bd. of Educ.*, 939 F. Supp. 2d 1232, 1236 (M.D. Fla. 2013), where official capacity claims were allowed to proceed against an individual defendant because the defendant employer was contesting liability of the defendant-employee). This warrants dismissal of the official capacity claims lodged against each of the individual defendants.

III.   *Defendants are not Liable for any Alleged Violation of Section 1983*

Plaintiffs' substantive due process claims brought pursuant to Section 1983 contained in Counts I-III fail to state a claim with respect to any defendant, because the facts pled in support fall short of establishing any Constitutional violation.

Plaintiffs bring claims for interference with parental rights purportedly secured by the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 65-66 (2000); *see also Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925) (recognizing "liberty of parents and guardians to direct the upbringing and education of children under their control"). State interference with the parent-child relationship may give rise to a Section 1983 action for damages. *See Morrison v. Jones*, 607 F.2d 1269, 1275-76 (1979). "Absent a 'compelling state interest' and an infringement 'narrowly tailored' to serve that interest, the government may not violate" a fundamental right. *Hillcrest Prop., LLP v. Pasco Cty.*, 915 F.3d 1292, 1297 (11th Cir. 2019). However, "[s]ubstantive due process challenges that do not implicate fundamental rights are reviewed under the 'rational basis' standard." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014) (citing *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013)).

Plaintiffs face a high bar because they are asserting a substantive due process violation. *Maddox v. Stephens*, 727 F. 3d 1109, *1119* (11th Cir. 2013). Indeed, "the Constitution does not protect against all encroachments by the state onto the interests of individuals," *Robertson v. Hecksel*, 420 F.3d 1254, 1262 (11th Cir. 2005). "[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Maddox*, 727 F.3d at 1119 (quoting *Waddell v. Hendry Cty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) (internal quotation marks omitted). "A deprivation is of constitutional stature if it is undertaken for improper motive and by means that were pretextual, arbitrary and capricious, and without rational basis." *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016) (citation omitted).

"Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious – that is, shock the conscience – the time the government actor made the decision." *Waddell*, 329 F.3d at 1305. Conduct intended to injure and unjustified by any government interest is most likely to be conscience-shocking. *Id.* Courts must conduct an "exact analysis

of circumstances before any abuse of power is condemned as conscience shocking." *Cty. of Sacramento*, 523 U.S. at 850.

Significantly, "the Supreme Court 'has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Maddox*, 727 F.3d at 1120 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). The Eleventh Circuit explained in *Maddox v. Stephens* that cases involving the assertion of a violation of parental liberty interests is a murky area of unenumerated constitutional rights and that courts thus must be careful and exercise the utmost care in analyzing claims in this subject area because the judiciary's constitutionalizing purported violations of parental liberty interests takes governmental decisionmaking outside the arena of public debate and legislative action. *Id.*

That is especially true here because the case involves school administration. Public education of children is unquestionably entrusted to the control, management, and discretion of school boards. *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968). "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Id*. And the state of course, separate from any parental

interest, has an interest in the wellbeing of its youth. *Ginsberg v. New York*, 390 U.S. 629, 640 (1968).

Plaintiffs' Section 1983 claims must be dismissed as to all Defendants, because no constitutional rights of the Plaintiffs are implicated by any of Defendants' alleged actions. The crux of this case is Plaintiffs' contention they had the right to be informed of and present for the meeting on September 8 involving discussions between School Board personnel and A.G. concerning gender identity issues, such as preferred names and pronouns, overnight trip lodging accommodations, and bathroom use. The problem is there is no Constitutional liberty interest requiring such notification and involvement. Indeed, in cases involving a viable allegation of interference with parental liberty interests the state has either required or prohibited some activity. These cases focus on an element of state coercion missing here.

Take for instance the cases cited by Plaintiffs for the purposes of establishing the existence of a parental liberty interest. *Troxel v. Granville*, involved parental liberty interests but in the context of the state's interference with the visitation rights of a minor child. 530 U.S. at 67-73. Similarly, *Parham v. J. R.*, involved state procedures governing the admission of children to psychiatric hospitals. 442 U.S. 584 (1979). *Prince v. Massachusetts*, involved a situation where child labor laws were construed to prohibit sales of religious tracts by children which the Supreme Court found unreasonably interfered with parental rights to raise those children. 321

U.S. at 166. There are numerous other cases, and the central point of them, is that the interference with parental rights is only actionable where the state is requiring or prohibiting some activity. *See*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923)(striking down state's prohibition on teaching any language other than English).

Here, there is no allegation in the Amended Complaint that A.G. was forced to participate in a meeting with school personnel to discuss gender identity issues.[5] In fact, the Amended Complaint states that A.G. approached Thomas about pronoun use and preferred names. There is no allegation school personnel directed, coerced, or encouraged, A.G. to conceal anything from Plaintiffs, or that there was any attempt to do so. There is no allegation A.G. requested parental involvement in meetings with school personnel. The facts as pled by Plaintiffs sets this case apart from others finding interference with parental liberty interests secured by the

---

[5] One addition to the Amended Complaint that was not present in the initial Complaint is worth mentioning. The Amended Complaint pleads, based only on information and belief, that Thomas raised the idea of having a meeting with A.G. and teachers at Deerlake. (*See* Doc. 38, p. 27). Raising the idea of having a meeting is not coercion but, in any event, the allegation is only based on information and belief and not personal knowledge. Conclusory allegations made "on information and belief" need not be taken as true. *See Smith v. City of Sumiton*, 578 Fed. Appx. 933, 936 at n.4 (11th Cir. 2014). In evaluating a motion to dismiss under Rule 12(b)(6), courts separate the conclusory allegations from the remaining well-pleaded factual allegations to determine if the well-pleaded allegations, when accepted as true, plausibly give rise to an entitlement to relief. *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013).

Fourteenth Amendment. Indeed, Plaintiffs' claims fail for the simple reason that they cannot show how their rights were burdened by state action.[6]

*Doe v. Irwin*, a case out of the Sixth Circuit Court of Appeals, is instructive. 615 F.2d 1162 (6th Cir. 1980). At issue in *Doe* was a condom distribution program for minors set up by a state-run clinic. Parents challenged the program arguing it interfered with their parental rights secured by the Due Process Clause, because it provided no notice to parents their minor children were using the clinic's services. The Sixth Circuit found there was no unconstitutional interference with parental rights stressing the fact the program was completely voluntary and there was no requirement minors avail themselves of the services of the birth control clinic, nor was there any prohibition on parents participating in decisions related to sexual activity or birth control concerning their minor children. *Id*. at 1166–69. Cogently, the Sixth Circuit summed up the issue thusly:

> In the absence of a constitutional requirement for notice to parents, it is clearly a matter for the state to determine whether such a requirement is necessary or desirable in achieving the purposes for which the Center was established. There is no basis for a federal court to impose conditions in the absence of an overriding constitutional requirement.

---

[6] It is not enough to say that the "prohibition" on teachers from informing parents of discussions related to gender identity issues suffices to show "coercion" necessary to establish conscience-shocking behavior sufficient to establish a constitutional violation. Such coercion does not run to the child or the parents and none of the cases that explore this concept speak about the prohibition in such a manner. *Contra Meyer*, 262 U.S. 390 (prohibiting students from learning certain foreign languages).

> The desire of the parents to know of such activities by their children is understandable. However the only issue before the district court and this court is whether there is a constitutional obligation on the Center to notify them. The record before us does not establish that the Center infringes a constitutional right of the plaintiffs by its practice of distributing contraceptive devices and medication to unemancipated minors without notice to their parents.

*Id*. at 1169.

There are numerous cases that stand for the proposition that a failure on the part of school staff to notify parents of issues involving their children does not amount to an infringement of parental liberty unless there is an element of coercion involved. *See, e.g.*, *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749, 754–60, 652 N.E.2d 580, 584–87 (Mass. 1995)(holding that voluntary condom distribution program in schools did not violate parental liberty interests under the Fourteenth Amendment because there was no coercion by the state, and no requirement that anyone participate in the program or prohibition of a constitutional nature); *Reardon v. Midland Cmty. Sch.*, 814 F. Supp. 2d 754, 767–72 (E.D. Mich. 2011)(holding that alleged counseling by school counselors that encouraged minor child to run away did not violate parents substantive due process rights because counselors did not exert coercive influence over minor child but merely provided counseling to her upon her request). *Doe v. Irwin, supra,* illustrates this point, as it involved coercion that is lacking in the allegations of the Amended Complaint.

Even cases that recognize a parental liberty interest in the upbringing of their children do not take that right to be unlimited. Cases that touch upon where these rights merge with the state's provision of education have interpreted the right only to mean that the state could not make public education mandatory. *See*, *e.g.*, *Runyon v. McCrary*, 427 U.S. 160 (1976)(holding that constitutional parental liberty rights do not interfere with school rights to determine the values and standards underlying educational programs). Indeed, courts have rejected attempts by parents to establish a fundamental right to dictate curriculum and program choices at public schools where they send their children. *Thomas v. Evansville-Vanderburgh School Corp.*, 258 Fed.Appx. 50, 53-54 (7th Cir. 2007) ("We agree that [plaintiff] has a fundamental right, secured by the due process clause, to direct the upbringing and education of her child.... But a right to choose the type of school one's child attends, or to direct the private instruction of one's child, does not imply a parent's right to control every aspect of her child's education at a public school.") (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204-07 (9th Cir. 2005); *Leebaert v. Harrington*, 332 F.3d 134, 140-42 (2d Cir. 2003); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995); *cf. Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972)). Both the Sixth and Ninth Circuits have held that nothing in the Constitution prohibits public schools from making curriculum choices or to

even direct the school administration more generally. *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1230–33 (9th Cir.), cert. denied, 141 S. Ct. 894 (2020)

An Eleventh Circuit case that did find "conscience-shocking" behavior in the context of a school official's actions sufficient to support a substantive due process violation of parental liberty interests shows how different that case is from this one. In *Arnold v. Bd. of Educ. of Escambia Cty. Alabama,* a school official coerced a child into seeking an abortion. 880 F.2d 305 (11th Cir.1989), *abrogated in part by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993). The minor children that conceived a child, along with their parents, sued the school district contending that their constitutional rights were infringed. Crucially, the parents alleged that the school official coerced the minor student into obtaining an abortion and to refrain from discussing it with her parents, assisted in procuring the abortion, and hired the student and her partner for menial jobs so that they could pay for the abortion. While the Eleventh Circuit held these actions could constitute infringement on the substantive due process rights of the parents, the key to that holding was the school officials' coercive pressure on a child to seek an invasive and controversial medical procedure, and to conceal that procedure and the condition that led to it from the child's parents. *Id.* at 312-314.

No coercion has been alleged here. There is no allegation that A.G. was required to do anything, coerced into taking any action, or encouraged to conceal

31

anything from Plaintiffs. There is no allegation that this was even suggested to A.G. and, in fact, School Board personnel provided Plaintiffs information about the meeting with A.G. (Doc. 38, pp. 30-32, 34, 36).[7]

Defendants recognize that the Southern District of Florida in *Johnson v. Dade Cty. Pub. Sch.*, No. 91-2952-CIV-DAVIS, 1992 WL 466902, at *5–6 (S.D. Fla. Nov. 25, 1992) did not interpret *Arnold* to require coercion to state a substantive due process claim in the parental rights context. But a close look at this unpublished, out-of-district decision reveals why it should not be relied on by this Court. The court in *Johnson* essentially held that it read *Arnold* to hold that coercion in the form of inducing a child not to communicate with their parents on a given subject was a

---

[7] The suggestion in the Amended Complaint that Oliveri and that Thomas infringed on Plaintiffs' constitutional rights by not disclosing or "concealing" the details of the meeting with A.G. when Plaintiffs first inquired about it is unsupported by the law. Never mind the fact that the Plaintiffs could have obtained information related to the meeting from A.G., and that A.G. had already raised all or nearly all of the gender identity issues subject of the meeting with Plaintiffs already, the fact remains that Plaintiffs were referred to Rodgers and very shortly after the meeting took place obtained information related to what occurred at the meeting and were assured that they would be part of all future meetings with A.G. But more importantly, the Eleventh Circuit recognized in *Arnold*, *supra* that parental rights are not unlimited and that guidance counselors played an important role as a "trusted confidant" to students. *See Arnold*, 880 F.2d at 313-314. Recognizing the important role that counselors play as a confidant to students, the Eleventh Circuit expressly disclaimed that it was constitutionally mandating that counselors inform parents of a minor that their child received pregnancy counseling. *See id.* at 314. This holding cannot be squared with the allegations of the Amended Complaint, and it can hardly be said that the facts of the complaint, and the context of those facts, "shocked the conscience" in a constitutional sense.

sufficient, but not necessary, condition to establish a substantive due process claim in the parental rights context. The court found it significant that two Supreme Court cases recognized a cause of action for interference with parental rights where coercion was not specifically mentioned. The first, *Pierce v. Society of Sisters,* 268 U.S. 510 (1925), where parents challenged a state ordinance requiring children to attend public school. The second, *Wisconsin v. Yoder,* 406 U.S. 205 (1972), where the Supreme Court struck down a school policy which prohibited Amish students from leaving traditional schooling after the eighth grade to attend vocational training within their community.

Respectfully, the Southern District got it wrong on both counts. Both *Pierce* and *Wisconsin v. Yoder* each involved situations where the state forced or required children to do something or prohibited children from doing something. In *Pierce*, children were required to attend public school. In *Wisconsin v. Yoder* children were prohibited from leaving school after eighth grade to attend vocational training in their community. Stated another way, in *Pierce* the child was forced or coerced to attend public school and, in *Wisconsin v. Yoder,* the child was forced or coerced to remain in school.

Second, the Southern District's interpretation reads the Eleventh Circuit's *Arnold* decision in a vacuum and in an obtuse way. Surely, the specific holding in *Arnold* was that a substantive due process claim could lie for interference with

parental rights where school officials engaged in overt acts to procure an abortion for a student without contacting her parents including exerting coercive pressure on the student to obtain an abortion and conceal it from her parents and helping the student procure funds for the abortion. *Arnold,* 880 F.2d at 308–09. Succinctly, Arnold held that "counselors must not *coerce* minors to refrain from communicating with their parents." *Id.* at 314.

But crucially, *Arnold* specifically rejected the notion that parental autonomy to direct the education of one's children is not beyond limitation. *Id.* at 313. The Eleventh Circuit explicitly recognized that not all infringements into parental rights by schools, including school counselors, was unconstitutional noting that "[w]hile counseling intrudes somewhat on parental control over a child, we acknowledge the important role a guidance counselor plays as a trusted confidant of many students. Counselors possess first amendment rights to free speech and we do not seek to curtail the beneficial use of counseling." *Id.* at 314. And directly applicable to this case, the Eleventh Circuit held that it was not "constitutionally mandating that counselors notify the parents of a minor who receives counseling regarding pregnancy." *Id.* While the Eleventh Circuit did hold that the coercive conduct in *Arnold* was sufficient to establish a substantive due process violation, a reading of the decision to find that coercion was not necessary to such a holding is superficial and ignores this qualification on the ultimate holding.

34

Numerous circuit courts and district courts throughout the country have found that coercive pressure on the part of a state actor is a necessary condition to stating a claim for a substantive due process violation in this context, some of them relying on *Arnold*. *See, e.g.*, *Doe v. Irwin*, *supra*; *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 264 (3d Cir. 2007)(affirming dismissal of complaint asserting interference with parental constitutional rights where governmental official provided daughter with emergency contraception without notifying her parents stressing the lack of coercion and explicitly holding that a constitutional violation would not lie in this context where there was no "manipulative, coercive, or restraining conduct by the State."); *Reardon*, *supra*; *Leontiev v. Corbett Sch. Dist.*, 333 F. Supp. 3d 1054, 1064–65 (D. Or. 2018)(dismissing parental right interference case for lack of coercive pressure involving school employee assisting child to run away); *Benitez v. Gresham–Barlow School Dist.*, 2012 WL 3878419 (D. Or. Sept. 6, 2012)(emphasizing the lack evidence of coercion in dismissing case similar to *Leontiev*).

And truth be told, the core facts of this case are different from the *Johnson* case as well. In *Johnson*, the school promoted a telephone counseling service that provided recorded messages on sensitive topics such as masturbation, sexuality, pregnancy, stress management, and drug use that any student could access. *Johnson*, 1992 WL 466902, at *1. Furthermore, teachers played the messages in their

classrooms on occasion. *Id.* The plaintiffs in *Johnson* alleged that advertising and distributing information about the telephone counseling service and playing the messages from the service in the classroom infringed on their parental rights. *Id.* The children in *Johnson* were forced to listen to and be exposed to content that their parents objected to in class. *Id.* There is no allegation in the Amended Complaint that A.G. was forced to do anything. Rather, A.G. initiated contact with Thomas regarding her preferred pronouns and name. Plaintiffs just object that they were not told about it. Regardless of what you want to call it, there is no way for the allegations in the Amended Complaint to be squared with the Eleventh Circuit's pronouncement in *Arnold* that it was not "constitutionally mandating that counselors notify the parents of a minor who receives counseling…" *See* 880 F.2d at 314.

The real problem alleged by Plaintiffs is not that the state actors *interfered* with them as parents; rather, it is that the state actors did not *assist* them as parents or affirmatively *foster* the parent/child relationship. *See Anspach*, 503 F.3d 256 (rejecting underlying core of claim in parental rights case that really was about state assisted fostering of the parent/child relationship). Plaintiffs are not entitled to that assistance under the Due Process Clause. Indeed, the Constitution "does not require the Government to assist the holder of a constitutional right in the exercise of that right." *Haitian Refugee Center, Inc. v. Baker,* 953 F.2d 1498, 1513 (11th Cir. 1992); *see also Ye v. United States,* 484 F.3d 634, 636 (3d Cir. 2007) (no

affirmative act constituting deprivation of liberty where publicly employed doctor wrongly assured patient that there was nothing to worry about and that he was fine); *Youngberg v. Romeo,* 457 U.S. 307, 317 (1982) ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"); *Harris v. McRae,* 448 U.S. 297, 317-318 (1980) (no constitutional obligation to fund abortions or other medical services). As the Supreme Court recognized in *Harris:* "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference ..., it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." 448 U.S. at 317-318.

Fairly summarized, no action of the School Board, School Board personnel, or any of the Defendants in this action burdened or infringed on any rights that Plaintiffs enjoy under the Due Process Clause. Certainly, no action of the School Board, its personnel, or the Defendants was "conscience-shocking" sufficient to establish a Constitutional violation. As such, dismissal of Plaintiffs' Section 1983 claims is warranted. *See Doe*, 615 F.2d at 1169 (finding no need to consider whether there was a compelling state interest involved because there was no unconstitutional infringement of parental liberty interests).

IV.   *The Individual Defendants are Entitled to Qualified Immunity with Respect to Plaintiffs' Section 1983 Claims*

Qualified immunity offers complete protection for government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Critical public policy considerations, such as the "social costs [associated with claims against public officials] including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office" are bedrock principles of the qualified immunity defense. *Id.* at 814. Thus, "courts should think long and hard before stripping defendants of immunity." *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*). "Because qualified immunity is a defense not only from liability, but also from suit," it must be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

Qualified immunity protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law," *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002). It is a "muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can

reasonably anticipate—*before* they act or do not act—if their conduct will give rise to damage liability for them." *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996) (citing *Davis v. Scherer,* 468 U.S. 183, 195 (1984)). "If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." *Id.* (citing *Elder v. Holloway,* 510 U.S. 510, 513–15 (1994)).

Qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231. Qualified immunity "operates as a shield against civil damages due to mistaken judgments." *Harris v. Coweta Cty.*, 21 F.3d 388, 390 (11th Cir.1994). Stated differently, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Carroll v. Carman*, 574 U.S. 13, 17 (2014) (per curiam).

To receive qualified immunity, a public official must first establish they were "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194. Superintendent Hanna, Rodgers, Oliveri, and Thomas were acting within their discretionary authority as to the acts alleged in the Complaint. "[A] government official proves that he acted within his discretionary authority by showing objective circumstances which would compel the conclusion

that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks omitted); *see also*, *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (stating an official acts within her discretionary authority where she "perform[s] a legitimate job-related function…through means that [are] within his power to utilize").

The focus here is whether the discretionary action is of a type that fell within the employee's job responsibilities. *Id.* at 1266. First, courts are tasked with asking whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), and whether they were performing that function (b) through means that were within his power to utilize. *See Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." (emphasis added)).

Just because it is alleged that the governmental actor violated someone's constitutional rights does not mean that the act was not a legitimate job-related function or within the scope of the governmental actor's authority. *Holloman v.*, 370 F.3d at 1266. As the Eleventh Circuit explained in *Harbert Int'l, Inc. v. James*, "the inquiry is not whether it was within the defendant's authority to commit the

allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." 157 F.3d 1271, 1282 (11th Cir. 1998) (quotation marks and citation omitted). Courts look to the general nature of the governmental actor's actions "temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman v.*, 370 F.3d at 1266. For example, in *Sims v. Metropolitan Dade County,* 972 F.2d 1230 (11th Cir.1992), the Eleventh Circuit "did not ask whether it was within the defendant's authority to suspend an employee for an improper reason;" instead it asked whether the "discretionary duties included the administration of discipline." *Harbert,* 157 F.3d at 1282.

The second prong of this inquiry, whether the governmental actor is executing a job-related function — that is, pursuing his job-related goals — in an authorized manner extends to situations where governmental employees exercise powers that legitimately form a part of their jobs. *Holloman,* 370 F. 3d at 1266-67 (citing *Harlow,* 457 U.S. at 819 & n. 34). As explained in the *Holloman* when discussing this prong:

> Each government employee is given only a certain "arsenal" of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

*Id*. at 1467.

The actions alleged by Plaintiffs all implicate the discretionary authority of the individual Defendants as they focus on actions core to their duties as public officials – that is, managing the affairs of schools within the District, applying school procedures, and interacting with parents concerning the education and welfare of students in District schools. Moreover, with respect to Thomas specifically, and the other individual Defendants more generally, meeting with a student requesting counseling services is within their discretionary authority as educators and educational administrators of a school board that serves *in loco parentis* to students in its schools. Indeed, the Guide and the revised Guide concern efforts by school officials to ensure students are healthy, comfortable, and safe so that they can excel physically, mentally, and academically within the learning environment.

Because the individual defendants were acting within their discretionary authority, the burden shifts to Plaintiffs to establish that qualified immunity is inappropriate. *Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1194 (11th Cir. 2002). To do so, Plaintiffs must satisfy the following two-part test: (1) that they have alleged a violation of a constitutional right; and (2) that the right was "clearly established" at the time of the misconduct. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 236 and *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)). The steps in the test may be considered in whatever order is

deemed appropriate for the case. *Pearson*, 555 U.S. at 241-242. Meaning, this Court can determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all. *See, e.g.*, *Loftus v. Clark–Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012); *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).

The individual Defendants are entitled to qualified immunity under this framework. As already explained, no constitutional right was violated. At the very least, any such right was not "clearly established" at the time of the violation. A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis,* 561 F.3d at 1291–92 (internal citations omitted). Plaintiffs cannot establish that any purported constitutional right violated was clearly established in any way.

First, the undersigned can identify no case establishing that the alleged actions of the individual Defendants, as pled, give rise to a constitutional violation. The cases cited in the Amended Complaint purporting to establish these rights are distinguishable as addressed hereinabove.

Second, the undersigned can similarly identify no broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right of Plaintiffs that was abridged. It is certainly relevant to both inquiries that there are a multitude of cases, already cited and analyzed herein, that hold the exact kind of conduct purported to be unconstitutional was completely lawful. Also relevant is the historical deference that courts give to educational institutions and administrators to make decisions governing school administration. If anything, it is established that school administrators and school boards are typically given wide latitude to run schools, accountable to the will of the local electorate, and that constitutionalizing administrative decision-making in the school sphere is not done lightly.

Finally, no conduct alleged in the Amended Complaint is so egregious that a constitutional right was clearly violated in the total absence of case law that would put the individual defendants on notice that their conduct was unlawful. Indeed, this third category is "narrow" and "encompasses those situations where 'the official's conduct lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Loftus,* 690 F.3d at 1205 (quoting *Terrell v. Smith,* 668 F.3d 1244, 1257 (11th Cir. 2012)). As discussed, no alleged conduct of any of the individual defendants "shocked the conscience" in a

44

constitutional sense, and none of the conduct lies at the core of Due Process Clause of the Fourteenth Amendment sufficient for the Plaintiffs to establish that any individual defendant is not entitled to qualified immunity.

"The inquiry whether a federal right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Loftus*, 690 F. 3d at 1204 (quoting *Coffin v. Brandau,* 642 F.3d 999, 1013 (11th Cir.2011) (en banc)). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* 577 U.S. ——, 136 S.Ct. 305, 308 (2015)).

The alleged constitutional violation in this case, the failure to inform Plaintiffs about, and involve them in, one meeting held at school with their child concerning gender identity issues, was certainly not clearly established and, in fact, the Eleventh Circuit explicitly condoned the alleged constitutional violation. As explained, the Eleventh Circuit has only recognized a viable substantive due process claim for the interference with parental rights when there is an element of coercion that is lacking here. *See Arnold*, 880 F.2d at 314 ("*Coercing* a minor to obtain an abortion or to assist in procuring an abortion and to refrain from discussing the matter with the parents unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." (emphasis added)). And

more to the point, the Eleventh Circuit in *Arnold* explicitly held that it was not "constitutionally mandating that counselors notify the parents of a minor who receives counseling…" *Id.*

Given this legal landscape, no reasonable person would have known that any action pled in the Amended Complaint violated Plaintiffs' Constitutional rights warranting dismissal of the Section 1983 claims against Hanna, Rodgers, Oliveri, and Thomas in their individual capacities. Because any claim for declaratory relief is moot, these defendants should be dismissed from this action entirely for this independent reason.[8]

V.   *Plaintiffs' Florida Constitutional Claims are Without Merit Even if Found not to be Mooted by the Revised Guide*

Even assuming, *arguendo*, that Plaintiffs' claims under the Florida Constitution are not moot and subject to dismissal as a matter of law due to the form of relief sought (i.e. damages), they should be dismissed for a host of other reasons.

First, the Florida Constitution does not create a cause of action against private persons. Therefore, the individual capacity claims in Counts IV and V against

---

[8] Even if this Court were to find claims to declaratory relief were not moot, or that the Plaintiffs' substantive due process claims were not otherwise viable, the application of qualified immunity to the individual defendants would still warrant dismissing them entirely from this action, because injunctive relief cannot be obtained from an individual capacity defendant. *See Brown v. Montoya*, 662 F.3d 1152, 1161 (10th Cir. 2011)(citing *Hafer v. Melo,* 502 U.S. 21, 30, 27 (1991))("Plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief.").

Superintendent Hanna, Rodgers, Oliveri, and Thomas should be dismissed. *Blanco v. City of Clearwater, Fla.*, 9 F. Supp. 2d 1316, 1319 (M.D. Fla. 1998). *See also Riggins v. Beseler*, 3:10-CV-1187-J-25JBT, 2013 WL 12086790, at *17 (M.D. Fla. Mar. 26, 2013), *aff'd*, 568 Fed. Appx. 850 (11th Cir. 2014)("a violation of the privacy provision of the Florida Constitution does not serve as a basis for a cause of action against an individual…"); *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. 4th DCA 1997)(affirming dismissal of claim under Article I, §9 of the Florida Constitution against and holding, "[t]o allow Garcia to bring a cause of action based on a violation of our state's constitution, where no concomitant duty arises for private citizens, would extend the waiver of sovereign immunity beyond the stated intent of the statute. It would also create a duty of care arising from the state constitution where none has previously existed").

Second, Defendants recognize that parents have a fundamental right to parent their children and that such right is protected through the Florida Constitution. *D.M.T. v. T.M.H.*, 129 So. 3d 320, 335 (Fla. 2013). But nothing about the Defendants' alleged actions interferes with Plaintiffs' right to parent their child. Instead, Plaintiffs' Constitutional claims surmise that school personnel in Florida have an affirmative duty under the Florida Constitution to notify parents every time their child requests that their school treat them as a particular gender, refer to them by a preferred name, or address "other matters" related to their gender identity

47

regardless of the circumstances. (Doc. 38 at pp. 83-84) The Florida Constitution does not create such a broad duty to provide such notification. *See In re T.W.*, 551 So. 2d 1186 (Fla. 1989)(finding Florida law that required minors to obtain parental consent before getting an abortion to be a violation of minors' rights of privacy under the Florida Constitution). Therefore, Count IV, asserting a violation of the Florida Constitution's privacy provision, should be dismissed.

Finally, as it pertains to Count V (asserting a violation of the Florida Constitution's substantive due process clause), Florida courts recognize that the due process clause in the Florida Constitution provides no greater protection than the U.S. Constitution. *See Barrett v. State*, 862 So. 2d 44, 47 (Fla. 2d DCA 2003)(case involving alleged procedural due process violation); *Fla. Canners Ass'n v. Fla. Dep't of Citrus*, 371 So. 2d 503, 513 (Fla. 2d DCA 1979) ("We consider the federal and Florida constitutional guarantees as imposing the same standard"). Thus, substantive due process claims arising under the Florida Constitution and U.S. Constitution are analyzed under the same framework. As such, Count V fails for the same reasons as Plaintiffs' claims brought under the U.S. Constitution.

## *Conclusion*

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

### ***Request for Oral Argument***

Defendants request oral argument on this motion. Defendants estimate that one hour is needed for argument.

Respectfully submitted this 15th day of July 2022.

/s/ *Jeffrey D. Slanker*

**JEFFREY D. SLANKER**
Florida Bar No. 100391
jslanker@sniffenlaw.com
/s/ *Terry J. Harmon*

**TERRY J. HARMON**
Florida Bar No. 0029001
tharmon@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 937975
mspellman@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for Defendants*

## WORD COUNT CERTIFICATION

This document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), and this Court's Order enlarging the word count limitation (Doc. 54) as it contains 11,990 words, including headings, footnotes, and quotations, as well as the case style, signature block and Certificates of Word Count and Service.

/s/ *Jeffrey D. Slanker*

**JEFFREY D. SLANKER**

## <u>CERTIFICATE OF SERVICE</u>

    The undersigned certifies that on this 15th day of July 2022, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Jeffrey D. Slanker*

**JEFFREY D. SLANKER**