[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10385

_____

JANUARY LITTLEJOHN,
JEFFREY LITTLEJOHN,

Plaintiffs-Appellants,

*versus*

SCHOOL BOARD OF LEON COUNTY, FLORIDA,
ROCKY HANNA,
Individually and in his official capacity as
Superintendent of Leon County Schools,
DR. KATHLEEN RODGERS
Individually and in her official capacity as
Former Assistant Superintendent Equity Officer
and Title IX Compliance Coordinator for Leon County Schools,
RACHEL THOMAS,
Individually and in official capacity as
Counselor at Deerlake Middle School,

2                    Opinion of the Court                 23-10385

ROBIN OLIVERI,
Individually and in her official capacity as
Assistant Principal of Deerlake Middle School,

                                              Defendants- Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00415-MW-MJF

————————————————

Before ROSENBAUM, NEWSOM, and TJOFLAT, Circuit Judges.

ROSENBAUM, Circuit Judge:

Our system of government divides the government's pow-
ers among three branches: the legislature, the executive, and the
judiciary. Each branch generally performs different types of ac-
tions.

This case requires us to determine whether Defendants-Ap-
pellees Leon County School Board and its employees' actions,
which Plaintiffs-Appellants January and Jeffrey Littlejohn chal-
lenge, were legislative or executive. That distinction governs
which analytical framework we apply in a substantive-due-process
case like this one.

The Littlejohns allege that the Board and its officials violated their parental due-process rights when the officials met with and permitted the Littlejohns' thirteen-year-old child to express the child's gender identity at school.  In compliance with the Board's guidelines at the time, school officials developed a gender-identity-related "Student Support Plan" for and with the child without the Littlejohns' involvement and contrary to the Littlejohns' wishes.

As we explain, these actions are executive, not legislative, in nature.  So we apply the substantive-due-process framework that governs analysis of executive actions.  That framework asks whether the officials' conduct "shocked the conscience."  Because the school officials' actions here do not satisfy that standard as a matter of law, after careful consideration and with the benefit of oral argument, we affirm the district court's order dismissing the Littlejohns' claims.

## I.      BACKGROUND

### A.  Factual Background[1]

At the time relevant to this litigation, the Littlejohns' child was thirteen years old and attended Deerlake Middle School in Tallahassee, Florida.  The Littlejohns' child was assigned female at birth, but before the 2020–21 school year, asked to go by they/them pronouns and a "male" name, J.  The Littlejohns did not allow their

---

[1] We recount the facts in the light most favorable to the Littlejohns.  *See Burban v. City of Neptune Beach*, 920 F.3d 1274, 1278 (11th Cir. 2019).

child to use a different name or pronouns, though they permitted the child to use "J." as a "nickname" at school. Mrs. Littlejohn informed the child's teacher that a private therapist that the Littlejohns hired was seeing the child, and she asked the teacher not to use a different name or pronouns for the child. But the child told school counselor Rachel Thomas that the child wanted to use the name J. and they/them pronouns.

The School Board maintains a Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide ("Guide"). The School Board's LGBTQ+ Equity Committee developed the Guide, under the supervision of Superintendent Rocky Hanna and Assistant Superintendent Dr. Kathleen Rodgers. The Guide is "a tool for schools, students and their parents and legal guardians to effectively navigate existing laws, regulations and policies that support LGBTQ+ [Leon County School] students."

At the time of the events underlying this litigation, the 2018 version of the Guide was in effect. The School Board released an updated Guide in June 2022. But because the 2018 Guide governed Defendants' actions here, we consult the 2018 Guide in this appeal.

Among other resources, the 2018 Guide contained a Question-and-Answer portion, which discussed parental-notification procedures. It instructed staff not to notify parents if a student's behavior led staff to believe the student was LGBTQ+:

> Q: A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified?

A: No. Outing a student, especially to parents, can be very dangerous to the student[']s health and well-being. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+, many of whom have been rejected by their families for being LGBTQ+. Outing students to their parents can literally make them homeless.

The Guide also included a template for a Transgender/Gender Nonconforming Student Support Plan. That template contained an intake checklist asking whether the child's parents were "aware" of their gender identity, whether the parents were "supportive," and whether the parents were to be notified.

After the Littlejohns' child expressed a desire to socially transition at school, Thomas and other school staff met with the child to develop a Student Support Plan. Because the child did not affirmatively request parental presence at that meeting, in accord with the Guide, school officials did not notify the Littlejohns. And the Student Support Plan stated that the Littlejohns were "aware, but not supportive" of their child's desire to use a preferred name and pronouns.

When the Littlejohns learned about their child's Student Support Plan meeting and social transition at school, they contacted school and district administrators. Thomas and Assistant Principal Robin Oliveri called Mrs. Littlejohn, and Thomas told her that the Littlejohns were not invited to their child's Student Support Plan meeting because, "by law," the child had to request

parental attendance.  And, Thomas stated, the child was "protected" under a non-discrimination law that did not require parental notification.  Oliveri added that the school designed its protocol of not including parents without the child's approval to protect the child's safety.

The Littlejohns then repeatedly called and emailed Dr. Rodgers.  Eventually, Dr. Rodgers stated in an email to the Littlejohns, "We currently do not have any Florida specific law that obligates us to inform the parents or says we cannot listen to the student without their parent present."[2]

### B.  *Procedural History*

The Littlejohns sued the School Board, Hanna, Rodgers, Thomas, and Oliveri, alleging that they violated the Littlejohns' substantive-due-process and privacy rights under both federal and state law.  In their operative First Amended Complaint, the

---

[2] After the Littlejohns filed suit, Florida enacted its "Parents' Bill of Rights" law.  *See* Fla. Stat. § 1014.01 *et seq* (2021).  That law provides that the State or its entities cannot "infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means."  *Id*. § 1014.03.  In June 2022, the School Board approved a revised Guide "consistent with the pronouncements in Florida's Parents' Bill of Rights" and related legislation.  The 2022 Guide provides, among other things, that "School personnel must not intentionally withhold information from parents unless a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect . . . ."

Littlejohns asserted five causes of action: three under 42 U.S.C. § 1983 and the United States Constitution and two under the Florida Constitution.[3]

As relevant here, the Littlejohns alleged that Hanna and Dr. Rodgers violated their parental-due-process and familial-privacy rights by preparing and authorizing the Guide. They also asserted that Thomas violated their parental-due-process and familial-privacy rights by meeting with and developing a Student Support Plan for their child without notifying them. As for Oliveri, the Littlejohns alleged that she violated their parental-due-process and familial-privacy rights by "concealing information" about the child's social transition at school. Finally, the Littlejohns contended that the School Board violated their parental-due-process and familial-privacy rights by authorizing and implementing the 2018 Guide, as well as by authorizing their exclusion from their child's Student Support Plan meeting.

The Littlejohns sought both damages and prospective relief. They sought a "declaration that Defendants violated [their] fundamental rights" by (1) permitting their child to "select[] a new 'affirmed name and pronouns,' without parental notification and consent"; (2) prohibiting school staff from communicating with them about their child's "discordant gender identity"; and (3) instructing school staff to "deceive" them by "using different names and

---

[3] In their original complaint, the Littlejohns also asserted two causes of action under Florida statutes, but they did not reallege them in their First Amended Complaint.

pronouns around parents than are used in school." They also sought nominal and compensatory damages against the Board and against the individual Defendants in their individual capacities.

Defendants moved to dismiss. The district court granted the motion without prejudice. First, the district court held that the release of the 2022 Guide mooted all claims for injunctive relief, as those claims were based on the superseded 2018 Guide. Next, the district court found that the individual Defendants were entitled to qualified immunity on the damages claims. As for the damages claims against the School Board, the district court determined that the challenged actions—the failure to include the Littlejohns in the Student Support Plan meeting and allowing the Littlejohns' child to socially transition at school—did not violate the Littlejohns' rights under the "shock the conscience" test. And because the district court concluded that the School Board's actions did not "shock the conscience," it dismissed the claims. Finally, the district court declined to exercise supplemental jurisdiction over the Florida constitutional claims after it dismissed the federal claims.

The Littlejohns timely appealed.[4] On appeal, they do not challenge the district court's mootness determination on the 2018 Guide or its decision not to exercise supplemental jurisdiction over the Florida-law claims. So we do not discuss those claims further.

---

[4] On appeal, eleven organizations, along with a coalition of 21 states, filed briefs as amici curiae in support of the Littlejohns and reversal.

## II.    STANDARD OF REVIEW

We review a grant of a motion to dismiss for failure to state a claim de novo, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff.  *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1278 (11th Cir. 2019).

## III.    DISCUSSION

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As we've noted, the Littlejohns assert that Defendants violated their substantive-due-process rights to "make decisions concerning the care, custody, and control of their children" and to "direct the medical and mental health decision-making for their children," as well as their right to familial privacy.  Our substantive-due-process precedent recognizes certain rights as "fundamental," meaning they are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (cleaned up).  Because it makes no difference to the outcome here,

we assume without deciding that the Littlejohns invoke "funda-
mental" rights.[5]

On appeal, the Littlejohns challenge only the district court's
dismissal of their claims seeking damages. Again, the Littlejohns
sought damages for Defendants' alleged violations of their funda-
mental parental-due-process and familial-privacy rights. And they
based these claims on Defendants' actions permitting their child to
socially transition at school without their involvement or authori-
zation, including Defendants' creation of a Student Support Plan
for the child.

We conclude that the district court correctly dismissed those
claims. To explain why, we divide our discussion into three parts.
Section A explains the different analytical frameworks we apply in
substantive-due-process cases about executive and legislative ac-
tion, respectively. Section B shows that the Littlejohns challenge
executive, not legislative, action. As a result, the "shocks the con-
science" standard—not strict scrutiny—applies. And Section C
concludes that the Littlejohns have not alleged conduct that

---

[5] Substantive-due-process jurisprudence requires a "a 'careful description' of
the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quoting
*Reno v. Flores*, 507 U.S. 292, 302 (1993)). The Supreme Court has recognized
parents' "fundamental right . . . to make decisions concerning the care, cus-
tody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000)
(plurality opinion). Under the umbrella of that right, it has also recognized
parents' "plenary authority to seek [medical] care for their children, subject to
a physician's independent examination and medical judgment." *Parham v. J.R.*,
442 U.S. 584, 604 (1979). We express no opinion about whether Defendants'
actions implicated the Littlejohns' child's medical or mental-health care.

"shocks the conscience," so the district court correctly dismissed their claims.

### A.  We apply different analytical frameworks to assess executive and legislative actions that allegedly violated substantive-due-process rights.

The Fourteenth Amendment's Due Process Clause prohibits a state or its officials from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.  Due process has both a procedural and substantive component.  *See Glucksberg*, 521 U.S. at 719–20.  This case concerns the latter: substantive due process.

To state a substantive-due-process claim under § 1983, a plaintiff must allege "(1) a deprivation of a constitutionally protected interest, and (2) that the deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016) (citation and internal quotation marks omitted).

To determine whether Defendants' actions violated the Littlejohns' rights, we must first identify whether Defendants' challenged actions were "legislative" or "executive" in nature.  That's so because our due-process precedent applies different evaluative frameworks to "legislative" and "executive" actions.  *See McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (en banc).

"Executive" action violates a plaintiff's substantive due-process rights—even if the right involved is a fundamental one—if the action "shocks the conscience." *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In contrast, we use different levels of scrutiny to determine whether legislative action violates a plaintiff's substantive due-process rights. To identify the correct level of scrutiny, we "craft[] a careful description of the asserted right" and ascertain whether it is so "deeply rooted in this Nation's history and tradition" as to be fundamental. *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (quoting *Glucksberg*, 521 U.S. at 721). If legislative action implicates a fundamental right, that action must survive strict scrutiny. *See id.* If it involves a right that is not fundamental, we subject that action to rational-basis review. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

The Littlejohns challenge this description of the governing frameworks. They point to our language in *McKinney* and argue that the "shocks the conscience" test does not apply to their fundamental-rights claim, no matter whether Defendants' action was "executive" or "legislative."[6] And to be sure, we have characterized the "shocks the conscience" standard as "[a]n alternate substantive

---

[6] Defendants assert that the Littlejohns forfeited this claim by failing to raise it in the district court. We need not assess that contention because, as we explain, the Littlejohns' claim fails on the merits, in any case.

due process test" used where the challenged action does not implicate a fundamental right.  *McKinney*, 20 F.3d at 1556 n.7.

But after we issued *McKinney*, the Supreme Court clarified in *Sacramento* that the executive-action framework we've described above governs all substantive-due-process claims involving executive action—even those involving fundamental rights.  In *Sacramento*, a high-speed police chase tragically resulted in the death of a sixteen-year-old.  *See* 523 U.S. at 836–37.  The teen's survivors sued, claiming that the police officer violated their son's "substantive due process right to life" through their deliberate or reckless indifference.  *Id.* at 837.

But the Court disagreed.  In reaching that conclusion, the Court noted that "the touchstone of due process is protection of the individual against arbitrary action of government," even if "the fault lies . . . in the exercise of power without any reasonable justification in the service of a legitimate governmental objective," as it does when a substantive-due-process violation occurs.  *Id.* at 845–46 (cleaned up).  Then, the Court distinguished between substantive-due-process violations that the government commits in its legislative versus its executive capacities.  *Id.* at 846.  The Court explained that "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue."  *Id.*  That's because challenges to "executive action . . . raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution

be demoted to . . . a font of tort law." *Id.* at 847 n.8; *see also Paul v. Davis*, 424 U.S. 693, 701 (1976).

When "executive action" is involved, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Sacramento*, 523 U.S. at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)).  And to satisfy that standard, the Court continued, "the cognizable level of executive abuse of power" is "that which shocks the conscience." *Id.*

So in *Sacramento*, the Court considered whether the officer's deprivation of the teen's life was "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Id.* at 840.  The Court determined it wasn't.  Because the death occurred during a high-speed chase, and officers engaged in that kind of activity must make split-second decisions, the Court found that the officer's conduct there did not "shock the conscience." *See id.* at 855.

Importantly for our purposes, the Court clarified that the "conscience shocking" inquiry is a "threshold question" that necessarily precedes any fundamental-rights analysis.  *See id.* at 847 n.8.  In other words, even if a plaintiff alleges that executive action violated a fundamental right, the plaintiff must first show that the action "shock[ed] the contemporary conscience." *See id.* (characterizing "egregious behavior" as a "necessary condition" for a

substantive-due-process violation).[7]  To the extent that any conflict exists between *Sacramento* and our later cases (e.g., *Waldman*), *Sacramento* necessarily controls.  *Cf. United States v. Dubois*, 94 F.4th 1284, 1301 (11th Cir. 2024) ("when prior . . . precedents conflict, the earlier case controls" (quoting *MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1250 (11th Cir. 2023))).

Our precedent illustrates the *Sacramento* framework in practice.  Take *Maddox v. Stephens*, 727 F.3d 1109 (11th Cir. 2013).  *Maddox* concerned the same fundamental parental right that the Littlejohns assert.  In *Maddox*, the plaintiff alleged that a state social

---

[7] The Dissent asserts that *Sacramento* does not require us to apply the "shocks the conscience" standard to state actions that burden a right "implicit in the concept of ordered liberty," even if those state actions are executive in character.  Diss. at 26.  In support, it highlights *United States v. Salerno*, 481 U.S. 739, 746 (1987), as an example of the Court explaining that a plaintiff can state a substantive-due-process claim by alleging conduct that "shocks the conscience" *or* interferes with a right "implicit in the concept of ordered liberty." Diss. at 26.  We respectfully disagree with that reading of *Salerno* and *Sacramento*.  We do not parse "the language of an opinion . . . as though we are dealing with language of a statute."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  So we cannot take from *Salerno*'s use of "or" that the "shocks the conscience" standard does not apply to the Littlejohns' claim.  Rather, we must assess the body of binding precedent as a whole, including the guidance *Sacramento* offers.  And to the extent that body of binding precedent is conflicting, we think our best path forward is, as Judge Newsom points out in his concurring opinion, to follow the clearest rule statement, *see* Newsom Op. at 13–15—the one that *Sacramento* provides and that our binding precedent follows.  So precedent directs us to apply the "shocks the conscience" standard to all executive action, even if the executive action burdens a right "implicit in the concept of ordered liberty" in the process.

worker violated her parental substantive-due-process rights by re-moving her child from her custody and placing the child with the child's grandmother. *Id.* at 1113. We found that the plaintiff had "undisputed[ly]" pled a violation of her substantive-due-process rights. *Id.* at 1119. But we said that such a violation was not enough—rather, only conduct that is "arbitrary or conscience shocking in a constitutional sense" could trigger a substantive-due-process violation. *Id.* (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). So we reversed the district court's denial of summary judgment for the social-worker defend-ant. *Id.* at 1127.

As *Maddox* shows, the Littlejohns are mistaken in their con-tention that the "shocks the conscience" standard does not apply when we assess claims that the government's executive actions vi-olated (even fundamental) substantive-due-process rights.

Nor, as the Dissent contends, are *Sacramento*'s and *Maddox*'s directions about how to apply the "shocks the conscience" standard dicta. Diss. at 3. Justice Souter offered footnote 8 as a direct re-sponse to Justice Scalia's concurrence that refused to apply the "shocks the conscience" standard. *Sacramento*, 523 U.S. at 843 n.8. So the Court's reasoning as to why the standard applied was neces-sary to the opinion's central rationale and its holding that Officer Smith's behavior did "not shock the conscience." *Id.* at 855. Whether the Court could have resolved the case on narrower grounds does not detract from the fact that the shocks-the-con-science standard was crucial to the grounds on which the Court *did*

resolve the case. And that makes it binding. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

But even if it were dicta, we have long distinguished between "dicta" and "Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). And even assuming *Sacramento*'s footnote 8 is dicta, it's not the "subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta." *Id.* Rather, it's "well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Id.* So we give that reasoning and its clear implications substantial weight.

In any event, *Maddox*'s application of the "shocks the conscience" standard is binding. As the Dissent recognizes, *Maddox* held "that it was not clearly established that Stephens's conduct . . . was conscience shocking." Diss. at 37. If Maddox didn't need to prevail under the "shocks the conscience" standard, then we couldn't have awarded Stephens qualified immunity on the ground that we did. In other words, if Maddox could have prevailed by proving only that the defendants violated a fundamental right under clearly established law, then our conclusion that the law did not clearly establish that Stephens's conduct was conscience shocking would have been irrelevant—the "shocks the conscience" standard wouldn't have been an element of Maddox's claim. But we held that the "shocks the conscience" standard applied to Maddox's parental-rights claim. *Maddox*, 727 F.3d at 1119. So we applied the standard and concluded he couldn't prove that

element under clearly established law. Our application of the
"shocks the conscience" standard was therefore necessary to our
holding in *Maddox*, and it binds us here as prior precedent. *See
Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998).

>   B. *The Littlejohns challenge executive, not legislative, ac-
>   tion, so the "shocks the conscience" standard applies.*

We must decide, then, whether the Littlejohns challenge
"legislative" or "executive" action. We begin by defining those
terms. "Executive acts characteristically apply to a limited number
of persons" and "typically arise from the ministerial or administra-
tive activities of members of the executive branch." *McKinney*, 20
F.3d at 1557 n.9. "Legislative acts, on the other hand, generally ap-
ply to a larger segment of—if not all of—society; laws and broad-
ranging executive regulations are the most common examples." *Id.*
For example, a school board rule of general applicability is "legis-
lative" action. *See Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194,
198 (1979) (per curiam). But an "administrative decision" that "af-
fects only a limited class of persons" is a "textbook 'executive act.'"
*Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005).

Defendants' actions with respect to the Littlejohns' child
were "executive." The Littlejohns challenge Defendants' "deci-
sion" to create a Student Support Plan for their child and permit
the child to socially transition at school, an action that "affect[ed]
only a limited class of persons." *See id.* Put differently, the Lit-
tlejohns challenge Defendants' application of the Guide to their
child. That is, they challenge Defendants' individualized action

consistent with the Guide's general directives.  That is "executive" action.  *See Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir. 1991) ("A legislative act involves policy-making rather than mere administrative application of existing policies.").

To be sure, the Guide itself is arguably "legislative," as it was a "broad-ranging" policy that "generally appl[ied] to a larger segment of . . . society," the Leon County School District.  *See McKinney*, 20 F.3d at 1557 n.9.  But the Littlejohns waived any general challenge to the Guide (or its adoption and broad implementation). In their opposition to Defendants' motion to dismiss, the Littlejohns asserted that "Defendants' course of conduct, not the contents of the 2018 Guide," was the "focus of [their] action."  We cannot revive this waived issue.  *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc).  In any event, the district court found that the adoption of the 2022 Guide mooted any challenge to the 2018 Guide, a determination that the Littlejohns do not challenge on appeal.  So all that remains is the Littlejohns' challenge to "textbook 'executive act[s].'"[8]  *See Brown*, 409 F.3d at 1273;

---

[8] We reach a different conclusion than the First Circuit recently did when it determined a similar school-gender-identity policy was legislative action. *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 346–47 (1st Cir. 2025).  We do so for two reasons.  First, the Littlejohns litigated the case differently than did the plaintiffs in *Foote*.  As we discuss above, the Littlejohns waived their general challenges to the Guide, its adoption, and its broad implementation.  By contrast, in *Foote*, the Protocol was itself the "chief target of the Parents' complaint."  *Id.* at 347.  The focus of the parents' challenge in *Foote* was a more characteristically legislative act—a general policy and its routine

*C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 385, 387 (11th Cir. 1996) (holding the suspension of students under an existing school policy was executive action).

And *Maddox* made clear that even when a plaintiff alleges violations of her fundamental parental rights, executive action must "shock the conscience" to violate due process. *See Maddox*, 727 F.3d at 1119. In *Maddox*, the parental-rights interest was at its apex—a state official removed a child from her mother's custody. *See id.* at 1113. Yet we applied the "shock the conscience" standard all the same. *See id.* at 1119. And several of our sister circuits have done so as well. *See, e.g.*, *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (applying the "shocks the conscience" standard even when the plaintiff alleged interference with fundamental parental rights); *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (same); *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 816 (8th Cir. 2011) (same); *Siefert v. Hamilton County*, 951 F.3d 753, 766 (6th Cir. 2020) (same); *Miller*

---

applications—not, as we see it here, a more characteristically executive act—the specific application of a general policy to one person. Second, our precedent does not appear to take as narrow a view of executive action as does the First Circuit. The First Circuit indicated that executive conduct is typically associated with "instant judgment." *Id.* By contrast, we've considered executive action the application of a broad rule to "only a limited class of persons," like the enforcement of zoning regulations. *Brown*, 409 F.3d at 1273–74. To be sure, we've explained that similar regulations or policies may be legislative acts themselves, *see Crymes*, 923 F.2d at 1485–86, and plaintiffs could surely style their complaints to challenge them as legislative action. But the Littlejohns didn't do that here; they challenged the "application of existing policies" to their child. *Id.* at 1485. And that, we've held, is the hallmark of executive action.

*v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999) (same); *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) (same), *cert. denied sub nom.*, *Goe v. McDonald*, 143 S. Ct. 1020 (2023).

We must follow our precedent here. *See, e.g., United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("Under [the prior panel precedent rule], a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.").

### C. Defendants' actions did not "shock the conscience."

So we must now determine whether Defendants' actions "shocked the conscience." They did not.

As the Supreme Court has clarified, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Sacramento*, 523 U.S. at 849. And "[o]nly the most egregious conduct" meets this standard. *Waldman*, 871 F.3d at 1292.

We begin once again with *Maddox*. We decided *Maddox* on qualified-immunity grounds, finding that the plaintiff had not "cited any case that would make it clear to a reasonable social worker at the time that her actions were arbitrary or conscience shocking." 727 F.3d at 1126. So we did not decide whether the social worker's conduct "shocked the conscience" and thus violated the plaintiff's substantive-due-process rights. *See id.* at 1127 n.19.

Because *Maddox* did not perform the "shocks the conscience" analysis, it does not resolve the Littlejohns' claims.

So we look to other precedent applying the "shocks the conscience" test in the educational context for guidance. True, these cases did not involve interference with parental due-process rights, like the Littlejohns allege. But their analysis of the "shocks the conscience" test remains instructive.

For example, we found that corporal punishment with a metal weight lock, which ultimately blinded a student in one eye, was "arbitrary" and "conscience-shocking." *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1075–77 (11th Cir. 2000). We reasoned that a school official violated a student's substantive-due-process rights if "(1) [he] intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Id.* at 1075. That test, we reasoned, contemplates "egregious official abuse of force." *Id.* at 1076. And we extended *Neal*'s framework to a case where a school principal "struck [a student] with a metal cane in the head, ribs and back," finding that the principal was not entitled to qualified immunity. *Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903, 904 (11th Cir. 2003).

But, since *Neal*, we have repeatedly rejected claims of "conscience-shocking" conduct in educational settings. In *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (per curiam), the defendant "slammed" a door in the plaintiff's face, "violently swung the door," and "shoved [the plaintiff's] face." Even though

the defendant was arrested for criminal battery, we concluded that the defendant's conduct did not "shock[] the conscience" beyond the commission of a state-law tort. *Id.* at 1047–48.

Nor did we find a substantive-due-process violation when a student died from electric shock after touching a live wire during a class demonstration. *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1374–75 (11th Cir. 2002). The plaintiffs, the deceased student's parents, argued that school officials "were particularly arbitrary, reckless, and deliberately indifferent" in allowing the demonstration to occur. *Id.* at 1376. But we concluded that, under our case law, the plaintiffs' "allegations of 'deliberate indifference'" did not "'shock the conscience' in a way that gives rise to a due-process violation." *Id.* at 1378.

We extended *Nix*'s reasoning in another case concerning a student's death, this time following an "intense" football practice. *See Davis v. Carter*, 555 F.3d 979, 980 (11th Cir. 2009). The plaintiffs, the deceased student's parents, alleged that the football coaches failed to provide enough water, ignored the student's complaints that he was dehydrated, subjected the student to "rigorous conditioning drills," and failed to attend to the student even after he collapsed. *Id.* at 980–81. We found that the football coaches were entitled to qualified immunity because their conduct did not "rise to the conscience-shocking level." *Id.* at 984. Though the coaches may have been "deliberately indifferent to the safety risks posed by their conduct," we said, they did not "act[] willfully or maliciously with an intent to injure," so they did not violate the student's

constitutional rights. *Id.* Rather, the plaintiffs' claims were "properly confined to the realm of torts." *Id.*

Taken together, *Nix* and *Davis* impose a high bar: even where a student *dies*, school officials' behavior does not "shock the conscience" if it is no more than reckless or deliberately indifferent. *See id.*; *cf. also L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1331 (11th Cir. 2020) (expressing "doubt that deliberate indifference can ever be 'arbitrary' or 'conscience shocking' in a non-custodial setting"). Rather, something more is required, like "malicious[]" conduct, *see Davis*, 555 F.3d at 984, or "obviously excessive" force, *see Neal*, 229 F.3d at 1076. We do not have to fix the precise height of that bar to conclude that the Littlejohns' allegations do not clear it.

Comparing the facts here to those in our cases above, we cannot conclude that Defendants' actions with respect to the Littlejohns' child "shocked the conscience." The child was not physically harmed, much less permanently so. *Contra Neal*, 229 F.3d at 1071; *Kirkland*, 347 F.3d at 904; *Dacosta*, 304 F.3d at 1047; *Nix*, 311 F.3d at 1375; *Davis*, 555 F.3d at 980–81.[9] Defendants did not remove the Littlejohns' child from their custody. *Contra Maddox*, 727 F.3d at 1113. And Defendants did not force the child to attend a Student Support Plan meeting, to not invite the Littlejohns to that meeting, or to socially transition at school. In fact, Defendants did not force the Littlejohns' child to do anything at all. *Cf. Sacramento*, 523 U.S.

---

[9] We do not suggest that only physical harm can support a substantive-due-process violation. We offer this list only as illustrative (not exhaustive) examples drawn from our precedent.

at 855. And perhaps most importantly, Defendants did not act with intent to injure. To the contrary, they sought to help the child. Under these circumstances, even if the Littlejohns felt that Defendants' efforts to help their child were misguided or wrong, the mere fact that the school officials acted contrary to the Littlejohns' wishes does not mean that their conduct "shocks the conscience" in a constitutional sense.

Finally, we are not persuaded by the Littlejohns' attempts to distinguish *Sacramento* and its framework because this case does not involve "exigent circumstances" or "split-second life or death decisions." We agree, of course, that whether government action "shocks the conscience" depends on context. But the context does not change the applicable legal framework. After all, *Sacramento* is clear that its framework applies to *all* substantive-due-process cases that involve executive action. *See Sacramento*, 523 U.S. at 847 ("[T]he substantive component of the Due Process Clause is violated by executive action *only* when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" (emphasis added) (citation omitted)); *see also id*. at 847 n.8 (explaining that "executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims").

Not only that, but we have applied *Sacramento*'s framework in cases that did not concern "split-second" or law-enforcement decisions—most relevantly, *Maddox*. We reject the Littlejohns' efforts to cabin *Sacramento* and reiterate that the "shocks the conscience"

test is appropriate for *all* substantive-due-process challenges to ex-ecutive action.

Because the Littlejohns failed to state a claim that Defend-ants' (executive) actions "shocked the conscience," the district court properly granted Defendants' motion to dismiss.[10]

## IV.    CONCLUSION

For the reasons we've discussed, we affirm the district court's grant of Defendants' motion to dismiss.

**AFFIRMED.**

---

[10] Because we find that the Littlejohns' complaint fails to state a claim on the merits, we do not reach the individual Defendants' alternative argument that they are entitled to qualified immunity.

Rosenbaum, Circuit Judge, concurring:

Judge Newsom's concurrence today marks at least the fourth time he's lamented substantive due process in one of his opinions. And although his opinion today complains specifically about substantive-due-process doctrine as it applies to "executive" state action,[1] the first paragraph of Judge Newsom's concurrence takes issue with substantive due process even as we apply it to "legislative" state action. I haven't previously had a chance to respond to Judge Newsom's concerns about substantive due process,[2] but given that he's raised the issue repeatedly, I did not think I could forego answering here.

Judge Newsom has long said he's "for ditching substantive due process altogether and exploring" what he thinks is a more "promising" and "principled" vehicle "for protecting individual

---

[1] To be clear, I don't write to address Judge Newsom's critiques of how we've distinguished between substantive-due-process challenges to "legislative" and "executive" state action or of the "shocks the conscience" test that we apply to challenges to executive action. Newsom Op. at 3–18. Rather, I address only what we generally think of when we speak of substantive due process: substantive-due-process challenges to "legislative" state action—which do not employ the "shocks the conscience" test. That I don't address "executive" substantive-due-process claims and the "shocks the conscience" test is neither an endorsement of nor objection to these frameworks. It's just that, in light of the critical mass of Judge Newsom's attacks on substantive-due-process challenges to "legislative" state action, I feel my focus here needs to be on that (and in any case, this concurring opinion is already quite long doing just that).

[2] I was on the en banc Court in *Sosa v. Martin County*, one of Judge Newsom's previous outings with substantive due process. But there, I needed to use my dissent to explain why the Majority Opinion was incorrect.

rights against state interference"—the Fourteenth Amendment's Privileges or Immunities Clause. *See Sosa v. Martin County*, 57 F.4th 1297, 1307 (11th Cir.) (en banc) (Newsom J., concurring) (citing Kevin Newsom, *Setting Incorporationism Straight: A Reinterpretation of the* Slaughter-House Cases, 109 Yale L.J. 643, 658–87 (2000)), *cert. denied*, 144 S. Ct. 88 (2023). In Judge Newsom's view, substantive due process "loos[es] judges to foist their policy preferences on society." Newsom Op. at 3.

No doubt a serious charge. But respectfully, I disagree with Judge Newsom's conclusion. So before Judge Newsom leaves substantive due process for constitutional roadkill, I have a few thoughts.

Let's start where we agree. We agree that the Constitution protects certain unenumerated rights. *See*, *e.g.*, U.S. Const. amend. XIV, § 1. It is beyond dispute that our Founders intended even broad provisions, like the Due Process Clause or the Privileges or Immunities Clause, to constrain government. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

But we disagree about the precise meaning of those words and the doctrine we can pull from them. To put it another way, we disagree about the methodology by which we should identify and enforce fundamental rights.

Under current doctrine, which we home in the Due Process Clause, fundamental rights are those that are deeply rooted in our Nation's history and tradition and implicit in our concept of ordered liberty. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Think marriage, which has always been "the foundation of the family and of society." *Maynard v. Hill*, 125 U.S. 190, 211 (1888).

For his part, Judge Newsom would prefer to make our fundamental-rights jurisprudence anew under the Privileges or Immunities Clause. But to my knowledge, Judge Newsom hasn't yet shared how his view of the privileges-or-immunities doctrine will work. Still, he has left open the possibility that the Privileges or Immunities Clause could accommodate some of the individual liberties our current doctrine secures. *See, e.g.*, *Sosa*, 57 F.4th at 1307 (Newsom J., concurring); Newsom, *Incorporationism*, *supra*, at 736 n.450 (reserving "for another day whether the Court's privacy decisions . . . might find support in a resurrected Privileges or Immunities Clause" (cleaned up)).

So what's the difference, a reader might wonder. Given his charge that substantive-due-process doctrine "loos[es] judges to foist their policy preferences on society" because "it's so untethered from traditional interpretive sources," Newsom Op. at 3, a reader might think that the guardrails on substantive due process are substantially weaker than those on any framework under the Privileges or Immunities Clause.

Not so. *See infra* Section III.A. No matter whether we travel under substantive-due-process doctrine, the Privileges or Immunities Clause, or even certain enumerated-rights amendments, the first leg of our journey generally requires us to determine whether the claimed right is a fundamental one. And in each case, we must

employ all the usual tools, like the Constitution's structure, its history, and our traditions to assess that. We also consider precedent.

Take the Privileges or Immunities Clause. The text doesn't tell us what our predecessors understood a "privilege" or "immunity" to be. Or consider the First Amendment. True, we know the Constitution protects "the freedom of speech." U.S. CONST. amend. I. But we can't tell from the text alone, for instance, whether the provision protects those who burn American flags. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). So we resort to our usual means of interpreting the Constitution—history, tradition, structure, and precedent—to fill in the gaps. And we do the same thing when we conduct a substantive-due-process analysis.

That brings us to the second step of a fundamental-rights analysis. To my knowledge, Judge Newsom hasn't yet shared how that would work under his view of the Privileges or Immunities Clause. So I'll assume the second step would work in one of two ways.

One the one hand, the second step may adopt a tiers-of-scrutiny approach, as the Supreme Court did when it applied the Privileges or Immunities Clause in *Saenz v. Roe*, 526 U.S. 489 (1999). There, the Supreme Court said that we evaluate the constitutionality of a law that burdens a fundamental right by subjecting it to at least strict scrutiny. *Id.* at 504. That means we ask whether the law is narrowly drawn to further a compelling government interest, and if it isn't, the law doesn't survive. If, on the other hand, the first step of our analysis reveals the claimed right isn't fundamental,

then *Saenz* seems to suggest we apply rational-basis scrutiny, meaning the law stands if we can conceive of a rational basis for it.

But guess what:  At the second step of the substantive-due-process framework, we also apply these same tiers of scrutiny based on whether a right is fundamental or not.  So again, no difference!

On the other hand, the second step of analysis could follow the historical approach the Court has employed in some recent constitutional cases—think the Second Amendment, for instance. If so, we'd look for "relevantly similar" historical analogues for the challenged law.  But when we do that, the level of generality at which we define the relevant regulatory tradition that has governed the asserted right can determine whether we will find a "relevantly similar" historical analogue and thus whether the law stands or falls.  That determination—the level of generality at which we define the relevant regulatory tradition—is not a binary one.  So by its nature, it allows judges substantial discretion.  Indeed, some might say more than do the tiers of scrutiny.

Yes, it would be great if the Constitution gave us indisputably clear direction for every question, but it doesn't.  No document could.  But that doesn't mean that the Constitution's intent to protect unenumerated fundamental rights is not clear.  It is.  Indeed, it's beyond dispute that the Constitution protects unenumerated fundamental rights: the Ninth Amendment's text says so; the historical record unambiguously reveals the Founders' intent to protect unenumerated fundamental rights; the Framers of the

Fourteenth Amendment saw the Fourteenth Amendment as protecting unenumerated fundamental rights; and the source of that protection is clearly in Section One of the Fourteenth Amendment—whether under the Due Process Clause or the Privileges or Immunities Clause, or even some combination of the two.

Plus, as I've just summarized, the tests we apply to protect those rights under either substantive-due-process doctrine or the Privileges or Immunities Clause require us to engage in essentially the same analysis. And for literally years now, the Supreme Court (and the lower courts following suit) has applied substantive-due-process doctrine to consider challenges to claimed unenumerated fundamental rights.

In short, applied properly and faithfully, substantive due process does not allow judges to "foist their policy preferences on society" any more than we may when we construe constitutional rights under other parts of the Constitution—whether under enumerated-rights provisions or the Privileges or Immunities Clause.

This opinion proceeds in three parts. But as a heads up, that doesn't mean it's brief. Before I can address the charge that substantive due process is the *modus operandi* of judicial activism, I must first lay some foundation.

Towards that end, Section I starts with Judge Newsom's argument that substantive due process is "unmoored from history." Newsom Op. at 2. It shows that our Founders always intended and the people always understood that our constitutions, both federal and state, preserved to the people fundamental yet unenumerated

rights. This history lays the groundwork for our understanding of what makes an unenumerated right fundamental.

Section II then compares modern substantive-due-process doctrine to those historical principles. It explains that today's jurisprudence largely adheres to the understanding that the Founders and the drafters of the Fourteenth Amendment held about the process by which courts identify unenumerated rights and about the substance of those rights. Far from dismissing "traditional interpretive sources," *id.* at 3, substantive-due-process precedent requires that we employ them.

And in Section III, I'll address head on the assertion that, "[i]f ever there were a doctrine that gave a veneer of truth to the vicious lie that judges just decide cases in accordance with their priors, it's substantive due process." *Id.* Section III responds to Judge Newsom's suggestion, as well as his pulling of substantive due process's fire alarms—*Dred Scott* and *Lochner*—as reasons to abandon the doctrine. And it shows that neither *Dred Scott* nor *Lochner* (as erroneous and, in *Dred Scott*'s case, abhorrent as they were) validate the charge that substantive due process is rotten at its core any more than *Plessy v. Ferguson*'s separate-but-equal abomination proves the Equal Protection Clause is fatally defective.

## I.    The Constitution protects and Founding Era and Reconstitution Era Americans intended for courts to enforce unenumerated fundamental rights.

Our Constitution rests on a bargain (the "social contract"). Each of this country's citizens sacrifices some of their freedom to

form a government that provides for the common defense, promotes the general welfare, and secures the blessings of liberty. U.S. CONST. pmbl. But we don't relinquish all our rights. Some, after all, are "unalienable."[3] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). The Framers listed some of those preexisting privileges in the Constitution's first eight Amendments. Still, at no point did they intend, or did our country's citizens understand, the enumeration of some rights to deny or disparage other limitations on governmental authority. Indeed, the Ninth Amendment could not say so any more clearly. Americans always understood that courts would enforce individuals' retained rights and would check acts not within the state and federal governments' powers.

This understanding of how state and federal constitutions secure our fundamental rights animated the drafters of the Fourteenth Amendment's Section One, which, among other things, precludes states from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of the citizens of the United States" or "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The lead-

---

[3] Nowadays, we more commonly use the term "inalienable." But "unalienable" and "inalienable" mean the same thing. *See Unalienable*, BLACK'S LAW DICTIONARY (12th ed. 2024) (stating as the only definition for the term, "See inalienable"); *Unalienable*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/unalienable_adj (last visited October 24, 2024) [https://perma.cc/KMF8-STLN]. To conform to modern preference, this opinion uses the term "inalienable" except when quoting sources that use the term "unalienable."

up to and aftermath of the Civil War made clear that the states had not adequately secured fundamental rights for some within their borders—namely, Black Americans.  So the Fourteenth Amendment enabled the federal government, including its courts, to enforce those rights.

This Section details that history.  It first recounts Americans' view of unenumerated, fundamental rights at the Founding.  Then, it discusses fundamental-rights jurisprudence during the Antebellum period.  And last, it shows how Americans during Reconstruction adopted the Fourteenth Amendment to ensure the federal government could secure Americans' unenumerated, fundamental rights.  This history lays the groundwork for understanding how modern substantive due process accords with our predecessor's understanding of what makes an unenumerated right fundamental.

A.    *When Americans ratified the Constitution, they understood that courts would secure Americans' unenumerated, fundamental rights.*

We the people are sovereign in these United States.  Through the state and federal constitutions, we cede some of our natural freedoms in exchange for an elected government that acts for the common good.  *See generally* JOHN LOCKE, TWO TREATISES OF GOVERNMENT (1689); *see* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).  To the states, we grant broad police powers to regulate the public health, safety, and welfare.  *See, e.g.*, *Munn v. Illinois*, 94 US. 113, 124 (1876); *Jacobson v. Massachusetts*, 197 US. 11, 27 (1905).  And to the federal government, we grant a set of

"enumerated powers." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). But those grants of authority are not absolute. From both, we retain a set of fundamental rights the government cannot infringe.

The Framers found this proposition unremarkable. "In large part, the notion that Americans enjoyed a common set of basic rights was an engrained assumption that needed no explanation." Jud Campbell, *General Citizenship Rights*, 132 Yale L.J. 611, 634 (2023).[4] The "fundamental principles of civil and religious liberty" formed "the basis whereon these republics, their laws and

---

[4] These limitations on government generally fall into two buckets: inalienable natural rights and common-law rights. *See* Baude, Campbell & Sachs, *infra*, at 1196–98. The first are "unceded portions of right," such as the "freedom of religion," Letter from Thomas Jefferson to Noah Webster, Jr. (Dec. 4, 1790), *in* 18 The Papers of Thomas Jefferson 131, 132 (Julian P. Boyd ed., 1971) [hereinafter Jefferson to Webster], the sanctity of the family, *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion), or the right to marry, *Obergefell v. Hodges*, 576 U.S. 644, 669 (2015), that Americans did not grant to the government through the social contract. The second, Jefferson explained, are "certain fences which experience has proved peculiarly efficacious against wrong," such as "trial by jury, Habeas corpus laws, free presses." Jefferson to Webster, *supra*, at 132. In other words, the second bucket includes rights that developed through the common law or that the colonies' experiences with Britain proved necessary. *See United States v. Williams*, 113 F.4th 637, 649 n.5 (6th Cir. 2024) (citing 2 Documentary History of the Constitution of the United States of America 321 (Washington: Department of State, 1894)) (referring to the Third Amendment as a "restrictive" provision). Americans generally cede their remaining liberties, such as the right to contract or acquire and possess property, "to be regulated, modified, and, sometimes, absolutely restrained" by the government for the public good. *Ogden v. Saunders*, 25 U.S. 213, 320 (1827) (opinion of Trimble, J.).

constitutions are erected." The Northwest Ordinance, Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51 n.a. So "the power to violate and disregard" these rights did not "lurk[] under any general grant of legislative authority" or "general expressions of the will of the people." *Wilkinson v. Leland*, 27 U.S. (2 Pet.) 627, 657 (1829).

The Framers expressly articulated some (though not all) of these fundamental rights in the Bill of Rights. Indeed, "there was broader agreement that Americans enjoyed certain *fundamental* legal rights with determinate legal content." William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 STAN. L. REV. 1185, 1199 (2024). After all, the Bill of Rights was "not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897).

The "right of the people peaceably to assemble," for instance, "existed long before the adoption of the Constitution of the United States"; it "is, and always has been, one of the attributes of citizenship under a free government" that "'derives its source' . . . from those laws whose authority is acknowledged by civilized man throughout the world." *United States v. Cruikshank*, 92 U.S. 542, 551 (1875) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211 (1824)); *see also District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) ("[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right."); *Crawford v. Washington*, 541 U.S. 36, 54 (2004) (concluding the Sixth Amendment's

Confrontation Clause referenced "the right of confrontation at common law").[5]

The debate between the Federalists and Anti-Federalists over the first ten amendments illustrates this point that the Framers understood the Constitution to protect these rights that pre-existed it—whether the Constitution expressly named them or not. Anti-Federalists pushed for a Bill of Rights because they believed the Necessary and Proper Clause risked granting Congress too much power. *See Brutus No. 2* (1787), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 372, 374 (Hebert J. Storing, ed., Univ. Chi. Press 1981) (suggesting the federal government's power is "complete, with respect to every object to which they extend"). The Federalists offered two responses.

First, echoing the inherent limitations on government that Americans inherited from the English common law, the Federalists argued that "a bill of rights is not necessary." 1 ANNALS OF CONG. 456 (1789) (Joseph Gales ed., 1834) (remarks of Rep. James Madison). That was so, they reasoned, because a bill of rights would be a mere "declaration of rights" in which the people were already "secure," "whether" a bill of rights "declare[d] them or not." *Id.* at

---

[5] The Framers also saw Article 1, Section 10, as articulating preexisting limitations on legislative authority. *See* THE FEDERALIST No. 44 (James Madison) ("Bills of attainder, ex-post-facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation.").

742 (remarks of Rep. Roger Sherman).[6]   In fact, Federalists like Noah Webster "spoofed Anti-Federalists" who attempted to list the several rights they misperceived the new federal government to now be able to abrogate.   AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION: THE PRECEDENTS AND PRINCIPLES WE LIVE BY 124 (2012).   For instance, Webster proposed a mocking amendment that "Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times . . . ." *Id.*

And second, the Federalists argued that enumerating certain rights "would disparage those rights which were not placed in that enumeration."   1 ANNALS OF CONG. 456 (1789) (Joseph Gales ed., 1834) (remarks of Rep. James Madison); AMAR, AMERICA'S UNWRITTEN CONSTITUTION, *supra*, at 125.   To some, the risks

---

[6] Remarks like these were common. *See, e.g.,* 2 DEBATES ON THE ADOPTION OF THE FEDERAL CONSTITUTION 161–62 (Jonathan Elliot ed., 2d ed., Philadelphia, J.B. Lippincott 1891) (remarks of Theophilus Parsons) ("[N]o power was given to Congress to infringe on any one of the natural rights of the people by this Constitution; and should they attempt it without constitutional authority, the act would be a nullity, and could not be enforced."); Letter from Pierce Butler to James Iredell (Aug. 11, 1789) ("A few milk-and-water amendments have been proposed by Mr. M[adison], such as liberty of conscience, a free press, and one or two general things already well secured."), *reprinted in* DAVID K. WATSON, THE CONSTITUTION OF THE UNITED STATES: ITS HISTORY, APPLICATION AND CONSTRUCTION 1368 n.21 (1910); Virginia Ratification Convention Debates (June 16, 1788) (remarks of George Nicholas) ("A Bill of Rights is only an acknowledgement of the pre-existing claim to rights in the people.   They belong to us as much as if they had been inserted in the Constitution."), *reprinted in* 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1334 (John P. Kaminski et al. eds., 1993).

enumeration posed were particularly stark because enumeration could foreclose "the progress of things," in which we may "discover some great and Important" right that "we don't now think of." Letter from Edmund Pendleton to Richard Henry Lee (June 14, 1788), *in* 8 THE LETTERS AND PAPERS OF EDMUND PENDLETON 532, 532–33 (David John Mays ed., 1967).

Both responses reflected the Framers' intuitions that enumeration wasn't necessary to preserve Americans' fundamental rights. And the Federalists' second concern emphasized that enumeration might even endanger, rather than secure, fundamental rights.

Still, ultimately, the Federalists agreed to append a Bill of Rights to the Constitution, in part, to appease the Anti-Federalists. *See, e.g.*, Letter from George Washington to James Madison (May 31, 1789), *reprinted in* 2 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES 419, 419 (Dorothy Twohig ed., 1987). Madison recognized some of the Anti-Federalists' concerns. Although he acknowledged the "force" of the Federalists' first "observation" that a Bill of Rights is not necessary, Madison underscored the practical, "salutary effect against the abuse of power" that enumeration might provide.[7]  1 ANNALS OF CONG. 456–57 (1789) (Joseph Gales ed., 1834) (remarks of Rep. James Madison).

_____

[7] Madison argued that enumeration would guard against overzealous governing in all its forms. Enumeration, he said, would "establish the public opinion in . . . favor" of Americans' rights and "rouse the attention of the whole

Even so, as to the Federalists' second concern that a declaration of some rights might undermine rights that base principles of the social contract and English common law secured, Madison considered it "one of the most plausible arguments" in opposition to the Bill. *Id.* at 456. So the people ratified another amendment to ensure that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. amend. IX.

The Ninth Amendment confirmed what Americans already understood: "[t]he people were entitled to various preexisting and customary rights already in place at the Founding" as well as rights the people inherently "withheld from the government . . . when government was established." *See* AMAR, AMERICA'S UNWRITTEN CONSTITUTION, *supra*, at 108–09 (confirming the Ninth Amendment protects rights that people inherently "withheld from the government . . . when government was established," which may

---

community," helping to "control the majority from those acts to which they might be otherwise inclined." 1 ANNALS OF CONG. 455 (1789) (Joseph Gales ed., 1834) (remarks of Rep. James Madison). And, he continued, enumeration would "impress some degree of respect for [individual liberties]," especially among legislators who occupied "the most powerful" branch of government. *Id.* at 454–55. Plus, Madison remarked, a declaration of rights could spur the judiciary "to consider themselves in a peculiar manner the guardians of those rights." *Id.* at 457. In this way, the judiciary could overcome its "natural feebleness" and "continual jeopardy of being overpowered, awed, or influenced by [the] co-ordinate branches." THE FEDERALIST NO. 78 (Alexander Hamilton). In sum, Madison found persuasive the realist and political, rather than the legal, justifications for enumeration. Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 571 (2017).

still "emerge[] long after the Founding" through "practice[] by each generation of Americans"); *see also Griswold v. Connecticut*, 381 U.S. 479, 490 (1965) (Goldberg, J., concurring) ("[T]he Framers did not intend that the first eight amendments be construed to exhaust the basic and fundamental rights which the Constitution guaranteed to the people."). And that was so whether the Constitution expressly enumerated those fundamental rights or not.

B.    *Throughout the Antebellum period, courts secured Americans' unenumerated, fundamental rights.*

As the Founders intended, Antebellum courts routinely enforced Americans' fundamental rights. And both state and federal courts did so even when the pertinent constitution didn't have a textual hook explicitly guaranteeing the right at issue.

1.    State courts routinely enforced unenumerated rights against state abridgment.

State courts commonly enforced fundamental rights. And they did so even though, as the Supreme Court held in *Barron v. Baltimore*, 32 U.S. 243, 250–51 (1833), before the ratification of the Fourteenth Amendment, the Bill of Rights did not bind them. State courts also enforced fundamental rights even though state constitutions did not include all the rights that the federal Constitution's first eight amendments listed. These so-called "*Barron* contrarian" state courts regularly enforced the Bill of Rights's limitations in their state.

But they did so not because they disagreed with *Barron* and thought the amendments bound "the states of [their] own

legislative force" (though some did so believe). Rather, they enforced the Bill of Rights's limitations because they saw the amendments as "declaratory of certain fundamental common-law rights" owed to any citizen of a free society. AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 147, 153 (1998); Baude, Campbell & Sachs, *supra*, at 1200 & n.85.

Consider *Nunn v. Georgia*, 1 Ga. 243 (1846). There, the Georgia Supreme Court enforced a citizen's right to bear arms for self-defense even though the adjudication was not "made on clauses in the State Constitution[]." *Id.* at 249. The court dismissed the right's unenumerated status as immaterial because the Second Amendment codified "an unalienable right, which lies at the bottom of every free government," and the people could not have "intended to confer" the power to abridge it "on the local legislatures." *Id.* at 250. *Nunn* then confirmed that other fundamental rights, like the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; in all criminal prosecutions, to be confronted with the witness against them; to be publicly tried by an impartial jury; and to have the assistance of counsel for their defence," were *"as perfect under the State as the national legislature"*; they *"cannot be violated by either."* *Id.* at 251 (emphasis in original).

Many courts treated the Takings Clause similarly. New Jersey's constitution, for instance, did not provide for a right to compensation when the government confiscated private property.

Yet New Jersey's supreme court rejected the argument that non-enumeration precluded a plaintiff's takings claim. The court explained that the limitation was "operative as a principle of universal law; and the legislature of this State, can no more take private property for public use, without just compensation, than if this restraining principle were incorporated into, and made part of its State Constitution." *Sinnickson v. Johnson*, 17 N.J.L. 129, 146 (1839); *see Young v. McKenzie*, 3 Ga. 31, 44 (1847) (enforcing the rights declared in the Takings Clause because it embodies a "great common law principle . . . applicable to all republican governments, and which derived no additional force, as a *principle*, from being incorporated into the Constitution of the United States"); *Bradshaw v. Rodgers*, 20 Johns. 103, 105–06 (N.Y. Sup. Ct. 1822) (same); *L.C. & C.R.R. Co. v. Chappell*, 24 S.C.L. (Rice) 383, 387, 389 (1838) (same); *Hall v. Washington County*, 2 Greene 473, 478 (Iowa 1850) (same); *State v. Glen*, 52 N.C. (7 Jones) 321, 330–31 (1859) (same).

These examples are not outliers. The force of preexisting, fundamental rights was "widespread" in state courts and "reflective of a serious theory of constitutional government"—even though the Bill of Rights did not, at that time, bind the states. Jason Mazzone, *The Bill of Rights in the Early State Courts*, 92 MINN. L. REV. 1, 26 n.98, 29–31 (2007).

2.     Despite their limited subject-matter jurisdiction, federal courts also enforced unenumerated rights against government abridgment.

And federal courts applied that same thinking to many rights that the Bill of Rights does not expressly declare. Indeed, federal courts acknowledged and enforced unenumerated rights in the Antebellum period, although in limited contexts. At that time, federal courts often lacked jurisdiction over claims that a state denied a citizen's fundamental rights. Exercised against the states, those rights, although fundamental, were not *federal* rights sufficient to trigger federal courts' arising-under jurisdiction, let alone one of the Judiciary Act's limited grants of the Supreme Court's appellate jurisdiction. *Cf. Calder v. Bull*, 3 U.S. (3 Dall.) 386, 392 (1798) (opinion of Chase, J.) ("[T]his court has no jurisdiction to determine that any law of any state Legislature, contrary to the Constitution of such state, is void.").[8] As a result, petitioners could not pursue state violations of their fundamental rights on appeal from state courts to the Supreme Court. *Compare Trs. of Dartmouth Coll. v. Woodward*, 1 N.H. 111, 114 (1817) ("The legislative power of this state . . . is limited only by our constitutions and by the fundamental principles of all government and the unalienable rights of mankind."), *with Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4

_____

[8] Plus, if a state court upheld a fundamental right as a federal right superior to a state's action, the losing party could not appeal its loss to the Supreme Court. *See* Judiciary Act of 1789, ch. 20, § 25, 1 Stat. 73, 86 (codified as amended at 28 U.S.C. § 2104); RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 25 (7th ed. 2015).

Wheat.) 518, 625, 644–54 (1819) (opinion of Marshall, C.J.) (ruling only on the Contracts Clause); *see also* Baude, Campbell & Sachs, *supra*, at 1203 (highlighting the same dynamic in *Barron*).

That said, federal courts did adjudicate fundamental-rights claims in two circumstances. First, plaintiffs could seek redress for violations of their fundamental rights under the Constitution's Privileges and Immunities Clause, U.S. CONST. art. IV, § 2, cl. 1. (not to be confused with the Privileges or Immunities Clause, U.S. CONST. amend. XIV, § 1, which was not ratified until 1868). And second, courts adjudicated fundamental-rights claims when parties invoked diversity jurisdiction. I discuss each circumstance in turn.

As to the first circumstance where federal courts adjudicated fundamental-rights claims, plaintiffs could seek redress for violations of their fundamental rights under the Constitution's Privileges and Immunities Clause. At the Founding, the Framers presumed that a citizen's home state would guarantee to its citizens the base freedoms inherent in our social contract. But the Framers worried that states and their courts might discriminate against out-of-state Americans. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 74 (1938). So they included the Privileges and Immunities Clause to protect citizens' fundamental rights, and they guaranteed a federal forum to secure the enforcement of those rights. *See* THE FEDERALIST No. 80 (Alexander Hamilton) ("[I]n order to the inviolable maintenance of that equality of privileges and immunities to which the citizens of the Union will be entitled, the national judiciary ought to

preside in all cases in which one State or its citizens are opposed to another State or its citizens.").

*Corfield v. Coryell* is the authoritative case on the matter. 6 F. Cas. 546 (C.C.E.D. Pa. 1825) (No. 3,230) (Washington, Circuit Justice). And for our purposes, it both confirms the Founders' understanding of fundamental rights and provides an early template for how courts applied those initial understandings to distinguish fundamental rights from non-fundamental ones.

In *Corfield*, a Pennsylvania citizen claimed that a New Jersey law prohibiting him, as a nonresident, from harvesting oysters in the State violated the Privileges and Immunities Clause because it deprived him of a right New Jersey guaranteed to its own citizens. *Id*. at 551–52. The Court rejected the argument.

The Privileges and Immunities Clause, Justice Washington clarified, protected only "those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign." *Id*. at 551. Among those rights were "[p]rotection by the government; the enjoyment of life and liberty, with the right to

acquire and possess property of every kind, and to pursue and obtain happiness and safety." *Id.* at 551–52.[9]

And under these "general heads" fell many other rights: the right to "pass through, or to reside in any other state, for purposes of . . . professional pursuits"; "to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts"; "to take, hold and dispose of property"; to be "exempt[] from higher taxes or impositions than are paid by the other citizens of the state"; and to participate in "the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised." *Id.* at 552.

But that wasn't all. Justice Washington recognized that protected privileges and immunities included "[t]hese, and many others which might be mentioned." *Id.*

Still, those privileges and immunities did not include oyster harvesting. The oyster beds at issue were peculiar to New Jersey. *Id.* So a right to access them was neither common to all Americans

---

[9] Justice Washington's qualification that these rights are "subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole," *Corfield*, 6 F. Cas. at 552, does not undermine the notion that unenumerated, fundamental rights operate as a limitation on government authority. Rather, Justice Washington's statement comports with the understanding that legislatures could regulate but not abridge people's rights, a distinction that turned, in part, on the subject matter of the purported regulation. *See supra* note 4; *infra* Section II; Baude, Campbell & Sachs, *supra*, at 1196–99, 1237–38. After all, "[n]o fundamental right—not even the First Amendment—is absolute." *McDonald v. City of Chicago*, 561 U.S. 742, 802 (2010) (Scalia, J., concurring).

nor inherent in our system of governance. *See id.* (explaining citizens of the several states are not entitled to participate in rights "which belong exclusively to the citizens of any other particular state"). In fact, history and common-law authorities confirmed that states generally held exclusive rights to certain public resources, like oysters. *Id.* (quoting 2 HUGO GROTIUS, THE RIGHTS OF WAR AND PEACE, ch. 2, § 5). Simply, the right to farm them was one of the "advantages" that states by positive law "secured to their own citizens." *Id.*; *see also Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 387 (1978) ("[W]hen [Justice Washington] considered the reach of the Privileges and Immunities Clause, [he] included in his list of situations, in which he believed the States would be obligated to treat each other's residents equally, only those where a nonresident sought to engage in an essential activity or exercise a basic right.").

I pause to emphasize the distinction Justice Washington made. He interpreted the Privileges and Immunities Clause to protect the "various preexisting and customary rights already in place at the Founding" as well as rights the people "withheld from the government . . . when government was established." AMAR, AMERICA'S UNWRITTEN CONSTITUTION, *supra*, at 108–09 (discussing plausible interpretations of the Ninth Amendment). That is, Justice Washington understood the Privileges and Immunities Clause to protect rights of "general citizenship," *Butler v. Farnsworth*, 4 F. Cas. 902, 903 (C.C.E.D. Pa. 1821) (No. 2,240) (Washington, Circuit Justice), inherent in all "free Republican governments," *Calder*, 3 U.S. (3 Dall.) at 388 (opinion of Chase, J.).

Indeed, many of the *Corfield* rights are not enumerated in the Constitution, but we continue to subject laws that burden them to heightened scrutiny precisely because they concern "fundamental matter[s] in a free and democratic society," *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) (right of suffrage),[10] or issues that are "sufficiently basic to the livelihood of the Nation," *United Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 219, 221 (1984) (quoting *Baldwin*, 436 U.S. at 383) (pursuit of a common calling in the various states).

In contrast, when governments guarantee a claimed right under only some circumstances—such that we can say the right is not truly common to all free governments—we generally defer to regulations of that purported right that require "each citizen to so

---

[10] Justice Washington's mention of voting rights underscores another similarity between Antebellum jurisprudence and our current doctrine. Justice Washington recognized that states may prescribe regulations on rights to suffrage, *Corfield*, 6 F. Cas. at 552; *see* U.S. CONST. art. I, § 2, cl. 1, but posited that the Privileges and Immunities Clause could bar deprivations of the franchise to those otherwise-eligible individuals who moved from another state, *see Abbot v. Bayley*, 23 Mass. 89, 92 (1827). This understanding correlates with modern doctrine's recognition that, although Americans don't have the right to vote for every government office, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966). So for instance, a state would abridge a citizen's fundamental right to vote by imposing unduly restrictive residency requirements on suffrage. *See, e.g., Carrington v. Rash*, 380 U.S. 89, 96 (1965); *Dunn v. Blumstein*, 405 U.S. 330, 360 (1972).

conduct himself . . . as not unnecessarily to injure another." *Munn*, 94 U.S. at 124.

And modern jurisprudence adopts this way of distinguishing between fundamental and non-fundamental rights. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (overturning a conviction for teaching German because "[n]o emergency has arisen which renders knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed"). As Section I.C. of this Concurrence explains, the Fourteenth Amendment's drafters relied heavily on *Corfield*'s conception of fundamental rights in crafting Section One of that amendment. The drafters considered fundamental those rights that people throughout the several states "have, at all times, . . . enjoyed." *Corfield*, 6 F. Cas. at 551. And now, to identify whether a claimed right is fundamental, our current substantive-due-process jurisprudence calls for such an analysis of trends across jurisdictions. So *Corfield* shows that modern fundamental-rights doctrine generally secures those rights our Founders intended for the courts to protect.

Returning to the two circumstances in which courts adjudicated fundamental-rights claims in Antebellum times, the second circumstance occurred when parties invoked diversity jurisdiction. Diversity jurisdiction enabled federal courts to resolve claims on non-federal grounds. So plaintiffs could petition federal courts to review state legislative actions that they thought improperly abridged their fundamental rights. *See* Laurence H. Tribe,

*Substantive Due Process*, *in* 5 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 2570 (Leonard W. Levy & Kenneth L. Karst eds., 2000).

 *Terrett v. Taylor* offers a good example of this. 13 U.S. (9 Cranch) 43 (1815). There, Justice Story denied Virginia's attempt to seize land that Virginia's colonial government had granted to the Episcopal Church. *Id.* at 43, 50–52. Although no state constitutional provision barred Virginia's legislation, the Court struck it down as "utterly inconsistent with a great and fundamental principle of a republican government." *Id.* at 50–51.

 *Terrett*'s resolution and its reasoning mirrored those of the "vested-rights" cases in which the Supreme Court enforced unwritten limitations on states' legislative authority over property. In *Fletcher v. Peck*, for instance, "the unanimous opinion of the court" confirmed that Georgia could not revoke its prior land grants "either by general principles which are common to our free institutions, or by the particular provisions of the constitution of the United States." 10 U.S. (6 Cranch) 87, 139 (1810) (opinion of Marshall, C.J.); *see also id.* at 132 (opinion of Johnson, J.) ("I do not hesitate to declare that a state does not possess the power of revoking its own grants. But I do it on a general principle, on the reason and nature of things . . . .").

 And in *Wilkinson v. Leland*, Justice Story affirmed the principles set forth in *Taylor*. He explained the "fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred," so no legislative

act could "transfer the property of A. to B. without his consent." *Wilkinson*, 27 U.S. (2 Pet.) at 657.  Indeed, "no [such] case . . . has ever been held a constitutional exercise of legislative power in any state in the union."  *Id.*  And that principle has been firmly established by the Court since *Calder v. Bull*.  *See* 3 U.S. (3 Dall.) at 388 (opinion of Chase, J.) ("[A] law that takes property from A. and gives it to B . . . is against all reason and justice, for a people to entrust a Legislature with [such] powers").

To be sure, some contested the reasoning of these decisions. *See id.* at 399 (opinion of Iredell, J.) ("[T]he Court cannot pronounce [a legislative act] to be void, merely because it is, in their judgment, contrary to the principles of natural justice.").  But those views were outliers at the time.  Frederick Mark Gedicks, *An Originalist Defense of Substantive Due Process: Magna Carta, Higher-Law Constitutionalism, and the Fifth Amendment*, 58 EMORY L.J. 585, 651 (2009).  And even those jurists acknowledged that unenumerated rights ought to at least inform their reading of statutes.  *See, e.g., Minge v. Gilmour*, 17 F. Cas. 440, 444 (C.C.D.N.C. 1798) (No. 9,631) (Iredell, Circuit Justice).

Plus, others who disfavored applying unenumerated fundamental rights as a matter of federal law acknowledged their force when a plaintiff invoked the federal courts' diversity jurisdiction. *See, e.g., Citizens' Sav. & Loan Ass'n v. City of Topeka*, 87 U.S. (20 Wall.) 655, 662–63 (1875) (Miller, J.) ("[T]here are such rights in every free government beyond the control of the State. . . .  There are limitations on such power which grow out of the essential

nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name."). So these disagreements stemmed from a perceived lack of federal authority to enforce unenumerated fundamental rights, at least in some cases. But as I discuss later, the Fourteenth Amendment dispelled that misguided perception.

Ultimately, it's unsurprising that each of these vested-rights cases sounds in the unenumerated-rights language state courts employed in enforcing the rights that the Takings Clause embodies.[11] And we can say the same thing about Justice Washington's approach to fundamental rights in *Corfield*; his opinion applies the same principles that drove state courts to apply substantive Bill-of-

---

[11] The fundamental-rights rationale pervaded vested-rights cases in state courts as well. *See, e.g.*, *Regents of the Univ. of Md. v. Williams*, 9 G. & J. 365, 408 (Md. 1838) ("And independently of the constitution of the United States, and of this state, that act is void as opposed to the fundamental principles of right and justice, inherent in the nature and spirit of the social compact."); *White v. White*, 4 How. Pr. 102, 111 (N.Y. Sup. Ct. 1849) ("[T]he security of the citizen against such arbitrary legislation rests upon the broader and more solid ground of natural rights, and is not wholly dependent upon these negatives upon the legislative power contained in the constitution. . . . The exercise of such a power is incompatible with the nature and objects of all governments, and is destructive to the great end and aim for which government is instituted, and is subversive of the fundamental principles upon which all free governments are organized."); *Currie's Adm'rs v. Mut. Assur. Soc'y*, 14 Va. (4 Hen. & M.) 315, 438–39 (1809) ("[The] legislature is bounded . . . by the principles and provisions of the constitution and bill of rights, and by those great rights and principles, for the preservation of which all just governments are founded.").

Rights protections. These cases reflect the dominant jurisprudence of the Antebellum period: Both state and federal courts, when confronted with alleged abridgments of fundamental rights, considered whether the claimed state action burdened a liberty interest that our system of government inherently protects. Both sets of courts asked whether the people implicitly withheld the claimed right at the formation of government, whether the right was common to Americans across the several states, and whether it had been historically subject to government regulation or abridgment.

If these considerations sound familiar, it's because they are. As I discuss further in Section II, they are essentially the same inquiries we conduct under modern substantive-due-process doctrine.

The key distinction between our modern jurisprudence and that of the Antebellum period is that, during the Antebellum period, the federal government did not enjoy the same authority it later gained to guarantee Americans' fundamental rights. But as the next section shows, the drafters of the Fourteenth Amendment expanded that authority.

C. *Americans ratified the Fourteenth Amendment to ensure the federal government, including its courts, would secure unenumerated fundamental rights against state abridgment.*

The drafters of the Fourteenth Amendment intended to make more readily available federal enforcement of Americans' fundamental rights. As I've mentioned, until that time, the Constitution and Bill of Rights generally did not open federal courts to

fundamental-rights claims.  "Under Article IV's Privileges and Immunities Clause, *Corfield* rights were enforceable only by out-of-state citizens," and "under *Barron*, the rights set out in the first eight amendments were enforceable only against the federal government.  Congress thus lacked broader power to secure general fundamental rights against state abridgment."  Baude, Campbell & Sachs, *supra*, at 1218; *see* CONG. GLOBE, 39th Cong., 1st Sess. 2765 (1866) (statement of Sen. Jacob Howard).  Of course, that was a feature of the Framers' constitutional design; the Framers assumed states would secure their citizens' fundamental rights.

But by the Civil War, practice had proven that wasn't necessarily the case.  So although the Constitution and Bill of Rights declared some of the fundamental rights guaranteed to the people, individuals could not depend on an ability to enforce those rights.  As Representative John Bingham, the main drafter of the Fourteenth Amendment, summarized,

> No State *ever* had the right, under the forms of law or otherwise, to deny to any freeman the equal protection of the laws or to abridge the privileges or immunities of any citizen of the Republic, *although many of them have assumed and exercised the power, and that without remedy.*

CONG. GLOBE, 39th Cong., 1st Sess. 2542 (1866) (statement of Rep. John Bingham) (emphasis added).

The Georgia Supreme Court offers a good example of the trend John Bingham observed.  In the mid-1840s, that tribunal

secured many individual rights that Georgia's constitution had not enumerated. *See, e.g.*, *Nunn*, 1 Ga. at 249, 251 (right to bear arms, as well as other Bill-of-Rights guarantees); *McKenzie*, 3 Ga. at 41–42 (takings). But by 1848, the Court clarified that "[f]ree persons of color" did not possess many of those rights, as they were not "citizens." *Cooper v. City of Savannah*, 4 Ga. 68, 72 (1848). So, the court held, they were "not entitled to bear arms, vote for members of the legislature, or to hold any civil office." *Id.*

And *Cooper* was part of a larger trend; other states' supreme courts routinely ratified their state's denials of Black Americans' fundamental rights. *See, e.g.*, *Amy v. Smith*, 11 Ky. (1 Litt.) 326, 334 (1822) (upholding law restricting free Black Americans' right to file lawsuits); *Indiana v. Cooper*, 5 Blackf. 258, 259 (Ind. 1839) (upholding law requiring bond for free Black Americans traveling in the state); *Nelson v. Illinois*, 33 Ill. 390, 395 (1864) (upholding law excluding free Black Americans from "emigration" to and "settlement in" Illinois). Indeed, this trend perhaps reached its awful apex in the notorious U.S. Supreme Court case *Dred Scott v. Sandford*. 60 U.S. (19 How.) 393 (1857) (holding that the Constitution did not extend American citizenship, with its attendant rights and privileges, to Black Americans and that slaves are "property" within the meaning of the Due Process Clause).

Most prominently, the states involved in this trend and this line of cases denied the fundamental rights that the Civil Rights Act of 1866 aimed to secure: namely, Black Americans' rights "to make and enforce contracts, to sue, be parties, and give evidence, to

inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property . . . ." Ch. 31, § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981(a), 1982).

But the Fourteenth Amendment's drafters expressed outrage at these deprivations. They were concerned because Black Americans had been denied equal rights. And they also clarified that the federal government should play a role in enforcing all Americans' fundamental rights. After all, fundamental rights are "certain absolute rights which pertain to *every* citizen, which are inherent, and of which a State cannot constitutionally deprive him." CONG. GLOBE, 39th Cong., 1st Sess. 1833 (1866) (statement of Rep. William Lawrence) (emphasis added); *see id.* at 1757 (statement of Sen. Lyman Trumbull) (explaining the Civil Rights Act secures "inherent, fundamental rights which belong to free citizens or free men in all countries, . . . and they belong to them in all the States of the Union").

Crucially, the Fourteenth Amendment's drafters understood fundamental rights to encompass more than those that the Constitution's first eight amendments identify. They invoked the social-contract precepts that animated the Framers' view of Americans' fundamental rights. *See, e.g.*, *id.* at 1118 (statement of Rep. James Wilson) (explaining the rights of "general citizenship" are those that "a citizen does not surrender because he may happen to be a citizen of the State which would deprive him of them . . . .").

In fact, they often referenced *Corfield*'s broad understanding of fundamental rights. *See, e.g.*, *id.* at 1117–18 (statement of Rep. James Wilson) (quoting 6 F. Cas. at 551–52); *id.* at 2765 (statement of Sen. Jacob Howard) (same); *see also* JOHN HART ELY, DEMOCRACY AND DISTRUST 29 (1980) (confirming the Fourteenth Amendment's "framers repeatedly adverted to the *Corfield* discussion as the key to what they were writing"). So perhaps it's unsurprising that Section 1 of the Fourteenth Amendment, which, among other things, prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law," echoes *Corfield*'s recognition of the right to "[p]rotection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety," 6 F. Cas. at 551–52.

And the Framers of the Fourteenth Amendment near-universally employed the broad language characteristic of fundamental-rights jurisprudence—not just of the jurisprudence of their time but also of ours. *Compare* CONG. GLOBE, 39th Cong., 1st Sess. 3031 (1866) (statement of Sen. John Henderson) ("the rights that attach to citizenship in all free Governments"), *id.* at 1833, 1836 (statement of Rep. William Lawrence) (rights that are "inherent in every citizen of the United States" and "exist anterior to and independently of all laws and all constitutions"), *and id.* at 1089 (statement of Rep. John Bingham) (rights "universal and independent of all local State legislation"), *with Holden v. Hardy*, 169 U.S. 366, 389 (1898) (rights "which inhere in the very idea of free government"), *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) (rights which are "so

rooted in the traditions and conscience of our people as to be ranked as fundamental"), *overruled by Malloy v. Hogan*, 378 U.S. 1 (1964), *and Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (rights which strike at the "very essence of a scheme of ordered liberty"), *overruled by Benton v. Maryland*, 395 U.S. 784 (1969).

In other words, the Fourteenth Amendment's drafters, in explaining their intent, conveyed that Americans are entitled to a set of fundamental rights, which "cannot be fully defined in their entire extent and precise nature" but to which "should be *added* the personal rights guaranteed and secured by the first eight amendments of the Constitution." CONG. GLOBE, 39th Cong., 1st Sess. 2765 (1866) (statement of Sen. Jacob Howard) (emphasis added); *see id.* ("[H]ere is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, *some* by the first eight amendments of the Constitution." (emphasis added)).

To that end, Representative Bingham proposed a constitutional amendment to secure federal enforcement of those rights. Echoing Antebellum jurisprudence, he noted that, although the Framers assumed Americans enjoyed a set of fundamental rights that no state could deny, "[a] grant of power . . . is a very different thing from a bill of rights." *Id.* at 1093 (statement of Rep. John Bingham). Before the Fourteenth Amendment, fundamental rights largely were not federally enforceable rights. And the federal government could ensure they became so only if an amendment "vested [the federal government] with power to hold [the states] to

answer before the bar of national courts." *Id.* at 1090 (statement of Rep. John Bingham).

As the Supreme Court later confirmed, "one of the primary purposes . . . of the Fourteenth Amendment was . . . to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States." *Hurd v. Hodge*, 334 U.S. 24, 32–33 (1948). In other words, the Fourteenth Amendment sought to end any question of the constitutionality of federal civil-rights legislation. The drafters were concerned at the time about the Civil Rights Act's private right of action, which secured a federal forum for plaintiffs to enforce their rights, ch. 31, § 3, 14 Stat. 27 (1866) (codified as amended at 42 U.S.C. § 1988). But the Fourteenth Amendment also ensured the constitutionality of the legislation that followed it, including 42 U.S.C. § 1983, *see* Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. §§ 1983, 1985–1986).[12]

---

[12] Although the Fourteenth Amendment sought to enable Congress to enact private rights of action, Congress may "enforce" the Fourteenth Amendment through other means, too. U.S. CONST. amend. XIV, § 5. The Fourteenth and Fifteenth Amendments' drafters understood each amendment's enforcement section to implement the expansive language of *McCulloch v. Maryland*. *See* CONG. GLOBE, 39th Cong. 1st Sess. 1118 (1866) (remarks of Rep. James Wilson) (quoting 17 U.S. (4 Wheat.) 316, 421 (1819)). So the Reconstruction Amendments support "broad congressional power to administer strong and even selective medicine to individual states" that have often abridged Americans' fundamental rights. Akhil Reed Amar, *The Lawfulness of Section 5 — and Thus of Section 5*, 126 HARV. L. REV. F. 109, 114 (2013) (emphasis omitted). For instance, Congress may "enact reasonably prophylactic remedial legislation," *Tennessee v. Lane*, 541 U.S. 509, 523 (2004), and, when necessary, even require

After rounds of revision, Representative Bingham introduced a version of the Fourteenth Amendment that resembled its final form.  That revision's Section One includes precisely the same second sentence as the one in the version of the Fourteenth Amendment that Congress ultimately ratified:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

CONG. GLOBE, 39th Cong., 1st Sess. 2542 (1866) (statement of Rep. John Bingham).  As Bingham introduced it, he emphasized that "[t]he necessity for the first section of this amendment . . . is one of the lessons that have been . . . taught to all the people of this country by the history of the past four years of terrific conflict." *Id.*  "[T]hat is, to protect by national law the *privileges and immunities* of all the citizens of the republic *and the inborn rights* of every person within its jurisdiction whenever the same shall be abridged or denied by the unconstitutional acts of any State."  *Id.* (emphases added).  Simply, the drafters intended, and Americans understood,[13]

---

that states preclear certain laws with the federal government, *see South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).

[13] Recent scholarship has shown that the *Congressional Globe* is highly probative not just of legislative intent but also the public meaning of the Fourteenth

the Fourteenth Amendment to enable federal courts to protect *all* fundamental rights, not just those enumerated in the Constitution's amendments. Indeed, the text of the amendment reflects that on its face.

After all, Section One purposely employs expansive language. Had the drafters envisioned a narrow conception of Americans' liberties, they would have listed or referred to those the Bill of Rights protects. Instead, they recognized that Americans' rights "cannot be fully defined in their entire extent and precise nature." *Id.* at 2765 (statement of Sen. Jacob Howard). The drafters "did not presume to know the extent of freedom in all of its dimensions," so they used broad but clear terms to "entrust[] to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning." *Obergefell v. Hodges*, 576 U.S. 644, 664 (2015). Our duty to secure Americans' fundamental rights inheres in the Constitution's text and history.

---

Amendment. *See* Rachel A. Shelden*, Finding Meaning in the Congressional Globe: The Fourteenth Amendment and the Problem of Constitutional Archives*, 2 J. AM. CON. HIST. 715, 730–33 (2024). The *Globe* seldom contained speeches made to an invested congressional audience; instead, it reprinted curated addresses that representatives wished to make to their constituents. *Id.* at 727–30. So it offers a unique snapshot of "a congressman's sense of what mattered to people in their home districts," *id.* at 731, and therefore reflects part of an "expressive of a feedback loop in which constituents and their representatives conveyed their views to one another," *id.* at 732.

\*        \*        \*

Ultimately, our modern doctrine successfully discharges that duty.  To be sure, the Supreme Court has concluded it does so under the Due Process Clause instead of the Privileges or Immunities Clause.  *See McDonald v. City of Chicago*, 561 U.S. 742, 758–59 (2010) (plurality opinion); *cf. Slaughter-House Cases*, 83 U.S. 36, 79 (1872) (Miller, J.) (interpreting the Privileges or Immunities clause to cover only rights peculiar to federal citizenship).  But the only conclusion that the Founding, Antebellum, and Reconstruction history supports is that our modern rights jurisprudence (which enforces fundamental but unenumerated rights) accurately reflects our Founders' intentions, regardless of the textual hook.  *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 n.22 (2022) (quoting *Corfield*, 6 F. Cas. at 551–52).

So most respectfully, the common refrain that "substantive due process" is oxymoronic, *see, e.g., Sosa*, 57 F.4th at 1306; *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1244 (11th Cir. 2024) (Pryor, C.J., respecting the denial of rehearing en banc), misses the point.  Perhaps homing the protection of fundamental rights in the Due Process Clause instead of the Privileges or Immunities Clause leaves room for debate.[14]  But homing them somewhere in the Constitution does not.

---

[14] My point is a pretty narrow one: if the Court is interpreting the Due Process Clause in accordance with Americans' intentions when they ratified the Fourteenth Amendment, *stare decisis* requires consistency in our fundamental-

Our doctrine sometimes imperfectly yet accurately captures the Constitution's text and its animating principles. *See Gundy v. United States*, 588 U.S. 128, 166–67 (2019) (Gorsuch, J., dissenting) ("When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines." (citing *McDonald*, 561 U.S. at 758) (plurality opinion)). But that is not a reason to abandon settled principles of constitutional jurisprudence.

The history is unambiguous. It shows beyond dispute that the Constitution secures unenumerated rights and that the Constitution includes textual provisions to advance that purpose. That we interpret the Constitution to do so and to be faithful to the principles that animated the Founders and Fourteenth Amendment ratifiers is more important than which textual provision we read as doing so.

---

rights jurisprudence. We can conclude that our current doctrine—though in Judge Newsom's considered view, homed in the incorrect constitutional text—still accords with the original understanding of the Fourteenth Amendment's Section One. And we can also recognize that a doctrinal shift to the Privileges or Immunities Clause may introduce to our fundamental-rights jurisprudence methodological or substantive error by destabilizing a century and a half of law. *Cf. Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (explaining *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process"). So without more, I am unconvinced that substantive due process—an accurate (yet purportedly imperfect) reflection of our predecessors' aims—is an approach to constitutional interpretation that we should leave behind.

The important question, then, is not whether the Due Process Clause is the proper textual hook for the doctrine. Rather, the important question is whether our current doctrine protects, in essence, the rights that Americans at the Founding and at the ratification of the Fourteenth Amendment intended courts to secure from government interference. And as Section II explains, I think our current doctrine does.

## II. Substantive due process sufficiently reflects the Founders' intentions of how courts would secure Americans' fundamental rights.

The Fourteenth Amendment guarantees everyone due process of law, opens the federal courts to claims of state deprivations of fundamental rights, and enables the federal government to enforce those protections.

And that brings me to the next point. As substantive due process developed in the decades after the Fourteenth Amendment's ratification, fundamental-rights jurisprudence has more or less matched the understandings Americans had at the Founding and at the time the states ratified the Fourteenth Amendment.

The rest of this section proceeds in two parts. First, I review today's substantive-due-process doctrine. Then, I highlight the key similarities between our doctrine and the principles our history illustrates.

A.   *Modern jurisprudence secures fundamental rights that are deeply rooted in this nation's history and tradition.*

Today, when a plaintiff alleges a violation of their unenumerated fundamental rights, we generally employ a two-step inquiry under substantive due process to resolve the claim. At the first step, we determine whether a right is "fundamental." *See Washington v. Glucksberg*, 521 U.S. 702, 710 (1997). And at the second, we scrutinize the government action either strictly or loosely depending on whether the right asserted is fundamental.

If the right is fundamental, then we presume the government action is wrongful, and the government must show its action is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).[15] But if the right is not fundamental, then we presume the government action lawful, and we uphold the law as long as it is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. This rational-relation test is particularly light-handed—much like a "sieve," *Eknes-Tucker*, 114 F.4th at 1296 (Rosenbaum, J., dissenting from the denial of

---

[15] Alternatively, Supreme Court precedent has suggested that a regulatory tradition may establish the constitutionality of a law. *See United States v. Rahimi*, 602 U.S. 680, 691 (2024) (explaining "if a challenged regulation fits within [our regulatory] tradition, it is lawful"); *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922) ("If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it."). So even if a plaintiff establishes at step one of our fundamental-rights analysis that the constitution protects "a liberty interest . . . generally speaking, that must give way when there is a tradition denying the specific application of that general interest." *Kerry v. Din*, 576 U.S. 86, 95 (2015) (plurality opinion).

rehearing en banc)—because we sustain the government's action if "there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commcn's, Inc.*, 508 U.S. 307, 313 (1993); *see Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955).

That is not to say rational-basis review is completely toothless. Courts have stricken action a government has taken under a mere "pretext of executing its powers." *McCulloch*, 17 U.S. (4 Wheat.) at 423. Typically, we have done so when the facts reveal that a government's claim to regulate for the public welfare is just a pretext for its true, "bare . . . desire to harm a politically unpopular group." *USDA v. Moreno*, 413 U.S. 528, 534 (1973); *accord Zobel v. Williams*, 457 U.S. 55, 61–63 (1982); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–47 (1985); *Romer v. Evans*, 517 U.S. 620, 635 (1996). But these cases are few and far between.

The upshot of the difference between strict and rational-basis scrutiny, then, is that the most important substantive-due-process question is whether the claimed right is "fundamental." After all, the answer to that question often predicts whether the challenged law will stand or fall.

To determine whether a right qualifies as "fundamental," we assess whether the right is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 721 (cleaned up). One way to ascertain that a right is "deeply rooted in this Nation's history and tradition" or

"implicit in the concept of ordered liberty" is its enumeration in the first eight amendments.  *See Dobbs*, 597 U.S. at 237.

But the Due Process Clause does not protect those rights merely "because [they] are enumerated in the first eight Amendments"; it does so at least largely because those rights are "of such a nature that they are included in the conception of due process of law." *Twining v. New Jersey*, 211 U.S. 78, 99 (1908), *overruled by Malloy*, 378 U.S. at 6; *see Hurtado v. California*, 110 U.S. 516, 538 (1884) (declining to incorporate the Fifth Amendment right to a grand-jury indictment).  So the bottom-line inquiry for any right the Fourteenth Amendment secures, enumerated or unenumerated, is whether "our Nation's history, legal traditions, and practices" confirm that it is deeply rooted and implicit in our concept of ordered liberty.  *Glucksberg*, 521 U.S. at 710; *cf. Poe v. Ullman*, 367 U.S. 497, 554 (1961) (Harland, J., dissenting) ("[C]onclusive, in my view, is the utter novelty of this enactment.").

When we conduct this inquiry, we often begin with the English common law or, in some cases, even further back with the right's "ancient origins."  *Obergefell*, 576 U.S. at 659 (discussing marriage).  Core legal documents (such as the Magna Carta), parliamentary acts, and landmark British cases often supply the relevant principle or applicable rule of decision at common law.  *See, e.g.*, *Hurtado*, 110 U.S. at 522 (citing the Magna Carta); *Slaughter-House Cases*, 83 U.S. at 65–66 (explaining "the Parliament of Great Britain . . . continued to grant to persons and corporations exclusive privileges," just like Louisiana did to the slaughter-house at issue).  And

often, old legal treatises make an appearance—mostly from the recurring cast of Bracton, Coke, Hale, and Blackstone—to solidify our understanding of the prevailing legal norms.  *See, e.g.*, *Hurtado*, 110 U.S. at 522; *Glucksberg*, 521 U.S. at 710–12; *Obergefell*, 576 U.S. at 659–60; *Dobbs*, 597 U.S. at 272.

We rely on these sources because the Framers assumed that Americans enjoyed many of the same "guaranties and immunities which we had inherited from our English ancestors."  *Robertson*, 165 U.S. at 281.  But we have noted their limits as well: "The common law, of course, developed over time," and the Framers did not import English common law wholesale.  *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022).  So a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."  *Id.*

Next in our inquiry, we usually survey state and federal law relating to the claimed right at the Founding or the ratification of the Fourteenth Amendment.  For instance, in declaring that the Due Process Clause incorporated the Eighth Amendment's protection against excessive fines, the Supreme Court found that (a) at the time of the Founding, "the constitutions of eight States—accounting for 70% of the U.S. population—forbade excessive fines," and (b) in 1868, "upon ratification of the Fourteenth Amendment," the "constitutions of 35 of the 37 States—accounting for over 90% of the U.S. population—expressly prohibited excessive fines."  *Timbs v. Indiana*, 586 U.S. 146, 152 (2019); *see also Glucksberg*, 521 U.S. at 713–

16 (surveying the development of American legislation about suicide in rejecting a claim that a right to end one's life is fundamental).

But constitutional provisions and statutes are not the only sources of law we review—any source probative of our actual "legal traditions and practices" can be helpful. *See* AMAR, AMERICA'S UNWRITTEN CONSTITUTION, *supra*, at 103 ("Simply put, many of the . . . rights of the people . . . may be found in everyday American life—in the practices of ordinary Americans as they go about their affairs and in patterns of laws and customs across the land."). So for instance, we note how often executive officials or the courts protected a claimed right, as well as how often they enforced any purported prohibitions on that right. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 569 (2003) (recognizing sodomy laws were rarely "enforced against consenting adults acting in private"). We also consider newspapers, periodicals, or other materials that show that Americans "widely held" a particular view about the claimed right. *See, e.g.*, *Heller*, 554 U.S. at 615 (relying on "an editorial" to determine the Second Amendment's scope).

These authorities are important because they reveal the understandings of "those who ratified and adopted the relevant constitutional provision." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023). So they offer insight into the rights the people understood the Fourteenth Amendment to protect when they voted for

it. And that provides a substantial "claim to democratic legitimacy" when we declare government action invalid. *Id.*

Besides evidence from the Founding and Reconstruction, in determining whether a right is fundamental, we also look to modern statutory and constitutional trends among states, as well as other sources probative of the current, prevailing legal practices. Often, our review confirms the conclusion we gleaned from the historical materials. *See, e.g.*, *Timbs*, 586 U.S. at 153 ("Today, acknowledgment of the right's fundamental nature remains widespread."); *Glucksberg*, 521 U.S. at 719 ("[T]he States are currently engaged in serious, thoughtful examinations of physician-assisted suicide and other similar issues."). But other times, it highlights a radical departure from antiquated ideals. *See Obergefell*, 576 U.S. at 664.

And that departure may deserve recognition. Legal norms at common law, at the time of the Founding, and at the ratification of the Fourteenth Amendment are imperfect proxies of the rights the "people" retained. After all, not all the "people" could vote to ratify the Constitution or adopt the Fourteenth Amendment. Women couldn't vote until two decades into the 20th century. *See Minor v. Happersett*, 88 U.S. 162, 171 (1874); U.S. CONST. amend. XIX; *see also Dobbs*, 597 U.S. at 372–73 (Breyer, J., dissenting). And it wasn't until a century after the ratification of the Fourteenth Amendment that we legislatively ensured non-whites' access to the franchise. *See* Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at 52 U.S.C. §§ 10101, 10301–14,

10501–08, 10701–02).  So more recent laws, practices, and under-standings can provide a much-needed view of what rights *all* the people "retained."

But more to the point, such an inquiry recognizes that "[t]he nature of injustice is that we may not always see it in our own times."  *Obergefell*, 576 U.S. at 664.  Those who "wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions."  *Id.*  They used broad language and "entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning."  *Id.*; *see Ullman*, 367 U.S. at 542 (Harlan, J., dissenting) ("That tradition is a living thing.").  And rights that "only became analytically clear or won recognition after the adoption of the Ninth" and Fourteenth Amendments are still "covered by" their "letter and spirit."  Amar, America's Unwritten Constitution, *supra*, at 108.

At bottom, each of these pieces of evidence informs our as-sessment of whether a plaintiff's claimed right is "fundamental."  Our focus on these objective indicators of our history and tradition helps guard against "roaming at large into the constitutional field" while also ensuring that we do not wholesale forfeit the fundamen-tal rights our Founders charged the judiciary with securing.  *Gris-wold*, 381 U.S. at 502 (Harlan, J., concurring).

B.    *Four similarities among modern fundamental-rights doctrine,*
      *our founding principles, and historical practice show that mod-*
      *ern substantive-due-process doctrine imposes limitations on*

*government that Americans voted for when they ratified the Constitution and the Fourteenth Amendment.*

In four ways, our fundamental-rights doctrine channels the Founders' intentions, and the people's understandings, when they declared "that the enumeration of certain rights in the Constitution does not deny or disparage those rights retained by the people." U.S. CONST. amend IX.

*First*, our general understanding of what makes a right fundamental is essentially the same as it was at the Founding. In other words, our requirement that a fundamental right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" does not materially differ from the frameworks we see in early caselaw. Whether those rights are described as "vital principles in our free Republican governments," *Calder*, 3 U.S. at 388 (opinion of Chase, J.), "privileges and immunities which . . . belong, of right, to the citizens of all free governments," *Corfield*, 6 F. Cas. at 551, or "[i]mplied reservations . . . , without which the social compact could not exist," *Loan Ass'n*, 87 U.S. at 663, the opinions all invoke the same concept: The people retained a class of rights when we established our government, so "the power to violate and disregard them" does not "lurk[] under any general grant of legislative authority" or "general expressions of the will of the people," *Wilkinson*, 27 U.S. (2 Pet.) at 657.

*Second*, and relatedly, the justification for judicial enforcement of those rights has endured from the Founding to today. That is, the judiciary protects rights, at least under the Fourteenth

Amendment, because they are "in their nature, fundamental," *Corfield*, 6 F. Cas. at 551, not just because we enumerated some of them in the Constitution.

To be sure, enumeration is one source of authority. But the Founders, especially the Federalists, understood that base limits on government action inhered in the social contract, so enumeration was merely declaratory of rights that already limited government.

And the drafters of the Fourteenth Amendment understood the same thing when they noted that Sections One and Five of that amendment "establish[ed] no new right" but merely provided a means for the federal government "to protect and enforce those which already belong to every citizen." Cong. Globe, 39th Cong. 1st Sess. 1117 (1866) (statement of Rep. James Wilson); *id.* at 1836 (statement of Rep. William Lawrence) ("[T]his bill creates no new right, confers no new privilege, but is declaratory of what is already the constitutional rights of every citizen in every State . . . ."). It's that principle that underwrites our modern caselaw—we protect rights under the Fourteenth Amendment, at least in part, because they are "of such a nature that they are included in the conception of due process of law." *McDonald*, 561 U.S. at 759 (plurality opinion) (quoting *Twining*, 211 U.S. at 99). In other words, the promise of "due process of law" is not a promise of process for the sake of process; it's a promise of process for the sake of ensuring our fundamental rights have practical meaning.

*Third*, the legal methodology—that is, the relevant historical evidence and precedent—we use to determine whether a right is

fundamental has remained consistent.  As early cases said, fundamental rights were those that "have, at all times, been enjoyed by the citizens of the several states which compose this Union."  *Corfield*, 6 F. Cas. at 551; *see also Loan Ass'n*, 87 U.S. at 663 ("Implied reservations of individual rights . . . are respected by all governments entitled to the name.").  So our current inquiry into prevailing legal practices at the common law, across state governments, and even other countries, matches our earliest instincts about what made a right "fundamental."

And that similarity is more than a coincidence.  At both the time of the Founding and ratification of the Fourteenth Amendment, general law played a key role in the American legal system.  Its content "form[ed] the substratum of our laws."  *United States v. Burr*, 25 F. Cas. 55, 77 (C.C.D. Va. 1807) (No. 14,693) (Marshall, Circuit Justice).  And in many routine cases, it provided the "principle"—or the rule of decision—that "would obtain" in the "absence" of any applicable positive state or federal law.  *United States v. Chambers*, 291 U.S. 217, 226 (1934).  So a reference to rights "respected by all governments entitled to the name," for instance, was a reference to rights as the general law defines them.  *See* Baude, Campbell & Sachs, *supra*, at 1199 ("Lawyers and judges evinced the general-law character of these fundamental rights not only by using terms like these but also by explicitly describing the rights as shared among multiple jurisdictions.").

And when judges in our pre-*Erie*[16] days had to rely on the general law to supply a rule of decision, they "found" the general law in much the same way we now determine whether a right is fundamental.  They reviewed colonial, Founding, and Antebellum-Era treatises and scholarly works; a study of the English common law; and a catalog of relevant state-court decisions, among many other probative sources.  *See, e.g.*, *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 19–22 (1842); *Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109–12 (1833); *see also* St. George Tucker, Appendix to 1 William Blackstone, Commentaries 430 (S. Tucker ed. & comm. 1803).  And that review included an assessment of how law has developed over time.  *See* Baude, Campbell & Sachs, *supra*, at 1248 (explaining the general law "is shaped by legally recognized custom and practice; its contours can change as those practices change"); Danielle D'Onfro &

---

[16] In *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 71 (1938), the Supreme Court overturned *Swift v. Tyson*.  *Swift* held that federal courts sitting in diversity may, in the absence of a pertinent state statute, apply the general law to commercial disputes.  In other words, federal courts in diversity could use "general reasoning and legal analogies" to determine "the just rule furnished by the principles of commercial law to govern the case," 41 U.S. (16 Pet.) at 19, even if state courts applied a different rule of decision.  *Erie*, by contrast, required federal courts sitting in diversity to interpret all state substantive law as the "highest court" of a state would.  304 U.S. at 78.  And in doing so, *Erie* "overruled a particular way of looking at law which dominated the judicial process" from the Founding to the beginning of the twentieth century.  *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 101 (1945).  State-court decisions were no longer "merely evidence" of the proper rule of decision that a federal court should apply but were now "the controlling formulations" of the applicable law itself.  *Id.*

Daniel Epps, *The Fourth Amendment and General Law*, 132 Yale L.J. 910, 940 (2023) ("Jurists and lawyers in 1791 would not have understood the common law as perfectly static."); *accord Obergefell*, 576 U.S. at 644 ("When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.").

So the difference between substantive due process and the vision of fundamental rights that the Founders and drafters of the Fourteenth Amendment held is not one of substance but one of vehicle—the same first principles continue to guide us even though we may now think about and describe the law differently. *See generally* Lawrence Lessig, *Fidelity in Translation*, 71 Tex. L. Rev. 1165 (1993).

*Fourth*, and finally, the current tiers of scrutiny adequately approximate the Founders' expectations about the bounds of the states' police powers. The core premise of the social contract is that "[w]hen one becomes a member of society, he necessarily parts with *some* rights or privileges which, as an individual not affected by his relations to others, he might retain." *Munn*, 94 U.S. at 124 (emphasis added). And social-contract theory recognizes that individuals cede those rights "for the public good." *Id.* at 125. These two precepts inform the boundaries of government authority. But they also raise two questions: (1) Which rights did the people retain when they "entered" the social contract, in that the state generally may not abridge them, and (2) how much may we second-guess whether the government acted "for the public good?"

I think our modern framework satisfactorily responds to these questions. As to the first question—the rights the people retained—we've just answered it: rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." Our review of past and present legal norms will ultimately reveal whether the claimed right is regularly abridged, or whether the claimed right is so routinely exercised and protected that we can conclude the people "retained" it when they entered the social contract. In that case, presumptively, the government could not infringe on that legally determinate right.

Strict scrutiny's allowance of some regulation of fundamental rights operates as a limited exception to the people's retention of those rights. But it is one that still finds its roots in the social contract's logic. Requiring the government to show that its action is "narrowly tailored to serve a compelling state interest," *Reno*, 507 U.S. at 302, is a way of forcing the government to show that its action in fact serves the "public good."

Some might view questioning whether a certain law is in the "public good" as policymaking. But the judiciary's acceptance of a government's asserted public interest often derives from objective sources, such as the historical evidence that we use to define the right in the first place. *See United States v. Rahimi*, 602 U.S. 680, 732 & n.7 (2024) (Kavanaugh, J., concurring) ("The Court has employed balancing only in discrete areas of constitutional law—and even in those cases, history still tends to play a far larger role than overt judicial policymaking."). So strict scrutiny is really just a

mechanism that helps courts and litigants define the scope a claimed right and delimit its outer boundaries.

In contrast, when a claimed right is not deeply rooted or implicit in the concept of ordered liberty, the judiciary historically has deferred to the legislature's determination that a particular act advances the public good. *Id.* at 253. "[T]he question" whether we sustain government action in the face a claim that such action abridges fundamental rights "is one of power, not of expediency." *Munn*, 94 U.S. at 132.

When the state has the power to act—because the people retained no right forbidding government intrusion—"the legislature is the exclusive judge" of whether the action benefits the public good. *Id.* at 133; *see, e.g.*, *Crowley v. Christensen*, 137 U.S. 86, 91 (1890) (deferring to the legislature because there "is no inherent right in a citizen to thus sell intoxicating liquors by retail"; it "is not a privilege of a citizen of the state or of a citizen of the United States"). We make no judgment on whether an act is expedient. Rather, we step in only "[i]f no state of circumstances could exist to justify such a statute," *Munn*, 94 U.S. at 132—that is, only if the government lacks the power to enact such a law. In that limited case, we can enforce constitutional limitations on purely "arbitrary exertions of power under the forms of legislation." *Hurtado*, 110 U.S. at 536.

So no functional distinction exists between today's rational-basis formulation and our country's historical deference to legislatures' determinations of what advances the public good. Indeed,

our current caselaw practically rips the words out of Reconstruction-era opinions. *Compare Munn*, 94 U.S. at 132 ("no state of circumstances could exist to justify such a statute"), *with Beach Commcn's*, 508 U.S. at 313 ("reasonably conceivable state of facts that could provide a rational basis").

Even today's focus on impermissible animus finds its roots in long-held restrictions on legislation enacted under pretexts or for partial or special purposes. *Compare McCulloch*, 17 U.S. (4 Wheat.) at 423 (pretexts), *Austin v. Murray*, 33 Mass. 121, 126 (1834) ("not a police regulation, made in good faith"), *Hurtado*, 110 U.S. at 536 ("special, partial, and arbitrary exertions of power"), *with Moreno*, 413 U.S. at 534 ("bare . . . desire to harm a politically unpopular group"); *City of Cleburne*, 473 U.S. at 446–47 (same); *Romer*, 517 U.S. at 635 (purpose of amendment "to make them unequal to everyone else").

In sum, modern fundamental-rights doctrine's ties to our historical roots refute calls to abandon modern doctrine because it is allegedly "unmoored from history," "ahistorical," and "manipulable," Newsom Op. at 2, 18, 3. If anything, the people's understanding of unenumerated rights at both the Founding and the ratification of the Fourteenth Amendment warrants modern fundamental-rights doctrine's continued use.

### III. Substantive due process offers a workable method for securing Americans' fundamental rights.

With the matters of history and text resolved, we can address the so-called "practical" and "pedigree" problems that

substantive due process purportedly presents. *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292, 1305–06 (11th Cir. 2019) (Newsom, J., concurring). Of course, given the historical directives to enforce unenumerated rights, these criticisms are ultimately unavailing. But it is worth highlighting that these criticisms still do not provide a good reason to abandon substantive-due-process doctrine.

A.    *Substantive due process employs routine tools of constitutional decisionmaking to declare what the law is, not what judges think the law should be.*

The practical problems Judge Newsom identifies seem to flow from what he sees as "malleable" standards inherent in our substantive-due-process doctrine. Newsom Op. at 3. He views our guideposts of history and tradition and our concept of ordered liberty as "vague shibboleths . . . untethered from the governing text" that "invite manipulable, policy-driven cherry-picking." *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1129 (11th Cir. 2021) (Newsom, J., concurring). And if we applied only those vague standards, perhaps we would, as Alexander Hamilton put it, "be disposed to exercise will instead of judgment." THE FEDERALIST NO. 78 (Alexander Hamilton). But as we've thoroughly discussed, our broad guideposts are not the end of the legal legwork our substantive-due-process doctrine requires. Applied faithfully and accurately, substantive due process looks like any other routine form of constitutional interpretation.

We, of course, start any constitutional analysis with the relevant text. Usually, the text readily indicates whether the plaintiff's

claim is plausible. For instance, both the Due Process Clause and the Privileges or Immunities Clause invite claims that a state has impermissibly infringed a person's individual rights. *See* U.S. CONST. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge . . . ; nor shall any State deprive . . . ."). But that textual invitation rarely resolves the question presented.

Many provisions include "general term[s], applicable to many objects." *Gibbons*, 22 U.S. (9 Wheat) at 189. Knowing that, at the time of Reconstruction, "the terms 'privileges' and 'immunities' . . . were used interchangeably with the words 'rights,' 'liberties,' and 'freedoms'" ultimately "reveal[s] little about" the "substance" of the rights Americans intended the Fourteenth Amendment to protect. *McDonald*, 561 U.S. at 813–14 (Thomas, J., concurring in part and concurring in the judgment). So we must use additional interpretive tools to discern their character and scope. *See, e.g.*, *McCulloch*, 17 U.S. (4 Wheat.) at 407 (determining the scope of Congress's powers through the Constitution's structure); *Hurtado*, 110 U.S. at 530–31, 535–38 (relying on history and other common-law principles to inform the meaning of the Due Process Clause).

For instance, to return to *Corfield*, when Justice Washington interpreted the scope of the Privileges and Immunities Clause, he appealed to the Constitution's structure and its history. He explained that it secured those "privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed

by the citizens of the several states"—as opposed to any privileges the states create by local law—because deprivations of those our fundamental rights would undermine our Founder's intent to secure a single Union.  6 F. Cas. at 551–52.  And in turn, he could conclude that a claimed right to oyster harvesting, a resource peculiar to New Jersey, did not fall within the scope of the Privileges and Immunities Clause.  *Id.*

Similarly, in the *Slaughter-House Cases*, Justice Miller, made clear that he could not interpret the Privileges or Immunities Clause "without a reference to [its] history," 83 U.S. at 67–68, 71 (discussing the eradication of slavery), or its structure, *id.* at 75–78 (discussing the federal government's limited role in "ordinary and usual" governance).  And through those tools, he discerned (perhaps incorrectly) that the provision ought to secure only rights which owe "their existence to the Federal government, its National character, its Constitution, or its laws," *id.* at 79.  As a result, it became apparent that the Fourteenth Amendment did not secure the Louisiana butchers' right to practice their trade free from the interference of a state-granted monopoly.  *Id.* at 80–81.

In both cases, our usual interpretive tools allowed us to refine an applicable principle from the general constitutional provision at issue, and that principle resolved the dispute.

In comparison, more specific provisions, such as those in the first eight amendments, may take us one step closer to resolving the constitutional question.  We know the claimed right exists at least in some form.  But, again, that small step rarely resolves the

legal question the facts present, and we must again bring out our jurisprudential toolkit.

Take the Sixth Amendment's Confrontation Clause. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). When the Court had to decide whether certain out-of-court statements (hearsay) could be admitted into evidence against a criminal defendant, the Court first announced that the "Constitution's text does not alone resolve this case." *Crawford v. Washington*, 541 U.S. 36, 43 (2004). That was so, the Court explained, because we "could plausibly read 'witnesses against' a defendant to mean those who actually testify at trial, those whose statements are offered at trial, or something else in between." *Id.* (internal citations omitted).

So the Court reviewed many of the sources we highlighted in our discussion of substantive-due-process doctrine. Precedents from the English common law (the case of Sir Walter Raleigh, in particular), the colonies' experiences with British rule, and Antebellum state-court practice supported the Court's conclusion that the Confrontation Clause prohibits the introduction of out-of-court testimonial statements. *See id.* at 43–50.

The Second Amendment provides another example. *See* U.S. CONST. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."). Though textually based, the full scope of the "right of the people to keep and bear Arms" was not

immediately clear; two sides of a dispute easily "set out very different interpretations of the Amendment." *Heller*, 554 U.S. at 577. But after a lengthy review of the English common law, our colonial history, the nation's ratification debates, and post-ratification practice from the Antebellum period to modern times, the Court confirmed "that the Second Amendment conferred an individual right to keep and bear arms." *See id.* at 577–95. Again, text alone did not clearly delineate the content of the asserted right, and the Court exercised judgment, in light of the historical record, to ascertain the text's "idiomatic meaning." *Id.* at 577.

Still, analysis rarely ends after we articulate the content of the Constitution's text. Rather, our reliance on the full breadth of our legal resources only deepens when we're called to examine a claimed right's scope in the face of state action that likely intrudes on that claimed right. Concrete questions of whether the state may "prohibit[] an individual subject to a domestic violence restraining order from possessing a firearm," *Rahimi*, 602 U.S. at 684, or prevent a natural father from establishing paternity over his putative child born to a married couple, *Michael H. v. Gerald D.*, 491 U.S. 110, 113 (1989) (plurality opinion), are not neatly answered by precedent confirming that the Second Amendment protects an "individual right to keep and bear arms," *Heller*, 554 U.S. at 595, or that Due Process Clause secures "the interest of parents in the care, custody, and control of their children," respectively, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). In both instances, we must determine whether our Nation's history and tradition permits such regulation. *See Rahimi*, 602 U.S. at 692; *Kerry v. Din*, 576

U.S. 86, 95 (2015) (plurality opinion) (explaining fundamental rights "must give way when there is a tradition denying the specific application of that general" right).

Sometimes, the historical analogues "are relatively simple to draw." *Bruen*, 5967 U.S. at 27. In *Michael H.*, California just adopted "the presumption of legitimacy" that "was a fundamental principle of the common law" and traditionally "protected the marital family . . . against the sort of claims Michael" asserted. 491 U.S. at 124. But other cases "may require a more nuanced approach," *Bruen*, 5967 U.S. at 27, often calling on us to determine whether a relevant tradition is sufficiently "enduring," "representative," and "comparable" to establish an exception to an enumerated right, *id.* at 69, 30, 27, or to support the existence of an unenumerated one, *see Glucksburg*, 521 U.S. at 721.

Those are difficult questions. How do we know, for instance, whether enough states adopted a particular policy to suggest that policy is a "representative" tradition? Or, how do we ensure that we are pulling the controlling principle from the adequately comparable analogous historical regulation at "just the right level of generality?" *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). These inquires do offer clear guideposts, and "reasonable minds sometimes disagree about how" to resolve them. *Id.*

But that does not make our exercise of discretion in answering those questions any less of "a commonplace task for any lawyer or judge." *Bruen*, 597 U.S. at 28. For instance, courts often determine whether a historical tradition is sufficiently representative

through historical facts, comparisons to those historical facts, and, in some cases, reasoning inward from clear outliers that provide ready first-cut answers. *Compare Bruen*, 597 U.S. at 67 (rejecting as relevant analogues regulations governing only "about two-thirds of 1% of the population"), *and Timbs*, 586 U.S. at 152 (concluding a representative tradition existed where 70% of the U.S. population forbade excessive fines), *with Antonyuk v. James*, 120 F.4th 941, 1022 (2d Cir. 2024) (concluding a representative tradition existed where "15.3 percent of the Nation's population," comprising "37.7% of the urban population living" in the United States, prohibited firearms in public parks); *see also Dobbs*, 597 U.S. at 239.

A rule to cut through each interpretive nuance may not exist in this area of law. But "many constitutional standards involve undoubted gray areas, and it normally might be fair to venture the assumption that case-by-case development will lead to a workable standard." *Rahimi*, 602 U.S. at 746 (Jackson, J., concurring) (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 540 (1985)) (cleaned up).

The point is that the legal reasoning in most constitutional cases, even when we apply an enumerated right, requires not just "exercise of judicial discretion," THE FEDERALIST NO. 78 (Alexander Hamilton), but an exercise of the *same kind* of judicial discretion that our unenumerated-rights jurisprudence calls for. As this discussion shows, fundamental-rights cases—whether based on broad provisions like the Due Process Clause, or on enumerated rights like those in the Second and Sixth Amendments—require careful

examinations of the Constitution's structure, its history, and our precedents to fashion a rule of decision. And the particularly tough questions that fundamental-rights cases pose exist in disputes involving rights of both species, enumerated and unenumerated.

So what, if anything, gives spark to Judge Newsom's assessment that "[i]f ever there were a doctrine that gave a veneer of truth to the vicious lie that judges just decide cases in accordance with their priors, it's substantive due process?" Newsom Op. at 3. Perhaps that many use the doctrine as a mechanism to bring politically salient issues before the courts. *See, e.g.*, *Sosa*, 57 F.4th at 1305 (Newsom, J., concurring) (explaining substantive due process has "often been invoked as a failsafe doctrine of sorts . . . to plug some perceived gap in the written Constitution"). And when we resolve any politically salient issue—whether involving enumerated rights or the scope of Congress's powers—charges of policymaking will ensue. *See* David E. Pozen & Adam M. Samaha, *Anti-Modalities*, 119 MICH. L. REV. 729, 746 (2021) ("Participants in constitutional debates routinely distinguish legitimate constitutional concerns from illegitimate considerations of policy when attacking their opponents or defending their own, ostensibly policy-free positions."). But that characterization cannot and should not give us reason to abandon the doctrine.

It's axiomatic our jurisdiction extends to some so-called "political cases" and that the "courts cannot reject . . . a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

That is especially in the case for rights many will claim the Fourteenth Amendment protects. Our forbearers adopted that amendment with the express intent to enable Americans "to hold [the states] to answer before the bar of national courts." CONG. GLOBE, 39th Cong., 1st Sess. 1090 (1866) (statement of Rep. John Bingham).

Our duty is "to be an intermediate body between the people and the legislature" by enforcing the will of the people as "declared in the Constitution." THE FEDERALIST NO. 78 (Alexander Hamilton). And we cannot abdicate it solely because some may misunderstand our "exercise of judicial discretion." *Id.* As Hamilton put it, such an argument is "of no weight," for if it were correct, it "would prove" only that "there ought to be no judges distinct from" the legislature. *Id.* We'd be left with no "bulwark . . . against legislative encroachments" on the rights of individuals. *Id.*

Yet Hamilton's reflections show that these are not new concerns. And as our examples illustrate, the "exercise of judicial discretion" is inevitable in any constitutional case, if not every one that comes before us. But our reasoned opinions are a response to that. They make us show our work and explain why the Constitution and our interpretive tools require the answer we give. And through that methodology, we have long been able to show the public that we're exercising our "judgment" in "declar[ing] the sense of the law," as opposed to exerting our "will" upon them. *Id.*

We employ well-refined jurisprudential tools, including textual and structural analyses, reviews of pertinent precedents, and surveys of our nation's history and tradition, to avoid policymaking

and to rebut any charges of it. *See* Pozen & Samaha, *supra*, at 736–
38, 746–50, 793–94; *id.* at 793 ("[W]henever the modalities are seen
to establish a relatively determinate proposition of law, that propo-
sition is eligible to stay in the constitutional box."). So Judge New-
som's "practical" criticisms are no stronger just because we secure
unenumerated rights through a general constitutional provision,
like the Due Process Clause (or for that matter, the Privileges or
Immunities Clause). They're an innate feature of judicial review—
and one the judiciary regularly handles.

B.     Dred Scott *and* Lochner *do not require us to abandon our*
       *fundamental-rights jurisprudence.*

Judge Newsom's invocation of substantive due process's
boogiemen, *Dred Scott* and *Lochner*, also flounders under scrutiny.
*Dred Scott* has little relation to our fundamental-rights jurispru-
dence. In fact, historical evidence suggests it played little to no role
in developing today's substantive-due-process doctrine. And *Loch-
ner* is a stand-in for arguments we already addressed—that, in some
cases, judges may get it wrong because they wrongly rely on their
own policy preferences instead of our legal and historical guide-
posts. But that, of course, can happen no matter the legal frame-
work, even under the alternative privileges-or-immunities doctrine
Judge Newsom proposes. His own proposals are not immune from
his own critiques. So although *Dred Scott* and *Lochner* provide im-
portant reminders of past mistakes, they do not suggest that we
ought to abandon American's fundamental rights. Rather, they
serve as warnings for us to faithfully apply the law and not allow

personal policy preferences to sneak into our analyses—whether we are applying substantive-due-process doctrine or any other legal framework under the Constitution.

>    1.  <u>*Dred Scott* has little relevance for our fundamental-rights jurisprudence</u>.

First, there's the claim that "substantive-due-process doctrine traces its roots" to *Dred Scott*. *Hillcrest*, 915 F.3d at 1305 (Newsom, J., concurring).  Not so.

That repugnant decision is not the root of our fundamental-rights jurisprudence—or even of substantive due process.  And it's simply incorrect to suggest that the Supreme Court conjured up substantive due process (or more generally, fundamental-rights jurisprudence) to constitutionalize slavery.  In fact, by the time the Supreme Court decided *Dred Scott*, substantive due process was already well established.  Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 YALE L.J. 408, 467, 469 (2010).[17]

---

[17] The Constitution's Due Process Clauses trace their origin to a 1354 statute, which improved upon the "law of the land" clause in the Magna Carta.  *See, e.g.*, 28 Edw. 3 c. 3 (1354) (Eng.); 42 Edw. 3 c. 3 (1368) (Eng.); Magna Carta 1225, 9 Hen. 3 c. 29 (Eng.).  The "law of the land" clause prohibited England from punishing a person "except by the lawful judgment of his peers and by the law of the land."  Magna Carta 1225, 9 Hen. 3 c. 29 (Eng.).  Sir Edward Coke, a prominent English jurist and Chief Justice of the Court of the King's Bench, linked the 1354 clause and the "law of the land" clause in his commentaries.  Randy E. Barnett & Evan D. Bernick, *No Arbitrary Power: An Originalist Theory of the Due Process of Law*, 60 WM. & MARY L. REV. 1599, 1607 (2019).  Throughout English common law, the "law of the land" provision and due-

Not only that, but the travesty of *Dred Scott* does not come from its reliance on substantive due process. True, *Dred Scott* found

---

process statutes stood as barricades against abuses of the royal prerogative. Barnett & Bernick, *supra*, at 1610–12; *Hurtado*, 110 U.S. at 531. Some even viewed them as having operated as limitations against Parliament itself. *See* Gedicks, *supra*, at 601–11 (discussing *Bonham's Case*, decided by Lord Coke, as an example of fundamental law limiting Parliament's legislative authority); James W. Ely, Jr., *The Oxymoron Reconsidered: Myth and Reality in the Origins of Substantive Due Process*, 16 CONST. COMMENT. 315, 321 (1999) ("Coke implied that the 'law of the land' constituted a substantive limitation on the power of government."). That view of Coke's jurisprudence never took hold in England; "the omnipotence of parliament over the common law was absolute, even against common right and reason." *Hurtado*, 110 U.S. at 531 (recognizing *Bonham's Case* as an exception to parliamentary supremacy). But Americans did not adopt England's system of government. Rather, throughout America, written constitutions helped limit governments' powers, and widespread acceptance of the separation of powers disentangled legislative and judicial authorities. *Id.* at 531.

So unlike in England, legislative acts in the United States were not equivalent to constitutional pronouncements. Instead, "law of the land" and due-process provisions imported from England operated as "limitations upon all the powers of government, legislative as well as executive and judicial." *Id.* at 532. And the Supreme Court observed in 1884 that what were once "[a]pplied in England only as guards against executive usurpation and tyranny" became in America "bulwarks also against arbitrary legislation." *Id.* As a result, many thought the Due Process Clauses guaranteed not just "particular forms of procedure, *but the very substance of individual rights to life, liberty, and property.*" *Id.* (emphasis added). In fact, "[b]y the time of the Fourteenth Amendment's ratification in 1868," substantive due process was well established: "courts in at least twenty of the thirty-seven then-existing states had endorsed some version of substantive due process in connection with interpreting either due process, law-of-the-land, or similar provisions in their own constitutions or the Fifth Amendment Due Process Clause." Williams, *supra*, at 469.

property ownership to be a fundamental right. But that isn't why *Dred Scott* is so abhorrent. Rather, *Dred Scott*'s obliteration of the law was its holding that *people* are property.

And that was not a conclusion the Court reached through substantive due process. So to argue that *Dred Scott*'s existence undermines substantive due process as a doctrine (or more broadly, fundamental-rights jurisprudence) is to miss the reason *Dred Scott* was so repugnant and erroneous—that contrary to the concept on which *Dred Scott* is based, people are not property but individuals entitled to equal dignity in both life and the law. *See* Williams, *supra*, at 467 ("Although Taney's *Dred Scott* opinion was unquestionably controversial at the time it was issued, there is virtually no evidence to suggest that such controversy stemmed from Taney's use of the Due Process Clause . . . .").[18]

Indeed, the drafters of the Fourteenth Amendment specifically sought to address that central and wrong premise of the *Dred Scott* decision. After all, Section One of that amendment both constitutionalizes birthright citizenship and guarantees those citizens' fundamental rights. U.S. CONST. amend. XIV, § 1. So it's especially odd to deploy *Dred Scott* as a reason for undermining the protections that very Section of the Fourteenth Amendment provides.

---

[18] *Dred Scott* was also erroneous on substantive due process's own terms. The United States had an established history of banning slavery. Congress did so in the Northwest Ordinance, and states throughout the Union enacted and upheld laws similar to the Missouri Compromise. *Dred Scott*, 60 U.S. at 620, 626–28 (Curtis, J., dissenting).

Rather than a justification for jettisoning fundamental-rights jurisprudence, *Dred Scott* is better understood as a wretched symptom of the deep racial divisions and discrimination that plagued the United States in the lead-up to the Civil War and that continued to dominate Supreme Court jurisprudence for the next near century, regardless of the constitutional provision at issue. *See, e.g.*, *Civil Rights Cases*, 109 U.S. 3 (1883) (Thirteenth and Fourteenth Amendments' enforcement provisions), *abrogated in part by Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964); *Plessy v. Ferguson*, 163 U.S. 537 (1896) (Equal Protection Clause), *overruled by Brown v. Bd. of Educ.*, 347 U.S. 483 (1954).

And if we lose sight of that fact, we miss the vestiges of those divisions that still marginalize some Americans today. *See Allen v. Milligan*, 599 U.S. 1, 22 (2023) (upholding the district court's findings "that political campaigns in Alabama had been 'characterized by overt or subtle racial appeals'" and "that 'Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented'"). In short, *Dred Scott* and its errors tell us nothing about the propriety of today's substantive-due-process jurisprudence (or about fundamental-rights jurisprudence more broadly).

> 2. *Lochner* does not offer a compelling reason to depart from our current fundamental-rights jurisprudence.

Critics also point to *Lochner v. New York*, 198 U.S. 45 (1905), as a reason for casting aside substantive due process. *Lochner* was

wrong. But it doesn't justify abandoning fundamental-rights juris-prudence.

In *Lochner*, the Court invalidated wage-and-hour legislation because it concluded the legislation violated the "general right to make a contract." *Id.* at 53.

But *Lochner* did not apply substantive due process as we conceptualize that doctrine today. Rather, it strained at length to characterize the wage-and-hour law as lacking any rational relationship to the state's police powers; it called the law a mere pretext for class legislation. *See id.* at 54–64. In other words, *Lochner*'s analysis departed from the many opinions emphasizing deference to the legislature in the regulation of contract and property rights. Victoria Nourse, *A Tale of Two* Lochner*s: The Untold History of Substantive Due Process and the Idea of Fundamental Rights*, 97 Cal. L. Rev. 751, 767, 798 (2009); *see, e.g.*, *Saunders*, 25 U.S. at 320 (opinion of Trimble, J.) (explaining citizens cede many contract and property rights "to be regulated, modified, and, sometimes, absolutely restrained" by the government for the public good).

So to reject *Lochner* is not to reject judicial enforcement of fundamental rights. As Justice Holmes pointed out in dissent, his disagreement with the majority did not preclude stringent review of statutes that "would infringe fundamental principles as they have been understood by the traditions of our people and our law." *Lochner*, 198 U.S. at 76 (Holmes, J., dissenting).

Plus, *Lochner* emphasized property rights, rather than the "privacy" rights on which our modern doctrine focuses. *See* AMAR,

AMERICA'S UNWRITTEN CONSTITUTION, *supra*, at 126.  And that difference is significant.  Property, by its nature in our system, is not equally distributed among every citizen.  So as a practical matter, citizens don't equally share the same rights when it comes to property.  In contrast, every citizen—land-owning or not—enjoys the same privacy rights.  And that equality in privacy rights echoes the Fourteenth Amendment's central principle of equality.  For that reason, modern doctrine is much more in tune with the import of the Fourteenth Amendment than was *Lochner*.

And relatedly, modern substantive-due-process doctrine has much more in common with the democracy-reinforcing theory of judicial review than its critics have given it credit for.  *See* Douglas NeJaime & Reva Siegal, *Answering the* Lochner *Objection: Substantive Due Process and the Role of Courts in a Democracy*, 96 N.Y.U. L. REV. 1902, 1908–09 (2021) (explaining judicial intervention in substantive-due-process cases "can be understood as democracy-promoting").

As a matter of methodology, modern doctrine allows us to intervene only when evidence from the democratic process plainly shows the claimed right is fundamental.  *See* Nourse, *supra*, at 798 (explaining substantive-due-process cases are an example of "'convergence,' where majorities are ready to recognize the rights of minorities").  And as a matter of substance, "unlike economic liberties, personal liberties," such as the "freedom to marry" or to direct one's children's upbringing, are often "vulnerable in the political process."  JAMES E. FLEMING, CONSTRUCTING BASIC LIBERTIES: A

DEFENSE OF SUBSTANTIVE DUE PROCESS 141 (Univ. Chi. Press 2022); NeJaime & Siegal, *supra*, at 1959 ("[Modern cases] differ from *Lochner* in the deeper sense that the claimants in the cases faced conditions of stigma, denigration, and inequality that impeded their democratic participation."). So both formally and functionally, reverence for and concerns about the democratic process guide modern substantive-due-process jurisprudence.

Each of these distinctions from *Lochner* helps constrain judicial discretion in substantive-due-process analysis. But as we've already discussed, the remaining judicial discretion is not an issue unique to substantive due process. Nearly every case with political relevance results in a charge—usually unfounded—that political or moral, rather than legal, reasoning motivates judges' decisions. *See* Pozen & Samaha, *Anti-Modalities*, *supra*, at 746. Still, we do not respond to such charges by abandoning provisions of the Constitution.

Also, the view that we should leave fundamental rights that the Constitution's text does not explicitly address to the mercy of the legislative process, *see* Newsom Op. at 1–3, abandons the Framers' intent to ensure protection of those rights.

And it may itself reflect a judge's view of what constitutes good governance. That is, it may show that a particular judge finds legislative or executive abridgment of fundamental rights to be less offensive than judicial protection of them. In other words, that view of fundamental-rights jurisprudence might itself betray a policy judgment. So the argument that unenumerated rights ought to

always and only be secured in the legislative process suffers from the same defect as the one it charges substantive due process with; it may turn on a judge's personal view that deference to the legislature—even despite blatant violation of fundamental rights—is always "better" for our system of government.

Finally, concerns about another *Lochner* don't end if we reject substantive due process. If Judge Newsom's privileges-or-immunities doctrine were to secure individual liberties, *see, e.g., Sosa*, 57 F.4th at 1307 (Newsom, J., concurring), it is difficult to see how any of the *Lochner*-esque critiques about intruding on issues properly reserved for the political sphere would lose their force. Courts would still be in the business of reviewing legislative and executive action, and critics would still cry *Lochner* when a court ultimately does hold unconstitutional actions by democratically elected officials.

Plus, even if we substantially limit the scope of our fundamental-rights jurisprudence, the troubles of judicial review, and its counter-majoritarian difficulty, persist. "The more deferential federal courts are toward" the legislative and executive branches, even when courts believe their coordinate branches' actions to be "wrong, misguided, or ill-motivated, the more deferential they might also be toward" acts that the Founders and the drafters of the Fourteenth Amendment intended the courts "to hold invalid." Baude, Campbell & Sachs, *supra*, at 1240. In other words, we just replace any *Lochner*-esque errors of wrongfully intervening in the democratic process with errors of wrongfully avoiding fulfilling

our judicial duty of invalidating unconstitutional acts. As a result, we erroneously enable the tyranny of the majority.

Examples of these cases are legion. For instance, in rejecting a substantive-due-process claim, the Supreme Court allowed a Virginia institution to forcibly sterilize one of its citizens by "cutting the[ir] Fallopian tubes." *Buck v. Bell*, 274 U.S. 200, 207 (1927), *abrogated by Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942). And in violation of the plainly articulated Equal Protection Clause, the Court has wrongly deferred to many violative government acts. *See, e.g.*, *Plessy*, 163 U.S. at 544 (separate but equal); *Korematsu v. United States*, 323 U.S. 214, 223 (1944) (upholding internment camps based on national origin), *overturned by Trump v. Hawaii*, 585 U.S. 667 (2018). These errors, which we've since corrected, were not reasons to give up on enforcing either clause.

In short, we can't jettison substantive due process on the argument that we've erred in the past or that we may err again. At the end of the day, history unambiguously shows that Americans twice voted to ratify constitutional provisions that secure through the courts unenumerated rights implicit in our system of ordered liberty. Any practical problems with implementing the Ninth and Fourteenth Amendments' directives were part of the "interest balancing" "the people" conducted when they voted for them. *Heller*, 554 U.S. at 635. So it is our duty to continue to adjudicate fundamental-rights claims when they come within our jurisdiction.

\*      \*      \*

To be sure, "[s]ubstantive due process [can be] hard." New-som Op. at 1 (quoting *Eknes-Tucker*, 114 F.4th at 1277 (Jordan, J., dissenting from denial of rehearing en banc)). But we don't throw out our precedents simply because their application can be "hard." And we certainly don't do so when a constitutional right is at stake. The people ratified our Constitution on the understanding that courts would secure their fundamental rights—both express and unenumerated—against government overreach. And when state courts did not live up to those initial expectations, the people rati-fied constitutional amendments to ensure federal courts would pick up the slack. So it is our duty to enforce the Ninth and Four-teenth Amendments and to secure fundamental rights, whether they are enumerated or not.

NEWSOM, Circuit Judge, concurring:

This case proves the truth of a colleague's recent observation that "[s]ubstantive due process is hard." *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1277 (11th Cir. 2024) (Jordan, J., dissenting from denial of rehearing en banc). Hard, indeed. To be clear, though, substantive due process is hard, in large part, because it—and, with it, the doctrine that courts have cobbled together to implement it—is *incoherent*. And it's incoherent, in large part, because it's *made up*. Enough is enough. Substantive due process isn't worth the candle. It's doing more harm than good, and we—by which I suppose I really mean my bosses at the Supreme Court—should ditch it.

Let me say two things at the outset, by way of preface. First, I think the defendants' conduct here—in essence, hiding from the Littlejohns the fact that their 13-year-old daughter had expressed a desire to identify as a boy at school—was shameful. If I were a legislator, I'd vote to change the policy that enabled the defendants' efforts to keep the Littlejohns in the dark. But—and it's a big but—judges aren't just politicians in robes, and they don't (or certainly shouldn't) just vote their personal preferences. The question for me, therefore, isn't whether the defendants' conduct was shameful, but rather whether it was *unconstitutional*. And if I've said it once, I've said it a thousand times: "Not everything that s[tinks] violates the Constitution." *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1303 (11th Cir. 2019) (Newsom, J., concurring in the judgment).

Second, the target of my criticism today is the doctrine that we have come (totally unironically) to call "substantive due process." In response to my critique, Judge Rosenbaum has penned a thorough, thoughtful, 75-page defense of that doctrine—an ode, really. I'm tempted, of course, to dig in and try my hand at a point-by-point rebuttal. But this case has been pending long enough, and the parties are entitled to a resolution of their dispute. Accordingly, I've decided to leave it alone entirely. I'll let readers draw their own conclusions about whether it's worth clinging to either substantive-due-process doctrine generally or the comically vacuous "shocks the conscience" test that courts have invented to implement it. My views will be clear enough.

With that brief preamble, let's jump in.

# I

I'm a longtime (and vocal) substantive-due-process skeptic. In an effort to avoid making a pest of myself—at least on this score—I won't rehash for a *fourth* time my formal critique of the doctrine. Because I've heard no convincing rebuttal, I'll just take as givens that substantive due process (1) makes a hash of constitutional text, (2) is unmoored from history, and (3) is tainted by ignominious precedents like *Dred Scott* and *Lochner*. *See, e.g.*, *Sosa v. Martin Cnty.*, 57 F.4th 1297, 1305 (11th Cir. 2023) (Newsom, J., concurring); *Hillcrest*, 915 F.3d at 1304–06; Kevin Christopher Newsom, *Setting Incorporationism Straight: A Reinterpretation of the* Slaughter-House Cases, 109 Yale L.J. 643, 733–42 (2000).

To be clear, though, it's worse than that.  Precisely because it's so untethered from traditional interpretive sources, substantive due process is infinitely malleable—and thus manipulable.  There's a little something in it for pretty much everyone.  More often than not, it's been progressives who have championed substantive due process—and particularly the doctrine's protection of unenumerated "privacy"-based rights—in the face of conservative critiques. Think *Griswold*, *Roe*, *Casey*, *Lawrence*, and *Obergefell*.

But sometimes, folks mysteriously switch sides.  Some staunch conservative skeptics of substantive due process's "privacy" strain, for instance, warmly (if a little sheepishly) embrace the "parental rights" strain exemplified by *Meyer* and *Pierce*—and, in turn, the progressive privacy hawks express apprehension.  Now maybe there are some principled differences.  It's not my intention today to adjudicate the extent to which, say, the common law provided more or less protection for personal or parental prerogatives. But let's be honest:  If ever there were a doctrine that gave a veneer of truth to the vicious lie that judges just decide cases in accordance with their priors, it's substantive due process.

## II

But in fact, as this case lays bare, it's even worse than *that*. In what follows, I'll explore yet another perversity of substantive-due-process doctrine.  Perhaps less salaciously than distorting constitutional text or loosing judges to foist their policy preferences on society, but no less importantly, substantive due process has

spawned all sorts of confusion concerning its day-to-day operation in real cases that affect real people.

Today's object lesson, on full display in this case: the distinction courts have drawn between substantive-due-process challenges to "legislative" and "executive" actions. With respect to challenges to *legislative* action, everyone seems to agree that the standard by which a court will conduct its review depends on whether a so-called "fundamental right" is at stake. If the legislative action infringes a fundamental right, the court will apply "strict scrutiny," meaning that the action will fall unless it's the "least restrictive means" of achieving some "compelling" governmental objective. *See, e.g.*, *Williams v. Morgan*, 478 F.3d 1316, 1320 (11th Cir. 2007); *see also, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (explaining that under strict scrutiny "the government must adopt the least restrictive means of achieving a compelling state interest" (quotation marks omitted)). By contrast, if no fundamental right is at stake, the court will review legislative action only for "rational basis," meaning that the law will survive so long as it is rationally related to any "legitimate" government purpose. *See, e.g.*, *Williams*, 478 F.3d at 1320; *Doe v. Moore*, 410 F.3d 1337, 1345 (11th Cir. 2005); Maj. Op. at 12. Pretty clean. Made up, to be sure, but clean.

When it comes to challenges to *executive* action, substantive-due-process doctrine is anything but clean. And the messiness begins with the so-called "shocks the conscience" test, which the Supreme Court seems (?) to have said is the standard against which

*all* executive actions should be measured—and which, accordingly, our opinion today applies to decide the parents' challenge to the school board's decision to exclude them from a planning meeting involving their gender-dysphoric child.   *See* Maj. Op. at 18–26. We'll circle back to this soon enough, but for the time being just take on faith that the Supreme Court said in *County of Sacramento v. Lewis* that "in a [substantive] due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."   523 U.S. 833, 848 n.8 (1998).

Where to begin with the shocks-the-conscience test?  The obvious place, I suppose, is with its hopeless obscurity, as to both the "what" and the "who."  With respect to the "what," I can't improve on Justice Scalia's colorful quip, in which he referred to the *"ne plus ultra,* the Napoleon Brandy, the Mahatma Gandhi, the Cellophane of subjectivity, th' ol' 'shocks-the-conscience' test."  *Id.* at 861 (Scalia, J., concurring in the judgment) (footnote omitted).  The shocks-the-conscience standard simultaneously means nothing and everything—it's utterly and totally in the eye of the beholder.  And with respect to the "who," *who* knows?  *Lewis* refers to "the contemporary conscience," *id.* at 848 n.8 (majority opinion), but whose?  The reasonable person's?  An unelected judge's?  The Borg's?  Frankly, I have no idea.

But digging a little deeper—and now we're really getting to the nub of the parties' dispute here—how exactly does the shocks-

the-conscience test fit into the substantive-due-process framework? Does it apply, as the school board here contends, to all challenges to executive actions, including those alleging infringements of fundamental rights? Or, as the parents insist, does it apply only to those cases in what I'll call the "residuum"—that is, those that deal with more mine-run executive conduct? And if it does apply in fundamental-rights cases, such that a shocked conscience is a necessary condition to invalidating the challenged executive action, is it also a sufficient condition? Or must a plaintiff show something more? To those foundational questions—What's the standard, and when does it apply?—the precedent provides no ready answers.

Let's look first at our own cases, which are, to put it charitably, dissonant. I'll take just a few of them, in chronological order, beginning with *Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002). There, we considered whether a college professor's conduct in slamming a glass door on a student stated a substantive-due-process claim. Significantly for present purposes, we framed the inquiry in disjunctive terms, as follows:

> Conduct by a government actor that would amount to an intentional tort under state law would only rise to the level of a substantive due process violation if it [1] "shocks the conscience" or [2] interferes with rights "implicit in the concept of ordered liberty"—in other words, only if it affects individual rights guaranteed, explicitly or implicitly, by the Constitution itself.

*Id.* at 1048 (enumeration added). So, per *Dacosta*, a plaintiff raising a substantive-due-process challenge to an executive official's action can prevail by showing that the conduct *either* shocked the conscience *or* implicated a fundamental right.

About a decade later, though, we seemed to reverse course, adopting an approach that required a substantive-due-process plaintiff to establish that an executive official's conduct *both* infringed a fundamental right *and* shocked the conscience. In *Maddox v. Stephens*, we acknowledged, at the outset, that a social worker's "safety plan" that placed a child in a grandmother's care interfered with a mother's "constitutionally protected liberty interest in the care, custody and management of [her] children." 727 F.3d 1109, 1118–19 (11th Cir. 2013) (citation and quotation marks omitted). But we went on to clarify that "not every wrong committed by a state actor rises to the level of a constitutional tort sufficient to trigger . . . substantive due process protection" and emphasized that "plaintiffs face a high bar when attempting to establish a substantive due process violation as conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Id.* (citation and quotation marks omitted). The upshot seems clear enough: A substantive-due-process plaintiff challenging executive action can't win, as *Dacosta* had indicated, by showing *either* conscience-shocking behavior *or* infringement of a fundamental right; rather, she must establish *both*.

And yet.  Just a few years later, we reversed course again, seemingly re-embracing a disjunctive, either-or framing.  In *Waldman v. Conway*, which involved an inmate's challenge to prison officials' classification of him as a sex offender, we said, as an initial matter, that "[t]he Fourteenth Amendment forbids the government from infringing fundamental liberty interests at all, unless the infringement is narrowly tailored to serve a compelling state interest."  871 F.3d 1283, 1292 (11th Cir. 2017).  We held that a sex offender's right to refuse registration and publication of his information wasn't "deeply rooted in this Nation's history and tradition" and, therefore, wasn't fundamental.  *Id*. (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).  We went on, though—citing *Lewis*—to clarify that "[w]here a fundamental liberty interest does not exist, substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power" and, more specifically, that "[e]xecutive action is arbitrary in a constitutional sense when it 'shocks the conscience.'"  *Id*.  And then, summarizing our holding, we said that the executive action at issue "[1] d[id] not infringe any fundamental rights . . . *and* [2] d[id] not shock the conscience."  *Id*. at 1293 (emphasis and enumeration added).  Pretty clearly, we treated either showing—infringement of a fundamental right or conscience-shocking behavior—as an independently sufficient basis for a substantive-due-process claim.

So our own precedent is a mess.  What about the Supreme Court's?  Not much better.  Let's start with the modern fountainhead, *Lewis*.  Briefly, in *Lewis*, parents of a motorcycle passenger killed in a high-speed police chase brought a substantive-due-

process claim against the officer involved in the pursuit. *See* 523 U.S. at 837. What does the Court's opinion tell us about the shocks-the-conscience test's role in a substantive-due-process analysis or the breadth of its application? Does the test apply to all challenges to executive action, or only some? Does it apply to cases implicating fundamental rights, or only those in what I've called the "residuum"? Short answer: Tough to say.

For starters, there are non-frivolous arguments that the Supreme Court meant to limit the scope of its holding to police-pursuit cases. After all, the Court described "[t]he issue in th[e] case" as "whether a police officer violates the Fourteenth Amendment[] . . . in a high-speed automobile chase aimed at apprehending a suspected offender," reported that it had "granted certiorari to resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case," and announced as its "hold[ing]" that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 836, 839, 854 (citation omitted).

There's also language in the *Lewis* opinion to suggest that even if not strictly limited to pursuit cases, the Court intended to apply the shocks-the-conscience standard only to "residuum" cases that don't implicate fundamental rights. The Court repeatedly cautioned against "arbitrary" government conduct, *see id.* at 836, 843, 845, 846, 847, and emphasized that "[t]he touchstone of due process

is protection of the individual against arbitrary action of government," *id.* at 845 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)) (alteration in original). Perhaps most pointedly in this respect, the *Lewis* Court said this:

> While due process protection in the substantive sense limits what the government may do in both its legislative, *see, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479 (1965), and its executive capacities, *see, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952), criteria to identify *what is fatally arbitrary* differ depending on whether it is legislation or a specific act of a governmental officer that is at issue. * * * Our cases dealing with executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense . . . ." * * * To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.

*Id.* at 846 (emphasis added). All of the "arbitrar[iness]" talk in *Lewis* is evocative of the standard that applies at the most deferential end of the scrutiny spectrum, and thus could be understood to imply that the Court wasn't addressing itself to cases implicating fundamental rights.[1]

---

[1] Which raises yet another complication: Might *Lewis* itself have *been* a fundamental-rights case? The Supreme Court never said as much in so many words, but one could reasonably assume that the right to "life," which the plaintiffs' son lost in the chase, is indeed fundamental. *Cf. Browder v. City of Albuquerque,*

But then there's *Lewis*'s footnote 8. There, the Court specifically responded to Justice Scalia's charge that the shocks-the-conscience test shouldn't apply, and that under *Glucksberg* the focus should instead be on whether "our Nation has traditionally protected the right [the plaintiffs] assert[ed]." 523 U.S. at 862 (Scalia, J., concurring in the judgment). The majority rejoined as follows, and in so doing gave every indication that the shocks-the-conscience standard applies, at the threshold and across the board, to *all* challenges to executive action, of whatever stripe and in whatever context:

> [A] case challenging **executive action** on substantive due process grounds, like this one, presents an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed. For **executive action** challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law. Thus, in a due process challenge to **executive action**, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of

---

787 F.3d 1076, 1080 (10th Cir. 2015) (Gorsuch, J.) (considering the "fundamental right to life" in a substantive-due-process case brought by the estate of a deceased occupant killed when his car was hit by a police cruiser).

contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. In none of our prior cases have we considered the necessity for such examples, and no such question is raised in this case.

In sum, the difference of opinion in *Glucksberg* was about the need for historical examples of recognition of the claimed liberty protection at some appropriate level of specificity. In an ***executive action*** case, no such issue can arise if the conduct does not reach the degree of the egregious.

*Id.* at 847–48 n.8 (emphasis added).[2]

_____

[2] In his dissenting opinion, Judge Tjoflat calls footnote 8 "pure dicta." Dissenting Op. at 28. The shocks-the-conscience test, he says, applies only to what he calls "executive power *plus*" cases—*i.e.*, those that involve "a common law tort claim styled as a constitutional violation." *See id.* at 19–20. Respectfully, I don't think *Lewis* supports that reading. The *Lewis* Court never drew a line between "executive-power-*plus*" and fundamental-rights cases—a line that, it seems to me, would be fuzzy and unstable in any event. *See supra* at 10–11 n.1. Nor is footnote 8 dicta—even under Judge Tjoflat's proposal for smoking out superfluous language. *See* Dissenting Op. at 8–9. After all, the *Lewis* majority expressly declined Justice Scalia's invitation to bypass the shocks-the-conscience test in favor of *Glucksberg*'s historical inquiry. *See Lewis*, 523 U.S. at

So, to summarize how things stood in the Supreme Court after *Lewis*:  Vague hints, perhaps, that the shocks-the-conscience test might have a narrower berth, but clearer indications that the Court meant for it to apply to *all* substantive-due-process challenges to executive action.

And what about since *Lewis*?  You guessed it—more uncertainty.  In *Chavez v. Martinez*, 538 U.S. 760 (2003), the Court considered a substantive-due-process claim against an officer who had allegedly subjected a witness to a coercive interrogation.  Writing for a three-justice plurality, Justice Thomas seemed to apply *both* the shocks-the-conscience *and* fundamental-rights analyses to conduct that was indisputably executive in nature.  First, the plurality cited *Lewis* and stated that it could not "agree with [the plaintiff's] characterization of [the officer's] behavior as 'egregious' or 'conscience shocking.'"  *Id.* at 774–75 (plurality opinion).  The plurality then said, though—citing *Glucksberg*—that "the Due Process Clause also protects certain 'fundamental liberty interests' from deprivation by the government, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Id.* at 775.  That certainly makes it *seem* like the plurality

---

847–48 n.8.  Because the officer's conduct didn't shock the conscience, the *Lewis* majority saw no need to consider "historical examples of protected liberty."  *Id.* at 847.  So, far from dicta, the idea that "a due process challenge to executive action" must first satisfy a shocks-the-conscience "threshold" was integral to the Court's reasoning.  *See id.* at 847–48  And the fact that Justice Scalia felt compelled to write separately in order to dispute that proposition confirms as much.  *See id.* at 860–62 (Scalia, J., concurring in the judgment).

thought that a substantive-due-process violation could be shown either way—by conscience-shocking conduct *or* by infringement of a fundamental right.

So, what to make of *Lewis* and *Chavez*?  Neither is crystal clear, but to the extent they give off notes, those notes are (also) discordant:  *Lewis* loudly indicates that the shocks-the-conscience standard applies to all substantive-due-process challenges to executive action, whereas *Chavez* suggests, albeit more quietly, that the test applies only outside the fundamental-rights context.  For myself, I tend to think a similarly perplexed then-Judge Gorsuch reconciled them about as well as can be done when he said that *Lewis* is relatively clear, *Chavez* is relatively not, and so *Lewis*'s rule (?) that the shocks-the-conscience standard applies across the board to all executive-action challenges governs.  His words:

> In *Chavez v. Martinez*, a three-justice plurality seemed to employ both the "legislative" and "executive" tests in a case challenging executive action.  What exactly this means is unclear. * * *  All we can say with certainty is that *Chavez* did not expressly overrule *Lewis*'s holding that the "arbitrary or conscience shocking" test is the appropriate one for executive action so we feel obliged to apply it.

*Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015) (citation omitted).

\*   \*   \*

While no clear rule really emerges from this jurisprudential dumpster fire, so far as I can tell, the best understanding is that any plaintiff challenging executive action on the ground that it violates substantive due process—even one who, like the plaintiffs here, insists that the executive actor's conduct has infringed a fundamental right—must prove conscience-shocking behavior as a necessary element of his claim.[3]

Now, finally, to a consideration of the implications of that conclusion.  Spoiler alert:  Goofy.

## III

So where does all this leave us?  The way I see it, the legislative-executive distinction, and the ensuing application of the shocks-the-conscience test to all challenges to executive actions, including those that affect fundamental rights, results in a liability regime that is totally bizarre:  If the government infringes a fundamental right via legislative act, it will almost certainly lose—because, as the old saw goes, strict scrutiny is "strict in theory, but fatal in fact."  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237

---

[3] Perhaps not surprisingly, a number of our sister circuits have come to that conclusion, as well.  *See, e.g.*, *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005); *Kane v. Barger*, 902 F.3d 185, 192 (3d Cir. 2018); *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc); *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765–66 (6th Cir. 2020); *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021); *Moran v. Clarke,* 296 F.3d 638, 644 (8th Cir. 2002) (en banc), *abrogated on other grounds by Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017).

(1995) (citation and quotation marks omitted).  By contrast, if the government infringes that right through executive action, it will almost certainly *win*—because, as the case law bears out, pretty much *nothing* shocks the conscience.

That makes *no* sense.  There's certainly no textual warrant for such a radical disjunction in the Fifth or Fourteenth Amendments' Due Process Clauses, both of which address the government generally, not a particular branch.  *See* U.S. Const. amend V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."); *id.* amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . .").[4]  But of course the lack of textual anchor shouldn't surprise us, because as I've said—too many times now—the substantive-due-process doctrine has no root in the text *at all*.  *See supra* at 2.

Nor, to my mind, can the application of a more indulgent constitutional standard to executive than to legislative action that implicates fundamental rights be squared with common sense.

---

[4] Nor does the shocks-the-conscience test find any footing in § 1983's text.  *See* 42 U.S.C. § 1983.  So while Judge Tjoflat might be right that a shocks-the-conscience "threshold requirement all but eliminates § 1983 as a remedy to compensate citizens whose fundamental rights have been violated by state and local executive action," Dissenting Op. at 43–44, I think he missteps in blaming this Court for "amend[ing]" § 1983, *see id.* at 47.  That charge, it seems to me, is more appropriately leveled at the Supreme Court than us, the middle-managers who must heed and seek to implement the high court's commands, however muddled or misguided.

Why should the executive branch of the government be given more leeway to violate constitutional rights than the legislative branch? Then-Judge Gorsuch, puzzling over the same divergence, suggested one possibility:

> Perhaps the answer lies in the fact that legislation touching on fundamental rights is clearly state action and clearly affects the liberty of an entire class of persons while executive action infringing fundamental rights can often come by way of isolated and unauthorized conduct by individual rogue executive agents against individual citizens.

*Browder*, 787 F.3d at 1079 n.1.

Maybe, but I'm skeptical. Executive officers often have and exercise authority to promulgate policies that mimic legislation, both in terms of the deliberation that goes into them and the ground they cover. And courts aren't always punctilious about distinguishing government conduct based on function rather than branch. To take just one example, the district court considering a substantive-due-process challenge to the Trump Administration's rescission of DACA applied the shocks-the-conscience standard despite the fact that, for all practical purposes, that executive action operated just like a statute. *See Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 777 (D. Md. 2018), *aff'd in part, vacated in part, and rev'd in part,* 924 F.3d 684 (4th Cir. 2019).

It seems to me (1) that the standards applicable to legislative and executive infringements of fundamental rights should

probably be the same and (2) if there's to be any divergence, then current law might have gotten matters exactly backwards. After all, it's at the very least arguable that "executive action—which, by its nature, is individual, targeted, and one-off, rather than broadly and generally applicable—holds the greater potential for abuse." *Hillcrest*, 915 F.3d at 1311 (Newsom, J., concurring in the judgment).

\*  \*  \*

Bottom line:  I've long known (and preached) that substantive-due-process doctrine is atextual, ahistorical, and contaminated by rogue precedents.  And I've long feared that it is susceptible to grave abuse on both sides of the jurisprudential divide.  This case has taught me that the legal framework the theory has generated is too far gone.  As the old saying goes, "If you find yourself in a hole, best to stop digging."  For decades, courts invoking substantive due process have bored a crater-sized hole in responsible constitutional decisionmaking.  We should be looking for ways to climb out of that hole, not deepen it.

T JOFLAT, Circuit Judge, dissenting:

The "right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.'" *Troxel v. Granville*, 530 U.S. 57, 91, 120 S. Ct. 2054, 2074 (2000) (Scalia, J., dissenting). "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests" the Due Process Clause protects. *Id.* at 65, 120 S. Ct. at 2060 (plurality opinion). "In a long line of cases, [the Supreme Court] ha[s] held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children . . . ." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997); *see also, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 626 (1923) (referring to "the right of the individual to . . . establish a home and bring up children"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 573 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control").

Today, this Court holds that Jeffrey and January Littlejohn, parents of a minor child, A.G., cannot recover damages under 42 U.S.C. § 1983 against four executives of the Leon County School District for violating their fundamental liberty interest in A.G.'s upbringing and education. The Court affirms the District Court's dismissal of the Littlejohns' complaint because the Littlejohns failed

to allege facts that the executives' conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Maj. Op. at 11; *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 1717 n.8 (1998). According to the Court, if there was any doubt the Littlejohns had to prove that the executives' conduct was conscience-shocking to be heard on their claim that the executives violated their fundamental interest in the upbringing and education of A.G., *Sacramento* eliminated it:

> Importantly for our purposes, the [Supreme] Court clarified that the "conscience shocking" inquiry is a "threshold question" that necessarily precedes any fundamental-rights analysis. In other words, even if a plaintiff alleges that executive action violated a fundamental right, the plaintiff must first show that the action "shock[ed] the contemporary conscience."

Maj. Op. at 14–15 (citations omitted).

The Court points to *Maddox v. Stephens*, 727 F.3d 1109 (11th Cir. 2013), as "illustrat[ing] the *Sacramento* framework in practice." Maj. Op. at 16. *Maddox* is "precedent," the Court states, because it "concerned the same fundamental parental rights that the Littlejohns assert." *Id.* According to the Court, in *Maddox*, "[w]e found that the plaintiff had 'undisputed[ly]' pled a violation of her substantive-due-process rights. But we said that such a violation was not enough—rather, only conduct that is 'arbitrary or conscience shocking in a constitutional sense' could trigger a substantive-due-process violation." *Id.* (citations omitted).

I do not read the Supreme Court's opinion in *Sacramento* as holding that "the conscience shocking inquiry is a threshold question that necessarily precedes any fundamental-rights analysis." *Contra* Maj. Op. at 14–15. Nor do I read this Court's opinion in *Maddox* as holding that "only conduct that is 'arbitrary or conscience shocking in a constitutional sense' could trigger a substantive-due-process violation." *Contra id.* at 16. If today's opinion states the law, then enforcement in the Eleventh Circuit of the fundamental liberty interests the Littlejohns seek to vindicate under 42 U.S.C. § 1983 has come to an end. I respectfully dissent.

                    *           *           *

I turn first to three points to keep in mind while reading this dissent. Then, in Part I, I turn to the legal backdrop surrounding fundamental rights and the "shocks-the-conscience standard." In Part II, I turn to the factual issues litigated in *Sacramento* and the holding the Supreme Court reached based on the resolution of those issues. In Part III, I explain why *Maddox*'s holding is not an application of *Sacramento*'s holding in the fundamental rights context. Rather, the portion of *Maddox* that the Majority cites is pure dicta. By taking it as the law, the Court has trampled on the province of the Legislature, amended § 1983, and violated our Constitution's separation of powers. In part IV, I conclude.

                    *           *           *

It will be helpful in reading this dissent to keep three points in mind:

### A. Executive Power

The first point is that executive power falls under the "police power." Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Police power is "[t]he inherent and plenary power of a sovereign to make all laws necessary and proper to preserve the public security, order, health, morality, and justice. It is a fundamental power essential to government." *Police Power*, Black's Law Dictionary (12th ed. 2024). The executive branch of government at the state and local levels is charged with attaining the government's police power objectives. The executives appointed to attain the objectives are given the authority—the executive power—needed to do that work.

In Florida, the provision of public education is an exercise in police power. Article IX of the Florida Constitution establishes a public education system, comprised of a State Board of Education, School Districts (by county), and School Boards that are charged with operating the schools within the districts. Fla. Const. art. IX, §§ 1(a), 2, 4. Drawing on its police power, the Leon County School Board authorized its LGBTQ+ Equity Committee to develop the Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide. The School Board assigned Superintendent Hanna, Assistant Superintendent Rogers, Assistant

Principal Oliveri, and Counselor Thomas the task of implementing the Guide. Their interactions with A.G. and the Littlejohns involved the exercise of executive power.

If "the [police] power [is] so abused as to cause its exertion to exceed the limits of the police power," the exertion is brought under "the prohibitions of" the Due Process Clause of the Fourteenth Amendment. *Pac. Gas & Elec. Co. v. Police Ct. of Sacramento*, 251 U.S. 22, 25, 40 S. Ct. 79, 81 (1919). Because executive power derives from the police power, the same is true if executive power is abused.

In his opinion for the Court in *Sacramento*, Justice Souter used the following phrases to describe executive behavior that exceeds the limits of executive power, bringing the behavior under the prohibition of the Fourteenth Amendment Due Process Clause and "most probably support[ing] a substantive due process claim," 523 U.S. at 849, 118 S. Ct. at 1718:

- "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.*
- "[A]n abuse of executive *power* so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Id.* at 840, 118 S. Ct. at 1713 (emphasis added).
- "[B]ehavior . . . so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8, 118 S. Ct. at 1717 n.8.

### B. Dicta

The second point is that dicta are not precedential—only holdings are. "A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'" *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring). This is because Article III of the U.S. Constitution confines federal courts to the resolution of actual "Cases" or "Controversies." U.S. Const. art. III, § 2.[1] Dicta, however, are statements or observations in a court's opinion that are not directly related to the facts or legal questions *necessary* to resolve the action. Chief Justice Marshall explained why dicta are not binding:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full

---

[1] Although the role of federal courts might be debated amongst the bar, bench, and lectern, I agree with Judge Newsom that "once a court has fulfilled its obligation—that is, has said enough to resolve the parties' dispute—it *should* just stop. It shouldn't forge ahead, reach out, and declare more law." *United States v. Files*, 63 F.4th 920, 933 (11th Cir. 2023) (Newsom, J., concurring), *cert. denied*, 144 S. Ct. 419 (2023).

> extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821). In other words, "Dicta are less carefully considered than holdings, and, therefore, less likely to be accurate statements of law." Michael C. Dorf, *Dicta and Article III*, 142 U. Pa. L. Rev. 1997, 2000 (1994). "[C]ourts are more likely to exercise flawed, ill-considered judgment, more likely to overlook salutary cautions and contraindications, more likely to pronounce flawed rules, when uttering dicta than when deciding their cases." Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1255 (2006).

In addition to accuracy problems, confusing dicta as binding presents a profound separation of powers issue. "[C]ourts have legitimate authority only to decide cases, not make law in the abstract." Dorf, *supra*, at 2001. Because dicta are outside the case or controversy, relying on dicta ventures into the terrain of advisory opinions and steps on the line separating the Legislature's province to make law from the Judiciary's role in deciding controversies.[2]

---

[2] Chief Justice Jay and the Associate Justices noted as early as 1793 that the constitutional separation of powers counsels against the "propriety of [the federal judiciary] extrajudicially deciding" questions which arise outside of a case or controversy. Letter from Chief Justice John Jay and the Associate Justices to President George Washington (August 8, 1793), 3 Correspondence & Public Papers of John Jay 488–89 (Henry P. Johnston ed., 1891). Consequently, "[f]ederal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers." *Flast v. Cohen*, 392 U.S. 83, 97, 88 S. Ct. 1942, 1951 (1968); *see also Muskrat v. United States*, 219

How do we know what is dictum? Judge Pierre Leval offers an illustrative test:

> To identify dictum, it is useful to turn the questioned proposition around to assert its opposite, or to assert whatever alternative proposition the court rejected in its favor. If the insertion of the rejected proposition into the court's reasoning, in place of the one adopted, would not require a change in either the court's judgment or

---

U.S. 346, 356, 31 S. Ct. 250, 253 (1911) ("[U]nless [the judicial power] is asserted in a case or controversy within the meaning of the Constitution, the power to exercise it is nowhere conferred."). The judicial power does not create "roving commission[s] to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S. Ct. 2190, 2203 (2021*); see also Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241, 144 S. Ct. 771, 777 (2024) ("[F]ederal judges are not counselors or academics; they are not free to take up hypothetical questions that pique a party's curiosity or their own.").

This limitation on the judicial power is a necessary guard of liberty, for "there is no liberty if the power of judging be not separated from the legislative and executive powers." The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). As such, the Supreme Court emphasizes that rendering advisory opinions gives rise to dangers and must therefore be avoided. *See Michigan v. Long*, 463 U.S. 1032, 1041, 103 S. Ct. 3469, 3476 (1983). "However much provision may be made on paper for adequate arguments (and experience justifies little reliance) advisory opinions are bound to move in an unreal atmosphere." Felix Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1002, 1006 (1924). Ignoring this restriction on the federal judiciary poses grave danger, given the political function implicit in the power of the judiciary to abrogate unconstitutional behaviors. *See id.* at 1007. No matter the evil presented to the courts, the federal judiciary "cannot rightly attempt to protect the people, by undertaking a function not its own." *Id.* at 1008.

the reasoning that supports it, then the proposition is dictum. It is superfluous. It had no functional role in compelling the judgment.

Leval, *supra*, at 1257.

Our Circuit abides by these principles. Former Chief Judge Ed Carnes, joined by Chief Judge William Pryor, clarifies in his concurrence in *Nelson v. Tompkins*: "This Court has often stressed that no decision can hold anything that goes beyond the facts of the case." 89 F.4th 1289, 1303 (11th Cir. 2024) (Carnes, J., concurring).[3]

---

[3] *See also, e.g., Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case. All statements that go beyond the facts of the case . . . are dicta. And dicta [are] not binding on anyone for any purpose." (citations omitted)); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) ("The holdings of a prior decision can reach only as far as the facts and circumstances frame the precise issue presented in that case."); *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." (quoting *United States v. Hunter*, 172 F.3d 1307, 1309 (11th Cir. 1999) (Carnes, J., concurring) (quotation marks omitted))); *see also Moon v. Head*, 285 F.3d 1301, 1318 (11th Cir. 2002) (Carnes, J., concurring) ("Those statements are dicta. They are dicta because they go beyond the facts of the [earlier] case itself . . . ."); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007) ("Judicial opinions do not make binding precedents; judicial decisions do." (quoting

So what do *Sacramento* and *Maddox* hold? And how much of what was written are obiter dicta? The answers to these questions are pertinent to an accurate understanding of the law as it stands.

### C. Liberty Interests

The third point is that, unless otherwise indicated, in using the terms "fundamental right(s)," "fundamental liberty interest(s)" and "parental right(s)," I am referring to liberty interests like the provisions of the Bill of Rights that have been incorporated into the Fourteenth Amendment through its Due Process Clause because they are "'fundamental to our scheme of ordered liberty,' or 'deeply rooted in this Nation's history and tradition.'" *Timbs v. Indiana*, 586 U.S. 146, 150, 139 S. Ct. 682, 687 (2019) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S. Ct. 3020, 3036 (2010)).

### I.    Fᴜɴᴅᴀᴍᴇɴᴛᴀʟ Rɪɢʜᴛs Pʀᴇ-*Sᴀᴄʀᴀᴍᴇɴᴛᴏ*

Before I discuss why *Sacramento* does not hold what this Court purports it does, it is imperative to understand the backdrop against which *Sacramento* took place.

In 1923, the Supreme Court clarified that the liberty guaranteed by the Fourteenth Amendment "denotes not merely freedom from bodily restraint" but also protects liberties including "the right . . . to . . . bring up children." *Meyer*, 262 U.S. at 399, 43 S. Ct. at 626.

---

*Dantzler v. IRS*, 183 F.3d 1247, 1251 (11th Cir. 1999) (alteration adopted) (quotation marks omitted))).

The Supreme Court has continued to affirm the proposition that parents have a fundamental liberty interest in raising their children. *See Glucksberg*, 521 U.S. at 720, 117 S. Ct. at 2267; *Pierce*, 268 U.S. at 534–35, 45 S. Ct. at 573. In other words, the Littlejohns assert a *fundamental* interest,[4] meaning it ought to be protected from unnecessary government interference, regardless of whether that interference is "conscience shocking." So where did "shocks the conscience" come into play?

"Shocks the conscience" made its debut in *Rochin v. California*, 342 U.S. 165, 172, 72 S. Ct. 205, 209 (1952). There, the Court held that a conviction premised on drugs that were obtained by pumping the defendant's stomach violated the Due Process Clause of the Fourteenth Amendment. At the time, Justice Frankfurter, who wrote the majority opinion, did not believe that the Fourth, Fifth, and Sixth Amendments applied to the states through the Fourteenth Amendment. Instead, Justice Frankfurter stated that conduct that "shocks the conscience" violated Due Process because it "offend[s] the community's sense of fair play and decency." *Id.* at 173, 72 S. Ct. at 210. But *Rochin* never suggested that "shocks the conscience" was a threshold requirement or an element of a Due Process claim.

For a while, "shocks the conscience" appeared only sparingly. In 1957, the Court applied the standard to deny a habeas petition. *Breithaupt v. Abram*, 352 U.S. 432, 436–37, 77 S. Ct. 408, 411

---

[4] The Majority "assume[s] without deciding that the Littlejohns invoke 'fundamental' rights." Maj. Op. at 10.

(1957). Then in *United States v. Salerno*, the Court stated that "substantive due process prevents the government from engaging in conduct that shocks the conscience *or* interferes with rights implicit in the concept of ordered liberty." 481 U.S. 739, 746, 107 S. Ct. 2095, 2101 (1987) (emphasis added) (citations and internal quotation marks omitted). There, it was clear that "shocking the conscience" was not a threshold requirement to vindicate a fundamental right, hence the Court's disjunctive framing. That is seen later in *Youngberg v. Romeo*, where the Court held that the Due Process Clause protects against unsafe confinement and unreasonable body restraints. 457 U.S. 307, 324, 102 S. Ct. 2452, 2462 (1982). In *Youngberg*, the Court never mentioned "shocks the conscience" or even cited *Rochin*. *See generally id.*

Indeed, "[a]n analysis of every Supreme Court citation to *Rochin* from 1952 to 1998 demonstrates that, outside the context of the evidentiary exclusionary rule, the shocks the conscience test was cited much more frequently in dissenting opinions, often rejected, and strongly criticized. It was never considered to be the only standard for challenging executive misconduct, nor was it viewed as supplanting fundamental rights analysis." Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience Test*, 13 Chap. L. Rev. 307, 315–16 (2010).

Our Circuit precedent supports this understanding of the law. For example, in *Arnold v. Bd. of Educ. of Escambia Cnty.*, we found

> that a parent's constitutional right to direct the upbring-
> ing of a minor is violated when the minor is coerced to
> refrain from discussing with the parent an intimate

> decision such as whether to obtain an abortion; a deci-
> sion which touches fundamental values and religious be-
> liefs parents wish to instill in their children.

880 F.2d 305, 312 (1989), *abrogated on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 113 S. Ct. 1160 (1993).[5] *Arnold* makes no mention of "shocking the conscience" because hornbook constitutional law principles do not require it to do so. We correctly acknowledged that fundamental rights were protected from government intrusion even when that intrusion did not "shock the conscience."

No more, according to the Majority. It reads *Sacramento* to muzzle the vindication of fundamental rights. What's more—the Majority purports that *Sacramento* did all of this in a footnote. Instead of fundamental rights being protected from an executive actor's intrusion, they are protected only if the act "shocks the conscience." The Majority is wrong.

## II.    COUNTY OF SACRAMENTO V. LEWIS

Today, this Court holds that "even if a plaintiff alleges that executive action violated a fundamental right, the plaintiff must first show that the action 'shock[ed] the contemporary conscience.'" Maj. Op. at 15. In other words, a plaintiff must allege and prove that the executive's action exceeded the limits of his authorized

---

[5] In *Swann v. Southern Health Partners, Inc.*, 388 F.3d 834 (2004), we held that *Leatherman* overruled *Arnold* to the extent it held a heightened pleading standard applied to § 1983 actions. *Id.* at 837. That makes no difference here.

power and therefore constituted a substantive due process viola-
tion. The Court reaches that holding because *Sacramento* "clarified
that the 'conscience shocking' inquiry is a 'threshold question' that
necessarily precedes any fundamental-rights analysis." Maj. Op. at
14–15. But *Sacramento* did no such thing.

Justice Souter's opinion for the Court in *Sacramento* states the
issue before the Court as "whether a police officer violates the
Fourteenth Amendment's guarantee of substantive due process by
causing death through deliberate or reckless indifference to life in
a high-speed automobile chase aimed at apprehending a suspected
offender." 523 U.S. at 836, 118 S. Ct. at 1711. The Court answered
no and held that "in such circumstances *only a purpose to cause harm
unrelated to the legitimate object of arrest*[6] will satisfy the element of
arbitrary conduct *shock*ing to *the conscience*, necessary for a due pro-
cess violation."[7] *Id.*, 118 S. Ct. at 1711–12 (emphasis added).

## A.  The Facts Leading to Suit

The facts underpinning the Supreme Court's holding in *Sac-
ramento*—that the police officer did not violate the Fourteenth
Amendment's guarantee of substantive due process—were these:

---

[6] I read "unrelated to the legitimate object of arrest" as beyond the limits of
executive power.

[7] The Court in *Sacramento* granted certiorari "to resolve a conflict among the
Circuits over the standard of culpability on the part of a law enforcement of-
ficer for violating substantive due process in a pursuit case." *Id.* at 839, 118 S.
Ct. at 1713.

On May 22, 1990, at approximately 8:30 p.m., petitioner James Everett Smith, a Sacramento County sheriff's deputy, along with another officer, Murray Stapp, responded to a call . . . . Upon returning to his patrol car, Stapp saw a motorcycle approaching at high speed. It was operated by 18-year-old Brian Willard and carried Philip Lewis, respondents' 16-year-old decedent, as a passenger. . . .

Stapp turned on his overhead rotating lights, yelled to the boys to stop, and pulled his patrol car closer to Smith's, attempting to pen the motorcycle in. Instead of pulling over in response to Stapp's warning lights and commands, Willard slowly maneuvered the motorcycle between the two police cars and sped off. Smith immediately switched on his own emergency lights and siren, made a quick turn, and began pursuit at high speed. For 75 seconds over a course of 1.3 miles in a residential neighborhood, the motorcycle wove in and out of oncoming traffic, forcing two cars and a bicycle to swerve off the road. The motorcycle and patrol car reached speeds up to 100 miles an hour, with Smith following at a distance as short as 100 feet; at that speed, his car would have required 650 feet to stop.

The chase ended after the motorcycle tipped over as Willard tried a sharp left turn. By the time Smith slammed on his brakes, Willard was out of the way, but Lewis was not. The patrol car skidded into him at 40 miles an hour, propelling him some 70 feet down the road and inflicting massive injuries. Lewis was pronounced dead at the scene.

*Id.* at 836–37, 118 S. Ct. at 1712.

### B. *The lawsuit*

Lewis's parents and the representatives of Lewis's estate, invoking 42 U.S.C. § 1983, sued Sacramento County, the Sacramento County Sheriff's Department, and Deputy Smith, "alleging a deprivation of Philip Lewis's Fourteenth Amendment substantive due process right to life."[8] *Id*. at 837, 118 S. Ct. at 1712. The District Court granted summary judgment for the county and sheriff's department and dismissed the claim against Smith on the ground of qualified immunity. *Id*. The Ninth Circuit reversed as to Smith and remanded the case for further proceedings, finding a genuine issue of fact as to whether "Smith's conduct amounted to deliberate indifference." *Id*. at 838, 118 S. Ct. at 1712–13.

On certiorari, the Supreme Court restated the plaintiffs' claim against Smith as: "Smith's actions in causing Lewis's death were *an abuse of executive power* so clearly *unjustified by any legitimate objective of law enforcement* as to be barred by the Fourteenth Amendment." *Id*. at 840, 118 S. Ct. at 1713 (emphasis added).

### C. *The Supreme Court's Decision*

The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by

---

[8] Philip Lewis's parents initially sued in state court bringing claims under 42 U.S.C. § 1983 for the deprivation of Lewis's life and for compensation under state law for Lewis's wrongful death. *Lewis v. Sacramento County*, 98 F.3d 434, 437 (9th Cir. 1996). The defendants removed the case to federal court based on federal question jurisdiction. *Id*.

an action under § 1983." *Id.* at 854, 118 S. Ct. at 1720. The sum and substance of *Sacramento*'s holding is that Smith's behavior in doing his job as a law enforcement officer did not deny Philip Lewis substantive due process.[9]

> Smith was faced with a course of lawless behavior for which the police were not to blame. They had done nothing to cause Willard's high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes. Willard's outrageous behavior was practically instantaneous, and so was Smith's instinctive response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce Willard's lawlessness, or to terrorize, cause harm, or kill.

> Regardless whether Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience . . . .

*Id.* at 855, 118 S. Ct. at 1721.

---

[9] The Court reversed the Ninth Circuit's decision and, in effect, affirmed the District Court's summary judgment on the ground that the *Sacramento* plaintiffs failed to create an issue of fact warranting a jury trial on their substantive due process claim. *See id.* at 855, 118 S. Ct. at 1721.

### D. Footnote 8

Today's majority rests its decision on a "clarification" hidden within *Sacramento*'s footnotes. According to this Court, Justice Souter clarified *Sacramento*'s "holding" in footnote 8:

> As we explain in the text, a case challenging executive action on substantive due process grounds, like this one, presents an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed. For *executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law.* Thus, *in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.* That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. In none of our prior cases have we considered the necessity for such examples, and no such question is raised in this case.

*Id.* at 847 n.8, 118 S. Ct. at 1717 n.8 (emphasis added).

### 1. A Font of Tort Law

The portion of footnote 8 italicized above indicates that Justice Souter, like the Supreme Court as a whole, was concerned about 42 U.S.C. § 1983 becoming a "font of tort law." *Id.* The complaint in *Sacramento* alleged that Deputy Smith caused Philip Lewis's death "through deliberate or reckless indifference to life in a high-speed automobile chase." *Id.* at 836, 118 S. Ct. at 1711. In essence, the complaint presented a common law tort claim styled as a constitutional violation.[10] That is, the only thing distinguishing the plaintiffs' claim from a tort was that the defendant happened to be a state actor. As a result, the plaintiffs could argue that Smith's actions deprived Lewis "of life . . . without due process of law" in violation of the U.S. Constitution. *See* U.S. Const. amend. XIV.

In *Sacramento*, Justice Souter avoids the "font of tort law" problem by restating the claim as an abuse of executive power: "Smith's actions in causing Lewis's death were an abuse of *executive power* so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Id.* at 840, 118 S. Ct. at 1713 (emphasis added). Footnote 8 further ensures the avoidance with this statement: "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may

---

[10] California law prevented the *Lewis* plaintiffs from bringing their claim as a state law tort action. *See* Cal. Veh. Code § 17004 (1990) (providing that a public employee is not liable for civil damages resulting from the operation of an emergency vehicle in immediate pursuit of a suspected criminal).

fairly be said to shock the contemporary conscience." *Id.* at 847 n.8, 118 S. Ct. at 1717 n.8. This sentence and the "font of tort law" sentence preceding it describe deliberate and tortious conduct. Thus, footnote 8 essentially creates an "executive power *plus*" inquiry: to amount to a substantive due process claim, the officer's behavior must exceed the limits of his executive power. The "plus" is that the behavior is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.*

Using this test in *Littlejohn* is inapt. The executives who deprived the Littlejohns of their constitutional right did not commit a common law tort or abuse their executive power. To the contrary, the Littlejohns allege the deprivation of parental rights that are anchored in the Constitution because they are "'fundamental to our scheme of ordered liberty,' or 'deeply rooted in this Nation's history and tradition.'" *See Timbs*, 586 U.S. at 150, 139 S. Ct. at 687 (quoting *McDonald*, 561 U.S. at 767, 130 S. Ct. at 3036). And the deprivation took place while the executives were simply doing their jobs. The Littlejohns' lawyers could not have alleged that the executives' behavior was beyond the scope of the executives' job responsibilities and executive power. That is because the behavior naturally fell within their authority to implement the Guide and was not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento*, 523 U.S. at 847 n.8, 118 S. Ct. at 1717 n.8. The lawyers could not allege that the executives abused their power when acting under policy because Rule 11 prohibits such frivolity. *See* Fed. R. Civ. P. 11(b)(2).

The Majority is mistaken to apply the "shocks the conscience" test here. A straightforward reading of footnote 8 and related passages of Justice Souter's opinion reveals that the threshold requirement does not apply in § 1983 cases brought against executives for the infringement of a fundamental liberty interest that—like many of the Bill of Rights provisions—has been incorporated into the Fourteenth Amendment through its Due Process Clause.

Foremost in the *Sacramento* Court's mind was the proposition that

> the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States" . . . . "[O]ur Constitution . . . does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

523 U.S. at 848–49, 118 S. Ct. at 1718 (citations omitted).

Footnote 8 to Justice Souter's opinion deals with what a plaintiff must show to place his tort claim at the other end of the end of the customary tort law culpability spectrum and therefore obtain a hearing on whether the executive's infringement of his liberty is compensable in damages. Below, I recite the relevant passages of footnote 8 followed by commentary that clarifies what the footnote means.

*Excerpt 1*

As we explain in the text, a case challenging executive action on substantive due process grounds, like this one, presents an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed. For executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law. Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

*Id.* at 847 n.8, 118 S. Ct. at 1717 n.8.

The Court is taking steps to ensure that enforcing a liberty interest in life (or physical security) is not demoting the Constitution to a font of tort law. The conduct the plaintiff introduces in responding to the threshold question must be more than "deliberate or reckless indifference to life" (or physical security). *Id.* at 836, 118 S. Ct. at 1711. It must constitute an abuse of the executive's

police power so egregious, so outrageous as to shock the contemporary conscience. Stated another way, the executive action must involve "conduct intended to injure [the plaintiff] in some way unjustifiable by any government interest." *Id.* at 849, 118 S. Ct. at 1718. That is, the conduct was an unjustified exercise of the police power. Only after finding that the executive engaged in such conduct will the trial court consider whether historical examples of enforcing the liberty interest involved are needed to allow the plaintiff to go forward with his tort claim.

Lastly, the reference to "the constitutional proportions of constitutional claims" is a reference to claims like the Littlejohns' for the enforcement of liberty interests incorporated into the Fourteenth Amendment for protection.

### Excerpt 2

That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them.

*Id.* at 847 n.8, 118 S. Ct. at 1717 n.8.

In deciding whether the executive's conduct shocked the contemporary conscience, the trial court considers the standards of conduct governing "traditional executive behavior" and "contemporary practice." *Id.* Trial courts routinely draw on such standards in personal injury cases to determine whether to find the defendant liable for alleged tortious behavior.

*Excerpt 3*

Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. In none of our prior cases have we considered the necessity for such examples, and no such question is raised in this case.

*Id.*

Opinions in *Washington v. Glucksberg* differed about the need for historical examples of the recognition of the claimed liberty protection at some level of specificity. *Compare* 521 U.S. at 720–22, 117 S. Ct. at 2268, *with id.* at 765, 117 S. Ct. a 2281–82 (Souter, J., concurring in the judgment) In footnote 8, Justice Souter stated that in an action challenging executive conduct, the historical-examples issue cannot arise unless the conduct is so egregious and outrageous that it shocks the contemporary conscience. *Sacramento*, 523 U.S. at 847 n.8, 118 S. Ct. at 1717 n.8.

The issue before the Court in *Sacramento* was whether Deputy Smith's conduct constituted "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Id.* at 840, 118 S. Ct. at 1713. In other words, the question was whether Deputy Smith "intended to injure [Lewis] in some way unjustifiable by any

government interest." *Id*. at 849, 118 S. Ct. at 1718. That is "the sort of official action most likely to rise to the conscience-shocking level." *Id*. A substantive due process claim was unavailable because Smith was doing his job and had no intention to injure Lewis.

The language of footnote 8 makes it clear that the Court was not holding that a claim asserting an executive's violation of a liberty interest protected by the Fourteenth Amendment could only go forward if the plaintiff first alleged and proved that executive's conduct shocked contemporary conscience.

### 2.  Conflicting Standards

Justice Souter was aware of the foundational differences between a substantive due process claim founded on an abuse of executive power so egregious and outrageous that it shocks the contemporary conscience and a claim founded on a right incorporated into the Fourteenth Amendment as fundamental to the Nation's scheme of ordered liberty. *United States v. Salerno*, which Justice Souter cites in *Sacramento*, highlights the differences:

> "[S]ubstantive due process" prevents the government from engaging in conduct that "shocks the conscience," . . . or interferes with rights "implicit in the concept of ordered liberty."

*Salerno*, 481 U.S. at 746, 107 S. Ct. at 2101 (quoting *Rochin*, 342 U.S. at 172, 72 S. Ct. at 209; *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S. Ct. 149, 152 (1937)).

Under *Rochin*'s standard, an executive is answerable for engaging in conduct beyond the executive power, conduct that is not remotely related to the executive's job responsibilities and is so abusive and outrageous as to shock the contemporary conscience—executive power "plus."

Under the other standard, quoted from *Palko v. Connecticut*, an executive is answerable for violating a fundamental right even if that violation occurred in the scope of the executive's job.

The executives whom the Littlejohns sued were engaging in conduct within their executive power and job responsibilities when they allegedly violated the Littlejohns' parental rights. Requiring the Littlejohns to allege and prove the contrary to obtain a day in court on their parental rights claims is to require them to allege and prove a falsehood, a farce. Their rights will go unenforced.

The word "or" that appears in *Salerno*'s statement of what "substantive due process prevents" tells us that *Sacramento* did not intend to create such a farce. Substantive due process prevents executive "conduct intended to injure in some way unjustifiable by any government interest," *Sacramento*, 523 U.S. at 849, 118 S. Ct. at 1718, that is beyond the executive's job responsibilities, and is so abusive of the executive's power as to shock "the contemporary conscience," *id.* at 847 n.8, 118 S. Ct. at 1717 n.8, *or* conduct that is within the executive's job responsibilities and the executive power but "interferes with rights implicit in the concept of ordered liberty," *id.* at 847, 118 S. Ct. at 1717 (citations and internal quotation marks omitted).

*Salerno* did not contemplate the absurdity of requiring a plaintiff alleging interference of a fundamental right to simultaneously allege something quite different. The word "or" avoids the absurdity.

As we and the Supreme Court have explained, "[t]he ordinary use of 'or' is almost always disjunctive, and *the words it connects are to be given separate meanings.*" *Santos v. Healthcare Rev. Recovery Grp.*, 90 F.4th 1144, 1153 (11th Cir. 2024) (per curiam) (quoting *United States v. Woods*, 571 U.S. 31, 45, 134 S. Ct. 557, 567 (2013) (internal quotation marks omitted)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.").

In sum, requiring the Littlejohns to satisfy *Rochin*'s conscience-shocking standard to have a day in court under *Palko*'s violation-of-a-fundamental-right standard makes no sense. If, as the Court states, "the [Supreme] Court clarified that the 'conscience shocking' inquiry is a 'threshold question' that necessarily precedes any fundamental-rights analysis," Maj. Op. at 14–15, why does *Sacramento* acknowledge that substantive due process functions in two totally unrelated causes of action, each with mutually exclusive and contradictory elements?

### 3.  Obiter Dictum

Even if footnote 8 set out what the Majority purports it does, nothing in footnote 8 would *hold* that a plaintiff cannot claim that executive action violated a fundamental right without first alleging

and proving that the action was beyond the limits of executive power and was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento*, 523 U.S. at 847 n.8, 118 S. Ct. at 1717 n.8. Rather than a holding, the footnote 8 language this Court relies on is pure dicta.

The language is dicta because the *Sacramento* plaintiffs' complaint did not allege that Deputy Smith violated a fundamental liberty interest. The complaint asserted the claim Justice Souter identified in the opening paragraph of his opinion for the Court: Deputy Smith "violate[d] the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* at 836, 118 S. Ct. at 1711.[11] Justice Souter described a tort claim in substantive due process clothing. Nothing in the complaint presented the issue of whether a plaintiff suing an executive for violating a fundamental liberty interest incorporated into the Fourteenth Amendment must allege and prove as a threshold matter that the executive's behavior was beyond the executive power and, in the words of footnote 8, "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8, 118 S. Ct. at 1717 n.8. Since the issue was not presented, it could not have been

---

[11] Restated by Justice Souter, the issue was whether "Smith's actions in causing Lewis's death were *an abuse of executive power* so clearly *unjustified by any legitimate objective of law enforcement* as to be barred by the Fourteenth Amendment." *Id.* at 840, 118 S. Ct. at 1713 (emphasis added).

decided.[12] The issue was not presented and decided because the facts would not support it. And as Justice Souter understood, the

---

[12] Judge Newsom resists this conclusion by asserting that "under Judge Tjoflat's proposal for smoking out superfluous language," footnote 8 is not dicta because "Justice Scalia felt compelled to write separately" on the issue, "the [*Sacramento*] majority expressly declined Justice Scalia's invitation to bypass the shocks-the-conscience test in favor of *Glucksberg*'s historical inquiry," and the "'threshold' was integral to the Court's reasoning." Newsom Concurrence at 12 n.2. But this reasoning misses the mark—thrice over.

First, the test I discuss is not simply my "proposal." It is grounded in Article III of the Constitution. We are only empowered to resolve "Cases" or "Controversies." U.S. Const. art. III, § 2. So, the inquiry is whether the statement was necessary to resolve the case, not whether it was merely significant or noteworthy. This principle has long been recognized, with courts distinguishing between essential reasoning and dicta. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2277 (2024) (Gorsuch, J., concurring) (noting that courts must "be careful not to treat every 'hasty expression . . . as a serious and deliberate opinion" (quoting *Steel v. Houghton*, 1 Bl. H. 51, 53, 126 Eng. Rep. 32, 33 (C. P. 1788)); *Dictum*, Black's Law Dictionary (1st ed. 1891) (defining dictum as "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or the case at bar, but not necessarily involved in the case or essential to its determination").

Second, dicta are not synonymous with frivolity. To be sure, the "shocks the conscience" standard is significant. But significance does not make a statement necessary to the decision. Here, the Court was not asked to address the standard—nor did the facts demand it. The Court granted certiorari on a narrow question, and this broader constitutional analysis had no place in resolving the case. In doing so, the Court ventured beyond the facts and the issues, offering a constitutional pronouncement without the proper occasion. That is the very essence of dicta.

Court's practice "is not to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 572, 113 S. Ct. 2217, 2247 (1993) (Souter, J., concurring in part and concurring in the judgment) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring) (internal quotation marks omitted).

Elevating the shocks-the-conscience standard from dicta to binding authority contravenes the critical safeguard of adversarial proceedings, and as discussed more below, ignores basic principles of separation of powers. The Majority creates a legal rule that has not been subjected to the scrutiny of adversary proceedings and judicial review. Law develops best when it arises from genuine cases and controversies, where parties present arguments, challenge assumptions, and force courts to carefully consider the full implications of a rule. "[J]udges think differently—more carefully, more focused, more likely to think things through—when our words bring real consequences to the parties before us." *United*

_____

Third, Justice Scalia's response does not elevate dicta to law. His dissent was focused on the case before the Court—a "police-pursuit case[]." *See* Newsom Concurrence at 9. Scalia did not engage with the test in the context of fundamental rights, and neither did the majority.

In the end, Judge Newsom exposes one of *Sacramento*'s core problems. He points to a dissent to argue that a footnote is not dicta, muddying the waters by using non-binding commentary to reify dicta into precedent. This only deepens the "crater-sized hole in responsible constitutional decisionmaking." *See id.* at 18.

*States v. Burris*, 912 F.3d 386, 410 (6th Cir. 2019) (en banc) (Kethledge, J., concurring in the judgment). That process is absent here. What was once mere dicta—an aside not essential to the decision—now takes on the force of settled law that has not been fully tested.

Ordinarily we think of separation of powers in terms of legislative or executive overreach. But the issue here is judicial overreach. The Constitution limits our role to deciding actual disputes, not creating advisory rules, or pronouncing law outside the context of a case. *See Flast*, 392 U.S. at 96, 88 S. Ct. at 1950. So, by taking footnote 8 in *Sacramento* as binding law (supposing it supports what the majority purports it does), this Court has exceeded its authority under Article III. The Court taking a statement developed outside of the adversarial system and applying it as "law" transcends the judicial function from resolving disputes to creating law.

Here, "[t]he Supreme Court's later admonition in *District of Columbia v. Heller* about latching onto unargued, unbriefed, unconsidered pronouncements has never rung more true: 'It is inconceivable that we would rest our interpretation . . . upon such a footnoted dictum in a case where the point was not at issue and was not argued.'" *Wilson v. Midland Cnty., Tex.*, 116 F.4th 384, 407 (5th Cir. 2024) (en banc) (Willett, J., dissenting) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 625 n.25, 128 S. Ct. 2783, 2816 (2008)).

### III.   *Maddox v. Stephens*

The Majority also claims that *Maddox v. Stephens* is precedent here. That is not so.

*Maddox* was an interlocutory appeal. The issue was whether, on a motion for summary judgment, the District Court erred in denying Babette Stephens qualified immunity from suit on Nicole Maddox's claim that Stephens, a Gwinnett County, Georgia, social worker, violated her fundamental liberty interest in the care, custody, and management of her minor child, J.O.. 727 F.3d at 1113. Maddox alleged that Stephens disregarded her liberty interest "in preparing and implementing a safety plan that allegedly prohibited [her] from removing the child from the paternal grandmother's care." *Id.*

### A.   Case Overview

In determining whether Stephens was entitled to summary judgment on her qualified immunity defense, the District Court had two options. It could decide whether the facts underlying Maddox's claim, taken in the light most favorable to Maddox, established that Stephens's conduct violated Maddox's fundamental liberty interest, or it could avoid that decision and decide whether the law clearly established that Stephens's conduct was unlawful in the circumstances of the case. The Court exercised the second option but found "that it could not conclude at the summary judgment stage that Stephens was entitled to qualified immunity." *Id.* at 1118.

In deciding whether the District Court erred in denying Stephens qualified immunity, this Court had the same options the District Court had. *Id.* First, it could decide whether the facts Maddox had presented on summary judgment showed that Stephens

violated her fundamental liberty interest as alleged.[13] Or second, it could decide whether the law clearly established that Stephens's conduct was unlawful. Like the District Court, this Court chose the second option. *Id.* at 1127 n.19 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009)).[14]

The Court began its qualified immunity analysis by observing that it "is undisputed . . . that Maddox has a liberty interest in the care, custody, and management of J.O. Maddox argues that *Stephens violated this liberty interest, and therefore that she has sufficiently asserted a substantive due process violation.*" *Id.* at 1119 (emphasis added).

As the following discussion indicates, it is debatable whether the Court viewed Maddox as alleging that Stephens violated a liberty interest protected by the Fourteenth Amendment, in the care and custody of her minor child, J.O.[15]

---

[13] If Stephens had argued that the summary judgment record revealed an absence of any evidence to support Maddox's claim, this Court would have affirmed the District Court's grant of qualified immunity (to Stephens) on the ground that Maddox failed to make out her claim.

[14] Since the record established that Stephens was exercising her discretionary authority at the time of the alleged violation, it became Maddox's burden to show that Stephens was not entitled to qualified immunity. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

[15] Maddox did not assert a substantive due process claim under the *Rochin* standard. Rather, she asserted under the *Palko* standard a claim that Stephens violated her liberty interest in the care and custody of her child. *See* Plaintiff's

The Court then went one step further and turned to what Maddox had to prove to establish the substantive due process violation. Maddox had to prove what she did not allege—that Stephens's conduct in preparing and implementing the safety plan was "arbitrary or conscience shocking in a constitutional sense." *Maddox*, 727 F.3d at 1119 (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003) (quotation marks omitted)).[16] Indeed, Stephens's actions "*must be* characterized as arbitrary, or conscience shocking, in a constitutional sense." *Maddox*, 727 F.3d at 1125–26 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S. Ct. 1061, 1070 (1992) (emphasis added) (internal quotation marks omitted)).

In eventually deciding that Stephens was entitled to qualified immunity because Maddox had not shown that the lawlessness of Stephens's conduct was clearly established, the Court returned to what Maddox had to prove to prevail on her claim. It *assumed* that Maddox had satisfied the "high bar" and that Maddox had thus introduced evidence on summary judgment sufficient to establish that Stephens's alleged actions were arbitrary, or conscience

---

Response in Opposition to Department of Human Services' Motion for Summary Judgment 15, *Maddox v. Georgia Dep't Human Serv's*, No. 1:10-cv-02742-AT (N.D. Ga. Nov. 17, 2011), ECF No. 98.

[16] The Court emphasized that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Maddox*, 727 F.3d at 1119 (quoting *Sacramento*, 523 U.S. at 846, 118 S. Ct. at 1716) (internal quotation marks omitted)).

shocking, in a constitutional sense. *See Maddox*, 727 F.3d at 1119. The Court indulged that assumption several times:

> [A]ssuming *arguendo* that Stephens violated Maddox's substantive due process rights, Stephens is entitled to qualified immunity because the law was not clearly established that Stephens' actions were so conscience shocking as to violate Maddox's liberty interest in the care, custody, and management of J.O.

*Id.* at 1121.

> [F]or purposes of addressing Maddox's substantive due process claim, we can assume *arguendo* that Stephens violated Maddox's procedural due process rights. We nevertheless hold that Stephens is entitled to qualified immunity because she did not violate any clearly established substantive due process rights of which a reasonable state official in Stephens' shoes would have known during the pertinent time period.

*Id.* at 1125.

> [E]ven if we assume *arguendo*, although we expressly do not decide, that Stephens' actions violated Maddox's procedural due process rights, we cannot conclude that the law was clearly established at the time of the relevant conduct that Stephens' actions were conscience shocking, and thus we cannot conclude that there has been a violation of clearly established substantive due process law.

*Id.* at 1126–27.

> [W]e must conclude that it would not be clear to a rea-
> sonable social worker that her conduct violated Mad-
> dox's substantive due process rights; stated another way,
> a reasonable social worker would not have been on no-
> tice that her behavior was "conscience shocking" or "ar-
> bitrary."

*Id.* at 1126.

> Although Maddox cite[d] Eleventh Circuit and Georgia
> Supreme Court cases for the proposition that procedural
> requirements should be followed when the State takes
> custody of the child, she ha[d] not cited any case that
> would make it clear to a reasonable social worker at the
> time that her actions were arbitrary or conscience shock-
> ing.

*Id.*

My take from the Court's quoted statements is this: the
Court assumed that Maddox alleged that Stephens's behavior was
conscience-shocking. Then, based on that assumption, it held that
Maddox failed to show that it was clearly established that the be-
havior was unlawful.

The Court assumed that Stephens's behavior was con-
science-shocking even though Maddox never labeled Stephens's
behavior—in preparing and implementing a safety plan that pro-
hibited Maddox from removing the child from the paternal grand-
mother's care—as conscience shocking. Instead, Maddox labeled
the behavior as a violation of her fundamental liberty interest, an
interest protected by the Fourteenth Amendment.

In short, this Court did not hold that Stephens's conduct "in preparing and implementing a safety plan that allegedly prohibited Maddox from removing the child from the paternal grandmother's care" violated Maddox's liberty interest. *Id.* at 1113. It also did not hold that *Sacramento* required Maddox to allege that Stephens's conduct was "an abuse of executive power so clearly unjustified by any legitimate objective of [that power] as to be barred by the Fourteenth Amendment." *Sacramento*, 523 U.S. at 840, 118 S. Ct. at 1713. What it did hold—indeed, all that it held—was that it was not clearly established that Stephens's conduct in preparing and implementing the safety plan was conscience shocking. *Maddox*, 727 F.3d at 1127.[17]

---

[17] Following the issuance of our mandate, Maddox moved the District Court to dismiss her 42 U.S.C. § 1983 claims and remand the case to the state court. The District Court described Maddox's motion in footnote 2 of its September 6, 2013, order granting the motion:

> Plaintiffs state that despite their disagreement with the Eleventh Circuit's application of the law to the facts of this case, they are bound to accept the Eleventh Circuit's opinion as the law of the case. Therefore, "Plaintiffs do not wish to proceed to trial on the [Section 1983] conspiracy claim with the belief that if the Plaintiffs obtain a favorable verdict, the 11th Circuit Court of Appeals would once again reverse." (Doc. 132 at 5).

*Maddox v. Georgia Dep't of Hum. Services*, No. 1:10-cv-02742-AT, 2013 WL 9348224, at *1 n.1 (N.D. Ga. Sept. 23, 2013).

## B. *Assuming* Maddox *Is the Law*

In this section, I describe the litigation of a fundamental rights claim post-*Maddox*, which, according to the Court, "illustrates the *Sacramento* framework in practice" and has become Eleventh Circuit precedent.[18] Maj. Op. at 16.

Posit a complaint like the one in *Littlejohn* with one exception. Along with asserting claims against the four executives, the complaint properly presents a § 1983 claim against the Leon County School Board based on the *Monell* doctrine.[19] That is, the

---

[18] I, of course, disagree that *Maddox* is precedent here. Additionally, and as Judge Newsom acknowledges in his concurrence, one of our first substantive due process styled cases post-*Sacramento* maintained *Salerno*'s disjunctive framing of "shocks the conscience or interfer[ing] with rights implicit in the concept of ordered liberty." Newsom Concurrence at 6; *see Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002). *Maddox* and *Dacosta* are not precedential here because both cases involve common law torts dressed up in substantive due process clothing, and both revolve around qualified immunity rather than the standard for substantive due process. *See* discussion *supra*. That said, if the majority holds that *Maddox* is precedent, it has not wrestled with why that holding would not defy our prior panel precedent rule.

[19] In *Monell v. Dep't Soc. Serv's*, 436 U.S. 658, 98 S. Ct. 2018 (1978), the Supreme Court held that local governments, including school boards, are "persons" subject to liability under 42 U.S.C. § 1983 and thus can be held liable for constitutional violations that stem from their official policies or customs. *Id.* at 690–91, 98 S. Ct. at 2036. The School Board is not an "executive," however, as that term is used in *Sacramento* and *Maddox*. In *Sacramento*, an executive is one who carries out the objectives of the state's police power as expressed by a local governmental entity. The police power was law enforcement. The executive was Deputy Smith. The claim was that his conduct was not a legitimate

executives were performing their job-related functions while implementing the School Board's policy as reflected in the Guide.[20]

To prevail on their § 1983 claims against the executives, *Maddox* requires the Littlejohns to allege and prove as a threshold substantive due process claim that the executives' conduct in violating their parental rights was "arbitrary or conscience shocking in a constitutional sense." 727 F.3d at 1119 (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003) (quotation marks omitted)). Unless the Littlejohns prove that threshold claim, they will be unable to recover damages against the executives for violating their parental rights. But they will be able to proceed against the School Board based on the executives' violation of their parental rights.

_____

pursuit of a law enforcement objective. In *Maddox*, the police power concerned the welfare of families and children and was exercised by the Georgia Department of Human Services Division of Family and Children Services ("DFCS"). The executives were social workers like Stephens. The claim was that Stephens violated Maddox's fundamental parental rights. The claim *was not* that Stephens exceeded the legitimate objective of DFCS police power.

[20] That the executives violated the Littlejohns' parental rights while performing "a legitimate job-related function (that is, pursuing a job-related goal)," does not alter the fact that the executives were acting within their discretionary authority. *Holloman*, 370 F.3d at 1265–66.

Under Fed. R. Civ. P. 11,[21] the Littlejohns' lawyer cannot certify a complaint alleging that the executives' conduct in violating the Littlejohns' parental rights was "arbitrary or conscience shocking in a constitutional sense" without more. The lawyer cannot do so because the executives were simply performing their official duties.

Rule 11(b)(2) allows an attorney to present a "nonfrivolous argument for . . . reversing existing law or for establishing new law." The Littlejohns' lawyer concludes that to obtain the reversal of *Maddox* as precedent, Rule 11(b)(2) would permit him to file a complaint alleging that the executives' conduct in violating the Littlejohns' parental rights was "arbitrary or conscience shocking in a constitutional sense." So the lawyer drafts a complaint seeking damages against the executives for violating the Littlejohns' parental rights by engaging in conduct that was conscience-shocking and

---

[21] Rule 11(b)(3) states that

> [b]y presenting [a complaint] to the court, an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> . . . .
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3).

damages against the School Board based on the executives' con-
duct in violating the Littlejohns' parental rights.

The District Court dismisses the Littlejohns' § 1983 claim
against the executives because the complaint's factual allegations
describing the executives' violation of the Littlejohns' parental
rights show that the executives' actions were not arbitrary or con-
science-shocking in a constitutional sense. Instead, the factual alle-
gations show that the executives violated the Littlejohns' parental
rights while doing their jobs. The Court then duly convenes a jury
trial on the Littlejohns' claim against the School Board based on the
executives' violation of their parental rights. The Littlejohns pre-
vail. The jury finds that the executives violated their parental rights
and did so in carrying out School Board policy. The jury assesses
damages against the School Board, and the Court enters judgment
accordingly.

Assuming that *Maddox* is Eleventh Circuit precedent in
§ 1983 cases in which the plaintiff seeks the vindication of a right
protected by the Fourteenth Amendment, these will be the conse-
quences:

- If the executive's violation of the plaintiff's right is pursu-
  ant to policy of the entity governing the executive's au-
  thority to act, the plaintiff might be compensated by the
  entity under *Monell*. The plaintiff will not be compen-
  sated by the executive, though, because the plaintiff's
  lawyer will be unable to allege and prove that the execu-
  tive's conduct (in violating the plaintiff's right)

constituted under *Sacramento* an abuse of executive power so clearly unjustified by any legitimate objective of the exercise of that power as to be barred by the Fourteenth Amendment. Whether the executive will be deterred from violating a plaintiff's protected right will depend on the ability of the entity responsible for the executive's conduct to discipline the executive. In other words, Congress's intent in enacting § 1983 becomes superfluous as the remedy against the person who did the constitutional violation is not imposed under the statute, but left to the discretion of some other person.

- If the executive's violation of the plaintiff's protected right is not pursuant to the policy of the entity responsible for the executive's conduct, the plaintiff's right will not be vindicated at all. That is, the plaintiff will be unable to pursue the entity under *Monell* **a**nd the plaintiff's claim against the executive will fail because of the plaintiff's inability to prove that the executive's conduct was conscience shocking.

## IV.    SEPARATION OF POWERS

If *Sacramento* holds that plaintiffs cannot be heard on their fundamental rights claims for damages under § 1983 unless they allege and prove that the executive action underpinning their claims shocks the contemporary conscience, the Court ran roughshod over the separation of powers doctrine.

### A. The Value of Incorporated Rights

The Supreme Court acknowledges that certain liberty interests are fundamental to the American scheme of justice by incorporating them into the Fourteenth Amendment. They were incorporated like the Bill of Rights (with exceptions) because they were deemed "'fundamental to our scheme of ordered liberty,' or 'deeply rooted in this Nation's history and tradition.'" *Timbs*, 556 U.S. at 150, 139 S. Ct. at 687 (quoting *McDonald*, 561 U.S. at 767, 130 S. Ct. at 3036). These interests include the parental rights the Littlejohns seek to vindicate.

Congress enacted § 1983 as part of the Civil Rights Act of 1871. Its "purpose . . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 2162 (1972) (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)). The statute was "[w]ritten in sweeping terms against a backdrop of horrific violence, terror, and subjugation." *Wilson*, 116 F.4th at 409 (Willett, J., dissenting). So, it "was meant to *open* courthouse doors, not bolt them shut." *Id.*

The shocks-the-conscience threshold claim a plaintiff must allege and prove to be heard on his claims that executive conduct violated rights incorporated into the Fourteenth Amendment disserves Congress's purpose in enacting § 1983. Indeed, the threshold requirement all but eliminates § 1983 as a remedy to compensate

citizens whose fundamental rights have been violated by state and local executive action. And in doing so, the requirement waters down the constitutional significance of the citizen's rights.

But *Sacramento* harbored no such intention. When *Sacramento* was decided, the Supreme Court had rejected the idea that the incorporated rights had less value when made applicable to state and local government. In an increasing number of cases, "[t]he Court . . . has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *Malloy v. Hogan*, 378 U.S. 1, 10–11, 84 S. Ct. 1489, 1495 (1964) (quoting *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 275, 80 S. Ct. 1463, 1470 (1960) (opinion of Brennan, J.) (internal quotation marks omitted)).

Before *Sacramento*, the incorporated rights of citizens suing executives of the United States Government in federal court for damages were not watered down.[22] If a citizen claimed that a

---

[22] *Benton v. Maryland* held that "[o]nce it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' the same constitutional standards apply against both the State and Federal Governments." 395 U.S. 784, 795, 89 S. Ct. 2056, 2063 (1969) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 1447 (1968)). At the time, the Court thought it could imply causes of actions to remedy constitution violations. In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S. Ct. 1999 (1971), the Supreme Court implied a cause of action for damages under the Fourth Amendment against federal officials for unreasonable searches and seizures. *Id.* at 389, 91 S. Ct. at 2001. And it had implied causes of action for damages under the Fifth Amendment Due Process Clause against a Congressman for

federal executive violated an incorporated right, the citizen would be heard on the merits of his claim. After affording citizens the right to be heard in cases brought against federal executives, the Court would not, and did not, deprive citizens of the right to be heard in cases brought against state or local governmental executives for the violation of fundamental rights. To say that the Court would—and did—strains credulity.

For this reason alone, the Littlejohns are entitled to a day in court on the merits of their claims that the defendant executives violated their parental rights.

---

gender discrimination, *Davis v. Passman,* 442 U.S. 228, 248–49, 99 S. Ct. 2264, 2279 (1979), and under the Eighth Amendment Cruel and Unusual Punishments Clause for failure to provide adequate medical treatment, *Carlson v. Green*, 446 U.S. 14, 19, 100 S. Ct. 1468, 1472 (1980). Litigants sought the Court's creation of similar implied causes of action in 1983, 1987, 1988, and 1994. *Egbert v. Boule*, 596 U.S. 482, 486, 142 S. Ct. 1793, 1799–1800 (2022). To be sure, many of the claims cited in *Egbert* consistently failed as the Court became more reluctant to transcend the legislative function and imply causes of action (which supports that the Court would not impose a shocks-the-conscience standard today).

Evaluating the vindication of fundamental rights at the time of *Benton* also supports the ridiculousness of a shocks-the-conscience standard. The Court thought it could imply causes of action to federal officials, so it makes no sense that it would later go on to limit that enforcement against state officials by imposing a shocks-the-conscience requirement.

### B.  Amending § 1983

"The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697, 108 S. Ct. 2597, 2622 (1988) (Scalia, J., dissenting). The doctrine ensures that each branch of government—the Legislative, Executive, and Judicial—operates within its own distinct area. This prevents the concentration of power, which the Framers rightly feared to imperil liberty. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S. Ct. 863, 870 (1952) (Jackson, J., concurring) (explaining that "the Constitution diffuses power the better to secure liberty"). So, the Legislature's role is to make law. *See Patchak v. Zinke*, 583 U.S. 244, 250, 138 S. Ct. 897, 905 (2018) ("[T]he legislative power is the power to make law."). And the Judiciary's role is to interpret and apply the law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Let us recap with what the Legislature enacted in § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).

Today's holding is barred by the separation of powers doctrine. It either amends § 1983 or puts a gloss on the Littlejohns' parental rights that waters down their constitutional force. If the holding does the latter, it is obviously erroneous. It requires no subtle analysis to demonstrate that.

Only Congress has the power to amend or otherwise alter § 1983. The Supreme Court's decision in *Egbert* makes that clear. The issue there was whether the Court should adhere to the holding in *Bivens* and imply a cause of action for damages under the First and Fourteenth Amendments. *Egbert*, 596 U.S. at 490, 142 S. Ct. at 1802. The Court held that the task of providing a federal remedy, such as § 1983, for a federal executive's violation of a constitutional right belonged to Congress: "whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." *Id*. at 498, 142 S. Ct. at 1807.

The Supreme Court's approach to separation of powers issues is hardly the same as it was when the Court decided *Bivens* and, years later, *Sacramento*. Since *Bivens* and its progeny, the Court has not implied additional causes of action for the violation of Constitutional rights. "Now long past the heady days in which th[e] Court assumed common-law powers to create causes of action," it "ha[s] come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Id*. at 491, 142 S. Ct. at 1802 (citations and internal quotation marks omitted). This reasoning is just as

applicable to limiting causes of actions as creating them. "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128, 134 S. Ct. 1377, 1388 (2014) (citation omitted). Yet, the "shocks-the-conscience" test does just that. Posit how § 1983 would change if this test was in it:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any right, privilege, or immunity secured by the Constitution and laws, shall be liable to the party injured in an action at redress [**if that person's actions also shocked the contemporary conscience**].

I would say that today the Supreme Court would not entertain an argument that § 1983 should be amended judicially to cut down on fundamental rights cases. The separation of powers doctrine precludes this Court from applying the shock-the-conscience requirement to bar the Littlejohns' parental rights claim here.

## V.    CONCLUSION

Judge Newsom may be correct—the "substantive due process" cases that have snowballed since *Sacramento* are a "dumpster fire." Newsom Concurrence at 15. But that is no excuse for today's result. As Justices Alito and Thomas recently warned in a factually similar case, "[t]his case presents a question of great and growing

importance." *Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*, 145 S. Ct. 14, 14 (2024) (Alito, J., dissenting from denial of certiorari). That same question is before us now: Does the Constitution still protect parents' fundamental right to direct the upbringing of their children when government actors intrude without their knowledge or consent?

The Majority says it does not. It reaches this conclusion by applying an illogical, unauthorized, and atextual "shocks-the-conscience" standard that denies the Littlejohns the ability to vindicate their fundamental right to raise their child. Binding precedent in *Arnold* requires a different approach.[23] The question is whether the Littlejohns alleged a violation of a fundamental right, not whether the conduct also "shocked the conscience." And if *Sacramento* changed the law as the Majority purports it did, the vindication of fundamental rights under that "framework" is an issue of first impression in our Circuit.

Today's decision ignores bedrock separation of powers principles, waters down fundamental rights, and flies in the face of our

---

[23] "While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003). Because *Sacramento* is not "clearly on point" for all the reasons stated in this dissent, the Majority has violated our prior panel precedent rule. And even if *Sacramento* was on point, *Dacosta* would be our first case post-*Sacramento*. *See Dacosta*, 304 F.3d at 1048 (maintaining *Salerno*'s disjunctive of "shocks the conscience *or* interfer[ing] with rights implicit in the concept of ordered liberty" (emphasis added)).

prior panel precedent rule. It is as wrong as it is ominous for the future of fundamental rights in the Eleventh Circuit.

I respectfully dissent.