No. 23-10385-HH

# United States Court of Appeals
for the
# Eleventh Circuit

JANUARY LITTLEJOHN,
JEFFREY LITTLEJOHN,

*Plaintiffs-Appellants,*

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA,
ROCKY HANNA, DR. KATHLEEN RODGERS, RACHEL
THOMAS, ROBIN OLIVERI,

*Defendants-Appellees.*

**BRIEF OF *AMICI CURIAE* MANHATTAN INSTITUTE AND OKLAHOMA COUNCIL OF PUBLIC AFFAIRS SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL**

Ryan Haynie
OKLAHOMA COUNCIL OF
PUBLIC AFFAIRS
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

Ilya Shapiro
  *Counsel of Record*
John Ketcham
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

April 26, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 11th Cir. R. 26.1-1(a), *amici curiae* the Manhattan Institute for Policy Research and the Oklahoma Council of Public Affairs state that (1) they, respectively, have no parent corporations; and (2) no corporations hold any stock in either *amicus*.

Dated: April 26, 2025                             /s/ *Ilya Shapiro*
                                                                Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICI CURIAE* ................................................................ 1

BACKGROUND AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT .................................................................................................. 3

   I. Social Transition Constitutes a Mental-Health Intervention for Children Who Would Otherwise Likely Desist in Their Adopted Gender Identity before Adulthood ............................................. 3

      A. Medical Research Worldwide Demonstrates That Social Transition Is a Mental-Health Intervention with Medical Implications for Children and Adolescents ................................. 4

      B. In Most Cases, Childhood-Onset Gender Dysphoria Remits Naturally by Adulthood, but Social Transition May Contribute to the Persistence of Gender Dysphoria ................... 5

      C. Transgender Identity in Adolescents Is Also Likely Unstable ... 7

      D. Clinicians Have Not Demonstrated a Consistent Ability to Distinguish between Transgender and Gender-Nonconforming Youths ............................................................... 9

   II. U.S.-Based Medical Groups Are Out of Step with World Health Authorities' Recognition of the Risks of Pediatric Social Transition ................................................................................................ 10

   III. En Banc Review Is Warranted Because This Case Presents a Question of Exceptional Importance ................................................. 13

CONCLUSION ............................................................................................. 14

CERTIFICATE OF COMPLIANCE .......................................................... 14

CERTIFICATE OF SERVICE .................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) .................. 14

*Troxel v. Granville*, 530 U.S. 57 (2000) .................................................... 14

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ....................................... 13

**Statutes and Rules**

Fed. R. App. P. 35 ..................................................................................... 14

**Other Authorities**

Annelou L. C. de Vries & Peggy T. Cohen-Kettenis,
   *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*,
   59 J. Homosexuality 301 (2012) .................................................. 4–5

E. Abruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*,
   J. Sex & Marital Therapy 1 (2023) ................................................. 8

Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*,
   23 Int'l J. Transgender Health S1 (Suppl. 1) (2022) ............... 12–13

Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*,
   13 Int'l J. Transgenderism 165 (2012) ........................................... 12

Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Final Report* (2024) .............................................................. 11–12

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307 (2019) ......................................... 5, 10

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (2018) ................................................................ 10

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, J. Sex & Marital Therapy 1 (2022) ............. 6

NHS England, *Supporting Children and Young People with Gender-related Questions or Distress and Their Sexual Orientation*, MindEd, July 11, 2023 ........................................................... 10–11

Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives Disease Childhood 1 (2024) ........................................ 2, 11

Steward L. Adelson et al., *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolescent Psych. 957 (2012) .............. 6–7

William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 41 Archives Sexual Behav. 759 (2012) ............................................ 6

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism  3869 (2017) ..... 7, 8, 9

# INTEREST OF *AMICI CURIAE*[1]

The Manhattan Institute is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency. It has sponsored scholarship and filed briefs opposing government actions that interfere with constitutional liberties.

The Oklahoma Council of Public Affairs is dedicated to promoting the flourishing of the people of Oklahoma by advancing principles and policies that support free enterprise, limited government, individual initiative, personal responsibility, and strong families.

*Amici* believe it is important to respect the basic rights of parents to direct their children's healthcare by prohibiting schools from socially transitioning children without parental notification and consent.

# BACKGROUND AND SUMMARY OF ARGUMENT

Decades of research have consistently shown that most children with gender dysphoria (GD) and most clinically referred children with gender-variant behavior come to terms with their natal sex ("desist") by

---

[1] In accordance with en banc Court rules, *amici* have filed a motion for leave to file this brief. *Amici* also sought consent from all parties as a courtesy, which consent was granted by counsel for all parties. Further, no part of this brief was authored by any party's counsel, and no person or entity other than *amici* funded its preparation or submission.

adulthood. Minors who are socially transitioned, however, are more likely to persist in their cross-gender feelings and, in time, seek medical interventions in the form of gonadotropin-releasing analogues (puberty blockers), cross-sex hormones, and surgeries. These interventions carry known risks, including lifelong sterility, sexual dysfunction, mood disorders, and increased chance of cancer and heart disease.

The best available systematic review of evidence found an "absence of robust evidence of the benefits or harms of social transition for children and adolescents." Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives Disease Childhood 1, 1 (2024). A comprehensive assessment of over four decades of research suggests, however, that social transition can lock in a temporary phase of identity development, leading to unnecessary medicalization and iatrogenic harm.

Consequently, whether well-established parental rights entitle parents to know about schools' efforts to socially transition their children represents "a question of exceptional importance." Fed. R. App. P. 35. The Court should grant the Petition for Rehearing En Banc and make clear

that schools cannot withhold critical information from parents about their children's mental health and well-being.

## ARGUMENT

### I. Social Transition Constitutes a Mental-Health Intervention for Children Who Would Otherwise Likely Desist in Their Adopted Gender Identity before Adulthood

"Social transition" refers to the use of youths' preferred names and pronouns, access to sex-specific accommodations, and, in some cases, practices such as breast-binding and genital-tucking. Healthcare professionals worldwide have recognized social transition as an active psychological intervention. Research strongly suggests that the vast majority of gender-dysphoric youths will naturally "desist," growing to feel comfortable with their natal sex. But social transition risks inhibiting this ordinary development, solidifying an otherwise passing phase of identity discordance past adolescence and, in turn, raising the potential for unnecessary medicalization.

In other words, social transition, far from relieving gender-related discomfort, may encourage these feelings to continue far longer than they would without it. Those who facilitate social transitions thus take part in a powerful psychological intervention.

3

### A. Medical Research Worldwide Demonstrates That Social Transition Is a Mental-Health Intervention with Medical Implications for Children and Adolescents

The risks of early social transition were acknowledged by the Dutch clinicians who pioneered pediatric gender transition. In 2012, they recommended that young children not socially transition before puberty, because: (1) most gender-dysphoric children will not persist in their adopted gender identity through adolescence; and (2) such non-persisting youths should be prevented "from having to make a complex change back to the role of their natal gender," which research had suggested would be difficult. Annelou L. C. de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. Homosexuality 301, 320 (2012).

The Dutch team also noted the danger of early social transition even for minors who *do* go on to full medical transition. Because medical transition cannot literally change a person's sex, they reasoned, it is important to ground the patient in reality and lower expectations about what drugs and surgeries can accomplish. The problem with "early transitions," they warned, "is that some children who have done so (sometimes as preschoolers) barely realize that they are of the other natal

4

sex. They develop a sense of reality so different from their physical reality that acceptance of the multiple and protracted treatments they will later need is made unnecessarily difficult." *Id.* at 308.

### B. In Most Cases, Childhood-Onset Gender Dysphoria Remits Naturally by Adulthood, but Social Transition May Contribute to the Persistence of Gender Dysphoria

The Dutch researchers' cautious approach to social transition and their warnings about its risks are buttressed by *decades of research* finding that most children with gender identity issues come to terms with their natal sex, typically during adolescence. Those studies found *desistence rates of between 61 and 100 percent*, with specific percentages as follows in chronological order of publication: 75; 87.5; 100; 95.5; 90; 98; 87.5; 61; 88; 63; 87.7. James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307, 313 (2019) (collecting 11 studies from 1972 to 2019).

Of note, the studies found not only that most gender-dysphoric children eventually desist, but that a majority of natal males (63–100 percent) and a substantial minority of natal females (32–50 percent) who desisted later turned out to be gay or lesbian, not transgender. Cross-gender feelings and behaviors in children are thus thought to be more

5

predictive of later same-sex attraction than of lifelong gender dysphoria and trans identity. Early social transition may hinder healthy development of gender-nonconforming homosexual children. *See also* Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, J. Sex & Marital Therapy 1, 5 (2022).

The American Psychiatric Association observed in a 2012 literature review that "only a minority" of those diagnosed with childhood gender identity disorder "will identify as transsexual or transgender in adulthood (a phenomenon termed persistence), while the majority will become comfortable with their natal gender over time (a phenomenon termed desistence)." William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 41 Archives Sexual Behav. 759, 763 (2012). That same year, the American Academy of Child and Adolescent Psychiatry acknowledged "longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood," and warned that "further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed." Steward L. Adelson et al.,

6

*Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolescent Psych. 957, 968 (2012).

A major concern among researchers and clinicians who treat gender-diverse youth is that social transition will inhibit that natural remission and solidify an otherwise passing phase of identity discordance. For example, the Endocrine Society cautions that children who have socially transitioned "may have great difficulty in returning to the original gender role upon entering puberty," and that social transition "has been found to contribute to the likelihood of persistence." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3879 (2017).

### C. Transgender Identity in Adolescents Is Also Likely Unstable

Proponents of social and medical gender reassignment for minors argue that when gender dysphoria begins in childhood and intensifies at the outset of puberty, the chances of desistence are very slim. This belief is not supported by evidence.

7

First, in the 11 desistence studies referenced above, some of the minors who desisted did so after they entered adolescence. Cantor, *supra*, at 311. That's why Endocrine Society guidelines mention that "childhood GD/gender incongruence does not invariably persist into adolescence *and adulthood*." Hembree et al., *supra*, at 3876 (emphasis added). Second, gender clinics in a variety of countries and researchers who study gender dysphoria in youth have observed a new patient cohort that does not fit the profile of the youth who participated in the original Dutch study and for whom the Dutch pioneered pediatric gender transition. *See* E. Abruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*, J. Sex & Marital Therapy 1, 12–13 (2023).

This new cohort of minors, which accounts for most of the meteoric increase in the number of minors seeking gender-transition services over the past decade, is composed of young people who did not have childhood gender-identity issues and whose gender-dysphoric symptoms began, often suddenly, after the start of puberty. *Id.* Most are natal girls with comorbid mental-health problems. *Id.* The very fact that these teenagers exist suggests that transgender identity is neither innate nor immutable.

8

### D. Clinicians Have Not Demonstrated a Consistent Ability to Distinguish between Transgender and Gender-Nonconforming Youths

Some supporters of social transition argue that clinicians can reliably distinguish persisters from desisters in childhood. Children who express gender identity in a way that is "insistent, persistent, and consistent" (IPC), these supporters argue, can be regarded as "true transgender" children. The ability to avoid false positives means that clinicians can recommend social transition even if many or most children desist, and even if social transition is inappropriate for children who appear to be, but are not, transgender.

Proponents of IPC point to research showing that some factors—including age, natal sex, and diagnosis of GD—are associated with a higher rate of persistence. They argue that children in whom one or more of these factors appear are "true transgender." The problem with this argument is that it tries to infer *individual* predictions from *population* data. The Endocrine Society's 2017 guidelines on treatment of gender dysphoric youth, for example, recognize that "[w]ith current knowledge, we cannot predict the psychosexual outcome for any specific child." Hembree et al., *supra*, at 3876.

9

## II. U.S.-Based Medical Groups Are Out of Step with World Health Authorities' Recognition of the Risks of Pediatric Social Transition

The American Academy of Pediatrics has called for automatic gender affirmation (social transition) of minors, irrespective of age, since 2018. Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1, 57 (2018). The AAP statement has been criticized for its inaccuracies and misrepresentations, *see* Cantor, *supra*, at 313, and contrasts sharply with medical authorities abroad.

For example, in 2023, the U.K. National Health Service published a module for schools in which it reiterated that social transition is "a complex decision and should be considered an 'active intervention.'" NHS England, *Supporting Children and Young People with Gender-related Questions or Distress and Their Sexual Orientation*, MindEd, July 11, 2023, https://bit.ly/478qu8z. "Supporting a social transition without the involvement of parents or carers," the NHS emphasized, "can create complex difficulties within families and is not recommended. Secrets between parents or carers and their children are problematic and are likely to create further issues in the future." *Id.* As for the concern about

10

abusive parents, "if there are significant concerns . . . schools should seek careful and detailed safeguarding oversight to assess risks." *Id.*

The Cass Review, a comprehensive report on youth gender transition commissioned by NHS England and released in April 2024, conducted a systematic review of the evidence for mental health outcomes of social transition in minors and found an "absence of robust evidence of the benefits or harms of social transition for children and adolescents." Hall, *Impact of Social Transition*, *supra*, at 1. The Review emphasized that social transition should be thought of as an "active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Final Report* 158 (2024).

For young children in particular, full social transition may lock in a temporary phase of identity confusion, making persistence and medicalization more likely. "Clinical involvement in the decision-making process should include advising on the risks and benefits of social transition as a planned intervention, referencing best available evidence. This is not a role that can be taken by staff without appropriate clinical

11

training." *Id.* at 164. And crucially, for both children and adolescents, "Outcomes for children and adolescents are best if they are in a supportive relationship with their family. For this reason parents should be actively involved in decision making unless there are strong grounds to believe that this may put the child or young person at risk." *Id.*

Even the U.S.-based World Professional Association for Transgender Health (WPATH) recognized that "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition," and that the desire for social transition "may reflect an expression of their gender identity" but it could also "be motivated by other forces." Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*, 13 Int'l J. Transgenderism 165, 176 (2012). Because "[a] change back to the original gender role can be highly distressing," parents should rely on "[m]ental health professionals" to help them "make decisions regarding the timing and process of any gender role changes for their young children." *Id.*

WPATH's Version 8 now recommends social transition for children but only "when it would be beneficial." Eli Coleman et al., *Standards of*

12

*Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S76 (Suppl. 1) (2022). Who determines that? According to WPATH, "health care professionals [should] discuss the potential benefits and risks of a social transition with families who are considering it." *Id.* at S69, S77. For adolescents, WPATH recommends that "family members . . . work collaboratively" with "community members" such as school officials, "unless [families'] involvement is considered harmful to the adolescent." *Id.* at S52. WPATH's new recommendations are not based on systematic reviews of evidence and discuss only the benefits of social transition, but even they emphasize the need for clinical consultation.

## III. En Banc Review Is Warranted Because This Case Presents a Question of Exceptional Importance

Parental rights are among the oldest and best-established substantive protections provided under the Fourteenth Amendment's Due Process Clause. That parents have the right to control the healthcare decisions of their children is "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Whether these rights entitle parents to know about public schools' efforts to socially

13

transition their children has emerged as "a question of exceptional importance," Fed. R. App. P. 35, in multiple circuit courts. *See, e.g.*, *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025).

The Supreme Court has repeatedly said that parents or legal guardians are best-positioned to understand and address the needs of their children and adolescents, including mental-health needs. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66–69 (2000). Because social transition is a powerful psychosocial intervention, it is a decision that should be made by, or in consultation with, students' parents or legal guardians.

## CONCLUSION

For the foregoing reasons, and those stated by the Plaintiffs-Appellants, the Court should grant the Petition.

Respectfully submitted,

/s/ *Ilya Shapiro*

Ryan Haynie
OKLAHOMA COUNCIL OF
PUBLIC AFFAIRS
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

April 26, 2025

Ilya Shapiro
   *Counsel of Record*
John Ketcham
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(b)(4) as the brief contains 2,595 words, excluding those parts exempted by 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 26, 2025        /s/ *Ilya Shapiro*
                             Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing motion with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.

Dated: April 26, 2025        /s/ *Ilya Shapiro*
                             Counsel for *Amici Curiae*