No. 23-10385

# United States Court of Appeals
*for the*
# Eleventh Circuit

———————————

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

*Plaintiffs-Appellants,*

– v. –

SCHOOL BOARD OF LEON COUNTY, FLORIDA, ROCKY HANNA,
DR. KATHLEEN RODGERS, RACHEL THOMAS, ROBIN OLIVERI,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
IN NO. 4:21-CV-415-MW-MJF
(Hon. Mark E. Walker)

———————————

## *AMICI* BRIEF OF LIBERTY JUSTICE CENTER, WISCONSIN INSTITUTE FOR LAW & LIBERTY, AND DR. ERICA E. ANDERSON, PhD, SUPPORTING REHEARING EN BANC

LIBERTY JUSTICE CENTER
EMILY RAE
*Counsel of Record*
7500 Rialto Boulevard, Suite 1-250
Austin, Texas 78735
(512) 481-4400

WISCONSIN INSTITUTE
  FOR LAW & LIBERTY
LUKE N. BERG
*Counsel of Record*
330 East Kilbourn Avenue, Suite 725
Milwaukee, Wisconsin 53202
(414) 727-9455

*Attorneys for Amici*

No. 23-10385-HH

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(a), Amici certify that the Certificate of Interested Persons stated in Appellants' Petition for Rehearing En Banc is complete and correct, except that, in addition to those persons and entities listed, the following persons have an interest in the outcome of this appeal:

Liberty Justice Center states that it is a nonprofit corporation registered in the State of Texas, and has no parent company and no stockholders.

Wisconsin Institute for Law & Liberty states that it is a nonprofit corporation registered in the State of Wisconsin, and has no parent company and no stockholders.

Dr. Erica E. Anderson has previously filed an amicus brief in this case and therefore was included in the Appellants' Certificate of Interested Persons.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS
    AND CORPORATE DISCLOSURE STATEMENT .................... C-1

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICI .............................................................................. 1

STATEMENT OF THE ISSUE ................................................................. 2

INTRODUCTION ..................................................................................... 2

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT .............................................................................................. 4

CONCLUSION ........................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Kaltenbach v. Hilliard City Sch.*,
  No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025) .....................4

*McConkie v. Nichols*,
  446 F.3d 258 (1st Cir. 2006) ...................................................................4

*Parham v. J. R.*,
  442 U.S. 584 (1979) ................................................................................4


**Statutes & Other Authorities:**

American Psychiatric Association,
  *What is Gender Dysphoria?* .................................................................13

American Psychological Association, *Guidelines for Psychological
  Practice With Transgender and Gender Nonconforming People*,
  70(9) APA (2015) ...................................................................................11

Cantor, James M., *Transgender and Gender Diverse Children and
  Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex &
  Marital Therapy (2019) ...........................................................................6

Cass, H., *Independent review of gender identity services for children
  and young people: Final report* (April 2024).........................................7

Hembree, Wylie C., et al., *Endocrine Treatment of Gender-
  Dyshporic/Gender-Incongruent Persons: An Endocrine Society
  Clinical Practice Guideline*, Endocrine Society, 102(11)
  J Clin. Endocrinol. Metab (2017) .....................................................9, 14

Olson, Kristina R., et al., *Gender Identity 5 Years After Social
  Transition*, 150(2) Pediatrics (Aug. 2022) .............................................6

Rae, James R., et al., *Predicting Early-Childhood Gender Transitions*,
  30(5) Psychological Science (2019).........................................................5

Singal, Jesse, *How the Fight Over Transgender Kids Got a
  Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016)..........................8

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258 (2022) ............................................. 9-10

Steensma, T. D., et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry (2013) ................................................................ 6

The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC7") (Version 7, 2012) ................ 5

UK Department for Education, *Gender Questioning Children: Non-statutory guidance for schools and colleges in England, Draft for consultation* (December 2023) ................................................. 7

Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) Journal of Homosexuality (2022) ..................................................................................... 13

Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 1 9(2) International Journal of Transgenderism (2018) .......................... 8

## INTEREST OF AMICI[1]

The Liberty Justice Center and Wisconsin Institute for Law & Liberty are both nonprofit, nonpartisan, public-interest litigation firms that seek to protect economic liberty, private property rights, free speech, and other fundamental rights, including the fundamental right to parent under the Fourteenth Amendment.

Dr. Erica E. Anderson, PhD, is a clinical psychologist practicing in California and Minnesota with over 45 years of experience and is a transgender woman. Between 2019 and 2021, Dr. Anderson served as a board member for the World Professional Association for Transgender Health (WPATH) and as the President of USPATH (the United States arm of WPATH). Since 2016, Dr. Anderson's work has focused primarily on children and adolescents dealing with gender-identity-related issues. She has seen hundreds of children and adolescents for gender-identity-related issues in that time, many of whom transition, with her guidance and support. As a practitioner serving children and adolescents

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than the amici curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

experiencing gender incongruence, Dr. Anderson has a strong interest in ensuring the best possible support and assistance for those children. In her view, appropriate care requires parental involvement.

## STATEMENT OF THE ISSUE

Whether the panel erred in concluding that secretly transitioning a minor child at school without involving the parents does not "shock the conscience."

## INTRODUCTION

The Leon County School District, like other school districts around the country, maintained a policy of allowing minor children to secretly adopt a new gender identity at school, requiring all staff to treat them as though they were the opposite sex, without parental notice or consent, and even directing staff to conceal this from parents in various ways. Numerous mental-health professionals believe that a gender-identity transition during childhood is a profound and difficult treatment decision and that parental involvement is critical for many reasons: to properly assess the underlying sources of the child's feelings; to evaluate the risks and benefits of a transition; to identify and address any coexisting issues;

to provide ongoing support; and ultimately, to decide whether a transition will be in their child's best interests.

The District applied its Policy to Appellants' child, facilitating a social transition at school without notice to them or their consent, in violation of their long-established right to make health-related decisions for their minor child. The District Court nevertheless dismissed their complaint on the grounds that usurping their parental role over this major decision was not "conscience shocking."

A panel of the Eleventh Circuit affirmed this decision, stating that Appellants needed to demonstrate *both* a violation of constitutional rights and that the District's actions "shocked the conscience." That is not the test for violations of a parent's fundamental rights, but regardless, the District's actions here *were* conscience-shocking. Both errors warrant rehearing en banc.

## SUMMARY OF ARGUMENT

A social transition to a different gender identity during childhood or adolescence is a major and potentially life-altering decision. And social transition is not the best approach for all children experiencing gender incongruence. A child or adolescent who exhibits a desire to change their

name and pronouns should receive a careful professional assessment. Given the significance of this decision, parents must be involved and must ultimately decide what is best for their child.

## ARGUMENT

Even if a shocks-the-conscience test applies in this context—and Amici agree with Appellants that it does not—school officials deciding, *in place of parents*, what is best for their child and then hiding that decision from them is exactly the kind of thing that *does* shock the conscience. *See McConkie v. Nichols*, 446 F.3d 258, 261 (1st Cir. 2006) (noting that "conscience-shocking conduct usually entails" things like a "significant interference with a protected relationship, such as the parent-child relationship"). Indeed, policies like Leon County's are "beyond troubling." *Kaltenbach v. Hilliard City Sch.*, No. 24-3336, 2025 WL 1147577, at *1 (6th Cir. Mar. 27, 2025) (Thapar, concurring). Or, as the Supreme Court has put it, the idea that government actors can override parents solely because they believe they know better is "statist" and "repugnant to American tradition." *Parham v. J. R.*, 442 U.S. 584, 603 (1979).

When children and adolescents express a desire to socially transition to a different gender identity (to change their name and pronouns to ones

at odds with their natal sex), there is a major fork in the road about whether a transition will be in the youth's best interests, with potentially lifelong implications. Parents must be involved in this decision, for many reasons.

First, there is an ongoing debate in the mental health community about how quickly and under what conditions children and adolescents who experience gender incongruence should transition socially. Childhood social transitions were "[r]elatively unheard-of 10 years ago" but have become far more frequent in recent years.[2] Before the recent trend in some circles to immediately "affirm" every child's and adolescent's expression of a desire for an alternate gender identity, a robust body of research had found that, for the vast majority of children (roughly 80 to 90 percent), gender incongruence does not persist.[3] As one researcher summarized, "*every* follow-up study of GD [gender diverse]

_____

[2] Rae, James R., et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681, at 669–70 (2019), https://doi.org/10.1177/0956797619830649.

[3] *See*, *e.g.*, The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC7") at 11 (Version 7, 2012), *available at* https://www.wpath.org/media/cms/Documents/ SOC%20v7/SOC%20V7_English.pdf.

children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition."[4]

These studies were conducted before the recent trend to quickly transition, whereas some newer studies of youth who *have* socially transitioned show much higher rates of persistence. A study in 2013 found that "[c]hildhood social transitions were important predictors of persistence, especially among natal boys."[5] Another recent study of 317 transgender youth found that 94% continued to identify as transgender five years after transitioning.[6]

Considering the vastly different rates of persistence between youth who transition and those who do not, many experts in the field are

---

[4] Cantor, James M., *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698 481.

[5] Steensma, T. D., et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590, at 588 (2013), https://doi.org/10.1016/j.jaac.2013.03 .016.

[6] Olson, Kristina R., et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022), https://doi.org/10.1542/peds. 2021-056082.

concerned that a social transition may affect the likelihood that a child's or adolescent's experience of gender incongruence will persist.

In the UK, for example, a recent, comprehensive review of the evidence by the National Health Service concluded that "social transition in childhood may change the trajectory of gender identity development for children with early gender incongruence."[7] This review also found that "those who had socially transitioned at an earlier age and/or prior to being seen in clinic were more likely to proceed to a medical pathway," with all the associated risks and complications. In view of this evidence, the report concluded that "parents should be actively involved in decision making" about a social transition.[8] And, consistent with these findings, the UK's Department for Education issued guidance directing that "[p]arents should not be excluded from decisions taken by a school . . . relating to requests for a child to 'socially transition.'"[9]

---

[7] Cass, H., *Independent review of gender identity services for children and young people: Final report* at 31–32 (April 2024), https://cass.independent-review.uk/home/publications/final-report/.
[8] *Id.* at 163.
[9] UK Department for Education, *Gender Questioning Children: Non-statutory guidance for schools and colleges in England, Draft for consultation*, at 3 (December 2023), https://bit.ly/3zPhlGw.

Dr. Kenneth Zucker, who for decades led "one of the most well-known clinics in the world for children and adolescents with gender dysphoria," has argued that a social transition can "become[ ] self-reinforcing" because "messages from family, peers, and society do a huge amount of the work of helping form, reinforce, and solidify gender identities."[10] He has also written that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence."[11]

The authors of the 2013 study referenced above expressed concern that "the hypothesized link between social transitioning and the cognitive representation of the self" may "influence the future rates of persistence," while noting that this "possible impact of the social transition itself on

---

[10] Singal, Jesse, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016), https://www.thecut.com/2016/02/fight-over-trans-kids-got-a-researcher-fired.html.

[11] Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2) International Journal of Transgenderism 231–245 (2018), available at https://www.researchgate.net/publication/325443416.

cognitive representation of gender identity or persistence" had "never been independently studied," Steensma (2013), *supra* n.5, at 588–89.

The Endocrine Society's guidelines similarly recognize that "[s]ocial transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence" and may "contribute to the likelihood of persistence."[12]

The World Professional Association for Transgender Health (WPATH), which takes a decidedly pro-transitioning stance, has acknowledged that "[s]ocial transitions in early childhood" are "controversial," that "health professionals" have "divergent views," and that there is insufficient evidence "to predict the long-term outcomes of completing a gender role transition during early childhood." WPATH SOC7, *supra* n.3, at 17.[13] WPATH encourages health professionals to

---

[12] Hembree, Wylie C., et al., *Endocrine Treatment of Gender-Dyshporic/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society, 102(11) J Clin. Endocrinol. Metab. 3869–3903, at 3879 (2017), https://doi.org/10.1210/jc.2017-01658.

[13] The latest version of WPATH's standards of care guidelines (version 8) continues to acknowledge that "there is a dearth of empirical literature regarding best practices related to the social transition process." *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health

*defer to parents* "as they work through the options and implications," *even* "[i]f parents do not allow their young child to make a gender role transition." *Id.*

In short, when a child or adolescent expresses a desire to change name and pronouns to another gender identity, mental health professionals do not universally agree that the best decision, for *every* such child or adolescent, is to immediately "affirm" their desire and begin treating that child or adolescent as the opposite sex. And whether transitioning will be helpful or harmful likely depends on the individual child or adolescent.

While the mental-health community continues to debate whether socially transitioning is generally beneficial or not, it is beyond dispute that there is currently little solid evidence about who is right, given how recent of a trend this is. *See supra* n.13.

Even setting aside the debate about socially transitioning, there is near universal agreement that, when a child or adolescent exhibits signs of gender incongruence (and a request to change name/pronouns would

---

2022 S1–S258, at  S76 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

qualify), each can benefit from the assistance of a mental-health professional, for multiple reasons.

Every major professional association recommends a thorough professional evaluation to assess, among other things, the underlying causes of the child's or adolescent's feelings and consider whether a transition will be beneficial. The American Psychological Association, for example, recommends a "comprehensive evaluation" and consultation with the parents and youth to discuss, among other things, "the advantages and disadvantages of social transition during childhood and adolescence."[14] The Endocrine Society likewise recommends "a complete psychodiagnostic assessment." *Supra* n.12, at 3877. WPATH, too, recommends a comprehensive "psychodiagnostic and psychiatric assessment," covering "areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement," "an evaluation of the strengths and weaknesses of family functioning,"

---

[14] American Psychological Association, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70(9) APA 832–64, at 843 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.

11

any "emotional or behavioral problems," and any "unresolved issues in a child's or youth's environment." WPATH SOC7, *supra* n.3, at 15.[15]

A professional assessment is especially important given the "sharp increase in the number of adolescents requesting gender care" recently, particularly among adolescent girls ("2.5-7.1 times" adolescent boys). WPATH SOC8, *supra* n.13, at S43. As WPATH acknowledges, an increasing number of "adolescents [are] seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years," indicating that "social factors also play a role," including "susceptibility to social influence." *Id.* at S44–S45.

There is also growing awareness of adolescents who come to "regret gender-affirming decisions made during adolescence" and later "detransition," which many find to be a "difficult[ ]" and "isolating experience." *Id.* at S47. In one recent survey of 237 detransitioners (over 90% of which were natal females), 70% said they realized their "gender

---

[15] WPATH SOC8, *supra* n. 13, at S45, likewise states that "a comprehensive clinical approach is important and necessary," "[s]ince it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person."

dysphoria was related to other issues," and half reported that transitioning did not help.[16]

Another reason for professional involvement is to assess whether the child or adolescent needs mental-health support. Many experience dysphoria—psychological distress—associated with the mismatch between their natal sex and perceived or desired gender identity. Indeed, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders' (DSM-V) official diagnosis for "gender dysphoria" is *defined by* "clinically significant distress." *See What Is Gender Dysphoria?*, American Psychiatric Association.[17]

Gender incongruence is also frequently associated with other mental-health issues. WPATH's SOC8 surveys studies showing that transgender youth have higher rates of depression, anxiety, self-harm, suicide attempts, eating disorders, autism spectrum disorders, and other emotional and behavioral problems than the general population. *Supra*

---

[16] Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) Journal of Homosexuality 1602–1620, at 1606 (2022), https://doi.org/10.1080/00918369.2021.1919479.
[17] American Psychiatric Association, *What is Gender Dysphoria?* https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

n.13, at S62–63. All major professional organizations recommend screening for these coexisting issues and treating them if needed. *Id*.; APA Guidelines, *supra* n.14, at 845; Endocrine Society Guidelines, *supra* n.12, at 3876.

Finally, professional support can be vital *during* any transition. A transition can "test [a young] person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports," and "[d]uring social transitioning, the person's feelings about the social transformation (including coping with the responses of others) is a major focus of [ ] counseling." Endocrine Society Guidelines, *supra* n.12, at 3877.

It should go without saying, but parents cannot obtain a professional evaluation, screen for dysphoria and other coexisting issues, or provide professional mental-health support for their children, if their school hides from them what is happening at school.

To summarize, no professional association recommends that teachers and school officials, who have no expertise whatsoever in these issues, should facilitate a social transition while at school, treating minors as if

14

they are really the opposite sex, in secret from their parents. Usurping the parents in this way is conscience-shocking.

## CONCLUSION

This Court should rehear this case en banc.

Respectfully Submitted,

LIBERTY JUSTICE CENTER

/s/ Emily Rae

EMILY RAE
*Counsel of Record*
7500 Rialto Blvd., Ste. 1-250
Austin, TX 78735
erae@ljc.org
(512) 481-4400

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

/s/ Luke N. Berg

LUKE N. BERG
*Counsel of Record*
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
rick@will-law.org
(414) 727-7367

*Attorneys for Amicus Curiae*
*Dr. Erica E. Anderson, PhD*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 2,568 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: April 30, 2025

/s/ Emily Rae
EMILY RAE

16