No. 23-10385

# United States Court of Appeals for the Eleventh Circuit

———————————

JANUARY LITTLEJOHN & JEFFREY LITTLEJOHN,
PLAINTIFFS-APPELLANTS,

*v.*

SCHOOL BOARD OF LEON COUNTY FLORIDA, ET AL.,
DEFENDANTS-APPELLEES,

———————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA,
NO. 4:21-cv-415, HON. MARK E. WALKER, PRESIDING*

———————————

**BRIEF OF DEFENDING EDUCATION AS *AMICUS CURIAE*
SUPPORTING PETITION FOR REHEARING EN BANC**

———————————

CHRISTOPHER MILLS
Spero Law LLC
557 East Bay Street #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

Counsel for *Amicus Curiae*

APRIL 30, 2025

# CERTIFICATE OF INTERESTED PARTIES AND
# CORPORATE DISCLOSURE STATEMENT

*January Littlejohn, et al. v. School Board of Leon County Florida, et al.*, No. 23-10385:

The undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in prior filings, have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

1. Defending Education (*amicus*) does not have a parent corporation, and no corporation owns 10% or more of its stock.

2. Mills, Christopher (counsel for *amicus*) of Spero Law LLC.

*/s Christopher Mills*
Christopher Mills

Counsel for *Amicus Curiae*

April 30, 2025

C-1 of 1

# EN BANC STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *United States v. Salerno*, 481 U.S. 739 (1987); *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc); *Arnold v. BOE of Escambia Cnty.*, 880 F.2d 305 (11th Cir. 1989); *Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002); *Waldman v. Conway*, 871 F.3d 1283 (11th Cir. 2017).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: When the application of an official policy infringes the plaintiff's fundamental constitutional rights, can those rights not be vindicated unless the plaintiff also proves that the defendant's conduct "shocked the conscience"?

<u>*/s Christopher Mills*</u>
Christopher Mills

Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

Certificate of Interested Parties and Corporate Disclosure Statement ........................i

En Banc Statement ................................................................................................................i

Table of Citations................................................................................................................ iii

Statement of the Issue .......................................................................................................1

Interest of *Amicus Curiae* ..................................................................................................1

Summary of the Argument................................................................................................2

Argument..............................................................................................................................3

    I.    The panel's decision leaves parents without meaningful recourse to vindicate their constitutional rights. ...................................3

    II.    Secretly transitioning children is a widespread problem in public schools. ...........................................................................................8

## TABLE OF CITATIONS

Page(s)

**CASES**

*Cruz-Erazo v. Rivera-Montanez*,
  212 F.3d 617 (1st Cir. 2000) ...................................................................................7

*Doe v. Pine-Richland Sch. Dist.*,
  2024 WL 2058437 (W.D. Pa. May 7, 2024) ..........................................................4

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
  78 F.4th 622 (4th Cir. 2023) ................................................................................3, 4

*Kaltenbach v. Hilliard City Schs.*,
  730 F. Supp. 3d 699 (S.D. Ohio 2024) ...................................................................4

*Kaltenbach v. Hilliard City Schs.*,
  No. 24-3336, Dkt. 59 (6th Cir. Mar. 28, 2025) .....................................................10

*Lee v. Poudre Sch. Dist.*,
  2023 WL 8780860 (D. Colo. Dec. 19, 2023) .........................................................4

*Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*,
  647 F. Supp. 3d 1271 (N.D. Fla. 2022) ..................................................................6

*Marbury v. Madison*,
  5 U.S. 137 (1803) ...................................................................................................8

*Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*,
  629 F. Supp. 3d 891 (N.D. Iowa 2022) ..................................................................5

*Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*,
  83 F.4th 658 (8th Cir. 2023) ...................................................................................5

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
  145 S. Ct. 14 (2024) ...............................................................................................5

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
  95 F.4th 501 (7th Cir. 2024) ...................................................................................4

**STATUTES**

20 U.S.C. § 1232g(d) ...............................................................................................12

**OTHER AUTHORITIES**

ACLU, *Open Letter to Schools about LGBTQ Student Privacy* (Aug. 26, 2020), https://perma.cc/KM2H-2MT3 ................................................................11

Donna St. George, *Gender Transitions at School Spur Debates over when, or if, Parents are Told*, Wash. Post (July 18, 2022), https://perma.cc/BVZ5-T3PK....10

Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People* (Apr. 2024), https://perma.cc/74EA-L76V ............................ 10, 11

Kate Anderson et al., *The Biden Administration's Proposed Changes to Title IX Threaten Parental Rights*, The Federalist Soc'y (Jan. 5, 2023), https://fedsoc.org/commentary/fedsoc-blog/the-biden-administration-s-proposed-changes-to-title-ix-threaten-parental-rights .........................................................11

Katie J. M. Baker, *When Students Change Gender Identity, and Parents Don't Know*, N.Y. Times (Jan. 22, 2023), https://www.nytimes.com/2023/01/22/us/gender-identity-students-parents.html ............................................................9

*Legal Guidance on Transgender Students' Rights* (June 2016), https://perma.cc/26N8-23D5 .................................................................................................9

National Center for Education Statistics, *Fast Facts*, https://perma.cc/RZ4B-MWU7 (last visited Apr. 11, 2025) ..........................................................9

Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies*, https://defendinged.org/investigations/list-of-school-district-transgender-gender-nonconforming-student-policies/ (last updated Apr. 21, 2025) ...........................................................................9

*Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools*, https://perma.cc/US5J-6AZW (last visited Apr. 11, 2025) .....................9

U.S. Department of Education, *Press Release: U.S. Department of Education Directs Schools to Comply with Parental Rights Laws* (Mar. 28, 2025), https://perma.cc/K87Q-L96U ................................................................12

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinic. Endocrinology & Metabolism, Vol. 102, Iss. 11 (Nov. 1, 2017).............11

## STATEMENT OF THE ISSUE

1. Whether the Littlejohns' parental rights claims are subject to a threshold "shocks the conscience" inquiry.

## INTEREST OF *AMICUS CURIAE*

Defending Education is a national, nonprofit membership association. Its members include many parents with school-aged children. Launched in 2021, it uses advocacy, disclosure, and litigation to combat the increasing politicization and indoctrination of K-12 and postsecondary education. It has a substantial interest in this case. The Fourteenth Amendment protects the fundamental right of parents to direct the upbringing of their children. The panel's decision, however, will prevent parents, including members of Defending Education, from meaningfully vindicating this fundamental right.[1]

---

[1] No party's counsel authored, and no party, party's counsel, or other person—other than *amicus curiae*, its members, or its counsel—contributed money for this brief.

## SUMMARY OF THE ARGUMENT

Facing parents of public school children is an explosion of policies that allow school personnel to socially transition their young children—giving children new names, pronouns, restrooms, and field trip bunks—in secret. Defending Education has found that nearly a quarter of the nation's students are subject to these policies. These "social transitions" are not neutral interventions. While the overwhelming majority of children with gender incongruity grow out of it, most children who are socially transitioned do *not*. Rather, they go on to increasingly invasive and irreversible interventions—puberty blockers, sterilizing cross-sex hormones, and experimental genital surgeries. Yet schools are refusing to even tell parents that they are setting their children on this dangerous pathway.

If the fundamental parental right to direct a child's upbringing protects anything, it protects against state-sanctioned transition of a child without parents' knowledge. But courts are leaving parents with no way to vindicate this right. When parents challenge a school's policy—a "legislative" action—they are often told that their concerns are too speculative so they lack standing. And when parents challenge a school's application of its policy to their child, decisions like the panel's tell them they cannot assert their fundamental right unless they clear an insurmountable hurdle: the "shocks the conscience" test. The result is to deny parents meaningful judicial recourse. To correct this result, the Court should grant rehearing en banc.

2

## ARGUMENT

**I.     The panel's decision leaves parents without meaningful recourse to vindicate their constitutional rights.**

Judicial recourse was already elusive for parents seeking to vindicate their constitutional right to direct their children's upbringing against schools seeking to secretly socially transition their children. Courts confronting similar cases have often denied standing to parents of children who have not yet been covertly transitioned by their schools. In effect, these courts have told parents to wait until their child is secretly socially transitioned—no matter if, by design, they will not know that. Yet parents are now told by the panel that even once that happens, and they bring an appropriate lawsuit, they cannot prevail because challenges to "executive action" are initially governed by an insurmountable "shocks the conscience" standard. This ruling would make it near-impossible for parents to vindicate their constitutional rights, depriving them of the ability to guide their children's development.

Courts routinely (and wrongly) deny standing to parents who challenge similar secret transition policies before they are imposed on their child. Typical is one Fourth Circuit decision, which held that such parents lack a current injury because their children did not yet have "any discussions with school officials about gender-identity or gender-transition issues"—so "no information is being withheld." *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023). The Fourth Circuit also said that no impending injury existed because the

3

parents had "not alleged that they suspect their children might be considering gender transition." *Id.* at 630. The obvious response is that the *point* of these policies is to deny parents that knowledge, but the Fourth Circuit swept that aside. The court held it irrelevant whether "the government hides information" that would let the parents "determine whether they had been injured" enough for the court's liking. *Id.* at 631.

Other courts have come to the same conclusion. One held that parents' "worry and concern do not suffice to show that any parent has experienced actual injury." *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 506 (7th Cir. 2024). Another went further, holding that "[e]ven if the child" "identifies as transgender," "standing still does not exist unless [the] child has some interaction with the District pursuant to its gender policy." *Doe v. Pine-Richland Sch. Dist.*, 2024 WL 2058437, at *9 (W.D. Pa. May 7, 2024). Similar decisions abound. *See Kaltenbach v. Hilliard City Schs.*, 730 F. Supp. 3d 699, 703 (S.D. Ohio 2024) (holding that parents lack standing because they "offer no allegations that their children have told or will tell the school that they are (or may be) LGBTQ+"); *Lee v. Poudre Sch. Dist.*, 2023 WL 8780860, at *7 (D. Colo. Dec. 19, 2023) (parents of "disenrolled" student lack standing for prospective relief).

To be sure, denying standing to parents whose children are subject to secret transition policies is wrong. These policies "specifically encourage school personnel to keep parents in the dark about the 'identities' of their children, especially if the

4

school believes that the parents would not support what the school thinks is appropriate." *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 145 S. Ct. 14, 14 (2024) (Alito, J., dissenting from denial of certiorari). Under these policies, "parents' fear that the school district might make decisions for their children without their knowledge and consent is not 'speculative'"—parents "are merely taking the school district at its word." *Id.* But the reality is that many courts deny standing in these circumstances, perhaps "as a way of avoiding some particularly contentious constitutional questions." *Id.* at 14–15.

Defending Education experienced the use of standing to insulate these harmful policies from judicial review. On behalf of parent members, it sued the Linn-Mar Community School District in Iowa for a "parental exclusion policy" depriving parents of students in seventh grade and up the right to know their child's gender identity at school. The district court refused to find standing for this claim, reasoning that "no one has been denied information related to their child's gender identity or Gender Support Plan"—*yet*. *Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 629 F. Supp. 3d 891, 908 (N.D. Iowa 2022). The court also noted that one parent "has freely withdrawn their child from the school district," and held that "the harm of being 'forced' out of the school district is self-inflicted." *Id.* On appeal, the Eighth Circuit declined to reach the issue, holding that it was moot. *Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 83 F.4th 658, 665–66 (8th Cir. 2023).

5

Here, however, the Littlejohns navigated Article III's waters, which can be uniquely treacherous for disfavored or controversial rights. The Defendants were caught "hiding from the Littlejohns the fact that their 13-year-old daughter had expressed a desire to identify as a boy at school." Op. 1 (Newsom, J., concurring). More than that, the Defendants secretly encouraged the child "to choose a preferred name, preferred pronouns, preferred restroom, and preferred room sharing arrangements on school fieldtrips." *Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, 647 F. Supp. 3d 1271, 1274 (N.D. Fla. 2022). The Defendants' actions led to emotional distress, exacerbation of the child's "psychological and educational difficulties," "ongoing emotional and psychological damage to the[] family dynamic," and costs for providing the child an alternative, appropriate education. D. Ct. Dkt. 38 ¶ 163.

Yet even though the Littlejohns overcame jurisdictional hurdles—because the school had successfully started secretly transitioning their child—the panel greeted their case with an even more impossible burden. According to the panel, if the Littlejohns had challenged "legislative action" that "implicates a fundamental right," like the parental right to direct their children's upbringing, strict scrutiny would have applied. Op. 12. But because the Defendants had *applied* their policies to the Littlejohns' child, the panel held that the challenge was to executive action. *Id.* at 18. And according to the panel, "even if a plaintiff alleges that executive action violated

6

a fundamental right, the plaintiff must first show that the action shocked the contemporary conscience." *Id.* at 14 (internal quotation marks omitted).

This logic puts parents in a lose-lose situation. Challenge "legislative action" like "a school board rule of general applicability" (*id.* at 18), and be denied standing because no direct action has been taken. Or wait to challenge a direct action against your child—putting child and family in direct danger—and *still* be denied the ability to show a constitutional violation or obtain redress. As two judges on the panel explained, "pretty much *nothing* shocks the conscience" under the "shocks the conscience" test, so schools "will almost certainly win." Op. 16 (Newsom, J., concurring) (emphasis omitted). In short, "enforcement in the Eleventh Circuit of the fundamental liberty interests the Littlejohns seek to vindicate" will have "come to an end." Op. 3 (Tjoflat, J., dissenting).[2]

Rehearing is necessary to ensure that parents can meaningfully vindicate their rights to direct their children's upbringing—and protect them from transitioning zealots in many public schools. Though this case cannot fix the standing errors that have plagued similar cases, rehearing could at least ensure that parents who have suffered an actual secret transitioning of their child can find some possibility of meaningful recourse through the judicial process. As Judge Newsom explained, it

---

[2] Some courts have held that interference with protected familial relationships can meet this standard. *See Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 623 (1st Cir. 2000).

7

"is totally bizarre" to consign these parents to a near-certain loss when any other challenge to governmental infringement of a fundamental right would be a near-certain win under the strict scrutiny that applies to such infringements. Op. 15 (concurring opinion). "That makes *no* sense." *Id.* at 16. And combined with courts' widespread refusal to even hear cases challenging the policies themselves, the panel's reading has the added demerit of making it impossible for parents to assert their rights in this context. Though it may be overstatement to say "that every right" "must have a remedy," *Marbury v. Madison*, 5 U.S. 137, 147 (1803), there is no reason in law or logic for the Littlejohns to have no remedy. Rehearing en banc is needed to avoid that senseless result.

**II.    Secretly transitioning children is a widespread problem in public schools.**

Providing a meaningful way for parents to vindicate their right to guide their children's upbringing is especially important because of the increasing frequency of public schools secretly socially transitioning young children. Defending Education keeps track of school districts with policies stating that district personnel can or should keep a student's transgender status hidden from parents. At last count, 1,215 school districts nationwide were reported to have such policies—and the actual figure is likely higher. These districts cover over 12.3 million students, roughly a

8

quarter of the public school student population.[3] These policies draw on ideological guidance from groups like the National Education Association, which instructs school personnel not to "disclose a student's actual or perceived sexual orientation, gender identity, or gender expression to" "parents" "unless required to do so by law."[4] The NEA urges schools "to have a plan in place to help avoid any mistakes or slip-ups" that might clue in "unsupportive parents" about what schools are doing to their children.[5]

Thus, schools across the country are socially transitioning young students and concealing it from parents. The stories shared by families like the Littlejohns are heartbreaking. Wendell and Maria Perez, also in Florida, said that they found out that a school "employee had been counseling their 12-year-old about 'gender confusion' for months" "only after their child made two suicide attempts."[6] An Ohio school district apparently "encouraged young children to become transgender—then

---

[3] *See* Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies*, https://defendinged.org/investigations/list-of-school-district-transgender-gender-nonconforming-student-policies/ (last updated Apr. 21, 2025); National Center for Education Statistics, *Fast Facts*, https://perma.cc/RZ4B-MWU7 (last visited Apr. 11, 2025).
[4] *Legal Guidance on Transgender Students' Rights*, 6 (June 2016), https://perma.cc/26N8-23D5.
[5] *Schools in Transition*, 16, https://perma.cc/US5J-6AZW (last visited Apr. 11, 2025).
[6] Baker, *When Students Change Gender Identity, and Parents Don't Know*, N.Y. Times (Jan. 22, 2023), https://www.nytimes.com/2023/01/22/us/gender-identity-students-parents.html.

lied to parents about what was happening"—and one of those children also "attempted to commit suicide."[7] One mother in California "went two years without knowing her sixth grader had transitioned at school."[8]

What's more, no one can pretend that social transitions are some neutral intervention. As the United Kingdom's Cass Report—the seminal review of evidence about childhood gender transition—explained, "it is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes."[9] And "[t]he importance of what happens in school cannot be under-estimated."[10] Absent interventions like social transitioning, the vast majority of "children with gender dysphoria grow out of it." *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1268 (11th Cir. 2024) (Lagoa, J., concurring). But one "study found that 93% of those who socially transitioned between three and 12 years old continued to identify as transgender" five years later.[11] Another "study looking at transgender adults found that lifetime suicide attempts and suicidal ideation in the

---

[7] Order 2, *Kaltenbach v. Hilliard City Schs.*, No. 24-3336, Dkt. 59 (6th Cir. Mar. 28, 2025) (Thapar, J., concurring).
[8] St. George, *Gender Transitions at School Spur Debates*, Wash. Post (July 18, 2022), https://perma.cc/BVZ5-T3PK.
[9] Cass, *Independent Review of Gender Identity Services*, 158 (Apr. 2024), https://perma.cc/74EA-L76V.
[10] *Id*.
[11] *Id*. at 162.

10

past year was higher among those who had socially transitioned as adolescents compared to those who had socially transitioned in adulthood."[12]

Social transition is the start of a conveyor belt that sends a child through the medical transition pathway. According to the Endocrine Society—a proponent of medically transitioning children—"[i]f children have completely socially transitioned, they may have great difficulty in returning to the original gender role."[13] The Society even admitted that "there are currently no criteria to identify" when gender dysphoria could be reduced by early social transitions.[14] Social transitions are thus likely to usher children to dangerous, unproven, and sterilizing sex hormones and surgeries. *See Eknes-Tucker*, 114 F.4th at 1260–61, 1268–70 (Lagoa, J., concurring).

Even state laws purporting to ban these policies may not solve the problem. The ACLU has a threatening "open letter" to schools claiming that it is somehow unconstitutional "to disclose a student's sexual orientation or gender identity" "to a student's parents."[15] The Biden Administration took a similar position, suggesting that secret transitioning policies are required under Title IX and FERPA.[16] School

---

[12] *Id.* (internal quotation marks omitted).

[13] Hembree, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, J. of Clinic. Endocrinology & Metabolism, Vol. 102, 3879 (Nov. 1, 2017).

[14] *Id.*

[15] ACLU, *Open Letter* (Aug. 26, 2020), https://perma.cc/KM2H-2MT3.

[16] *See* Anderson, *The Biden Administration's Proposed Changes to Title IX Threaten Parental Rights*, Federalist Soc'y (Jan. 5, 2023), https://fedsoc.org/commentary/fedsoc-blog/the-biden-administration-s-proposed-changes-to-title-ix-threaten-parental-rights.

districts commonly make similar claims about FERPA, even though rights to educational records under FERPA are the *parents'* until the student turns 18. 20 U.S.C. § 1232g(d). Though the Department of Education is now investigating schools with secret transitioning policies for violating FERPA,[17] all this confirms the need for parents to be able to defend their fundamental right to direct their children's upbringing. Policies that let school officials transition children in secret undermine parents' ability to provide for their children's wellbeing and harm children.

Respectfully submitted,

*s/ Christopher Mills*
CHRISTOPHER MILLS
Spero Law LLC
557 East Bay Street #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

Counsel for *Amicus Curiae*

APRIL 30, 2025

---

[17] U.S. Department of Education, *Press Release* (Mar. 28, 2025), https://perma.cc/K87Q-L96U.

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 2,594 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  April 30, 2025

*/s Christopher Mills*
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  April 30, 2025

*s/ Christopher Mills*
Christopher Mills
