NO. 23-10385-HH

# In the United States Court of Appeals for the Eleventh Circuit

JANUARY LITTLEJOHN AND JEFFREY LITTLEJOHN,
*Plaintiffs-Appellants*,

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA, ROCKY HANNA, DR. KATHLEEN RODGERS, RACHEL THOMAS, AND ROBIN OLIVERI,
*Defendants-Appellees*.

On Appeal from the U.S. District Court
Northern District of Florida, Tallahassee Division
Case No. 4:21-CV-00415-MW/MJF

**BRIEF OF *AMICUS CURIAE* ABIGAIL MARTINEZ IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC**

Jeffrey C. Mateer
Keisha T. Russell
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
(972) 941-4444

April 30, 2025

Kayla A. Toney
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
(469) 440-7598
ktoney@firstliberty.org

*Counsel for Amici Curiae*

i

# CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3, Appellant certifies that the following persons have an interest in the outcome of this appeal:

Martinez, Abigail – Amicus Curiae

Mateer, Jeffrey M. – Counsel for Amicus Abigail Martinez

Russell, Keisha T. – Counsel for Amicus Abigail Martinez

Toney, Kayla A. – Counsel for Amicus Abigail Martinez

First Liberty Institute is a nonprofit corporation. It does not issue stock and are neither owned by nor are the owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public.

Respectfully submitted,

s/ *Kayla A. Toney*
Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
(469) 440-7598
ktoney@firstliberty.org

ii

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ................................................................................... ii

TABLE OF CITATIONS ................................................................................ iv

INTEREST OF *AMICUS CURIAE* ................................................................. 1

SUMMARY OF ARGUMENT ........................................................................ 2

ARGUMENT ................................................................................................... 3

I.   Ms. Martinez' tragic story shows that public school policies that exclude parents are devastating to families ................................................. 3

II.  Strict scrutiny should apply because Leon County violated two fundamental rights: due process and free exercise. .......................................... 8

CONCLUSION ............................................................................................... 12

CERTIFICATE OF COMPLIANCE .............................................................. 14

CERTIFICATE OF SERVICE ........................................................................ 15

# TABLE OF CITATIONS

**Cases**

*Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*,
   880 F.2d 305 (11th Cir. 1989).......................................................................... 9, 10

*Elrod v. Burns*,
   427 U.S. 347 (1976)……………………………………...………………..12

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020) ..................................................................................... 8, 9

*Holt v. Hobbs*,
   574 U.S. 352, 362 (2015)…………………………………………………11

*McKinney v. Pate*,
   20 F.3d 1550 (11th Cir. 1994)………………….....………………….………..8

*Morse v. Frederick*,
   551 U.S. 393 (2007) .............................................................................................. 12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ............................................................................................ 9

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925)……………………………………………...…………9

*Tatel v. Mt. Lebanon School District*,
   752 F. Supp. 3d 512 (W.D. Pa. 2024) ................................................................ 10

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
   450 U.S. 707 (1981) .............................................................................................. 11

*Waldman v. Comm'r*,
   871 F.3d 1283 (11th Cir. 2017)………………………………….………...8

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)……………………………………………..9, 11, 12

**Other Authorities**

*The Cass Review: Independent Review of Gender Identity Services for Children and Young People ("Cass Review")* (Apr. 2024) ......................................4

*Do No Harm Launches First National Database Exposing the Child Trans Industry* (Oct. 8, 2024) .................................................................................. 7

Dr. Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (February 2022)……………………..................7

*The Evidence to Support Medicalized Gender Transitions in Adolescents Is Worryingly Weak*, The Economist (Apr. 5, 2023)………………………….....7

First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022) ..... 9

Sarah Perry and Thomas Jipping, *Public School Gender Policies that Exclude Parents are Unconstitutional*, The Heritage Foundation (June 12, 2024)……………………………………………………………………  7

Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7……………...…………………4

"Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015) ............................................... 3, 7

# INTEREST OF *AMICUS CURIAE*[1]

*Abigail Martinez* is a California mother who lost her beloved daughter Yaeli to suicide in 2019. Ms. Martinez is a devout Christian who shares her family's tragic story hoping to prevent heartache from school policies that exclude parents and pressure minors to pursue gender transitions, often at the expense of their health. Ms. Martinez urges this Court to consider the consequences of its decision for the Littlejohns and for families around the country facing similar situations.



*Yaeli (right) and her mother Abigail Martinez.*
*Photos courtesy of Abigail Martinez.*

---

[1] All parties received notice and consented to this brief pursuant to Fed. R. App. 29(a)(2). Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief; and no person—other than amicus' counsel—contributed money intended to fund the brief.

## SUMMARY OF ARGUMENT

Government policies that exclude parents from their children's lives have devastating consequences and infringe on fundamental First and Fourteenth Amendment rights. Yet here, the district court reasoned that the Littlejohn's story did not "shock the conscience" because it did not result in custody loss or suicide. App.189. The panel took this even further, finding that "even where a student *dies*, school officials' behavior does not 'shock the conscience' if it is no more than reckless or deliberately indifferent;" "malicious conduct" or "obviously excessive" force is required. Maj.-Op.24. By this standard, unless a school district willfully murders a child, the parents have no claim. This erroneous standard absolves school districts of responsibility in all but the most extreme cases, and it ignores Supreme Court jurisprudence on fundamental rights. Courts should not require parents to wait until they lose custody or their child dies to seek redress.

For amicus Abigail Martinez, whose daughter was undoubtedly influenced by an agenda-driven public school, for the Littlejohns, and for families nationwide suffering under similar policies, their concerns merit strict scrutiny. This Court should grant rehearing so that parents can vindicate their fundamental rights before losing their children.

2

# ARGUMENT

## I. Ms. Martinez' tragic story shows that school policies excluding parents are devastating to families.

In 2015, Ms. Martinez' teenage daughter Yaeli began questioning her sexuality. The Arcadia Unified School District also began requiring staff to use preferred names and pronouns for transgender students without parental notification or permission, or any "medical or mental health diagnosis or treatment threshold."[2] Like Leon County, the district directed staff to keep students' gender identity "private" from parents. School staff told Yaeli to secretly join the LGBTQ club, where she was persuaded the only way to be happy was to change her gender. An older transgender student convinced Yaeli that her depression was because she was transgender. Yaeli's school psychologist then pushed her toward gender transition instead of treating her severe depression. Ms. Martinez tried advocating for her daughter's mental health and recalls, "the school staff should have helped me, but they became my worst enemy." When Yaeli was hospitalized after attempting suicide, her former principal came to the hospital and pressured Ms. Martinez to call

---

[2] "Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015), https://perma.cc/Y5G7-S5A4.

3

her daughter "Andrew," scornfully asking, "Is it too hard for you to call your child a new name?"[3]

At 16, Yaeli ran away from home. The people at school pushing Yaeli's gender transition convinced her the only way to get cross-sex hormones was to accuse her mother of abuse. Those accusations would land Yaeli in foster care, where the state would pay for gender transition without parental consent. The California Department of Child and Family Services (DCFS) placed Yaeli in a group home. DCFS placed Ms. Martinez on a child abuse registry while allowing her to continue raising her other three children.

On recommendation from the school psychologist, a judge ruled that Yaeli could receive cross-sex hormones, ignoring Ms. Martinez' pleas to treat her depression. Meanwhile, Ms. Martinez was shut out of Yaeli's life, only allowed one hourly visit per week, and her visits were heavily monitored by activists who told

---

[3] "The 'transition or die' narrative, whereby parents are told that their only choice is between a 'live trans daughter or a dead son' (or vice-versa), is both factually inaccurate and ethically fraught. . . it hurts the minority who are at risk, and who, as a result of such misinformation, *may forgo evidence-based suicide prevention intervention in the false hopes that transition will prevent suicide.*" Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7, 713, https://www.tandfonline.com/doi/pdf/10.1080/0092623X.2022.2046221 (emphasis added); *see also The Cass Review: Independent Review of Gender Identity Services for Children and Young People ("Cass Review")* at 22, 179, 195 (Apr. 2024), https://perma.cc/3QVZ-9Y52 (finding "no evidence that gender-affirmative treatments reduce deaths by suicide").

4

her to "have a funeral for your daughter and adopt your son." "I was told not to talk about God,'" Martinez recalls. "They told me if you do that, you'll never see your daughter."

 

*Family visit at the group home for Yaeli's 17th birthday.*
*Photos courtesy of Abigail Martinez.*

At 19, Yaeli was sent to independent living but continued to struggle with deep depression and poverty. Desperate for food, she reached out to her mom who immediately brought her groceries. Yaeli texted, "Mom, I wanted to cry because no matter what you're always there for me." Yaeli also told her mom she understood that she would never be able to become a boy, and that the cross-sex hormone treatments were causing severe pain in her bones. Yet instead of receiving the care and treatment Yaeli needed for depression, the state gave her testosterone and tore her away from her mom – her best source of support. After a grueling legal battle,

5

Ms. Martinez was absolved of all abuse claims and removed from the abuse registry. But it was too late. Two months later, Yaeli committed suicide by lying down in front of a train. Her death was so gruesome that the funeral home was not able to show her body to Ms. Martinez.

After Yaeli's death, Ms. Martinez requested meetings with school staff and state workers, but no one responded. She eventually sued the school district and DCFS, who admitted that they "aggressively pursued the implementation of inclusive, gender-affirming laws, policies, and supportive services for LGBTQ+ youth." The school district claimed their "staff would not be authorized or medically qualified to treat clinical depression." Yet the district thought itself medically qualified to facilitate Yaeli's transition behind her mother's back and even advocated her removal from home despite no evidence of abuse.

The legal system's utter failure to provide any adequate response only compounded the family's grief. "To them, my child was a number in the system. It's all political," said Ms. Martinez. "I want them to change this broken system, not to play with our children's lives. Not to go for what they believe. I don't want any other parent to suffer what I've been going through. This pain doesn't have a beginning or end."

How many children must be injured before a legal challenge survives? By the time a child attempts to transition, with parents left out, it's often too late to restore

6

the damaged relationship or prevent the mental health crisis exacerbated by school officials who facilitated the transition.[4]

Here, the Littlejohns' story may have ended as tragically as the Martinez family's. Both policies required staff to (1) use names and pronouns corresponding to gender identity, not biological sex, without parent permission; (2) conceal students' gender identity from their parents unless students request otherwise; and (3) socially transition students without medical or mental health screening.[5] Leon County's Policy is *more* hostile to parents than Arcadia's, because it requires a "support plan" to be created within 48 hours of a student's request that cannot be shared with parents. App.157-58. These policies, adopted by over 18,000 schools nationwide, are causing irreversible harm.[6]

---

[4] *See* Dr. Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://perma.cc/22BR-FFBE (social transition is an "active intervention because it may have significant effects on the child").

[5] *Compare* "Transgender Students – Ensuring Equity and Nondiscrimination," *supra* note 2, *with* R.38-1.

[6] Sarah Perry and Thomas Jipping, *Public School Gender Policies that Exclude Parents are Unconstitutional*, The Heritage Foundation (June 12, 2024), https://perma.cc/VJ35-DWRW. Medical transition treatments were performed on around 14,000 minors from 2019-2023. *Do No Harm Launches First National Database Exposing the Child Trans Industry* (Oct. 8, 2024), https://perma.cc/5LAR-L9V5. Yet systematic evidence-based reviews in Finland, Sweden, the U.K, and Florida have concluded that medical interventions largely do not resolve gender dysphoria and cause lasting harm to physical and mental health. *The Evidence to Support Medicalized Gender Transitions in Adolescents Is Worryingly Weak*, The Economist (Apr. 5, 2023), https://archive.ph/IaCvu#selection-1039.0-1039.88.

7

## II. Strict scrutiny should apply because Leon County violated two fundamental rights: due process and free exercise.

The opinions below told the Littlejohns that until their daughter is removed from custody or lost to suicide, they have no legal remedy under the Due Process Clause—perhaps not even then. App.189 (school did not abuse A.G. or "tr[y] to cause Plaintiffs to lose custody); Maj.-Op.24 ("even where a student *dies*, school officials' behavior does not 'shock the conscience' if it is no more than reckless or deliberately indifferent"). But our Constitution guarantees more. The "shock-the-conscience" standard does not apply when fundamental rights are involved. Pet.18-21; *Waldman v. Comm'r*, 871 F.3d 1283, 1292 (11th Cir. 2017) ("The Fourteenth Amendment forbids the government from infringing fundamental liberty interests at all, unless the infringement is narrowly tailored to serve a compelling state interest."); *see also McKinney v. Pate*, 20 F.3d 1550, 1556 n.7 (11th Cir. 1994) ("shock-the-conscience" is "[a]n alternate substantive due process test" used when fundamental rights are not at stake).

Yet parental rights need not rely solely on due process, because the Free Exercise Clause protects families seeking to raise their children according to their faith.[7] For 100 years, the Supreme Court has reaffirmed the "enduring American tradition" of "the rights of parents to direct 'the religious upbringing' of their

---

[7] While they did not bring a free exercise claim below, the Littlejohns share Ms. Martinez' Christian faith.

8

children." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065–66 (2020) (describing how many religious traditions entrust parents with primary responsibility for imparting their faith to their children without government interference).[8] In *Wisconsin v. Yoder*, the Supreme Court held that parental rights regarding religious upbringing are "specifically protected by the Free Exercise Clause," "[l]ong before . . . universal formal education." 406 U.S. 205, 214 (1972). *Yoder* described the Court's holding in *Pierce v. Society of Sisters,* 268 U.S. 510, 534-35 (1925), "as a charter of the rights of parents to direct the religious upbringing of their children." 406 U.S. at 233. The Court directly connected parental rights and religious beliefs: "the duty to prepare the child for additional obligations . . . must . . . include the inculcation of moral standards, and religious beliefs." *Yoder*, 406 U.S. at 233 (cleaned up).

In cases involving sexuality—where "the situation raises profound moral and religious concerns"—public schools may not "depriv[e] the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305, 313–14 (11th Cir. 1989) (school

---

[8] *See, e.g.,* First Liberty Institute, Public Comment on Section 1557 NPRM (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 faith groups on sex and gender).

9

officials violated Constitution when they coerced minor into abortion without parents' knowledge). As Judge Tjoflat's dissent emphasizes, the panel erred in ignoring *Arnold*, which applied fundamental rights analysis without mentioning "shock-the-conscience." Dissent.12-13. Like in *Arnold* and in Ms. Martinez' experience, school officials willfully excluded and overruled the Littlejohns.

Recent gender-confusion cases uphold this connection between parental rights and religious exercise. In *Tatel v. Mt. Lebanon School District*, gender-confusion instruction to elementary students was a "clear violation of the Free Exercise Clause" and of the parents' substantive due process rights. 752 F. Supp. 3d 512, 553–56 (W.D. Pa. 2024) ("when conflicts occur between parents and public schools on matters of the greatest importance, the Parents' rights prevail unless the public school can demonstrate a compelling interest"). Here, the district court drew an irrelevant distinction between the *Tatel* parents who challenged a *policy* and the Littlejohns who challenged officials' *conduct*. App.192. Yet the officials' conduct is based on policy, and the Littlejohns challenge both. Pet.13 ("Plaintiffs cannot sue policies; they always must sue executive actors"). In *Mirabelli v. Olson*, another federal court held that gender-manipulation policies which exclude parents "implicate[] the heartland of parental protection under the substantive Due Process Clause" and the Free Exercise Clause, upholding both claims. No. 3:23-CV-0768, 2025 WL 42507, at *11 (S.D. Cal. Jan. 7) ("By concealing a child's gender health

10

issues from the parents, parents are precluded from exercising their religious obligations to raise and care for their child at a time when it may be highly significant, because they are kept uninformed…")

Here, Leon County's practice of excluding parents from sensitive decisions about their children's health interferes with religious exercise by condoning false assumptions about religious beliefs. R.38 at ¶¶75-76 (describing "parent/community pushback on LGBTQ+ inclusion" as challenge to address). Requiring government officials to evaluate parents' beliefs to determine their "support" level violates the First Amendment under *Thomas v. Review Board*. 450 U.S. 707, 715–16 (1981) (government actors must not "undertake to dissect" sincere religious beliefs); *see also Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (government officials cannot question merits of individual's sincerely held religious beliefs). School officials often label religious parents as "non-supportive," as Ms. Martinez experienced when school officials shut her out, despite her loving advocacy for Yaeli's mental health. This practice erodes the formative relationship between children and their parents, who are uniquely equipped to address influences such as peer pressure and mental health challenges. If the government conceals their children's most difficult struggles, loving parents like Ms. Martinez and the Littlejohns *cannot* provide the support their children need.

11

Nor do parental rights evaporate when parents send their children to public school. As Justices Alito and Barrett recently observed, most parents cannot afford alternatives to compulsory public school. Transcript of Oral Argument at 51, 138, *Mahmoud v. Taylor*, 2025 WL 226842 (2025) (No. 24-297); *see also Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities.")

Infringement of these fundamental rights triggers strict scrutiny. *See Yoder*, 406 U.S. at 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Because Leon County's Policy violates fundamental rights under the First and Fourteenth Amendments, this Court should grant rehearing en banc and apply strict scrutiny.

## CONCLUSION

This Court should heed Ms. Martinez' concerns and the dire consequences of school policies that destroy familial bonds, so that Yaeli's tragic story never happens again.

12

Respectfully submitted,

| | |
|---|---|
| Jeffrey C. Mateer<br>Keisha T. Russell<br>First Liberty Institute<br>2001 West Plano Parkway,<br>Suite 1600<br>Plano, TX 75075<br>(972) 941-4444<br>krussell@firstliberty.org<br><br>*Counsel for Amicus Curiae*<br><br><br>April 30, 2025 | /s/ Kayla A. Toney<br>Kayla A. Toney<br>  *Counsel of Record*<br>First Liberty Institute<br>1331 Pennsylvania Ave. NW,<br>Suite 1410<br>Washington, DC 20004<br>(469) 440-7598<br>ktoney@firstliberty.org |

## CERTIFICATE OF COMPLIANCE

I, Kayla A. Toney, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 2598 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

April 30, 2025

/s/ *Kayla A. Toney*
_____

Kayla A. Toney
*Counsel for Amici Curiae*

14

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

April 30, 2025

/s/ *Kayla A. Toney*

Kayla A. Toney
*Counsel for Amici Curiae*

15