No. 23-10385-HH

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JANUARY LITTLEJOHN, *et al.*,

*Plaintiffs–Appellants*,

v.

SCHOOL BOARD OF LEON COUNTY, FLORIDA, *et al.*,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida, No.: 4:21-cv-00415-MW-MJF

## BRIEF RELIGIOUS FREEDOM INSTITUTE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING EN BANC

Denise M. Harle
Florida Bar No. 81977
SHUTTS & BOWEN LLP
215 S. Monroe Street
Suite 804
Tallahassee, Florida 32301
(850) 241-1717
dharle@shutts.com

Alyssa L. Cory
Florida Bar No. 118150
SHUTTS & BOWEN LLP
4301 W. Boy Scout Boulevard
Suite 300
Tampa, Florida 33607
(813) 229-8900
acory@shutts.com

*Counsel for Religious Freedom Institute*

*Littlejohn v. School Board of Leon County, Florida*
*Case No. 23-10385-HH*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(3), 26.1-2(b) and 26-1(3), Religious Freedom Institute certifies that the Certificate of Interested Persons filed by Plaintiffs–Appellants January Littlejohn et al. is correct, and certifies that the following additional listed persons may have an interest in the outcome of this case:

1. Cory, Alyssa L., counsel for Amicus Curiae

2. Harle, Denise M., counsel for Amicus Curiae

3. Religious Freedom Institute, Amicus Curiae

4. Shutts & Bowen LLP, counsel for Amicus Curiae

Amicus Curiae Religious Freedom Institute is a nonprofit 501(c)(3) organization, with no parent companies, subsidiaries, corporate affiliates, or publicly-traded shares.

Dated: 4/30/2025

/s/ Denise M. Harle
Counsel for Amicus Curiae
Religious Freedom Institute

## EN BANC STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the decisions of the Supreme Court or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *United States v. Salerno*, 481 U.S. 739 (1987); *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc); A*rnold v. BOE of Escambia Cnty.*, 880 F.2d 305 (11th Cir. 1989); *Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002); Waldman v. Conway, 871 F.3d 1283 (11th Cir. 2017).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: When the application of an official policy infringes the plaintiff's fundamental constitutional rights, can those rights not be vindicated unless the plaintiff also proves that the defendant's conduct "shocked the conscience"?

*/s/ Denise M. Harle*
Counsel for Amicus Curiae

i

# **TABLE OF CONTENTS**

Certrificate of Interested Persons And Corporate Disclosure Statement ................... C-1

En Banc Statement ........................................................................................................ .i

Table of Authorities .................................................................................................... iii

Statement of the Issue ................................................................................................. 1

Interest of Amicus Curiae .......................................................................................... 1

Summary of Argument ............................................................................................... 2

Argument ...................................................................................................................... 3

I.     Parental rights are deeply rooted in our nation's history and tradition ............... 3

     A.    At common law, parental authority was sweeping and assumed ............. 3

     B.    Looking to the original understanding of the Fourteenth Amendment, parental rights meet the history-and-tradition standard ............................................................................................. 5

     C.    Cases from more than a century ago reaffirm those principles ................ 6

II.    Directing the upbringing of one's children on matters of religion and theology is at the core of parental rights ................................................................. 7

     Judaism ................................................................................................. 8

     Islam ..................................................................................................... 9

     Hinduism .............................................................................................. 10

Conclusion .................................................................................................................. 12

Certificate of Service .................................................................................................. 13

Certificate of Compliance .......................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ................................................................. 8

*Bellotti v. Baird,*
   443 U.S. 622 (1979) ................................................................. 4

*Espinoza v. Montana Dep't of Rev.,*
   591 U.S. 464 (2020) ................................................................. 7

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) (Alito, J., concurring) ............................ 7

*Hardwick v. Bd. of Sch. Trs.,*
   205 P. 49 (Cal. Dist. Ct. App. 1921) ...................................... 6

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
   584 U.S. 617 (2018) ................................................................. 8

*\*Meyer v. Nebraska,*
   262 U.S. 390 (1923) ................................................................. 6

*Moore v. City of E. Cleveland,*
   431 U.S. 494 (1977) ................................................................. 5

*Morrow v. Wood,*
   35 Wis. 59 (Wis. 1874) ............................................................ 6

*Parham v. J.R.,*
   442 U.S. 584 (1979) ................................................................. 5

*\*Pierce v. Society of Sisters,*
   268 U.S. 510 (1925) ................................................................. 7

*Santosky v. Kramer,*
   455 U.S. 745 (1982) ................................................................. 5

*State ex rel. Sheibley v. Sch. Dist. No. 1, Dixon Cnty., et al.,*
   48 N.W. 393 (Neb. 1891) ........................................................ 4

## Table Of Authorities
### (Continued)

**Page(s)**

**Cases**

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ................................................................. 5

*State v. Ferguson*,
    144 N.W. 1039 (Neb. 1914) ................................................. 6

*\*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ......................................................... 6, 12

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ..................................................... 3, 7, 12

**Other Authorities**

*Al-A'raf* 7:80-81 ......................................................................... 10

*Al-Hujurat* 49:13 ......................................................................... 10

Aron Moss, *Separation in the Synagogue*, Chadbad.org,
    https://www.chabad.org/library/
    article_cdo/aid/160962/jewish/Separation-in-the-Synagogue.htm
    (last visited Apr. 28, 2025) ................................................. 9

*At-Tahrim* 66:6 ............................................................................ 10

*Brihadaranyaka Upanishad*, 1.5.17, https://vivekavani.com/bru1c5v17/ ...... 11

*Deuteronomy* 22:5 .......................................................................... 9

*Deuteronomy* 6:6-7 ........................................................................ 8

*Dharma Sastra*, vol. 6 Manu Sanskrit, ch. III, 80-93,
    https://archive.org/details/dharmasastra-with-english-translation-
    mn-dutt-6-vols-20-
    smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page
    /80/mode/2up ................................................................. 11

*Ephesians* 6:4 ............................................................................... 8

**Table Of Authorities**
**(Continued)**

                                                                          **Page(s)**

**Cases**

Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting
   Mozert after 20 Years*, 38 J.L, & Educ. 83, 117 (2009) ................................... 3

*Genesis* 5:2 ............................................................................................................ 9

Ibn Kathir, Tafsir *At-Tahrim* 66:6-66:8 ............................................................. 10

2 James Kent, *Commentaries on American Law* 159 (1827) .................................. 3

James Schouler, *Treatise on the Law of the Domestic Relations* (1870) ..................... 4

Jami` at-Tirmidhi, 43 ch. 34 ............................................................................. 10

*Jewish Education 101*, Chadbad.org,
   https://www.chabad.org/library/article_cdo/aid/1230127/jewish/Je
   wish-Education-101.htm (last visited Apr. 28, 2025) ................................... 9

Joseph K. Griffith II, *"Long Recognized at Common Law":* Meyer *and*
   Pierce's *Nineteenth- and Twentieth-Century Precedent on Parental Educational
   Rights and Civic Education,* 53 Perspectives on Political Science 1, 5
   (2024) ................................................................................... 4, 6, 7

Joseph K. Griffith II, *Is the Right of Parents to Direct Their Children's
   Education "Deeply Rooted" in Our "History and Tradition"?*, 28 Tex. Rev.
   L. & Pol. 795, 806 (2024) ................................................................ 12

2 Joseph Story, *Commentaries on Equity Jurisprudence* § 1341 (2d. ed. 1839) ...... 5

*Leviticus* 18:22 ...................................................................................................... 9

*Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, Am.
   Fiqh Acad., https://cdn.prod.website-
   files.com/67b8776cd35acd677425668e/67bf3ffd639d244cac1eb6a5_
   AFA_Resolution_on_Sex_Change_Procedures.pdf ............................... 10

Melissa Moschella, *Strict Scrutiny as the Appropriate Standard of Review for
   Parental Rights Cases: A Historical Argument*, 28 Tex. Rev. L. & Pol. 771,
   772 (2024) ......................................................................................... 8

## Table Of Authorities
### (Continued)

**Page(s)**

**Cases**

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1455 (1990)............................................. 7

Ronit Irshai, *Cross-Dressing in Jewish Law and the Construction of Gender Identity*, 38 Nashim: J. of Jewish Women's Stud. & Gender Issues 46, 47 (2021) ....................................................................................................... 9

Sahih al-Bukhari, 77 ch. 62................................................................................ 10

Satguru Bodhinatha Veylanswami, *Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2005), https://www.hinduismtoday.com/magazine/april-may-june-2005/2005-04-raising-children-as-good-hindus/ ....................................... 11

*Surah An-Nisa* 4:1............................................................................................. 10

1 William Blackstone, *Commentaries* (1770) ...................................................... 3

## STATEMENT OF THE ISSUE

Whether the Littlejohns' parental-rights claims are subject to a threshold "shocks the conscience" inquiry, and whether their allegations plausibly state a violation of fundamental constitutional rights.

## INTEREST OF AMICUS CURIAE[1]

Religious Freedom Institute is a nonprofit that supports religious freedom for all faith traditions and is committed to achieving broad acceptance of religious liberty as a fundamental human right.  RFI partners in advocacy through its action teams, which work to build coalitions and advance religious freedom as a priority for governments, civil society, religious communities, businesses, and the general public.  RFI has a strong interest in this case because weakening the right of parents to direct the upbringing of their children on matters of religion and theology endangers religious freedom.

---

[1] No counsel for a party authored this brief in whole or in part; no one, other than amicus and its counsel, made a monetary contribution for its preparation or submission.

1

## SUMMARY OF ARGUMENT

Since the founding of this nation, a fundamental aspect of parental rights has been the ability to guide the moral and spiritual upbrings of one's children, including beliefs about human nature and teachings from holy texts. And history shows no principled basis to distinguish between executive and legislative intrusions upon fundamental rights, let alone that an infringement of parental rights must "shock the conscience" to be legally recognized. Whatever the test, a government act that usurps parental authority to secretly indoctrinate a child about gender, sexuality, and how God created her is an assault on what the Founders and Framers recognized as sacred rights protected by the Constitution that are essential to a free society.

## ARGUMENT

### I. Parental rights are deeply rooted in our nation's history and tradition.

#### A. At common law, parental authority was sweeping and assumed.

"The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Parental rights emanate from natural law and "the most universal relation in nature." 1 William Blackstone, *Commentaries*, \*434 (1770).

The right that parents possess to make decisions for their children arises from the duties parents owe to their children. As early as the seventeenth century, a common-law system existed in which parents had "a God-given duty to nourish, protect and educate their young, and to have a corresponding right" to "fulfill those duties." Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L, & Educ. 83, 117 (2009). "The duty of parents . . . is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world." Blackstone, *supra*, at \*435.

The law has long protected parental rights—primarily for the child's sake. At common law, parents had "both the responsibility and the authority to guide their children's development and make important decisions on their behalf." DeGroff, *supra*, at 108. These duties fall to parents because "[t]he wants and weaknesses of children render it necessary that some person maintain them, and the voice of nature has pointed out the parent as the most fit and proper person." 2 James Kent, *Commentaries on*

*American Law* 159, 159 (1827).  Accordingly, the safeguarding of parental authority in relation to directing a child's education is essential for personal character and welfare due to the parent's superior vantage point. *See State ex rel. Sheibley v. Sch. Dist. No. 1, Dixon Cnty., et al.*, 48 N.W. 393, 395 (Neb. 1891) (a parent "certainly possesses superior opportunities of knowing the physical and mental capabilities of his child").

Parental authority is also essential for the maintenance of a free society and stable government.  "Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding." *Bellotti v. Baird*, 443 U.S. 622, 638-39 (1979).  The "strength of a [s]tate" thus depends in large part on the development of children into "a well-ordered, intelligent, and honorable population." James Schouler, *Treatise on the Law of the Domestic Relations*, 316 (1870).  And the common-law protection of parental authority served to "intimately tie[] together the duty and freedom of interdependent human beings, for the advantage of parents, the political community, and, most importantly, children."  Joseph K. Griffith II, *"Long Recognized at Common Law"*: Meyer *and* Pierce's *Nineteenth- and Twentieth-Century Precedent on Parental Educational Rights and Civic Education,* 53 Perspectives on Political Science 1, 5 (2024).

Ultimately, laws granting parental authority were designed to aid and assist parents in fulfilling their duties to their children.  "Because parents' rights flow from their duties, parents do not have the authority to violate their duty to care for, maintain, or educate their children." *Id.* at 3.  Thus, the state is justified in interfering "with the

4

ordinary rights of parents, as guardians by nature, or by nurture, in regard to the custody and care of their children" only in exceptional cases in which the "natural presumption . . . that the children will be properly taken care of" is overridden by proof of "gross ill treatment" by the parent. 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 1341 (2d. ed. 1839).

**B.    Looking to the original understanding of the Fourteenth Amendment, parental rights meet the history-and-tradition standard.**

American history and tradition presume the parental right to make decisions about their children's upbringing and education.  This presumption stems from a child's lack of "maturity, experience, and capacity for judgment required," and the "natural bonds of affection [that] lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).  The Supreme Court has held that parents have a "fundamental liberty interest" under the Fourteenth Amendment in the "care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see Moore v. City of E. Cleveland*, 431 U.S. 494, 503-04 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." (cleaned up)).  And "the 'liberty' specially protected by

5

the Due Process Clause includes [this parental] right . . . to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Courts in the mid-nineteenth century (coinciding with the ratification of the Fourteenth Amendment) routinely constrained school authority in favor of parents, recognizing parents' rights to hold their children out of classwork or school activities conflicting with their values. *See Morrow v. Wood*, 35 Wis. 59, 64 (Wis. 1874) (parent has "the right to direct what studies, included in the prescribed course, his child shall take"); *State v. Ferguson*, 144 N.W. 1039, 1043 (Neb. 1914) (ruling for the school would "destroy both the God-given and constitutional right of a parent to have some voice in the bringing up and education of his children"); *Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 50 (Cal. Dist. Ct. App. 1921) (school's power could not deny parents "their natural as well as their constitutional right to govern or control" their children). These decisions affirm the right of parents to direct the moral upbringing of their children.

## C.    Cases from more than a century ago reaffirm those principles.

Over a century ago, the Supreme Court articulated a parent's fundamental right to direct the upbringing of their children, in response to trends diminishing parental rights that originated from the establishment of compulsory-education laws. *Meyer* and *Pierce* declared parental rights, as understood by the common-law tradition, to be within the liberty protected by the Fourteenth Amendment. In *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), the Court stated the "liberty guaranteed . . . by the Fourteenth Amendment" includes, "[w]ithout doubt," the right "to marry, establish a home and

6

bring up children." And in doing so, the Court affirmed the reach of the parent's right "to give his children education suitable to their station in life," a right "long recognized at common law as essential to the orderly pursuit of happiness by free men." *Id.* at 399. Regarding "the liberty of parents and guardians to direct the upbringing and education of children," the Supreme Court in *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925), explained "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Meyer* and *Pierce* reaffirmed the primary authority of parents in matters concerning their children's education under the Fourteenth Amendment.

## II. Directing the upbringing of one's children on matters of religion and theology is at the core of parental rights.

The Framers were deeply concerned with freedom of conscience and religious liberties. By 1789, all states but one had constitutional guarantees for religious freedom. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1455 (1990). Free exercise of religion "was universally said to be an unalienable right." *Fulton v. City of Philadelphia*, 593 U.S. 522, 574 (2021) (Alito, J., concurring) (quoting McConnell, *supra*, at 1465). This enumerated sacred right is why, invoking the " 'enduring American tradition,' " the Supreme Court has "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Rev.*, 591 U.S. 464, 486, (2020) (quoting *Yoder*, 406 U.S. at

213-214, 232). "[D]uring the Founding Era and around the time of the Fourteenth Amendment's ratification, parents' jurisdiction over their children was understood to be prior to and independent of the state's." Melissa Moschella, *Strict Scrutiny as the Appropriate Standard of Review for Parental Rights Cases: A Historical Argument*, 28 Tex. Rev. L. & Pol. 771, 772 (2024).

Many faith traditions likewise hold a belief that parents are responsible for the moral upbringing of their children. Issues like sexual identity and the human person are fundamentally theological and moral. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 626, 633 (2018) (for "a devout Christian," questions of sexuality "implicate[] his deep and sincere religious beliefs"); *303 Creative LLC v. Elenis*, 600 U.S. 570, 582 (2023) (biblical beliefs on sexual orientation are "a sincerely held religious conviction"). While the Littlejohns are faithful Christians, *Ephesians* 6:4 ("[B]ring [your children] up in the discipline and instruction of the Lord."), numerous other religions address these issues in their doctrines and sacred texts—and adherents instill the teachings in their children.

This history makes the school's action here a double burden, striking at the core of child-rearing and religious freedom.

**Judaism**

A crucial tenet for Jewish Americans is the Torah's command that parents are to teach their children in principles of faith: "[T]hese words that I command you today shall be on your heart. You shall teach them diligently to your children . . . ." *Deuteronomy*

6:6-7. A rabbinic commandment called *chinuch* also directs parents to educate their children in following the Torah's precepts. *Jewish Education 101*, Chadbad.org, https://www.chabad.org/library/article_cdo/aid/1230127/jewish/Jewish-Education-101.htm (last visited Apr. 28, 2025).

The Torah is clear that humans were divinely created distinctly male and female. *Genesis* 5:2. Differences between the biological sexes are integral to Jewish religious worship, which separate men and women during synagogue prayer. Aron Moss, *Separation in the Synagogue*, Chadbad.org, https://www.chabad.org/library/article_cdo/aid/160962/jewish/Separation-in-the-Synagogue.htm (last visited Apr. 28, 2025). As one scholar observed, it is "axiomatic" that "a strict division between the genders is constitutive of the world of halakhah." Ronit Irshai, *Cross-Dressing in Jewish Law and the Construction of Gender Identity*, 38 Nashim: J. of Jewish Women's Stud. & Gender Issues 46, 47 (2021). Many observant Jews understand the Torah to prohibit homosexuality and transgenderism. The Torah states that men "shall not lie with a male as with a woman." *Leviticus* 18:22. It also commands that "[a] woman shall not wear a man's garment, nor shall a man put on a woman's cloak." *Deuteronomy* 22:5. Together these mitzvot, dating back several millenia, reflect Judaism's expectation that parents will inculcate the Torah's values in their children, including core faith teachings on sexuality.

## Islam

The Quran likewise teaches that parents are responsible for educating their

9

children in divine moral law.  It commands: "O believers! Protect yourselves and your families from a Fire whose fuel is people and stones . . . ." *Qur'an*, *At-Tahrim* 66:6. Ancient esteemed Muslim scholars have interpreted this passage as "an obligation for the Muslim to teach his near family members . . . what Allah has made obligatory for them and what Allah has forbidden for them."  Ibn Kathir, Tafsir *At-Tahrim* 66:6-66:8.

These generational teachings extend to Islam's prohibition on homosexual and transexual behavior.  As devout Muslims recognize, the Quran condemns men who "lust after men instead of women." *Qur'an, Al-A'raft* 7:80-81.  Both Shi'ah and Sunni Muslims hold to the Quran's teaching: "O Mankind! We created you all from a male and a female," *id., Al-Hujurat* 49:13—"all human beings, whether male or female." *Id., Surah An-Nisa* 4:1    And the Hadith—collected revelations of the prophet Muhammad—relays that "[t]he Messenger of Allah cursed the women who imitate men and the men who imitate women," Jami` at-Tirmidhi, 43 ch. 34, and "[t]he Prophet cursed effeminate men (those men who … assume the manners of women) and those women who assume the manners of men." Sahih al-Bukhari, 77 ch. 62.  Sharia law does not recognize sex change as possible. *Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, Am. Fiqh Acad., https://cdn.prod.website-files.com/67b8776cd35acd677425668e/67bf3ffd639d244cac1eb6a5_AFA_Resolution_on_Sex_Change_Procedures.pdf.

Collectively, Islamic teachings give Muslims a duty to impart their religions moral teachings, such as gender binary, to their children.

### Hinduism

For Hindus, *Dharma* is the natural universal law of religious or moral duties. Child-rearing is a parent's highest righteous duty: "Parents are indeed the first guru[, and] [t]he child's deepest impressions come from what the parents do and say." Satguru Bodhinatha Veylanswami, *Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2005), https://www.hinduismtoday.com/magazine/april-may-june-2005/2005-04-raising-children-as-good-hindus/. In Hinduism, parents have the preeminent right and obligation of parents to impart education to their children and help them understand their sacred duties in life. *Brihadaranyaka Upanishad*, 1.5.17, https://vivekavani.com/bru1c5v17/.

Ancient Hindu legal treatises, *Dharmasastra*, teach that marriage is divinely sanctioned—and heterosexual. *Dharma Sastra*, vol. 6 Manu Sanskrit, ch. III, 80-93, https://archive.org/details/dharmasastra-with-english-translation-mn-dutt-6-vols-20-smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page/80/mode/2up. It instructs that righteous behavior can only occur when sexual behavior is within heterosexual marriage, and when males and females align with their distinct roles and identities. *Gender and Sexuality*, Patheos, https://www.patheos.com/library/hinduism/ethics-morality-community/gender-and-sexuality (last visited Apr. 28, 2025). To allow one's child to be taught gender fluidity or practice transgenderism would violate *Dharma*.

11

* * *

Government officials here surreptitiously undermined both the parent–child relationship itself and deeply held religious beliefs that many American parents are doctrinally obliged to instill in their children. This action not only burdens a right "implicit in the concept of ordered liberty," *Glucksberg*, 521 U.S. at 721 (citation omitted) —child-rearing—it also assaults religious freedom with oppression, coercion, and discrimination. If parents have a right to opt-out their child from being taught "geography, book-keeping, grammar, singing lessons, domestic science, and dancing exercises," Joseph K. Griffith II, *Is the Right of Parents to Direct Their Children's Education "Deeply Rooted" in Our "History and Tradition"?*, 28 Tex. Rev. L. & Pol. 795, 806 (2024), then surely they have a right to *know* that school administrators are privately meeting with their child to encourage a "gender transition" plan. The school's action "unduly burdens the free exercise of religion," *Yoder*, 406 U.S. at 220, and fails strict scrutiny. It shocks the conscience too.

## CONCLUSION

The Court should grant the petition and reverse the panel decision.

*/s/ Denise M. Harle*
**SHUTTS & BOWEN LLP**
Denise M. Harle
Florida Bar No. 81977
215 S. Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
DHarle@shutts.com

12

Alyssa L. Cory
Florida Bar No. 118150
4301 W. Boy Scout Blvd, Suite 300
Tampa, Florida 33607
(813) 229-8900
ACory@shutts.com

*Counsel for Proposed Amicus Curiae*
*Religious Freedom Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Denise M. Harle*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of Fed. R. App. P. 29(a)(4) and 29(b)(4). This brief contains 2,598 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 40-3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2021 in 14-point Garamond font.

*/s/ Denise M. Harle*