No. 23-10385

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

JANUARY LITTLEJOHN, JEFFREY LITTLEJOHN,

PLAINTIFFS-APPELLANTS,

V.

SCHOOL BOARD OF LEON COUNTY, *ET AL*.,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court for the
Northern District of Florida, Tallahassee Division

Case No. 4:21-CV-415

## BRIEF OF *AMICUS CURIAE* OUR DUTY
## IN SUPPORT OF PLAINTIFFS-APPELLANTS'
## PETITION FOR REHEARING EN BANC

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

April 30, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1(a), *Amicus Curiae* Our Duty is a non-profit corporation whose 501(c)(3) application is currently pending. Our Duty has no parent companies, subsidiaries, or affiliates and does not issue shares to the public.

Dated: April 30, 2025

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ...................................................................iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ......................................................................................... 4

    Stories from Our Duty's members illustrate the irreparable
    harm school districts and government schools cause when they
    interfere with parents' right to direct their children's
    upbringing and medical care. .............................................................. 4

        A. Sue Y,  Mother of Detransitioned  Female ............................ 5

        B. Erin Friday, Mother of Desisted  Female................................ 7

        C. Wendell Perez, Father of Desisted Female ............................ 9

        D. Ann M., Lesbian Mother of a Desisted Male......................... 10

        E. Beth Bourne, Mother who Lost Physical Custody of her
           Daughter ................................................................................ 12

CONCLUSION ....................................................................................... 13

CERTIFICATE OF COMPLIANCE...................................................... 14

CERTIFICATE OF FILING AND SERVICE ........................................ 15

# TABLE OF AUTHORITIES

## Cases

*Parents Protecting Our Children v. Eau Claire ASD,*
   145 S.Ct. 14 (2024)..................................................................................3

## Other Authorities

Colin Wright, *BREAKING: New Documents Reveal Shocking Surge
   in Trans-Identified Students in Davis, CA Schools*, Reality's Last
   Stand, (Jan. 17, 2023)..........................................................................12

Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+
   youth in Yolo County: ElevateYouth works with residents aged 12
   to 36*, Daily Democrat (March 26, 2021) ............................................12

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Our Duty—USA ("Our Duty") is a secular nonprofit organization founded in 2024 to support parents eager to protect their children from the dangers of gender ideology. The organization has over 1,000 parent members from all 50 states with varied political views and ethnicities, but who have banded together because they have each lived the same nightmare: Every member has a child who has adopted a transgender identity.

Gender ideology has permeated the culture with stunning speed, influencing medical, government, and family decisions and creating an urgent need for clarity, education, and public discourse. Our Duty exists to help parents navigate these difficult issues and understands that its mission fundamentally depends on parents being empowered to know about and make informed decisions regarding their children's care. Our Duty and its parent-members believe that parents are in the best position to know what is in their children's best interests. Moreover,

---

[1] All parties received timely notice and consented to the filing of this brief. No party's counsel authored any part of this brief and no person other than *amicus* made a monetary contribution to fund its preparation or submission.

1

they believe that as parents they have the natural duty and constitutional right to make such decisions and give their children the tools they will need to thrive and live long, healthy, independent lives. As such, Our Duty and its members have a profound interest in the outcome of this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-Appellants January and Jeffrey Littlejohn allege that Defendants-Appellees, a Florida school district, unilaterally diagnosed their middle school daughter with "gender confusion," developed and implemented a "Support Plan" that treated their daughter as though she were a male, and took affirmative steps to conceal these actions from the Littlejohns, even instructing staff to "deceive" the parents. Op.3-7. Yet the panel held that the Littlejohns had failed to state a claim that their daughter's public school had violated their constitutional right to direct the upbringing of their child. Op.10.

*Amicus* Our Duty agrees with Judge Newsom that the panel majority's analysis "makes *no* sense," Newsom-Concur.8, and with Judge Tjoflat that its decision "is as wrong as it is ominous for the future of fundamental rights in the Eleventh Circuit," Dissent.49-50.

*Amicus* offers this brief because its members' stories underscore why the panel majority's dismissal of the Littlejohns' case constitutes an error of "exceptional importance" that demands the Circuit's attention. 11th Cir. R. 40-6. These personal stories from families across the nation confirm that this case presents "a question of great and growing national importance." *Parents Protecting Our Children v. Eau Claire ASD*, 145 S.Ct. 14 (2024) (Alito, J., joined by Thomas, J., dissental).

Caselaw, Florida law, and Our Duty[2] each affirm that, excluding abusive behavior, parents have the fundamental right to raise their children in the manner that they see fit. Government schools violate parents' Fourteenth Amendment rights when they box parents out and take it upon themselves to socially transition and treat their minor children. The Eleventh Circuit should grant the Littlejohns' petition to make this clear.

---

[2] Our Duty presents arguments based on federal caselaw and Florida law in its panel amicus brief, filed June 20, 2023, and available at https://eppc.org/news/brief-filed-by-eppc-scholar-defends-parents-fundamental-rights/.

# ARGUMENT

**Stories from Our Duty's members illustrate the irreparable harm school districts and government schools cause when they interfere with parents' right to direct their children's upbringing and medical care.**

The following five stories from Our Duty members illustrate the lasting harm that results when school districts and government schools exclude parents from critical decisions about their children's mental health and identity.[3] These parents, who include lifelong Democrats and same-sex couples, show that this crisis crosses political and cultural lines. What unites these experiences is a troubling pattern: overconfident school officials, often knowing far less about a child than the parents, pressure or facilitate social transition, keep secrets from families, and sometimes even report parents to authorities for seeking alternative care. The consequences have been severe—ranging from emotional deterioration and suicide attempts to loss of custody.

These stories demonstrate that adolescents' discomfort with their sex is often temporary, social transitions can interfere with a child's

---

[3] Each story below is described in greater detail in Our Duty's panel amicus brief, *id*., along with additional stories from Our Duty members that do not appear here.

4

ability to accept his or her sex, and that children suffer when government schools encourage and empower a social transition without parental involvement. In the stories below, these children's wellbeing began to improve when parents reclaimed their rightful authority and secured appropriate mental health support. It is vitally important that this Court rehear this case and uphold parents' constitutional right to direct their children's upbringing and care. Without robust protection of this right, children and families will continue to face irreparable harm.

## A.    Sue Y,[4] Mother of Detransitioned[5] Female

Sue Y's daughter, G, had a difficult adolescence, retreating socially and showing signs of depression. At twelve, G announced she was transgender. A Kaiser Permanente gender clinic told Sue she had to choose between a "dead daughter or a live son." With few options

---

[4] Due to the frequent and intense animus that is often directed at parents or children who resist the push to pursue a "gender transition," many Our Duty members use pseudonyms in this brief to protect themselves and their children from retaliation. The identity of each member whose story is told here is known to Our Duty.

[5] The term "detransitioned" as used in this brief indicates that a person pursued medical treatment in some fashion in furtherance of a transgender identity—e.g. puberty blockers, hormones, and/or surgeries—but then ceased such treatments and embraced his or her biological sex.

presented, Sue consented to puberty blockers and coordinated with G's public school on a social transition.

But the improvements Sue had been led to expect didn't materialize. G's mental health only declined—her depression got worse, she struggled with body image, became suicidal, and engaged in self-harm. After years of little progress and multiple psychiatric hospitalizations, Sue sought a second opinion from an out-of-state psychiatrist, who determined G's real struggles were not rooted in gender dysphoria but underlying mental health issues. The psychiatrist recommended discontinuing G's transition. Sue updated the public school and asked staff to stop their "affirming" counseling and social transition, backed by a letter from G's new doctor.

But school officials refused. Instead of deferring to G's mom and G's doctor, the school reported Sue to Child Protective Services, alleging abuse for not affirming G's previously-claimed identity.

Sue removed G from the public school and, at G's behest, enrolled her in a private all-girls school. G slowly began to thrive, stopped all transition-related behaviors, and today G is a well-adjusted young woman. Sue's experience shows the hazards of schools and clinics

6

overriding parental judgment and the importance of family-centered, individualized care.

## B.    Erin Friday, Mother of Desisted[6] Female

Erin Friday's daughter, P, was only 11 when a sex education class at her California public school told students they "could have been born in the wrong body." Within days, five classmates adopted LGBTQ labels. P cycled from "pansexual" to "lesbian" and—through chat-groups during COVID-19 lockdowns—to "transgender."

When high school resumed online, P's teachers asked students to share chosen names and pronouns. P presented herself as a male and her school—without Erin's knowledge or consent—affirmed P's male identity.

When Erin discovered what was happening, she was outraged that school counselors—who had never met P in person—had taken it upon themselves to affirm P as a male and keep P's mom in the dark. But school officials didn't just see Erin as an obstacle to be avoided;

---

[6] The term "desisted" as used in this brief indicates that a person had adopted an identity at odds with his or her sex, did not pursue medical interventions in furtherance of this identity, and has since embraced his or her sex as a constitutive part of his or her identity.

they also treated her as a threat that needed to be neutralized. P's school reported Erin to Child Protective Services, then the police.

Isolated and labeled "unsafe" by teachers, Erin had to counter the charges the school had filed with the police, mend the schism the school had created between Erin and her daughter, and also monitor P constantly—buying a safe to lock away money, IDs, and passports out of fear P would flee or hurt herself.

Erin ultimately withdrew P from public school, but the psychological damage was entrenched. It took Erin and P two more years to repair their relationship and for P to embrace her body. Today P is happy in her female body and has eschewed her years of identifying as transgender.

The school's usurpation of parental authority and open hostility to Erin's involvement left deep scars, but this family was fortunate: with persistent love and oversight, P avoided permanent harm. Erin's experience makes plain just how quickly and severely school actions can undermine family bonds and endanger children's wellbeing.

### C.    Wendell Perez, Father of Desisted Female

Wendell Perez's daughter, AP, was a sixth grader when her public school notified Wendell and his wife that AP had attempted suicide for the second time—the school had not reached out when it learned about AP's first attempt. But that was not the only thing AP's school had been keeping from her parents: the Perezes also learned that school counselors had been regularly meeting with AP, encouraging her to socially transition and use a male name. This announcement had been shared with other students and staff, who were encouraged to participate in AP's social transition and hide this process from her parents.

The school's conduct outraged AP's parents but it also hurt AP. The school counselor's focus on gender identity, public "outing," and secrecy from the family intensified AP's distress, leading to bullying, feelings of isolation, and ultimately, self-harm.

When AP's parents removed her from the hostile school environment and sought comprehensive mental health treatment, AP's true needs became clear. Inpatient care helped AP realize that her discomfort stemmed from feeling vulnerable as a girl and from the

influence of the school's LGBTQ programming, which had wrongly
equated interest in stereotypically male activities with being
transgender.

With specialized treatment and parental involvement, AP
gradually abandoned her trans identification. The Perezes are still
repairing the damage inflicted by the school's exclusionary practices
and overzealous affirmation. Their story makes clear that bypassing
parents in critical mental health and identity decisions can have
devastating, even life-threatening, consequences.

## D.    Ann M., Lesbian Mother of a Desisted Male

Ann M. is a longtime public school teacher in the Chicago suburbs,
where she lives with her wife and D, her teenage son. D had a history of
social awkwardness, anxiety, and depression, but had always been
comfortable in his male body. Ann was caught off guard when D, as he
entered his sophomore year, asked Ann to start using his new female
name.

Ann refused, siding with D's long-time therapist and pediatrician,
who suspected that his newly-expressed transgender identity was a
maladaptive coping mechanism stemming from his depression. D,

however, went behind his mom's back and asked his school to help him socially transition.

D's school set a social transition in motion and agreed to keep D's parents in the dark. One of his teachers reached out to D privately to let him know she was working with the school counselor and encouraged D to "stay true to yourself" by maintaining a female identity.

When Ann learned what was happening, she demanded the school stop undermining her job as D's mom. She also started taking a more active approach with D: she discussed the weak research cited by gender ideologues, she watched documentaries with D, and showed D the risks of transition. Supported at home and no longer socially affirmed by teachers, D resumed using his male name. He told his mother it was a relief to drop the female identity.

Ann's story demonstrates that even progressive families, broadly sympathetic with calls to protect the rights of people who identify as transgender, are harmed when government schools ignore parents' rights. Parents, relying on their own insights and working with trusted professionals, can prevent unnecessary social transitions and lasting harm.

### E.    Beth Bourne, Mother who Lost Physical Custody of her Daughter

Beth Bourne's daughter, S, had a history of anxiety. She had always excelled in STEM subjects and was deeply affected when her best friend was sexually assaulted. S also attended public school where four percent of students identified as transgender, nearly three times the national average.[7] Counseling services at the school were provided by CommuniCare, which intends to serve as a "chosen family" where transgender students can find a "safe place to 'be themselves' and talk to trusted adults."[8] Beth believes all these factors contributed her daughter's decision, at age 13, to identify as transgender.

Beth raised concerns about whether CommuniCare should be providing confidential counseling to minors. But Beth's efforts only resulted in the district targeting her as a parent who did not have her

---

[7] Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand, (Jan. 17, 2023), https://www.realityslaststand.com/p/breaking-new-documents-reveal-shocking.

[8] Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+ youth in Yolo County: ElevateYouth works with residents aged 12 to 36*, Daily Democrat (March 26, 2021) (emphasis added), https://www.dailydemocrat.com/2021/03/25/communicare-expands-services-for-lgbtq-youth-in-yolo-county/.

daughter's best interests in mind. The school's "chosen family" model trumped Beth's parental authority.

Custody issues prevented Beth from moving S to another school, but through Beth's interventions S has shown signs of desistence. S is wearing female clothes again, is no longer wearing a chest binder, and is expressing more comfort with her sex. Beth's experience illustrates the extreme consequences when schools, mental health contractors, and courts sideline parents in favor of rapid affirmation and secrecy. The loss of custody is the most devastating outcome, showing that parental rights and children's well-being are inextricably linked.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

April 30, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 2,364 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2304 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: April 30, 2025

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

## CERTIFICATE OF FILING AND SERVICE

I certify that I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.

DATED: April 30, 2025

/s/ Eric N. Kniffin
*Counsel for* Amicus Curiae

15